IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG SEMICONDUCTOR, INC.,

Plaintiffs,

v.

NETLIST, INC.,

Defendant.

C.A. No. 21-1453-RGA-JLH

REDACTED - PUBLIC VERSION

NETLIST, INC.

Counter-Plaintiff,

v.

GOOGLE LLC, ALPHABET INC., SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG SEMICONDUCTOR, INC.,

Counter-Defendants.

**NETLIST, INC.'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO STAY**

OF COUNSEL:
Jason Sheasby
H. Annita Zhong
Thomas C. Werner
Michael Tezyan
Andrew J. Strabone
Yanan Zhao
David Z. Kahn
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Netlist, Inc.*

Rebecca Carson
Jonathan M. Lindsay
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
(949) 760-0991

Dated: November 9, 2023

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 4

A. Samsung and Google Have Taken Netlist's LRDIMM Technology For Years ..... 4

B. The Central District of California Action ..... 5

C. Samsung Filed This Action The Day After Losing Summary Judgment In The Central District ..... 6

D. The First Eastern District Of Texas Action ..... 7

E. The Second Eastern District Of Texas Action ..... 8

F. Samsung's Ninth Circuit Appeal Of The Central District's Ruling ..... 8

III. LEGAL STANDARD ..... 11

IV. ARGUMENT ..... 11

A. A Stay Would Substantially Prejudice Netlist ..... 11

B. A Stay Will Not Simplify The Issues For Trial ..... 14

C. The Stage of This Litigation Weighs Against Granting a Stay ..... 15

D. The First-To-File Rule Does Not Require A Stay ..... 17

V. CONCLUSION ..... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Respiratory Therapeutics, Inc. v. Pharm. Holdings Corp.*,
2006 WL 7077359 (E.D. Pa. Nov. 2, 2006) ....................17

*B.E. Tech., L.L.C. v. Twitter, Inc.*,
2023 WL 3478567 (D. Del. May 16, 2023)....................13, 14

*Candid Care Co. v. Smiledirectclub, LLC*,
2021 WL 3269092 (D. Del. July 30, 2021) ....................18

*Cheyney State Coll. Faculty v. Hufstedler*,
703 F.2d 732 (3d Cir.1983)....................11

*Cisco Sys., Inc. v. Ramot at Tel Aviv Univ., Ltd.*,
2023 WL 315615 (D. Del. Jan. 19, 2023)....................11, 13

*Cooper Notification, Inc. v. Twitter, Inc.*,
2010 WL 5149351 (D. Del. Dec. 13, 2010)....................12, 15

*Dentsply Int'l, Inc. v. Kerr Mfg. Co.*,
734 F. Supp. 656 (D. Del. 1990)....................11, 13, 14

*E.E.O.C. v. Univ. of Pennsylvania*,
850 F.2d 969 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990) ....................18

*Gold v. Johns–Manville Sales Corp.*,
723 F.2d 1068 (3d Cir.1983)....................11

*Grider v. Keystone Health Plan Cent., Inc.*,
500 F.3d 322 (3d Cir. 2007)....................17

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936)....................11

*Merial Ltd. v. Cipla Ltd.*,
681 F.3d 1283 (Fed. Cir. 2012)....................18

*Mike Murphy's Enterprises, Inc. v. Fineline Industries, LLC*,
2016 WL 6441607 (E.D. Cal. Oct. 31, 2016) ....................14

*In re Mobile Telecommunications Techs., LLC*,
243 F. Supp. 3d 478 (D. Del. 2017)....................18

**Page**

*Netlist Inc. v. Samsung Elecs. Co.*,
2021 WL 7186853 (C.D. Cal. Oct. 14, 2021)....6

*Netlist Inc. v. Samsung Elecs. Co.*,
2023 WL 6820683 (9th Cir. Oct. 17, 2023)....2, 3, 9, 10

*In re Pfizer Inc.*,
364 F. App'x 620 (Fed. Cir. 2010)....17

*Profile Mfg., Inc. v. Kress*,
22 F.3d 1106 (Fed. Cir. 1994)....14

*Quadrant Structured Prod. Co. v. Veritin*,
23 N.Y. 3d 549 (2014)....10

*Serco Servs. Co., L.P. v. Kelley Co., Inc.*,
51 F.3d 1037 (Fed. Cir. 1995)....18

*SoftView LLC v. Apple Inc.*,
2012 WL 3061027 (D. Del. July 26, 2012)....16

*Structural Grp., Inc. v. Liberty Mut. Ins. Co.*,
2008 WL 4616843 (M.D. Pa. Oct. 16, 2008)....11

## I.    INTRODUCTION

The day after the Central District of California (the "Central District") granted partial summary judgment for Netlist, holding that Samsung had materially breached the Joint Development and License Agreement ("JDLA"), Samsung raced into this Court to file this declaratory judgment and breach of contract action. Samsung's Complaint raised the JDLA as a purported license defense to infringement notwithstanding that it had just lost summary judgment on the issue of whether the JDLA was properly terminated. Samsung brought this case knowing full well that it: (i) was moving for reconsideration of that partial summary judgment loss in the Central District; (ii) still had a future damages trial to conduct in the Central District (one that Samsung contended was essential to a final determination of material breach); and (iii) if the partial summary judgment ever became a final judgment, Samsung would file a Ninth Circuit appeal. Yet none of that concerned Samsung when it filed this action, or during the more than a year and a half of work performed on it thereafter. Consequently, Samsung's arguments now about purported "inefficiency" and how a stay supposedly "would also avoid the overlap between the License Action and the present case," ring hollow.  D.I. 202 ("Mot.") at 2.

In any event, the Ninth Circuit ruling that serves as the entire basis for Samsung's motion does not help Samsung. Three sections of the JDLA are at issue. First, the recitals, which are produced in their entirety below,



Ex. 1 (JDLA) at 1. Second, there is Samsung's supply obligation that makes no reference to the joint development collaboration:

[redacted]

*Id.* at 6.

In the Ninth Circuit, Samsung claimed that, in light of the recitals in the JDLA, the supply obligation was limited to the joint development collaboration. Specifically, Samsung quoted recital four: [redacted] *Id.* at 1.

> [T]he recitals are very clear -- and parties put recitals in agreements to make sure language isn't tortured down the road by lawyers and courts, right? Here's what our purpose is, interpret this agreement consistent with our purpose. And when you look at the recitals, what does it say about the licenses? Whereas in connection with their collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents**. *The licenses are being given in connection with the collaboration. That's the joint development project*.**

Ex. 2 (9th Cir. Hearing T. at 15:10-21 (emphasis added). This specific argument was relied on by the Ninth Circuit to find the supply obligation ambiguous: "Read as an integrated whole, however, the contract's apparent purpose as derived from its title, structure, and related provisions make § 6.2 'reasonably susceptible of more than one interpretation.' . . . . [W]e remand to the district court to consider in the first instance whether the extrinsic evidence 'creates a genuine issue of material fact' as to the provision's meaning." *Netlist Inc. v. Samsung Elecs. Co.*, 2023 WL

6820683, at *1-2 (9th Cir. Oct. 17, 2023).[1]

The third implicated section of the JDLA, the license grant, like the supply clause, makes no reference to the collaboration:



Ex. 1 (JDLA) at 8.

Samsung contends in this action that the JDLA license provision is ***not limited*** to the collaboration/joint development. D.I. 1 ¶ 13 (In the JDLA "Netlist granted SEC and its subsidiaries, including SSI, a perpetual, paid-up, worldwide, non-exclusive license to all patents owned or controlled by Netlist"). But that interpretation is the ***opposite*** of the successful argument Samsung made before the Ninth Circuit: "'Whereas, in connection with their collaboration hereunder, the Parties wish to grant to each other a cross license under each party's patents.' ***The licenses are being given in connection with the collaboration. That's the joint development project***." Ex. 2 (9th Cir. Hearing Tr.) at 15:17-21 (emphasis added).

Samsung cannot have it both ways. According to Samsung, the Accused Products in this case, DDR4 LRDIMMs, are not licensed because none of them are NVDIMM-P. Consequently,

[1] As the dissent noted, Samsung never asserted that its supply obligation was ambiguous until after it lost summary judgment in the Central District. *Id.* at 3, n.1 ("The majority's decision relies on Samsung's made-for-litigation theory that § 6.2 is ambiguous.").

the Ninth Circuit decision, and the remainder of the Central District case, do not dictate whether Samsung can prevail here on its license defense, nor do they have anything to do with Samsung's breach of contract claim.

In addition to all of the above, the recognized factors for granting a discretionary stay all favor denial here. First, an indefinite stay would substantially prejudice Netlist by preventing it from timely enforcing its patent rights. Second, a stay will not simplify this case because Samsung can "win" the Central District action on its supply obligation scope (i.e., that it was limited to the joint development collaboration) but still lose its license defense here based on its admissions about the license scope. Third, a trial date has been set in this case, and none has been set in the Central District. Samsung's motion should be denied.

## II. FACTUAL BACKGROUND

### A. <u>Samsung and Google Have Taken Netlist's LRDIMM Technology For Years</u>

The '523 Patent is infringed by Samsung's and Google's sale and use of DDR4 LRDIMMs. Netlist invented LRDIMMs as they are currently used in the industry. D.I. 127-02 at -34172 (Samsung statement that [REDACTED] [REDACTED]). After presenting its LRDIMM technology to Samsung, Google, and much of the industry, Netlist's LRDIMM designs were copied by Samsung and others and subsequently purchased and used by Google. Specifically, Netlist disclosed its distributed buffer technology to members of the industry in 2007 and 2008, including to Samsung and Google, under NDAs. D.I. 127-03 at -190130.

While Netlist took steps to keep its distributed buffer architecture confidential, its designs were ultimately leaked to the industry. This severely damaged Netlist's business. As an operating company that designs, manufactures, and sells products, this suit takes on heightened importance. When Texas Instruments leaked Netlist's designs to the industry, Netlist immediately identified the designs as Netlist's proprietary information. D.I. 127-4 at -63619:



Samsung exploited Netlist's high-end technology in a watered-down commodity product, destroying Netlist's business and preventing returns on its proprietary solutions. For example, although Netlist offered LRDIMMs to Google, a historic customer of Netlist, Google instead purchased and customized LRDIMMs from other entities. Samsung and Google's infringement has cost Netlist business and continues to harm Netlist. Because DDR4 LRDIMMs are now near the end of their life, an indefinite stay as to the '523 Patent will eliminate any possibility of Netlist recapturing DDR4 LRDIMM market share.

**B.     The Central District of California Action**

In August 2021, Netlist and Samsung both moved for summary judgment on whether Samsung had committed a material breach by its failure to supply product (something Samsung admitted it had failed to do). Ex. 3 (C.D. Cal., Dkt. 187) at 13 ("Samsung accepted and fulfilled some of the purchase orders, put some on backlog, and rejected others."). Samsung's position at summary judgment as to the interpretation of JDLA § 6.2 was that "Samsung's supply obligations

would only arise if and to the extent the NVDIMM-P product was commercialized but this never occurred." Ex. 4 (C.D. Cal., Samsung SSUF (Dkt. 157-02)), fact #21.

The Central District held that § 6.2 is unambiguously a mandatory supply obligation that is not limited to either the joint development project or the product that was intended to come out of that development (*i.e.* NVDIMM-P). In doing so, the Central District expressly noted that the JDLA is specific in its reference to the joint development project and/or joint product when it intends to be, and that the provisions of the JDLA that do not reference those terms (such as Samsung's mandatory supply obligation) cannot be read to include the supposed unstated limitation: "The coexistence of project-specific provisions and project-nonspecific provisions signals that the parties intended not to restrict the NAND and DRAM supply obligation to the NVDIMM-P project by omitting any mention of it in § 6.2." *Netlist Inc. v. Samsung Elecs. Co.*, 2021 WL 7186853, at *5 (C.D. Cal. Oct. 14, 2021). Moreover, because Samsung admitted that it had failed to supply product that Netlist had requested, breach was undisputed, as was materiality, given that Samsung's sole materiality argument was that its proffered contract interpretation was correct. The Central District then held a trial solely on the issue of the cost of cover damages.[2] The jury did not award the cost of cover damages. The Central District then awarded Netlist nominal damages and entered judgment in Netlist's favor.

### C. Samsung Filed This Action The Day After Losing Summary Judgment In The Central District

The day after the Central District granted summary judgment, and before the Central District jury trial on cost of cover damages, Samsung rushed to this Court and filed a preemptive

[2]. The Central District held that Netlist was precluded from recovering for the substantial consequential damages and other harm it suffered as a result of Samsung's failure to comply with its supply obligation because of a damages limitation provision in the JDLA (§ 12.5).

declaratory relief action seeking a declaration of non-infringement as to several patents and asserting a claim for breach of contract. D.I. 1. Samsung did so even though just ten days later, it moved for "reconsideration" of the Central District's summary judgment ruling. Ex. 5 (C.D. Cal. Dkt. 210). Samsung also took the position that the cost of cover damages trial still to be conducted was necessary because, without it, there would be no "breach" as a matter of law. Ex. 15 (C.D. Cal. Dkt. 201) at 15:6-15.

Despite the summary judgment ruling against it, Samsung's Complaint asserted that "Netlist has, without justification, unilaterally attempted to terminate a November 2015 Joint Development and License Agreement ('Agreement') in which Netlist granted Samsung a perpetual, paid-up, worldwide license to, among others, the Patents-in-Suit." D.I. 1 at ¶ 2 (emphasis added). Samsung has also asserted a license defense. D.I. 62 at 26-30. Netlist moved to dismiss this case, and Samsung successfully opposed it. D.I. 37).

The Central District action, followed by the inevitable Ninth Circuit appeal, proceeded in parallel with this case until Samsung filed its first motion for a stay on June 1, 2023. D.I. 115.

### D. The First Eastern District Of Texas Action

After Samsung filed this action, Netlist filed an action in the Eastern District of Texas ("*E.D. Texas I*"), 2:21-cv-00463-JRG. In *E.D. Texas I*, Samsung took the position that the JDLA license grant is broad: "The plain language of the JDLA unambiguously licenses all semiconductor products except Foundry Products and is not limited to the Joint Development Project." Ex. 6 (*E.D. Texas I*, Dkt. 290) at 2. Samsung also claimed that the consideration for this "broad" license was an $8 million payment under the JDLA. Ex. 7 (*E.D. Texas I,* Dkt. 566) at 57 ("Netlist perpetually licensed 87 patents to Samsung, including the asserted patents, in an agreement where Samsung paid $8 million."). On April 5, 2023, the Eastern District of Texas held that "Samsung had a license until July 15, 2020," i.e.,the date on which Netlist terminated the JDLA. Ex. 8 (*E.D. Texas I,* Dkt.

432) at 2. This ruling was consistent with the Central District's holding that the JDLA rights grants (e.g., supply) that made no explicit reference to the joint development collaboration should be interpreted without limitation to the joint development collaboration. *See supra* ¶ II(C).

*Samsung I* was tried to a jury, which on April 21, 2023 rendered a verdict that Samsung infringed Netlist's patents-in-suit, that Netlist's patents are not invalid, that Samsung's infringement was willful, and that Netlist is entitled to $303.15 million. Samsung has moved to vacate that verdict, and Netlist plans to oppose.

**E. The Second Eastern District Of Texas Action**

Netlist filed a second infringement action against Samsung in the Eastern District of Texas on August 1, 2022 ("*E.D. Texas II*"), 2:22-cv-00293-JRG. *E.D. Texas II* is set for trial on April 15, 2024. Samsung's license defense (which parallels its license defense in this case) will be part of that trial. Samsung has moved to stay *E.D. Texas II*, but the motion is meritless, and Netlist has opposed it. Ex. 9 (*E.D. Texas II*, Dkt. 187) (Motion to Stay); Ex. 10 (Dkt. 196) (Opposition).

**F. Samsung's Ninth Circuit Appeal Of The Central District's Ruling**

Samsung appealed the Central District's summary judgment ruling to the Ninth Circuit. In that appeal, Samsung reversed course on multiple issues.

For example, in the Central District, Samsung represented (as an undisputed fact) that "it considered the $8 million as consideration for Netlist's grant of patent licenses . . . ." Ex. 11 (C.D. Cal., Samsung SSUF (Dkt. 168-2)), fact #62. However, in the Ninth Circuit, Samsung represented that "there's an $8 million NRE fee that's paid. It's clearly for the joint development project, but it doesn't say it's specifically for the joint development project." Ex. 2 (9th Cir. Hearing Tr.) at 8:16-24. As another example, Samsung told the Central District that the absence of reference to joint development collaboration in a grant of rights clause means the clause is not limited to the joint development collaboration: "Sections 7 [release] and 8 [license] do not deal with the JDLA

and the joint development . . . So I very clearly will say to the jury in this case, if I get there, your Honor, Section 7 and Section 8 don't apply to joint development." Ex. 12 (C.D. Cal. Dkt. 213 (September 20, 2021 MSJ Hearing Tr.)) at 23:16-23. Whereas, in the Ninth Circuit, Samsung made the opposite argument, asserting that the fourth recital discussing the license grant in reference to the joint development collaboration meant that the clause was limited to the joint development collaboration:

> [T]he recitals are very clear -- and parties put recitals in agreements to make sure language isn't tortured down the road by lawyers and courts, right? Here's what our purpose is, interpret this agreement consistent with our purpose. And when you look at the recitals, what does it say about the licenses? Whereas in connection with their collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents. ***The licenses are being given in connection with the collaboration. That's the joint development project.***

Ex. 2 (9th Cir. Hearing Tr.) at 15:10-21 (emphasis added). In other words, Samsung's argument to the Ninth Circuit was that the license – which does not expressly refer to the joint development project collaboration – should be interpreted as being limited to that project in light of recital four.[3]

Samsung partially succeeded. In an unpublished 2-1 decision, the majority upheld multiple rulings of the Central District, but reversed the grant of summary judgment on the supply clause, § 6.2. The Ninth Circuit conceded that the Central District's initial assessment made sense. *Netlist Inc.*, 2023 WL 6820683, at *1 ("Standing alone, the plain language of § 6.2 favors Netlist's interpretation: that Samsung must fulfill all NAND and DRAM orders by Netlist for whatever purpose."), but, nevertheless, remanded for the Central District to consider in the first instance whether extrinsic evidence would create an issue of material fact on supply clause interpretation.

[3] This is the same interpretation the Korean Tax Tribunal adopted. *See* D.I.127-21 (Korean Tax Tribunal Decision) at 22 ("The license contract is a contract under which the parties may grant each other licenses ***to the extent necessary for the joint development*** above, and no royalties will be paid between the parties in that regard.").

The Ninth Circuit also reversed and remanded as to the materiality of Samsung's breach, finding that a disputed fact issue existed. *Netlist Inc*., 2023 WL 6820683, at *3.

Samsung's defense is unlikely to succeed at trial. First, even though the Ninth Circuit held that the scope of Samsung's supply obligation is ambiguous, Samsung's attempt to add an implicit joint development project limitation where the parties chose not to include it remains improper under New York law. *Quadrant Structured Prod. Co. v. Veritin*, 23 N.Y. 3d 549, 560 (2014) ("***Even where there is ambiguity***, if the parties to a contract omit terms—particularly terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission.") (emphasis added). It is precisely for this reason that the Ninth Circuit noted that, even with ambiguity, it still remains to be determined "whether the extrinsic evidence 'creates a genuine issue of material fact' as to the [supply] provision's meaning." *Netlist Inc.*, 2023 WL 6820683, at *1.

Second, Samsung's breach of the supply provision was clearly material. Samsung has already admitted: "[I]f [§] 6.2 is construed as Netlist is saying, that would have been the most important part of this contract by far. It would have outweighed anything else in the contract." Ex. 12 (C.D. Cal. Dkt. 213 (September 20, 2021 MSJ Hearing Tr.)) at 17:22-25. And Samsung has repeatedly acknowledged that its conduct would substantially harm Netlist. An internal Samsung email stated that [REDACTED] Ex. 13 (SAM-NET00600940). During his deposition, Indong Kim, Samsung's Vice President of Product Planning, also admitted that Samsung's conduct violated the agreement and was unethical. Ex. 14 (*Samsung I*, Indong Kim Depo. Tr.) at 47:22-48:6 [REDACTED]

[redacted]); *id*. at 70:7-15 [redacted])
(objections omitted).

## III. LEGAL STANDARD

The party seeking a stay bears the burden of showing that a stay is appropriate. *Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936). "Courts generally consider three factors to determine whether a stay is appropriate: (1) whether granting the stay will simplify the issues for trial; (2) the status of the litigation, particularly whether discovery is complete and a trial date has been set; and (3) whether a stay would cause the non-movant to suffer undue prejudice from any delay or allow the movant to gain a clear tactical advantage." *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ., Ltd.*, 2023 WL 315615, at *1 (D. Del. Jan. 19, 2023). If "there is 'even a fair possibility' that the stay would work damage on another party" then the moving party "must make a showing of 'a clear case of hardship or inequity' before the Court can enter a stay order." *Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 734 F. Supp. 656, 658 (D. Del. 1990) (quoting *Gold v. Johns–Manville Sales Corp.*, 723 F.2d 1068, 1075–76 (3d Cir.1983)). "Stays of indefinite duration are especially discouraged." *Structural Grp., Inc. v. Liberty Mut. Ins. Co.*, 2008 WL 4616843, at *5 (M.D. Pa. Oct. 16, 2008) (quoting *Cheyney State Coll. Faculty v. Hufstedler*, 703 F.2d 732, 738 (3d Cir.1983) for the proposition that "Landis approved stays of moderate length, and not those of indefinite duration").

## IV. ARGUMENT

### A. A Stay Would Substantially Prejudice Netlist

Netlist would be significantly prejudiced by a stay of this case. The '523 Patent is only

asserted against DDR4 LRDIMM products. These products are near the end of their life due to the rollout of next generation DDR5 DIMMs.[4] A stay may eliminate the viability of effective equitable remedies and may also raise issues with "stale evidence, faded memories, and lost documents." *Cooper Notification, Inc. v. Twitter, Inc.*, 2010 WL 5149351, at *4 (D. Del. Dec. 13, 2010) ("Much of the evidence [plaintiff] must amass to prove infringement exists in the minds of witnesses, whose memories will inevitably fade, and who may be difficult to find as time passes. Infringement will also depend to some extent on how Defendants' accused products and services function today, which will be harder to prove years from now.").

Samsung argues that Netlist will not be prejudiced because it is not seeking an injunction and "has a history of licensing its patents to others." Mtn. at 9. This is incorrect. First, Netlist has never granted a bare patent license because its primary focus is the sale of products. All of Netlist's licenses have been part of a strategic agreement that results in Netlist receiving a major supply to advance its business. D.I. 127-23 (SK Hynix); D.I. 117-01 at 1 (JDLA). Second, a stay would prevent Netlist from seeking an injunction against Google. Historically, Google was Netlist's customer and asked Netlist to assemble custom memory modules after Netlist presented Google with its designs and memory module technology under an NDA. After receiving Netlist's technology, Google took Netlist's designs and sourced them from different contractors. At the time (and repeatedly thereafter) Netlist informed Google that it had reason to believe Google was using Netlist's technology in its servers. *See* D.I. 127-24 at 15-17; D.I. 127-25. Rather than take a license, Google instead purchased and customized LRDIMMs from other entities. *E.g.*, D.I. 127-26 ([REDACTED]

[REDACTED]). Google's procurement of LRDIMMs include, without limitation, the DDR4

---

[4] *See, e.g.,* https://www.digitaltrends.com/computing/the-end-of-ddr4-ram/.

LRDIMMs identified in Netlist's Preliminary Infringement Contentions, served on April 27, 2023. Netlist intends to seek injunctive relief at least against Google because a judgment against Samsung's accused products alone will not be sufficient to prevent Google from sourcing its modules from other entities. Furthermore, importation and use of Samsung-branded DIMMs reflects only a portion of the total liability that Google faces, and does not prevent Google from purchasing, building, or using infringing products from other sources. E*.g.,* D.I. 127-27 (https://www.newegg.com/p/pl? d=DDR4+LRDIMM) (listing nineteen DIMM manufacturers). Thus, obtaining an injunction against Google is necessary to prevent Google from making, using, selling, or importing unlicensed products. Finally, regardless of whether Netlist can obtain injunctive relief, courts in this District have acknowledged that a patentee suing for infringement "is prejudiced by having its day in court delayed further" and by the increased risk of "evidence going stale." *Cisco*, 2023 WL 315615, at *2-3. *B.E. Tech., L.L.C. v. Twitter, Inc.*, 2023 WL 3478567, at *3 (D. Del. May 16, 2023) (holding that an "open-ended period of delay" waiting for appeal from an IPR was prejudicial even where no injunction was available).

Finally, Samsung has made no effort to demonstrate "a clear case of hardship or inequity" if a stay is not granted. *Dentsply*, 734 F. Supp. at 658. This failure is fatal because Netlist has demonstrated substantially more than "a fair possibility" that granting a stay would damage Netlist. *Dentsply*, 734 F. Supp. at 658. Samsung cannot even credibly claim that it would be prejudiced by denying the stay. "The same concerns"—potentially overlapping issues and judicial efficiency—that ostensibly "motivate [Samsung's] motion to stay were present when" Samsung filed this suit and when it opposed Netlist's motion to dismiss—a motion which would have ameliorated those concerns. The Court should "not elevate [Samsung's] failure to address its concerns in a timely fashion to an example of hardship warranting a stay." *Id.* at 659. "The failure of [Samsung] to act

sooner suggests that [Samsung] will not suffer any hardship from" the continuation of proceedings in this matter. *Id.*

**B. A Stay Will Not Simplify The Issues For Trial**

As demonstrated above, the issue in the Central District action is whether Samsung breached its supply obligation, and, therefore, whether the license was properly terminated. The issue in this case (in addition to infringement and Samsung's breach of contract claim, neither of which is being decided in the Central District action) is whether Samsung has a license defense. That means that Netlist can prevail in this case simply if the license is limited to NVDIMM-P – as Samsung has now successfully argued before the Ninth Circuit.

In addition, Foundry Products are expressly excluded from the JDLA's license grant. D.I. 117-01 at 8 (JDLA) § 8.3 [REDACTED]). A "Foundry Product" is defined as [REDACTED] *Id.* at 2. Thus, regardless of what happens in the Central District action, there will still be a dispute in this case as to whether any accused products, including accused products Samsung provides to Google, are Foundry Products and thus excluded from the license. Although Samsung claims that "[c]ourts have regularly stayed patent cases under similar circumstances," the cases it cites for this proposition are markedly dissimilar. Mot. at 11. None of these cases involve a plaintiff attempting to stay its own second filed case, and, in each instance, "[a]llowing the [first] court to first decide . . . contract and ownership issues could resolve the entire dispute between the parties, making the [second] action unnecessary." *Profile Mfg., Inc. v. Kress*, 22 F.3d 1106, *4 (Fed. Cir. 1994); *see also, e.g.*, *Mike Murphy's Enterprises, Inc. v. Fineline Industries, LLC*, 2016 WL 6441607, at *2 (E.D. Cal. Oct. 31, 2016) (defendant "has a complete

defense to . . . patent infringement" if its assumption of a license is established in the first proceeding). As explained above, the opposite is true, here: if Samsung succeeds in preserving its license, it will also have narrowed it to the point it no longer applies in this suit.

Finally, the Central District action cannot resolve Samsung's breach of contract claim in this case. That is yet another reason why a stay of this action in favor of the Central District action is not merited.

### C.     The Stage of This Litigation Weighs Against Granting a Stay

The stage of this litigation also weighs against a stay. Trial of this matter is set for February 3, 2025, and no trial date has been set in the Central District action. *See Cooper Notification*, 2010 WL 5149351, at *3 (denying stay and stating that "it is noteworthy that a schedule is in place and a ten-day jury trial is on the Court's calendar . . . Scheduling all of these matters is a challenge . . . [and] the Court sees no justification here to discard the schedule.").

In addition, the parties have expended considerable resources in this case. Netlist brought counterclaims against Samsung and brought new counterclaim-defendants, Google and Alphabet, into the case. Netlist has already produced over 51,000 documents, constituting the substantial bulk of documents Netlist will likely produce in this case. Netlist has also prepared and served 3,500 pages of preliminary infringement contentions, and over 500 pages of supplemental infringement contentions. The parties have also filed several rounds of pleadings and briefed and resolved several motions, including a motion to dismiss this action that Samsung opposed. Claim construction briefing is completed, and the Court held a Markman hearing.

Contrary to Samsung's contention, Netlist has expended significant effort in moving this case along. It is not a surprise that Netlist has not taken any depositions, given that the parties have deposed many of each other's witnesses as part of the *E.D. Texas I* litigation, and are undergoing more deposition discovery in the *E.D. Texas II* litigation right now. For example, the only accused

products at issue in this case are DDR4 LRDIMMs, and DDR4 LRDIMMs are at issue in both *E.D. Texas I and II*. There, Netlist deposed Samsung's corporate representatives on the operation, sales, marketing, and benefits of Samsung's DDR4 LRDIMMs. Similarly, Samsung deposed Netlist's corporate representatives on JEDEC-related issues, licensing-related issues, and business-related issues, among others. It would be inefficient for the parties to dive headlong into depositions in this case without assessing whether and the extent to which depositions are even needed. These actions do not reflect "resistance to pursuing this case," but rather, active participation.[5] The time and resources Netlist has invested in this case weigh against a stay. *SoftView LLC v. Apple Inc.*, 2012 WL 3061027, at *4 (D. Del. July 26, 2012) (the fact that "[s]ubstantial time and resources have been devoted in this case to scheduling and the resolution of discovery disputes, as well as Defendants' motions to sever, stay and dismiss" weighed against a stay).

Samsung strangely emphasizes that it successfully argued against Netlist's Motion to Dismiss. Mot. at 5. But it was Samsung who chose to bring this Action while the Central District action was under way, and it was Samsung who demanded this case be litigated in this forum. Netlist has cooperated with the litigation, adapted to Samsung's shifting positions, and brought its compulsory counterclaims. The parties are now two years into the case. The Central District action will not necessarily resolve any issue in this case, much less all of them. Consequently, a stay of this case would make no sense.

[5] Samsung notes that Netlist requested deadline extensions to facilitate co-pending litigation with Samsung in the Eastern District of Texas. Mot. at 6-7. These brief extensions do not reflect a lack of urgency in resolving this case, but rather common professional courtesy given that Netlist uses the same counsel in both jurisdictions. Samsung uses different counsel in Texas and Delaware.

### D. <u>The First-To-File Rule Does Not Require A Stay</u>

Samsung incorrectly argues that the "first to file" rule compels a stay. Mot. at 12. That rule does not apply here both because (1) Samsung is seeking a stay of its own second-filed action, and (2) the present litigation is not similar enough to the Central District action to trigger the rule.

Samsung should not be allowed to file second, proceed in its own second-filed case until it becomes strategically disadvantageous, and then invoke the first-filed rule to back out. If Samsung has committed to proceeding in this later second-filed case, it should see it through. Samsung "has chosen to sue here; it cannot credibly complain that proceeding with this suit is prejudicial." *Adams Respiratory Therapeutics, Inc. v. Pharm. Holdings Corp.*, 2006 WL 7077359, at *1 (E.D. Pa. Nov. 2, 2006) (holding first-filed rule inapplicable); *see also In re Pfizer Inc.*, 364 F. App'x 620, at 622 (Fed. Cir. 2010) (relying on *Adams Respiratory*). In fact, the rule is even less appropriate here. The first-filed rule is meant to afford "paramount consideration" to "the ***plaintiff's*** choice of forum" in the first-filed case. *Id.* at 621 (emphasis added). But here, Samsung—the initial ***defendant***—invokes the doctrine while Netlist—the initial plaintiff—opposes.

The first-filed rule "has no application in the circumstances of this case" for the additional reason that the Central District action is dealing with narrower issues. *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 334 n.6 (3d Cir. 2007). "[T]he later-filed case must be truly duplicative of the suit before [the court]. That is, [t]he one must be materially on all fours with the other." *Id.* (quotations omitted). The Central District action narrowly addresses whether Netlist properly terminated the JDLA as a result of Samsung's breach of the supply provision. This case, however, will address not only that question, but also whether Samsung infringes and whether the JDLA license even covers the Accused Products in light of Samsung's recent successful arguments at the Ninth Circuit. That degree of difference is inconsistent with the first-filed rule, especially

because "the scope of the instant action is potentially much broader than that of the" first action. *See In re Mobile Telecommunications Techs., LLC*, 243 F. Supp. 3d 478, 485 (D. Del. 2017).

Even if the first-to-file rule applied, a stay would still not be warranted. "The 'first-to-file' rule . . . is not . . . to be 'rigidly or mechanically applied.'" *Candid Care Co. v. Smiledirectclub, LLC*, 2021 WL 3269092, at *2 (D. Del. July 30, 2021) (quoting *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012)); *E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 971–72 (3d Cir. 1988) (rejecting "wooden application of the rule"), *aff'd*, 493 U.S. 182 (1990). Even where it would otherwise apply, it can be displaced by "considerations of judicial and litigant economy, and the just and effective disposition of disputes." *Serco Servs. Co., L.P. v. Kelley Co., Inc.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995). As discussed above, granting a stay in this case will not truly enhance judicial economy, and it would not afford Netlist a "just . . . disposition of disputes." The court can and should refuse a stay as an exercise of its discretion.

## V. CONCLUSION

For the reasons discussed above, Samsung's motion to stay should be denied.

Respectfully submitted,

*/s/ Emily S. DiBenedetto*
Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Netlist, Inc.*

OF COUNSEL:
Jason Sheasby
H. Annita Zhong
Thomas C. Werner
Michael Tezyan
Andrew J. Strabone
Yanan Zhao
David Z. Kahn
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Rebecca Carson
Jonathan M. Lindsay
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
(949) 760-0991

Dated: November 9, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2023, this document was served on Samsung-Netlist-COV@cov.com, qe-netlistvgoogle@quinnemanuel.com and on the persons listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Rodger D. Smith II
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com

Alice J. Ahn
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
aahn@cov.com

Brian Nester
Peter A. Swanson
Adam Mitchell
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
bnester@cov.com
pswanson@cov.com
amitchell@cov.com

Thomas Garten
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
(650) 632-4700
tgarten@cov.com

Kelly E. Farnan
Sara M. Metzler
RICHARDS, LAYTON & FINGER, PA
One Rodney Square, Suite 600
920 N. King Street
Wilmington, DE 19801
(302) 651-7705
farnan@rlf.com
metzler@rlf.com

David A. Perlson
Jonathan Tse
Michael Trombetta
Elle Wang
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davidperlson@quinnemanuel.com
jonathantse@quinnemanuel.com
miketrombetta@quinnemanuel.com
ellewang@quinnemanuel.com

Deepa Acharya
Jared Newton
Sandy Shen
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street, NW
Washington, DC 20005
(202) 538-8107
deepaacharya@quinnemanuel.com
jarednewton@quinnemanuel.com
sandyshen@quinnemanuel.com

*/s/ Emily S. DiBenedetto*
Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Netlist, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG SEMICONDUCTOR, INC., Plaintiffs, v. NETLIST, INC., Defendant. | ) | C.A. No. 21-1453-RGA-JLH |
| NETLIST, INC. Counter-Plaintiff, v. GOOGLE LLC, ALPHABET INC., SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG SEMICONDUCTOR, INC., Counter-Defendants. | ) | |

**[PROPOSED] ORDER DENYING SAMSUNG ELECTRONICS CO., LTD. AND SAMSUNG SEMICONDUCTOR INC.'S MOTION TO STAY**

Upon consideration of Plaintiffs and Counterclaim-Defendants Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc.'s Motion to Stay, the briefs and exhibits submitted therewith, and Defendant and Counterclaim-Plaintiff Netlist, Inc.'s opposition thereto,

IT IS HEREBY ORDERED THAT the Motion is denied.

SO ORDERED this _____________ day of _____________2023.

_____________________________________________
J.

# Exhibit 1







































# Exhibit 2

UNITED STATES COURT OF APPEALS, NINTH CIRCUIT

NETLIST INC.,
a Delaware corporation,

Plaintiff-Appellee,

vs. Case No.: 22-55209

SAMSUNG ELECTRONICS CO., LTD.,
a Korean corporation,
Defendant-Appellant.

TRANSCRIPT OF AUDIO-RECORDED ORAL ARGUMENT

Before: M. SMITH and DESAI, Circuit Judges, and AMON, District Judge

June 8, 2023

1:36 p.m.

Transcribed By:
TERRI NESTORE
CSR No. 5614, RPR, CRR

Job No. 6169798

to be your position that it's ambiguous and that it should be a jury trial on the meaning of it or do you say it clearly states your position and it should be read to apply only to the JDP?

MR. YODER: Yes, Your Honor.

Our position is that it is unambiguous, when the contract is read as a whole and when the apparent purpose of the contract is considered and the structure of the contract is considered along with the text.

JUSTICE DESAI: So is it your position that Samsung never had any supply obligation under the agreement, based on the language I think that you cite that says 6.2 imposed a supply obligation if the joint development product ever, quote, became commercialized?

MR. YODER: Well, let me just finish answering the first question, though, and that is, but in the alternative there is no question but that this agreement is reasonably susceptible to both proffered interpretations; whether the scope is limited to the joint development project or unlimited as Netlist contends.

JUSTICE AMON: But then what happens if we determine it's ambiguous?

Does it go back for a jury trial?

MR. YODER: Well, it's a good question and as Your Honor probably knows, courts handle that issue quite

differently, in terms of whether the issue just is presented to the jury as to whether there's a breach and then there's argument, whether the court gives fact questions to the jury to answer as to the disputed evidence.

JUSTICE AMON: Does the damages verdict continue to remain or do they have to redo damages in light of that?

MR. YODER: I think it would depend on the nature of the issue that would be remanded.

I think that under a certain scenario the damages wouldn't change but under a different scenario it would, depending upon the verdict. I think that would have to be hashed out with the district court.

JUSTICE AMON: I'm sorry, you probably want to answer that.

MR. YODER: I apologize. So the point is this: There was an obligation under 6.2. We don't deny that. There was an obligation to supply the memory chips in connection with the joint development project.

There was an obligation to supply it during the development stage so they had access to those chips and if the project were successful and the NVDIMM-P product were commercialized, there would be an obligation to supply those memory chips to Netlist, in order for Netlist to

sell the product.

JUSTICE AMON: But on the first point that you make, are you asking us to insert language after the word "products" that says in connection with the JDP?

I mean that language is nowhere in 6.2.

There's no language that ties it to the JDP, and there are other provisions in the contract that stand alone, separate and apart, from the JDP.

So how would we resolve this, you know, what you claim to be an ambiguity or maybe you say it's clear in the other direction, without the specific language that I think you need in that section that ties it to the JDP.

MR. YODER: Well, there is no language in 6.1 either that says NVDIMM-P controller in connection with the joint development project.

There's other provisions in the contract that clearly relate to the joint development project, that don't also say in connection with the joint development project. That's why you have to look at the structure of the agreement in order to interpret specific language.

For example, in Section 3.1, there's an $8 million NRE fee that's paid. It's clearly for the joint development project, but it doesn't say it's specifically for the joint development project.

JUSTICE SMITH: Counsel, let's argue window,

okay?

MR. YODER: Sure.

JUSTICE SMITH: Let's say that I, after looking at the contract as a whole, that I conclude that Section 6.2 is ambiguous. Now, that's contrary to what both parties say, but I do say it, that's it, that's arguendo that's what it is.

What do you do with that? If it's ambiguous, how does that affect your case?

MR. YODER: Well, if it's ambiguous, then under New York law you have to look to the extrinsic evidence to determine what the parties' intent was, and the parties' intent is the controlling issue there.

And in this case, the most compelling extrinsic evidence is the MOU, the memorandum of understanding of the parties, which followed the exchange of two term sheets, which made clear that the memory chips were to be raw material as part of the joint development project.

And Netlist's CEO, Mr. Hong, admitted in his deposition that under those term sheets, the raw materials were for the NVDIMM-P product.

JUSTICE SMITH: You're making the point you have to go outside the contract.

MR. YODER: Right.

JUSTICE SMITH: So you have to go back for a

MR. YODER: Yeah, and so but that also goes to materiality. One, it goes to whether there's a breach; it also goes to whether it's material.

Did Netlist really believe it was material when they sat on it for five years and didn't declare a breach?

And when finally the higher Korean tax authority overruled the lower Korean tax authority, was there a breach when the lower Korean tax authority agreed with Samsung? It's nonsense. It can't be.

But when the higher authority decides there's a refund, with interest, there's nothing to cure; but yet under the district court's interpretation, Samsung's out of luck. Never could have cured, never given a chance to cure, but there's this strict liability based upon what is determined five years later.

So not a breach, but also that should have gone to the jury on materiality.

JUSTICE SMITH: Well, I gather from Samsung's perspective, if there's ambiguity and if Section 6.2 is interpreted the way you think it should, considering the totality of the circumstances, the tax gets reversed as well because there's no ambiguity there, it's not strict liability and the declaratory relief gets overturned because the others didn't happen. Is that correct?

MR. YODER: Right. That's our position,

Your Honor. But even if the court doesn't agree that that should be the outcome, there needs to be a remand and a trial on these issues for sure.

And that's true as to materiality on 6.2 as well, and where I was going with that, when you go through the briefing on the issue of materiality, Netlist's argument was really, it was material because the supply obligation was a primary consideration for getting these licenses.

Well, number one, if you look at the JDLA and you look at the recitals, the recitals are very clear -- and parties put recitals in agreements to make sure language isn't tortured down the road by lawyers and courts, right?

Here's what our purpose is, interpret this agreement consistent with our purpose.

And when you look at the recitals, what does it say about the licenses?

Whereas in connection with their collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents.

The licenses are being given in connection with the collaboration. That's the joint development project.

And Netlist got a whole bunch of consideration in addition to this supply obligation.

If there were an unlimited supply obligation, it would be called out in some fashion.

JUSTICE SMITH: Do you want to save -- I thought you said you want to say five minutes.

It's up to you entirely, of course.

MR. YODER: No, and I am watching the clock, Your Honor, because I got a sense we need to do that.

But the thing I would say, though, just on the materiality, is that when you look at the record before Judge Scarsi on the 6.2 issue in materiality, Netlist's argument was that the supply obligation was the primary benefit that it received, and Judge Scarsi agreed with that. He said this was integral, this was a key component, and he made a factual finding based upon essentially a post hoc declaration by Netlist's CEO, and he disregarded all the other evidence in the record as to whether this was the primary benefit.

JUSTICE AMON: So it wasn't an undisputed fact?

MR. YODER: Pardon?

JUSTICE AMON: It wasn't an undisputed fact, then? In other words, the fact.

MR. YODER: It was disputed. It was disputed.

JUSTICE AMON: The fact was disputed?

MR. YODER: Very much disputed, yeah, whether --

JUSTICE DESAI: He shouldn't have resolved it against you because it was disputed?

MR. YODER: Yeah, absolutely not. I mean, even

just on his -- and he erred as a matter of law too, because instead of applying the multifactor test of materiality, he just picked out this one issue.

And even on that issue, there was a conflict in the facts in the record.

JUSTICE AMON: Can I just ask you one further question? You said that you did supply these memory components in connection with the JDP, what was being developed?

MR. YODER: Yes, Your Honor.

JUSTICE AMON: Why was there a need to do that?

MR. YODER: To create the product.

JUSTICE AMON: So there was some --

MR. YODER: To try to --

JUSTICE AMON: And did you also, during that time -- is the record clear that you submitted memory components for Netlist's other uses?

MR. YODER: Yes, there was, but that was true before, during and after, and it was done subject to purchase orders and acknowledgements that didn't reference the JDLA. So the parties' practice continued the same way during the JDLA as before, and our position is that doesn't really prove anything.

You really have to get into the extrinsic evidence to decide why are they doing that?

component parts was because there was a JDP, right?

MR. YODER: Correct. Correct.

But the purchase of the components for resale, the purchase of the NAND and the DRAM to sell to third parties was outside of the joint development agreement.

The SEC filings that Netlist made where they say we have no long-term supply agreement shows that; the fact that Netlist kept coming back to Samsung saying, give us a unlimited supply agreement, shows that. All of that shows that.

The thing I would say on materiality real quickly is that the evidence was before the court, and if the evidence showed that the parties did not intend a supply -- an unlimited supply obligation to be the primary consideration for these licenses, then even more so it wasn't material, it wasn't a material breach.

And all of that evidence was before the district judge. If you look at his ruling that he made in connection with the summary judgment decision, he said that -- and bear with me, I know I'm a little bit over.

It's the last point that I'll make.

Netlist, in its reply, acknowledges that there's a fact issue on materiality.

Netlist said that if Samsung was suggesting that there's a fact issue on materiality, there isn't. Look at

this extrinsic evidence.

The district court looked at extrinsic evidence on materiality. It relied on Mr. Hong's self-serving declaration. It ignored all the other evidence in the record about the three-year delay in claiming a breach, about the statements that were made to the SEC -- all of which, we submit, show that this wasn't material.

Final point is that if there is to be a remand, we would ask the court to consider allowing Samsung to raise its affirmative defenses; that those weren't required to be raised as part of the summary judgment, and I would just point the court to --

JUSTICE AMON: Isn't that too little, too late?

I mean, you should have raised those in connection with summary judgment and you didn't do it.

MR. YODER: May I answer that question?

JUSTICE SMITH: Yes.

MR. YODER: Okay. And I'll be brief.

No. If you look at -- the best thing to look at, Your Honor, is the district court's order on summary judgment. There was a lot of confusion about what the motion was.

The notice of motion said the merits of our claims. I don't know what that is. Their points and authorities talk about the four elements in New York, one

of which is damages; the others are contract, Netlist performance, Samsung's breach.

But what the district court did when he said, here's my ruling on summary judgment, it was as to three elements. It wasn't as to liability as a whole, it was existence of contract, performance of contract, and Samsung's breach of the supply provision. That's 1ER41.

And in response to a summary judgment motion that identifies three elements and says we want summary judgment on those, I don't believe that Rule 56 requires a defendant to put in affirmative defenses.

JUSTICE SMITH: Okay.

MR. YODER: Thank you so much.

JUSTICE SMITH: Any other questions by my colleagues? Thanks to counsel.

MR. YODER: Thank you.

JUSTICE SMITH: This is an interesting case. We appreciate the preparation on your argument.

The case just argued is submitted, and I'm pleased to say that the court is adjourned for the week.

THE BAILIFF: All rise.

Court for this session stands adjourned.

(End of recording.)

C E R T I F I C A T E

I, TERRI NESTORE, Certified Shorthand Reporter/ Transcriptionist, do hereby certify that I was authorized to transcribe the foregoing recorded proceeding, and that the transcript is a true and accurate transcription of my shorthand notes, to the best of my ability, taken while listening to the provided recording.

I further certify that I am not of counsel or attorney for either or any of the parties to said proceedings, nor in any way interested in the events of this cause, and that I am not related to any of the parties thereto.

Dated this 22nd day of October, 2023.

Terri Nestore

TERRI NESTORE, CSR 5614, RPR, CRR

# Exhibit 3

Ekwan E. Rhow - State Bar No. 174604
erhow@birdmarella.com
Marc E. Masters - State Bar No. 208375
mmasters@birdmarella.com
David I. Hurwitz - State Bar No. 174632
dhurwitz@birdmarella.com
Kate S. Shin - State Bar No. 279867
kshin@birdmarella.com
Christopher J. Lee - State Bar No. 322140
clee@birdmarella.com
Jong-min Choi - State Bar No. 329474
jmchoi@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Samsung Electronics Co., Ltd.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

NETLIST INC., a Delaware corporation,

Plaintiff,

vs.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,,

Defendant.

CASE NO. 8:20-cv-00993-MCS-ADS

**DEFENDANT SAMSUNG ELECTRONICS CO., LTD'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

Date: September 20, 2021
Time: 9:00 a.m.
Crtrm.: 7C

Assigned to Hon. Mark C. Scarsi
Courtroom 7C

## NOTICE OF MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on September 20, 2021, at 9:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 7C of the United States District Court for the Central District of California, located at 350 W. 1st Street, Los Angeles, CA 90012, Defendant Samsung Electronics Co. Ltd. ("Samsung") will and hereby does move this Court for summary judgment, or in the alternative partial summary judgment, in its favor and against Netlist Inc. ("Netlist") pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and Conclusions of Law, the accompanying Declaration of Joyce J. Choi and exhibits, the record of this proceeding to date, and any and all evidence that may be presented at the hearing of this matter.

This motion is made following a conference of counsel pursuant to Local Rule 7-3, which took place on August 7, 2021.

DATED: October 21, 2021

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: [signature]

Ekwan E. Rhow
Attorneys for Defendant Samsung Electronics Co., Ltd.

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 9

II. ARGUMENT ........ 11

A. The Best Evidence For Contract Interpretation Are the Writings That the Parties Signed ........ 11

B. Samsung Is Entitled to Judgment on Plaintiff's First Cause of Action for Breach of Contract (Supply) ........ 12

1. Section 6.2 Is Limited To the Supply And Pricing Of Components For The Joint Development Project ........ 12

a. The Parties' Long Standing Business Relationship Involved $200 Million of Purchases Over 15 Years ........ 12

b. The JDLA Involved Joint Development of a "Game Changing" Product Based On the NVDIMM-P Standard ........ 13

c. Section 6.2 Is Limited To Joint Development Work Under The JDLA ........ 15

d. The Negotiating History Shows That Section 6.2 Is Limited To Joint Development ........ 16

e. Netlist Admits The JDLA Is Not A Contract to Supply DRAM and NAND Beyond Joint Development ........ 19

f. The Parties' Course of Conduct Shows Samsung Had No Obligation To Supply All Chips At Request ........ 21

g. Netlist Did Not Fully Perform Its Obligations ........ 24

h. Netlist Should Be Estopped From Arguing Its Patent Licenses Provide Consideration For A Broader Supply Obligation ........ 25

2. Section 6.2 Is Too Indefinite To Be A Valid Supply Contract. ........ 26

a. The Phrase "At Netlist's Request" Is Not A Definite Quantity Term ........ 27

b. The JDLA Is Not A Requirements Contract ........ 28

c. The JDLA Is Not A Valid Options Contract ........ 28

C. Samsung Reasonably Deducted Withholding Taxes From Payment

To Netlist And Cooperated With Netlist's Efforts To Obtain A Refund .......... 29

D. Netlist Is Barred From Recovering Consequential Damages .......... 31

E. Netlist Has No Right To Terminate the JDLA .......... 32

III. CONCLUSION .......... 33

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Bird v. Computer Technology, Inc.*, 364 F. Supp. 1336 (S.D.N.Y.1973) ....... 16, 18, 20, 21

*Churchill v. Winter Chevrolet*, No. C-04-0489 JCS, 2005 WL 281170 (N.D. Cal. Feb. 4, 2005) ....... 25

*Corning Inc. v. VWR Int'l, Inc.*, No. 05 CV 6532 CJS, 2007 WL 841780 (W.D.N.Y. Mar. 16, 2007) ....... 28

*CSL Behring, LLC v. Bayer Healthcare, LLC*, 2019 WL 4451368 (D. Del. Sep. 17, 2019) ....... 28

*Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.*, 872 F. Supp. 103 (S.D.N.Y. 1995) ....... 32

*Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187 (E.D.N.Y. 1986) ....... 28

*GT Beverage Co. LLC v. Coca Cola Co.*, No. SACV1000209JVSRNBX, 2010 WL 11595832 (C.D. Cal. Aug. 2, 2010) ....... 25

*Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778 (9th Cir. 2001) ....... 25

*Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184 (S.D.N.Y. 1996) ....... 23

*International Gateway Exchange, LLC v. Western Union Financial Services, Inc.*, 333 F. Supp. 2d 131 (S.D.N.Y. 2004) ....... 31

*JA Apparel Corp. v. Abboud*, 568 F.3d 390 (2d Cir. 2009) ....... 12

*Johnson v. Oregon*, 141 F.3d 1361 (9th Cir. 1998) ....... 25

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ....................25, 26

*Miller v. McLean Cnty. Unit Dist. No. 5* (*In re Mod. Dairy of Champaign, Inc.*),
171 F.3d 1106 (7th Cir. 1999) ....................29

*Rapture Shipping, Ltd. v. Allround Fuel Trading B.V.*,
350 F. Supp. 2d 369 (S.D.N.Y. 2004) ....................25

*Rissetto v. Plumbers & Steamfitters Local 343*,
94 F.3d 597 (9th Cir. 1996) ....................25

*Septembertide Publ'g, B.V. v. Stein & Day, Inc.*,
884 F.2d 675 (2d Cir. 1989) ....................32

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
487 F.3d 89 (2d Cir. 2007) ....................31

*United States, for the Use of Integrated Energy, LLC v. Siemens Gov't Techs., Inc.*,
No. SACV1501534JVSDFMX, 2017 WL 10562969 (C.D. Cal. May 19, 2017) ....................31

**State Cases**

*Ashwood Capital, Inv. v. OTG Mgmt., Inc.*,
99 A.D.3d 1 (2012) ....................28

*Contrast Edison Elec. v. Thacher*,
229 N.Y. 172 (1920) ....................28

*Cty. of Jefferson v. Onondaga Dev., LLC*,
59 N.Y.S.3d 203 (2017) ....................24

*Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*,
93 N.Y.2d 584 (1999) ....................29

*Fed. Ins. Co. v. Americas Ins. Co.*,
258 A.D.2d 39 (1999) ....................12

*Greenfield v. Philles Recs., Inc.*,
98 N.Y.2d 562 (2002) ....................11

*Heyman Cohen & Sons v. M. Lurie Woolen Co.*,
232 N.Y. 112 (1921) .......... 29

*Jarecki v. Shung Moo Louie*,
95 N.Y.2d 665 (2001) .......... 29

*Lee v. Wright*,
108 A.D.2d 678 (1985) .......... 33

*Mar-Jon Mach. & Tool Co. v. Eastman Kodak Co.*,
534 N.Y.S.2d 47 (1988) .......... 27

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
84 N.Y.2d 430 (1994) .......... 32

*Rudman v. Cowles Commc'ns, Inc.*,
30 N.Y.2d 1 (1972) .......... 12

*Scott v. Palermo*,
233 A.D.2d 869 (1998) .......... 32

*Slamow v. Del Col*,
79 N.Y.2d 1016 (1992) .......... 11

*Sommer v. Federal Signal Corp.*,
79 N.Y.2d 540 (1992) .......... 32

*Studley v. Nat'l Fuel Gas Supply Corp.*,
107 A.D.2d 122 (1985) .......... 22, 23

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
1 N.Y.3d 470 (2004) .......... 27

*Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc.*,
67 A.D.2d 339 (1979) .......... 21

*Westmoreland Coal Co. v. Entech, Inc.*,
100 N.Y.2d 352 (2003) .......... 15

**Federal Statutes**

Fed. R. Civ. P. 12 .......... 31

Fed. R. Civ. P. 56 .......... 30

**State Statutes**

N.Y.U.C.C. § 2-311 ....................................................................................................29

8

Defendant's Motion for Summary Judgment or Partial Summary Judgment

## I. INTRODUCTION

The Complaint in this action marks the first time that Netlist disclosed its now-alleged interpretation of Section 6.2 of the Joint Development and License Agreement ("JDLA") – namely that Samsung was required to supply ***all*** chips that it requested for ***all*** of its DRAM and NAND needs, including beyond the joint development work contemplated therein. For the five years prior while Samsung was performing, Netlist never once described the JDLA in the manner it now alleges despite the fact that, as Netlist CEO Chuck Hong recently declared, this supposedly broad supply arrangement was "crucial" and "critical" to its business. SUF 39.

In every single 10-K certified to the SEC and Netlist's public shareholders since the JDLA was signed, Netlist never once described it as a supply contract, instead stating unequivocally and repeatedly that Netlist does not have "any long term supply contracts." In press releases touting the JDLA, Netlist makes no mention of the supposedly "crucial" supply provisions but instead touts the "long term partnership" focused on the development of a potential new standard and product–NVDIMM-P. In Netlist board presentations and resolutions, Netlist failed to mention to its own board the JDLA had solved its "critical" supply shortage issues. In other words, prior to this dispute and when obligated to be accurate to the SEC, its shareholders, and its board, Netlist never once described the JDLA as it now alleges here. That is because Netlist's interpretation of Section 6.2 is contrived.

The manufactured nature of Netlist's interpretation is further established by the contract negotiation documents and Chuck Hong's deposition admissions regarding the same. The only other document the parties ever jointly signed was the Memorandum of Understanding ("MOU") related to the JDLA. Chuck Hong admitted this MOU was designed to capture all important terms that would be included in the JDLA. If supply was "critical" as Chuck Hong now says, it would have been included in the MOU. But as he admitted, the MOU contained no such provision, instead providing for supply by Samsung if and to the extent the NVDIMM-P product that

was the subject of the JDLA was ever commercialized. SUF 30. But it never was, which meant Samsung never became obligated to supply any chips.

This evidence of intent is dispositive and undisputed. And Netlist cannot evade the MOU because Netlist's in-house attorney during negotiations on the JDLA confirmed Section 6.2 of the JDLA needed to conform with the MOU – the same MOU that Chuck Hong confirmed did not contain any obligation to supply ***all chips requested for all products.*** Summary judgment can be granted on this evidence alone.

But, even absent such evidence, Samsung should still prevail as the parties' subsequent course of conduct rebuts any notion of a guaranteed supply. Chuck Hong and his brother, Paik Ki Hong, who is Netlist's Vice President of Worldwide Operations, both confirmed in their recent declarations to this Court that Samsung fully performed under the JDLA in 2015, 2016 and into 2017. Yet they also confirmed in deposition that during that exact same time period, Samsung regularly did not fulfill all of Netlist's chip orders. As explained by both, this is simply a "reality" of the memory industry, which functions like any other commodity industry with buyers vying for limited supply and where allocation is the norm. This means that, contrary to Netlist's interpretation of the JDLA, it was never intended that Samsung could or would supply all chips that Netlist requested.

The better explanation for the parties' course of conduct is that Netlist's purchases in 2015 and thereafter were not pursuant to the JDLA but simply followed the practice of buying chips that Netlist had been following between 2000 and 2015 in which it had purchased more than $10 million per year on average from Samsung. Under that "industry norm" protocol, Netlist would provide forecasts, inquire about supply, obtain an allocation of available chips and then submit purchase orders. Notably, after the JDLA was executed and even after it was purportedly terminated, this exact same protocol continued and Netlist accepted the fact it was not receiving all the chips it wanted – establishing by conduct that Netlist did not believe the JDLA required Samsung to supply all of the chips it requested.

Netlist's alleged breach relating to tax withholdings suffers from a similar lack of disputed evidence undermining Netlist's allegation. It is undisputed that Netlist's CFO Gail Sasaki signed a tax form prior to execution of the JDLA, and after independently consulting with Netlist's tax professionals, that required withholdings. As Chuck Hong confirmed, Sasaki had authority to do so and would have done all necessary investigation prior to doing so. After this tax was withheld, Netlist had second thoughts and demanded the withholdings be released. Samsung cooperated to the extent it could but was not willing to simply adopt Netlist's tax position. Samsung's position was not unreasonable given Netlist's CFO had herself adopted a similar position. In any event, Netlist ultimately obtained a full refund with interest, negating its claim for damages.

Putting aside whether Netlist's interpretation of the JDLA is reasonable, Netlist's delay in bringing both its supply and tax-related breaches begs the question: why did Netlist file its complaint after years of supposedly repeated non-performance? The answer is simple: by terminating the JDLA and the cross-licenses contained therein, Netlist can set up a patent infringement claim which as its 10-K discloses, is part of its long-standing business plan to monetize its intellectual property through litigation. Such strategic maneuvering, however, cannot replace the clear terms of the JDLA and sidestep the undisputed evidence that has been uncovered. Summary judgment should be granted in Samsung's favor.

## II. ARGUMENT

### A. The Best Evidence For Contract Interpretation Are the Writings That the Parties Signed

Under New York law, which governs pursuant to the choice of law provision in the JDLA, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002). Where the contractual language is ambiguous, "extrinsic

evidence as to the parties' intent may properly be considered." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). Such extrinsic evidence may include the parties' course of performance under a contract, which is compelling extrinsic evidence of the parties' intent. *Fed. Ins. Co. v. Americas Ins. Co.,* 258 A.D.2d 39, 44 (1999) ("the parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties."). Evidence of contracting parties' negotiations may also be admissible to prove the meaning of an ambiguous contract term. *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 11 (1972) ("the court may and should look to the prior negotiations to determine what was intended.").

### B. Samsung Is Entitled to Judgment on Plaintiff's First Cause of Action for Breach of Contract (Supply)

Netlist's first cause of action alleges that Samsung breached a promise to supply it with all NAND and DRAM at Netlist's request. Samsung is entitled to summary judgment on this claim because (1) the supply obligation in Section 6.2 is limited to the NVDIMM-P joint development project, (2) Section 6.2 does not contain a definite or ascertainable quantity term necessary to create an enforceable supply obligation, and (3) Netlist cannot show that it fully performed its obligations under the contract.

#### 1. Section 6.2 Is Limited To the Supply And Pricing Of Components For The Joint Development Project

The express terms of the JDLA and the extrinsic evidence show that Samsung's promise in Section 6.2 was limited to the supply and pricing of NAND and DRAM products for the NVDIMM-P joint development project. Section 6.2 does not create a long-term supply contract for existing products or requirements outside of the joint development context. The JDLA, including Section 6.2, must initially be construed in the context of the long-standing business relationship between the parties.

##### a. The Parties' Long Standing Business Relationship Involved $200 Million of Purchases Over 15 Years

Netlist has been a customer of Samsung since at least 2001, purchasing over $200 million of NAND and DRAM products. SUF 1. Both before and after the JDLA,

Samsung has been a significant and continuous supplier of NAND and DRAM to Netlist, as reflected in Netlist's annual reports. SUF 2. In addition to purchasing memory products from Samsung, Netlist also purchased NAND and DRAM products from SK Hynix and Micron, as well as from sellers who purchased the products from the manufacturers for resale. SUF 3.

The DRAM and NAND industry functions like other commodity industries, such as crude oil. It has three primary suppliers – Samsung, SK Hynix and Micron. Dkt. 89-21 at ¶ 6. The amount of NAND and DRAM product that the overall market can supply is limited and demand for products exceeds available supply. SUF 4. Accordingly, Netlist, like other customers, would provide Samsung with advance forecasts of the amount of product it wishes to purchase, and Samsung would then let Netlist know how much product it could allocate and make available to Netlist to purchase. SUF 5. Following these discussions regarding allocations and availability, Netlist would issue purchase orders for specific amounts of product that Samsung had approved. SUF 6. Samsung accepted and fulfilled some of the purchase orders, put some on backlog, and rejected others, just as it did with other customers. SUF 7. The practice of forecasts, purchase orders, allocations and backlogs are "industry norms" according to Chuck Hong and continued after the JDLA was executed. SUF 4, 8.

**b. The JDLA Involved Joint Development of a "Game Changing" Product Based On the NVDIMM-P Standard**

In early 2015, Netlist approached Samsung to discuss a strategic partnership involving, among other things, joint development of a product based on a new standard called NVDIMM-P and licensing of Netlist's patents. SUF 9. The NVDIMM-P-related product was a "game changer" according to Chuck Hong and, based on presentation materials, was designed to take market share in a $15 billion industry. SUF 10. At that time, Netlist also raised a licensing aspect which was a subtle threat by Netlist of a potential claim for infringement of its LRDIMM patents and designed to convince Samsung to agree to the joint development route. SUF 11.

On November 12, 2015, after months of negotiations, Samsung and Netlist entered into the JDLA. SUF 13. The structure and terms of the JDLA reflect the express purpose of the contract, which as the recitals in the preamble indicate, is for the parties "to work together to jointly develop an interface and associated technologies for certain memory modules and promote such interface to standards-setting organizations," and grant each other licenses for intellectual property. SUF 14, 16. The JDLA defines the "Developed Product" to be a "NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications." SUF 15. The JDLA also includes a grant of cross-licenses and a release of threatened claims. SUF 16.

The JDLA states Netlist was to receive $8 million for non-recurring engineering on the NVDIMM-P development work, and concurrently with the JDLA, Samsung provided an additional $15 million convertible loan at 2% interest that allowed Netlist to pay off existing debt with less favorable financial terms.[1] SUF 17. In addition to its receipt of cash and financing from Samsung, Netlist would generate significant profits and obtain market share if the parties were able to develop this "game changing" standard for NVDIMM-P and produce a commercially feasible product under this new standard. SUF 18.

The JDLA seeks to implement these objectives, including terms for the collaborative NVDIMM-P development work, development milestones and a Statement of Work (Section 2, Appendices A and B); development costs (Section 3); IPR ownership (Section 4); schedule for standardization and productization (Section 5); supply of components for the joint development work (Section 6); a mutual release of claims (Section 7); and licensing of intellectual property (Section 8). SUF 19.

[1] Netlist was having cash flow issues which explains its overall approach. SUF 12.

### c. Section 6.2 Is Limited To Joint Development Work Under The JDLA

The Court should construe the meaning of Section 6.2 in light of the JDLA as a whole, rather than attempt to give meaning to those words outside of the context of the agreement. *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) ("The meaning of a writing may be distorted where undue force is given to single words or phrases"). Taken as a whole, the JDLA is an agreement for NVDIMM-P joint development and cross-licensing of intellectual property, as its terms, structure and title expressly show.

Section 6 of the JDLA, entitled "Supply of Components," includes mutual promises regarding the supply and pricing of components in connection with the NVDIMM-P joint development project. SUF 20. Section 6.1 states: "Supply by Netlist. Netlist will provide Samsung any ***NVDIMM-P*** controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." *Id.* As the NVDIMM-P product did not exist, Netlist was not required to supply anything yet.

Section 6.2 is the parallel provision and, if interpreted consistently with the remainder of Section 6 and the JDLA as a whole, was focused on providing supply for the NVDIMM-P product that was being developed. It states: "Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (i.e., among customers purchasing similar volumes of similar products)." SUF 20. Based on the testimony of Chuck Hong, Netlist's 30(b)(6) witness on the JDLA's negotiations, this supply obligation would arise only if and to the extent the NVDIMM-P product was commercialized. SUF 21. This also makes sense in the context of the overall joint development whereby Netlist had expertise with the controller of the NVDIMM-P product while Samsung had the NAND and DRAM supply necessary for the NVDIMM-P product.

Viewing the JDLA as a whole, the express terms of Section 6.2 were limited to the supply and pricing of NAND and DRAM components that Netlist requested for

the NVDIMM-P joint development. Section 6.2 has nothing to do with Netlist's requests for product outside of the joint development, which was covered by the parties' prior course of conduct which continued after the JDLA was executed. This reading is consistent with the express terms of the contract, the negotiating history, Netlist's admissions, and the parties' course of dealing. Netlist's contrary interpretation is inconsistent with the uncontroverted material facts.

**d. The Negotiating History Shows That Section 6.2 Is Limited To Joint Development**

Extrinsic evidence from the negotiations of this supply and pricing provision through drafts of the term sheet, Memorandum of Understanding, and the JDLA evince the parties' intent that Samsung was agreeing to supply the necessary raw materials only for the NVDIMM-P joint development project at a competitive price. *Bird v. Computer Technology, Inc.*, 364 F. Supp. 1336, 1343 (S.D.N.Y.1973) ("the Court may look to prior negotiations to determine what was intended."). There is no evidence Netlist asked Samsung during these negotiations to commit to a broader supply contract covering its needs for existing products and requirements, and no evidence Samsung ever agreed to any such term.

Chuck Hong testified Netlist's first proposal to Samsung in April 2015 focused on the cash consideration and did not mention a long term supply agreement. SUF 22. When Netlist sent Samsung the first draft of the term sheet on April 21, 2015, Netlist proposed, as part of the "Joint development and marketing" for the "Technology Collaboration," that Samsung supply "Flash" (which means NAND) and "DRAM" for the NVDIMM-P-related product.[2] SUF 23.

When the parties moved into negotiations of a term sheet, Netlist drafted a section entitled "Technology Collaboration" and proposed a subsection entitled "Raw

---

[2] The HVDIMM product (sometimes referred to as "HV" or "HyperDIMM" in the term sheets and elsewhere) would incorporate the proposed new NVDIMM-P standard the parties were supposed to work on under the JDLA. SUF 23.

Materials: Samsung will supply NAND, DRAM on mutually agreed terms." SUF 24, 25. Chuck Hong testified unequivocally that ***the supply obligation Netlist is alleging here was not contained therein.*** Instead, he conceded the supply section applied only to NVDIMM-P if and when it was ever commercialized: "Q. And so those were raw materials that were provided in connection with commercialization of the dash P product; correct? A. That's correct." SUF 26. In subsequent drafts of the term sheet, Netlist continued to express this clear understanding that Samsung's supply obligations would only arise if and to the extent the NVDIMM-P standard and products were ever commercialized—which never occurred. SUF 27-29.

Chuck Hong testified that his intent during the contract negotiations was to get Samsung's commitment to supply NAND and DRAM products for the NVDIMM-P product so Netlist would have sufficient supply if and when it was able to commercialize the technology. SUF 30. According to Chuck Hong, the NVDIMM-P was "industry changing" technology and its attempt to standardize a NVDIMM-P product was a significant business opportunity and Netlist had invested more than $10M in engineering costs. SUF 31. That is why Netlist put that "raw material" language in the term sheet under Technology Collaboration and Productization for the NVDIMM-P initiative. SUF 24-29. After exchanging additional drafts, the parties signed a final MOU that was intended to reflect all important deal terms. SUF 32. Section 6 of the MOU states:

> 6. Most Favored Nation (MFN): Netlist will provide Samsung any NVDIMM-P* controller at a price lower than the price Netlist provides to any other buyer. Either party may produce NVDIMM-P controller using its own technology and has no obligation to buy from the other party. *Raw Materials: Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM products.* (emphasis added.) SUF 32.

As to the MOU, Chuck Hong again admitted this language limited Samsung's

supply obligation to the NVDIMM-P development and this obligation would arise only if and to the extent the NVDIMM-P product "ever became commercialized." SUF 32. Thus, according to Chuck Hong's repeated testimony and the undisputed terms of the MOU, the parties expressly agreed the MOU did not contain the supply obligation that Netlist is now alleging.

Netlist cannot now evade the MOU as, during the negotiations of the JDLA, Netlist's in house attorney made clear the MOU was the sole basis for what became section 6 of the JDLA. On October 8, 2015, when the parties began drafting the JDLA from the MOU, Samsung proposed the following language to Netlist:

> 6.2 Supply by Samsung. Samsung will supply NAND and DRAM to Netlist on Netlist's request at a competitive price similar to the customers purchasing similar volumes of similar products. For the avoidance of doubt, any of the provisions under this Agreement will not be deemed to require Netlist to purchase any products from Samsung or to require Samsung to supply any products to Netlist. SUF 33.

On October 14, 2015, Netlist replied to Samsung, forwarding an email from Noel Whitley (Netlist's in-house counsel and VP of IP & Licensing) with his comments on the JDLA. SUF 34, 35. As to the new Section 6.2 of its proposed JDLA, Whitley wrote in all bold that this language "**Conflicts with MOU**" and that "Samsung states that nothing in this agreement will 'require Samsung to supply any products to Netlist.' Netlist removed this qualification and returned the language to reflect what was agreed to in the MOU." SUF 35. Samsung agreed to this change. *Id.*

The MOU's intent is clear based on Chuck Hong's testimony and Netlist's statements at the time. Under that MOU, the supply of NAND and DRAM as raw materials was limited to the NVDIMM-P joint project. SUF 32. That intent was carried forward into the terms of Section 6.2, which refers to the supply of components for the NVDIMM-P-related product. Indeed, when Samsung asked to add language stating it was not required to supply NAND and DRAM at all, Netlist rejected this addition and

demanded they revert to the MOU – namely, supply of raw materials for joint development of the NVDIMM-P standard and product. SUF 36.

Netlist CEO Chuck Hong admitted this repeatedly during his deposition. He testified Netlist wanted Samsung's assurance that it would supply NAND and DRAM to support "game-changing" NVDIMM-P sales if the joint development proved successful, and demand for the product took off. SUF 26, 28, 30, 31, 32, 37. Thus, the JDLA was never about ensuring Netlist a supply of product for its other requirements beyond the joint development; the mutual supply provisions were in connection with and limited to the joint development.

Netlist's CFO Gail Sasaki made this intent clear when she characterized the MOU during the discussions regarding the drafting of the JDLA, telling Samsung: "Both sides understood from the outset that this was a strategic deal, not a financial one. *The value that would be transferred and created resided in the patents and the technology*." (emphasis added.) SUF 38. If a supply agreement was the key consideration for Netlist in the deal (as Netlist now claims), Sasaki surely would have mentioned it. That she did not is further compelling evidence that Netlist understood the deal did not include an agreement to supply anything beyond what was necessary for the joint development project and only to the extent the NVDIMM-P was commercialized.[3]

**e. Netlist Admits The JDLA Is Not A Contract to Supply DRAM and NAND Beyond Joint Development**

While Netlist asserts in this litigation the JDLA is a supply contract, Netlist has repeatedly admitted that the JDLA is not, in fact, a supply contract that extends to Netlist's other requirements and requests.

While the exact language has changed over the years, Netlist has repeatedly and consistently disclosed the risks associated with not having a long-term supply contract

---

[3] It is not disputed that Netlist got the chips it needed for its initial development work and that the NVDIMM-P product was never commercialized. SUF 46, 47. Thus, Samsung's obligation to supply DRAM and NAND was never triggered.

for DRAM and NAND in its annual reports before 2015. SUF 43. But in its first 10-K after the JDLA was executed, Netlist continued to state that Netlist had "no long-term supply contracts" for these products. SUF 42.[4] This is no mere boilerplate disclosure of risk. Netlist said it had no long term supply contracts for DRAM and NAND in the very same section that it described its contract with and purchases from Samsung. *Id.* By contrast, in 2021, when Netlist entered into an actual supply contract with SK Hynix, it disclosed that the supply contract "entitles Netlist to purchase up to $600,000,000 of SK Hynix memory products during the term . . ." SUF 40.

Netlist management's presentation of the JDLA to its Board of Directors in November 2015 confirms this understanding. Chuck Hong's presentation to the Board, prepared by Netlist CEO Gail Sasaki, describes the technology collaboration and the cross-licensing of patents. SUF 41. No mention is made of the JDLA being a supply agreement for all of its existing DRAM and NAND requirements, which Chuck Hong now declares to be "crucial" and "critical." SUF 39, 41. This clearly would have been material to the Board had there been such a contract.

While Netlist disclaimed in its 10-K disclosures that the JDLA was a long-term supply agreement, Netlist proclaimed in its press release what the JDLA was in fact a "strategic alliance" and "long term partnership" focused on development of a "new class of NVDIMM-P." SUF 44. No mention is made that Netlist has been given a supply agreement for all of its existing products and requirements. *Id.*

Netlist's public filings, press releases, and Board materials are consistent with its statements to Samsung in the period before any dispute arose. Netlist's understanding

[4] Netlist's 2015 10-K states: "Our ability to fulfill customer orders or produce qualification samples is dependent on a sufficient supply of field programmable gate arrays ("FPGAs"), DRAM ICs and NAND flash, which are essential components of our memory subsystems. There are a relatively small number of suppliers of FPGAs, DRAM ICs and NAND flash, and we purchase from only a subset of these suppliers. ***We have no long-term FPGA, DRAM or NAND flash supply contracts.***" (emphasis added ) SUF 42. All subsequent Netlist's 10-Ks attest to the same. SUF 43.

that the JDLA was not a supply agreement for all of its existing needs and products is evident by Netlist's continued efforts to obtain a supply agreement in the years following the JDLA, long *before* it sought to terminate the contract. In February 2017, Netlist met with Samsung to request a "New Partner Type" that would actually require Samsung to provide "Product Allocation support for Netlist" and an "Official-Distributor Partnership Agreement." SUF 45. Netlist understood the JDLA did not guarantee it the product allocation or supply it wanted; otherwise it would not have proposed a new business relationship 18 months later, before there was any dispute under the JDLA. Indeed, when Netlist made this ask, Samsung told Netlist the JDLA was not an avenue to support Netlist's standard products. *Id.*

In sum, Netlist's repeated statements in its SEC filings, characterization of the JDLA to its own Board, and subsequent asks of Samsung show Netlist did not believe the JDLA was a supply contract in the manner it now alleges. This compelling evidence is uncontroverted and directly contradicts Netlist's position in this litigation.

#### f. The Parties' Course of Conduct Shows Samsung Had No Obligation To Supply All Chips At Request

The parties' performance in the pre-litigation period, particularly in the first two years following the JDLA, shows neither party intended Section 6.2 to create an obligation for Samsung to supply all of Netlist's requests for Samsung's NAND and DRAM products. *Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc.*, 67 A.D.2d 339, 341 (1979) (actual performance is the "most persuasive evidence of the agreed intention of the parties").

As to the development work, it is not disputed that Netlist received all of the chips it needed. SUF 46. And given the NVDIMM-P product was never commercialized, Samsung's duty to provide further chips was never triggered. SUF 47.

For Netlist's other needs outside the JDLA, Samsung continued to supply Netlist with NAND and DRAM in the same manner as it had done before. SUF 52. Samsung's sales to Netlist have continued from 2001 to the present day, according to

the same course of dealing that existed before the JDLA, after the JDLA, and that continues to this day even after Netlist purported to terminate the JDLA and filed this lawsuit. SUF 53. This consistent course of dealing before and after the JDLA provides strong evidence Netlist understood the JDLA did not guarantee it access to all of the Samsung product it requested, but only the product Samsung actually agreed to sell based on the parties' historical course of dealing. SUF 54; *Studley v. Nat'l Fuel Gas Supply Corp.*, 107 A.D.2d 122, 128 (1985) (following "the established rule that the practical construction put upon a contract by the parties in performing under it is of great importance in determining its meaning").

Based on their prior course of dealing and industry norms, Netlist and Samsung operated using advance forecasts, supply inquiries, purchase orders, limited allocations and backlogs. SUF 52-56. Prior to 2015, Samsung often could not supply Netlist's requested amount or any amounts. SUF 53. And this practice continued after the JDLA. SUF 49. For example, on April 6, 2016, less than six months after the JDLA, Raymond Jiang of Netlist wrote to Neal Knuth of SSI in hopes of buying more NAND: "I know it's insane but want to see try our luck...I know it's not something easy or possible, but want to give it try. Please let me know if any of these can be found." SUF 49 at NL039163-64. Knuth responded the next day: "No bid." *Id.* To provide just one more example of many, on December 14, 2016, Jiang asked Knuth: "How possible is it for you to get us 2100pcs of this DDR … DRAM?" Knuth replied: "Straight from SEC: we cannot support. Securing any additional stock and Product Allocation is not possible." SUF 49 at NL024952.

The fact Samsung could not fulfill all of Netlist's orders was not a breach of the agreement. As both Chuck Hong and Paik Ki Hong admitted as Netlist's 30(b)(6) witnesses and in their prior declarations, Samsung's performance was satisfactory in 2015, 2016 and into 2017. SUF 48. But in those same years, the order history and their testimony establishes Samsung regularly did not fulfill orders. SUF 49. Chuck Hong admitted this was "reality" and that allocations in the fixed supply DRAM/NAND

industry were "industry norms." SUF 49 (Exh. 7, Chuck Hong Dep.). Given the industry involves a commoditized product with limited supply, Netlist understood it could not get all chips it requested.[5]

What this evidence further shows is Netlist never believed the JDLA contained a supply component on anything beyond the NVDIMM-P product that had not yet been developed. Netlist's course of conduct with Samsung was established for the 15 years prior to the JDLA and continued even after Netlist purported to terminate the JDLA in 2020. SUF 53. Indeed, Samsung continues to supply chips to Netlist to the present day based on this very same protocol. *Id.*

Netlist's use of purchase orders both before and after the JDLA's execution provides another basis to dismiss Netlist's interpretation of Section 6.2. By their very terms, Netlist's purchase orders indicate they constitute new "offers" and supersede any prior agreements or discussions with Samsung, such as forecasts and informal e-mail or oral requests to purchase product. SUF 51, 57. Thus, Netlist cannot argue Samsung was obligated to supply any product beyond the amount reflected in Netlist's purchase orders, regardless of any earlier requests. *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1195 (S.D.N.Y. 1996) ("Prior agreements and negotiations are deemed to merge and be subsumed in a later written agreement.").

The end result is that Netlist purchased a substantial amount of NAND and DRAM from Samsung in each quarter from November 2015 to the present, although the amounts varied over time. SUF 58. Accordingly, Netlist has no evidence of breach

---

[5]   What Netlist and Chuck Hong appear to be complaining about is that the allocation to Netlist changed after Hong's close friend, YH Jun, who was President of Samsung's memory division, moved to a separate company in 2017. Choi Decl. Exh. 7 at 119:6-120:7. Up until that point, Chuck Hong had been able to use this relationship to "push through" certain orders and obtain red-carpet treatment. *Id.* Such treatment ended in 2017 when his friend moved. *Id.* Thereafter, Samsung continued to supply chips but not with the same level of attention that Netlist had previously enjoyed. SUF 52. That is not a breach of contract. The JDLA and the purchase orders – and not Chuck Hong's personal friendships – govern the parties' obligations.

of Section 6.2.

**g. Netlist Did Not Fully Perform Its Obligations**

Samsung is also entitled to summary judgment because Netlist did not fully perform its obligations under the JDLA, and thus cannot prevail on its breach of contract claim. *Cty. of Jefferson v. Onondaga Dev., LLC*, 59 N.Y.S.3d 203, 206 (2017) ("[O]ne of the essential elements of a cause of action for breach of contract is the performance of its obligations by the party asserting the cause of action for breach[.]")

Samsung engineer Indong Kim testified Netlist abandoned the NVDIMM-P standardization project that was a core component of the joint development work under the JDLA at some point before 2017. SUF 60. There was no written amendment authorizing Netlist to do so. And Chuck Hong testified that, in 2017, Netlist went its "separate ways" from Samsung and, instead of continuing work under the NVDIMM-P protocol, used the foundational development work and moved to a different product without Samsung. *Id.*

Even under Netlist's erroneous theory that the JDLA applied to product outside of the joint development project, Netlist also failed to perform by cancelling purchase orders. Chuck Hong testified it would be a breach of the JDLA if a purchase order was cancelled. SUF 64. While Netlist contends Samsung cancelled orders improperly, Netlist was forced to admit during depositions that it too cancelled such orders, as it did with the eMMC purchase orders in the second half of 2017. *Id.* The evidence establishes the eMMC orders at issue were a significant ask by Netlist as Samsung did not normally sell eMMC to customers like Netlist. SUF 61-62. Samsung allocated a significant amount of eMMC product to Netlist for 2017, much of which had previously been allocated to another customer. SUF 63. After prices for eMMC dropped unexpectedly in the second half of 2017, Netlist cancelled half of its eMMC order. SUF 64. If Netlist contends the failure to fulfill all purchase orders is a breach of the JDLA, Netlist's own cancellation of any purchase orders must also be one. Having failed to perform under its own interpretation of the JDLA, Netlist cannot prevail on

its claims for breach.

**h. Netlist Should Be Estopped From Arguing Its Patent Licenses Provide Consideration For A Broader Supply Obligation**

Netlist argued in its prior declarations to this Court that during the course of the JDLA negotiations, it agreed to accept less monetary consideration in return for a broader supply promise, and that the consideration it provided in return was a broad license to its patents. Dkt. 89-21 at ¶¶ 4-5. But this argument is directly contrary to Netlist's assertion to the Korean tax tribunal that the license granted in the JDLA was limited solely to the joint development project, which the tribunal relied upon in ruling for Netlist. SUF 65. Accordingly, Netlist should be estopped from making that argument in this case.

Under the equitable doctrine of judicial estoppel, a litigant is barred from obtaining an advantage by asserting a position in a case, and then later seeking to obtain an advantage by taking a clearly inconsistent position. *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600–01 (9th Cir. 1996); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001)(doctrine provides for the orderly administration of justice and dignity of proceedings).

The doctrine of judicial estoppel applies to statements made in prior administrative proceedings. *Rissetto*, 94 F.3d at 604, 605; *Churchill v. Winter Chevrolet*, No. C-04-0489 JCS, 2005 WL 281170, at *8 (N.D. Cal. Feb. 4, 2005). The doctrine also applies to foreign proceedings. *GT Beverage Co. LLC v. Coca Cola Co.*, No. SACV1000209JVSRNBX, 2010 WL 11595832, at *5 (C.D. Cal. Aug. 2, 2010) (discussing favorable authority on application to foreign proceedings); *Rapture Shipping, Ltd. v. Allround Fuel Trading B.V.*, 350 F. Supp. 2d 369, 374 (S.D.N.Y. 2004) (plaintiff estopped based on statements made in a Dutch Court).

"Federal law governs the application of judicial estoppel in federal courts." *Johnson v. Oregon*, 141 F.3d 1361, 1364 (9th Cir. 1998). Courts generally consider three factors when deciding whether to apply the doctrine. *New Hampshire v. Maine*, 532 U.S.

742, 743 (2001). First, courts determine whether "a party's later position [is] clearly inconsistent with its earlier position." *Id.* Second, courts consider whether a litigant successfully persuaded a court to accept one position, so that subsequent judicial acceptance of an incompatible position "would create the perception that either the first or the second court was misled." *Id.* Finally, courts take into account "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.*

Here, the inconsistency in Netlist's position is clear. In this case, Netlist asserts that its grant of patent licenses provides sufficient consideration for a long term supply obligation. In stark contrast, Netlist argued in its Korean tax appeal that: "the granting of cross licenses under the [JDLA] is limited to the joint research and development, and hence in cases where Samsung Electronics uses intellectual property rights of [Netlist] in the course of its own research and development, it does not constitute something that can be subject to the [JDLA]." SUF 65. Second, the Korean tax tribunal relied on Netlist's position that the license was limited in making its ruling. SUF 66. And third, Samsung would be prejudiced by Netlist's assertion of inconsistent positions here. On the one hand, Netlist is trying to use the Korean tax court decision to show that Samsung's withholding was improper. At the same time, Netlist asserts that its patent licensing provided valuable consideration for a long-term supply agreement.

Accordingly, Netlist should be estopped from asserting a position in this case that is inconsistent with its position in the Korean tax appeal.[6]

**2. Section 6.2 Is Too Indefinite To Be A Valid Supply Contract.**

As shown, the express terms and extrinsic evidence show that Section 6.2 is limited to the supply and pricing of DRAM and NAND for joint development. If the

---

[6] Samsung has consistently taken the position that the main purpose of the JDLA was patent licensing, which is why Samsung deducted withholding tax as a royalty. While Samsung agrees the licenses are broad, Netlist should not be allowed to argue one thing to its advantage in Korea and the direct opposite here.

Court were to find this term ambiguous on this point, Samsung would still be entitled to summary judgment because Section 6.2 lacks a definite or ascertainable quantity term. Netlist posits several theories as to how the provision could be sufficiently definite, either as (1) a contract to supply at request; (2) a requirements contract; or (3) an options contract. None of these proffered theories provides a sufficiently definite quantity term that could make Section 6.2 an enforceable supply contract.[7]

**a. The Phrase "At Netlist's Request" Is Not A Definite Quantity Term**

First, the phrase "at Netlist's request" in Section 6.2 is too indefinite to state a valid quantity term. The phrase neither states a definite quantity nor provides a fixed means to determine a volume of product. *Mar-Jon Mach. & Tool Co. v. Eastman Kodak Co.*, 534 N.Y.S.2d 47, 48 (1988) (contract of sale must be definite as to the quantity of the goods sold, or provide fixed means by which the quantities can be determined).[8] Rather, Netlist's theory is that it can request any quantity it wants, subject only to the implied covenant of good faith and fair dealing that would prohibit Netlist from requesting products beyond what it could possibly need for its channel distribution. But even as cabined by the implied covenant, there is no enforceable contract, as there was no meeting of the minds as to the quantity of product that Samsung would supply.

Nor is there any basis for the Court to imply a missing quantity term where none exists. *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include"). That is especially true where,

---

[7] Samsung does not ask the Court infer the JDLA is any of these species of contract. Rather, after conferring with Netlist to understand its theories, Samsung shows why each theory is insufficient to create a binding supply obligation.

[8] Contrary to Netlist's argument, this is not an issue Samsung must raise as an affirmative defense under the Statute of Frauds, but rather an element of Netlist's breach of contract claim – namely to prove the existence of a valid enforceable contract. There is no evidence of any agreement (oral or written) as to quantity.

as here, the parties are sophisticated companies that could be expected to have negotiated a quantity term had they chosen to do so. *Ashwood Capital, Inv. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (2012). Moreover, there is no objective method for the Court to imply a quantity term here.

**b. The JDLA Is Not A Requirements Contract**

Second, Section 6.2 cannot be a valid requirements contract. The JDLA does not contain any promise by Samsung to supply products to meet Netlist's requirements or needs, and Netlist has no obligation to purchase any quantity of product from Samsung whatsoever. There can be no requirements contract without a commitment from Netlist to buy exclusively from Samsung, or at the very least, a commitment to buy a minimum quantity or percentage of its requirements exclusively from Samsung. *Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187, 192 n. 3 (E.D.N.Y. 1986) ("Absent [the promise of exclusivity], the agreement is an indefinite quantities contract, where without more, the buyer's promise is illusory and the contract unenforceable against the seller."); *Corning Inc. v. VWR Int'l, Inc.*, No. 05 CV 6532 CJS, 2007 WL 841780, at *6 (W.D.N.Y. Mar. 16, 2007) (requirements contract is valid where buyer must purchase its requirements of product exclusively from seller up to a certain quantity); *CSL Behring, LLC v. Bayer Healthcare, LLC*, 2019 WL 4451368 at *2 (D. Del. Sep. 17, 2019) (exclusivity required under New York law).

Given the express language in Section 6.4 disclaiming any obligation to purchase any amount of product at all, the Court may not imply terms necessary to render the contract as an enforceable requirements contract. *Contrast Edison Elec. v. Thacher*, 229 N.Y. 172, 176 (1920) (where the court implied terms based on the clear intent of the parties to form a requirements contract). Thus, the JDLA cannot be interpreted as a requirements contract to satisfy the missing quantity term.

**c. The JDLA Is Not A Valid Options Contract**

Nor can the JDLA be construed as a valid options contract; it lacks a necessary quantity term. It is true, as the Court noted, that an options contract does not

necessarily require exclusivity. However, that does not mean that an options contract is exempt from the rule that any sales contract must have a definite or ascertainable quantity term to create an enforceable obligation. *See* N.Y.U.C.C. § 2-311 (an option contract must still be "otherwise sufficiently definite"); *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 590-91 (1999) (an option contract requires definiteness). While an option to buy "all" or "a stated minimum" of a buyer's requirements could supply the requisite definiteness, no such quantity term is found in the JDLA. *Heyman Cohen & Sons v. M. Lurie Woolen Co.*, 232 N.Y. 112, 115 (1921) (option contract not invalid for indefinite quantity term because "[t]he privilege to order more is coupled with the promise and obligation to accept a stated minimum").

The holding of the Seventh Circuit in *Miller v. McLean Cnty. Unit Dist. No. 5* (*In re Mod. Dairy of Champaign, Inc.)*, 171 F.3d 1106 (7th Cir. 1999), is not to the contrary. The court held in that case that given the absence of any evidence the schools were obligated to buy all of their milk requirements from the dairy, the dairy had no obligation to supply the schools' requirements. *Id.,* at 1110. While the court suggests in dicta that the schools could have argued the contracts were a buyer's option, they did not do so. *Id.,* at 1109. Thus, whether the contract was a valid buyer's option was neither litigated nor adjudicated in that case.

The opinion of New York's Court of Appeals in *Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665 (2001), also is inapposite. Because that case involved a sublease with an option to purchase a single apartment at a stated price, there was no issue about a definite quantity. *Id.,* at 667. Consistent with the case law governing sales contracts that require a definite quantity, a valid options contract still requires a specific quantity – which does not exist in the JDLA.

### C. Samsung Reasonably Deducted Withholding Taxes From Payment To Netlist And Cooperated With Netlist's Efforts To Obtain A Refund

Netlist's second claim for breach of contract alleges Samsung improperly deducted withholding taxes from the fee paid to Netlist under Section 3.1, and failed to

cooperate with Netlist's efforts to seek a refund from the Korean tax authorities. Neither contention is supported by evidence sufficient to withstand a Rule 56 motion. The JDLA provides Samsung may deduct applicable withholding taxes from payments due Netlist under the agreement, and that is what Samsung did. Section 3.1 sets forth Netlist's $8 million "NRE fee." SUF 17. Section 3.2 acknowledges Samsung may be required to deduct withholding taxes from this payment: "To the extent that any withholding taxes are required by applicable law for the payment set forth in this Agreement, ***Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea*** . . . . SUF 68.

In that regard, on November 5, 2015, shortly before the JDLA was signed, Samsung sent Netlist a tax form for Netlist to apply for a reduced tax rate as a foreign corporation. SUF 69. The form indicated that the tax rate on royalties pursuant to a treaty with the US was 16.5%. SUF 70. Sasaki reviewed the form, signed it, and returned it to Netlist after having consulted with tax professionals of Netlist's choosing. SUF 71. As Netlist's CFO, Sasaki had the authority to approve and sign the form, and consulted with a tax expert to ensure it was appropriate. SUF 72.

Immediately after the JDLA was signed, Samsung made the contractually required cash payment to Netlist of $8 million, less 16.5% deducted for withholding taxes, and paid that amount to the tax authority. SUF 73. Samsung did so because it considered the $8 million as consideration for Netlist's grant of patent licenses, and Korean law requires withholding of payments on such royalties.[9] SUF 74.

Second, Samsung did in fact cooperate with Netlist. What Samsung allegedly refused to do was "cooperate" the way (or how) Netlist wanted. Samsung had numerous communications with Netlist and PWC, Netlist's tax consultant, shared

---

[9] The Court correctly characterized Netlist's theory as alleging that "the NRE fee was not properly taxable," even if the withholding was lawful. (Dkt. 120 at 6.) But there is no evidence Samsung was not required to withhold taxes, even if such taxes ultimately were refunded.

drafts of what Samsung proposed to submit to the tax authorities, and even asked Netlist and PWC to propose language that they wanted Samsung to use. SUF 75. PWC even thanked Samsung for its cooperation, showing that cooperation is not what Netlist complains of here. SUF 76. What Netlist wanted was for Samsung to further Netlist's economic interests and deny that the $8 million was for patent royalties. SUF 77. Samsung had no contractual duty to provide such "cooperation" and could not do so based on its good faith belief.

Third, Netlist suffered no injury from Samsung's alleged failure to cooperate. Netlist won its tax appeal, and received a full refund plus interest. SUF 78. While Netlist did pay consultants and lawyers to obtain that result, there is no evidence that they would not have had to pay the same consultants' and lawyers' fees to obtain a refund even if Samsung had provided the kind of "cooperation" that Netlist wanted.

**D. Netlist Is Barred From Recovering Consequential Damages**

The parties to the JDLA expressly waived any claim to consequential damages for breach of the JDLA.[10] There is no dispute Netlist seeks damages including lost revenues and lost profits from allegedly lost business opportunities with third party customers. SUF 80. Such claims of lost profits and lost revenues are consequential damages. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) ("Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements.").

Netlist's claimed damages for lost revenues and lost profits are barred by Section 12.5 of the JDLA. SUF 81. Such express waivers of consequential damages are enforceable under New York law. *International Gateway Exchange, LLC v. Western Union*

[10] The Court denied Samsung's motion for judgment on the pleadings on this issue, stating that a Rule 12 "motion is not the proper vehicle for seeking adjudication of this issue." (DE 120 at 5.) Summary judgment is the proper vehicle for the Court to decide this issue. *United States, for the Use of Integrated Energy, LLC v. Siemens Gov't Techs., Inc.*, No. SACV1501534JVSDFMX, 2017 WL 10562969, at *5-6 (C.D. Cal. May 19, 2017) (partial summary judgment as to consequential damages barred by contractual waiver).

*Financial Services, Inc.*, 333 F. Supp. 2d 131, 149 (S.D.N.Y. 2004). This is particularly true where the contract is between sophisticated businesses, removing any potential concern about the waiver being unconscionable. *Scott v. Palermo*, 233 A.D.2d 869, 872 (1998).

There is no evidence of the kind of wrongful conduct that would be necessary for Netlist to avoid the consequences of this waiver. This would require evidence of "truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 438–39 (1994); *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554 (1992) (conduct necessary "to pierce an agreed-upon limitation of liability in a commercial contract, must 'smack[ ] of intentional wrongdoing.'"). Thus, the Court should grant partial summary judgment as to the issue of consequential damages.

**E. Netlist Has No Right To Terminate the JDLA**

Netlist seeks a declaration the JDLA be terminated based on the alleged breaches, but the undisputed facts show there was no supply obligation as alleged by Netlist and therefore no material breach of the JDLA. And Samsung supplied NAND and DRAM to Netlist every year following the JDLA. Netlist also received a full refund with interest, so the tax withholding claim could not possibly constitute a *material* breach. *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (for a breach to be material, it must "go to the root of the agreement between the parties.") Samsung is entitled to summary judgment on the declaratory relief claim.

**1. Netlist Waived Any Right To Terminate The JDLA**

Netlist long ago waived any right to terminate the contract based on its claims.[11] *Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.*, 872 F. Supp. 103, 110 (S.D.N.Y. 1995) (termination on the basis of material breaches "must be sought promptly" or it is deemed waived). Netlist executives internally discussed whether to provide notice of

[11] The Court's ruling on the MJOP addressed the election of remedies defense but not the separate defense of waiver. (DE 120 at 7.)

breach over the tax withholding dispute in March 4, 2016, but decided not to send a breach notice because it wanted to reap the benefits of its business relationship with Samsung. SUF 84. And as to the supply claim, Netlist asserts that "starting as early as the second quarter of 2017, Samsung began to refuse and/or cancel orders from Netlist. SUF 85. Instead, Netlist waited to provide notice of alleged breach until May 27, 2020, more than *four years* after it first considered doing so. SUF 86. Not coincidentally, the $15 million note is due December 31, 2021. SUF 87.

While the JDLA includes a "no waiver" clause, even broad "no waiver" clauses may themselves be waived if circumstances warrant, as they do here. *Lee v. Wright*, 108 A.D.2d 678, 680, 485 N.Y.S.2d 543, 544 (1985) ("Contrary to its conclusion that the non-waiver clause in the lease precluded any finding of waiver, it has long been the rule that parties may waive a "no-waiver" clause."). Netlist intentionally delayed suing for years, all the while benefiting from its business relationship with Samsung.

Netlist cannot have it both ways. Either the alleged breaches were not material and there is no right to terminate. Or if there were a material breach, then Netlist waived its claim by acquiescing in the alleged breaches since early 2016 (as to the tax withholding claim) and the first half of 2017 (as to the supply claim). Whether based on waiver (or other concepts such as laches or election of remedies), that is far too long for Netlist to have sat on its rights before trying to terminate the contract.

## III. CONCLUSION

For all these reasons, Samsung respectfully requests that the Court grant it summary judgment or, in the alternative, partial summary judgment.

DATED: October 21, 2021

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: /s/ Ekwan E. Rhow

Ekwan E. Rhow
Attorneys for Defendant Samsung Electronics Co., Ltd.

# Exhibit 4

Ekwan E. Rhow - State Bar No. 174604
erhow@birdmarella.com
Marc E. Masters - State Bar No. 208375
mmasters@birdmarella.com
Kate S. Shin - State Bar No. 279867
kshin@birdmarella.com
Christopher J. Lee - State Bar No. 322140
clee@birdmarella.com
Jong-min Choi - State Bar No. 329474
jmchoi@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Samsung Electronics Co., Ltd.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

NETLIST INC., a Delaware corporation,

Plaintiff,

vs.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,,

Defendant.

CASE NO. 8:20-cv-00993-MCS-ADS

**DEFENDANT SAMSUNG ELECTRONICS CO., LTD.'S [PROPOSED] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

[*Filed Concurrently with Notice of Motion and Motion for Summary Judgment or in the Alternative, Partial Summary Judgment; Declaration of Joyce J. Choi; [Proposed] Judgment*]

Date: September 20, 2021
Time: 9:00 a.m.
Crtrm.: 7C

Assigned to Hon. Mark C. Scarsi
Courtroom 7C

3783.16 3742471.2
1
DEFENDANT'S [PROPOSED] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW ISO MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

Case 8:20-cv-00993-MCS-ADS Document 154-2 Filed 08/09/21 Page 7 of 136 Page ID #: 5518

| | |
|---|---|
| Netlist. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." Section 6.2, the parallel provision, states: "Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (i.e., among customers purchasing similar volumes of similar products)." | |
| 21. Samsung's supply obligations would only arise if and to the extent that the NVDIMM-P product was commercialized but this never occurred. | Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 80:13-23, 92:4-12, 109:9-110:1, 116:3-9; ¶ 22, Exh. 21 at NL069668-69. |

**d. The Negotiating History Shows That Section 6.2 Is Limited To Joint Development**

| Defendant's Undisputed Material Facts | Supporting Evidence |
|---|---|
| 22. Netlist's first proposal to Samsung in April 2015 focused on the cash consideration, and did not mention a long term supply agreement. (" Q Now, at least on this proposal, Netlist didn't list supply as a component of the deal; correct? A Yes, it's not here.") | Choi Decl. ¶ 18, Exh. 17 at pp. 2-4; ¶ 18, Exh. 17 at NL107807; ¶ 8, Exh. 7 at 51:3-52:18. |
| 23. When Netlist sent Samsung the first | Choi Decl. ¶ 23, Exh. 22; ¶ 24, Exh. 23 |

3783.16 3742471.2

7

DEFENDANT'S [PROPOSED] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW ISO MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

8. Netlist is precluded from recovering lost profits, lost revenues from lost business opportunities, or any other consequential damages by Section 12.5 of the JDLA. Express waivers of consequential damages are enforceable under New York law. *International Gateway Exchange, LLC v. Western Union Financial Services, Inc.*, 333 F. Supp. 2d 131, 149 (S.D.N.Y. 2004).

9. To avoid the waiver of consequential damages, Netlist would have to provide evidence of "truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 438–39 (1994). No such evidence is presented here.

10. Netlist may not terminate the JDLA because it cannot prove a material breach.

11. Netlist waived any right to terminate the JDLA by waiting more than four years after the alleged breach to provide notice of termination. *Dun & Bradstreet Corp. v. Harpercollins Publishers, Inc.*, 872 F. Supp. 103, 110 (S.D.N.Y. 1995).

12. Netlist waived the "no waiver" provision in Section of the JDLA by continuing to accept the benefits of the contract for years without seeking termination. *TSS–Seedman's, Inc. v. Elota Realty Co.*, 72 N.Y.2d 1024, 1027 (1988).

DATED: August 17, 2021

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: */s/ Ekwan E. Rhow*
Ekwan E. Rhow
Attorneys for Defendant Samsung Electronics Co., Ltd.

# Exhibit 5

EKWAN E. RHOW (SB 174604)
erhow@birdmarella.com
MARC E. MASTERS (SB 208375)
mmasters@birdmarella.com
DAVID I. HURWITZ (SB 174632)
dhurwitz@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

MARC F. FEINSTEIN (SB 158901)
mfeinstein@omm.com
JOSEPH R. O'CONNOR (SB 274421)
joconnor@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

MICHAEL G. YODER (SB 83059)
myoder@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, Suite 1700
Newport Beach, California 92660
Telephone: (949) 823-6900
Facsimile: (949) 823-6994

Attorneys for Defendant Samsung Electronics Co., Ltd.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

NETLIST INC., a Delaware corporation,

Plaintiff,

vs.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,

Defendant.

CASE NO. 8:20-cv-00993-MCS-ADS

**DEFENDANT SAMSUNG'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF THE COURT'S ORDER RE: MOTIONS FOR SUMMARY JUDGMENT GRANTING SUMMARY JUDGMENT ON THIRD CLAIM FOR DECLARATORY RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Date: November 22, 2021
Time: 9:00 a.m.
Crtrm.: 7C

Assigned to Hon. Mark C. Scarsi
Courtroom 7C

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on November 22, 2021, at 9:00 A.M., or as soon thereafter as this matter may be heard in the above-entitled Court, before the Honorable Mark C. Scarsi, United States District Judge for the Central District of California, Western Division, located at 350 W. 1st Street, Los Angeles, CA 90012, in Courtroom 7C, Defendant Samsung Electronics Co., Ltd. ("Samsung") will, and hereby does, move the Court pursuant to Rule 54(b), Local Rule 7-18, and the Court's inherent authority for an order reconsidering and reversing this Court's Order re: Motions for Summary Judgment and Related Applications (Dkt. 186, filed provisionally under seal on October 14, 2021 ("Order"), to the extent it grants summary judgment in favor of Plaintiff Netlist Inc. ("Netlist") on its third claim for relief, for declaratory relief.[1] This motion does not seek reconsideration of the Order to the extent it grants summary judgment in favor of Netlist on is first claim for relief, for breach of the supply obligation, and its second claim for relief, for failing to pay the full NRE fees. Under Federal Rule of Civil Procedure 54(b) and Local Rule 7-18, reconsideration of an order is appropriate where the moving party demonstrates "a manifest showing of a failure to consider material facts presented to the Court before such decision." C.D. Cal. L.R. 7-18. Here, the Court's Order reflects that, in ruling on Netlist's summary judgment motion as to the third claim for relief, the Court did not consider material facts demonstrating that there are genuine issues of material fact with respect to (i) whether the alleged breaches of the Joint Development and License Agreement ("JDLA") were material, (ii) whether Netlist satisfied the contractual conditions precedent to terminating the JDLA, and (iii) whether Netlist waived its right to terminate the JDLA.

This Motion is based on this Notice, the accompanying Memorandum of

[1] On October 21, 2021, Netlist and Samsung jointly reported to the Court that they do not request that any portion of the Order be sealed. (Dkt. 189.)

Points and Authorities, all pleadings and records on file in this action, and such other evidence and argument as may be presented to the Court.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on October 18, 2022.

DATED: October 25, 2021 O'MELVENY & MYERS LLP

By: /s/ *Michael G. Yoder*
Michael G. Yoder
Attorneys for Defendant Samsung Electronics Co., Ltd.

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES .......... 8

I. INTRODUCTION .......... 8

II. THE COURT'S SUMMARY JUDGMENT ORDER .......... 11

III. LEGAL STANDARD .......... 11

IV. THE COURT FAILED TO CONSIDER MATERIAL FACTS SHOWING TRIABLE ISSUES AS TO WHETHER SAMSUNG'S ALLEGED BREACHES WERE MATERIAL .......... 12

A. Materiality Is a Multi-Factor Test That Almost Always Presents Questions of Fact for the Jury .......... 12

B. The Court Failed to Consider Material Facts Showing Triable Issues as to Whether the Withholding of Taxes Was a Material Breach of the JDLA .......... 15

C. The Court Failed to Consider Material Facts Showing Triable Issues as to Whether Samsung's Purported Breach of the Supply Provision Was Material .......... 17

V. THE COURT FAILED TO CONSIDER MATERIAL FACTS SHOWING GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER NETLIST SATISFIED THE CONDITIONS PRECEDENT TO TERMINATING THE JDLA .......... 21

VI. THE COURT FAILED TO CONSIDER MATERIAL FACTS SHOWING TRIABLE ISSUES AS TO WHETHER NETLIST WAIVED ITS RIGHT TO TERMINATE THE JDLA .......... 25

VII. CONCLUSION .......... 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Water Tech v. Amiad USA*, 2019 WL 4805330 (S.D.N.Y. 2019)....14

*ARP Films, Inc. v Marvel Entertainment Group, Inc.*, 952 F2d 643 (2d Cir. 1991) ....15

*Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461 (9th Cir. 1989) ....11

*Bear, Stearns Funding, Inc. v Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283 (S.D.N.Y. 2005) ....passim

*City of Amsterdam Indus. Dev. Agency v. Safari Enterprises Inc.*, 279 A.D.2d 865 (3d Dept. 2001) ....22

*Conant v. Alto 53, LLC*, 21 Misc. 3d 1147(A), 880 N.Y.S.2d 223 (Sup. Ct. 2008)....26

*Cristobal v. Siegel*, 26 F.3d 1488 (9th Cir. 1994) ....14, 24

*Crowley v. Epicept Corp.*, 547 Fed. Appx. 844 (9th Cir 2013)....14

*Elmhurst Dairy, Inc. v Bartlett Dairy, Inc.*, 97 A.D.3d 781 (2d Dept 2012) ....21

*F. Garofalo Elec. Co., Inc. v New York Univ.*, 300 A.D.2d 186 (1st Dept 2002) ....14

*Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt.*, L.P., 7 N.Y.3d 96 (2006) ....27

*In re 4Kids Entertainment*, 463 B.R. 610 (Bankr. S.D.N.Y 2011)....22

*In re Gotham Silver Co.*, 91 F. Supp. 520 (S.D.N.Y.1950) ....22

*Ixe Banco, S.A. v. MBNA America Bank*, 2009 WL 3124219 (S.D.N.Y. 2009)....24

## TABLE OF AUTHORITIES

Page(s)

*Kamco Supply Corp. v. On the Right Track, LLC*,
149 A.D.3d 275, 49 N.Y.S.3d 721 (2017) .......... 27

*KLS Diversified Master Fund, L.P. v McDevitt*,
507 F. Supp. 3d 508 (S.D.N.Y. 2020) .......... 16

*Kuhbier v McCartney, Verrino & Rosenberry Vested Producer Plan*,
239 F. Supp. 3d 710 (S.D.N.Y. 2017) .......... 14, 18

*Long Is. Med. & Gastroenterology Assoc., P.C. v Mocha Realty Assoc., LLC*,
191 A.D.3d 857 (2d Dept 2021) .......... 27

*Macarthur Properties I, LLC v. Galbraith*,
2018 WL 3412830 (N.Y. Sup. Ct. July 13, 2018) .......... 26

*Merrill Lynch & Co. Inc. v Allegheny Energy, Inc*.,
500 F.3d 171 (2d Cir. 2007) .......... 14

*Metro. Life Ins. Co. v Trujillo*,
2020 WL 2838528 (C.D. Cal. June 1, 2020) .......... 11

*Newmaker v. City of Fortuna*,
842 F.3d 1108 (9th Cir 2016) .......... 15

*Orange County Water Dist. v Unocal Corp*.,
2018 WL 6133719 (C.D. Cal. Apr. 10, 2018) .......... 12

*Pegasus Satellite Tel., Inc. v DirecTV, Inc*.,
318 F. Supp. 2d 968 (C.D. Cal. 2004) .......... 12

*Process America Inc. v. Cynergy Holdings, LLC*,
839 F.3d 125 (2d Cir. 2016) .......... 13, 15, 16, 18

*RES Exhibit Services, LLC v. Genesis Vision, Inc*.,
155 A.D.3d 1515 (4th Dept 2017) .......... 19

*Septembertide Publishing v. Stein and Day, Inc*.,
884 F.2d 675 (2d Cir. 1989) .......... 15, 16, 19

*Stassa v Stassa*,
123 A.D.3d 804 (2d Dept. 201) .......... 26, 27, 28

*Taub v Marchesi di Barolo S.p.A*.,
480 Fed. App'x 643 (2d Cir. 2012) .......... 15

Case 8:20-cv-00593-GW-JDE Document 210 Filed 11/20/21 Page 7 of 38 Page ID #:11838

TABLE OF AUTHORITIES

Page(s)

*Ulla-Maija, Inc. v Kivimaki*,
2005 WL 2429490 (S.D.N.Y. Sept. 30, 2005) ........ 22

*United States v. Desert Gold Mining Co.*,
433 F.2d 713 (9th Cir. 1970) ........ 11

*Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*,
373 F.3d 241 (2d Cir 2004) ........ 14

**Rules**

C.D. Cal. L.R. 7-18 ........ 8, 12

Fed. R. Civ. Pro. 54(b) ........ 8

Fed. R. Civ. Pro. 56(a) ........ 13, 24

Case 8:20-cv-00993-AG-ADS Document 210 Filed 11/22/21 Page 9 of 38 Page ID #:11839

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

In its October 14, 2021 Order Re: Motions for Summary Judgment and Related Applications (the "Order"), the Court, *inter alia*, granted summary judgment in favor of Netlist on its third claim for relief, seeking a declaratory judgment that Netlist properly terminated the parties' Joint Development and License Agreement ("JDLA"). By this Motion, Samsung requests that the Court, pursuant to its inherent authority, Federal Rule of Civil Procedure 54(b), and Local Rule 7-18, reconsider and reverse this portion of the Order on the grounds that the Court manifestly failed to consider material facts demonstrating genuine issues of material fact as to whether Netlist's termination of the JDLA was effective. Fed R. Civ. Pro. 54(b); C.D. Cal. L.R. 7-18.[2]

***First***, the Court failed to consider material facts showing triable issues with respect to whether Samsung's alleged breaches of the JDLA were material. Under New York law, which governs here, whether a contract breach is material is determined based upon a multi-factor test. It was Netlist's burden to adduce evidence showing no triable issue as to whether the alleged breaches were material, but in its briefs in support of its motion for partial summary judgment, Netlist failed to discuss any of the relevant factors under this test. Not surprisingly, therefore, the Court failed to address any of these factors in its Order, including the impact of the claimed breaches on Netlist relative to the overall value of the agreement, how termination would result in a forfeiture of Samsung's valuable patent license, and whether the behavior of Samsung comported with standards of good faith and fair dealing. Had the Court considered these factors, drawing all reasonable inferences

[2] Although Samsung disagrees with the Court's grant of partial summary judgment in favor of Netlist on its first and second claims for relief, for breach of the supply and tax withholding terms of the JDLA, Samsung does not seek reconsideration of those rulings.

in favor of Samsung as the non-moving party, the Court would have had to conclude there are genuine issues of material fact as to whether Samsung's alleged breaches were material. Materiality is almost always an issue for the jury, and this case is no different.

***Second,*** the Court failed to consider material facts showing triable issues with respect to whether Netlist met its burden of proving that it satisfied the contractual conditions precedent to terminating the JDLA. The termination provision of the JDLA—section 13.2—expressly conditions a party's right to terminate on its giving notice of a material breach and allowing 30 days to cure. A party cannot satisfy this condition if it intentionally delays giving notice of a breach and fails to identify the specific instances of breach or describe how to cure them in the notice, and thereby denies the other party a reasonable opportunity to cure. But that is precisely what Netlist did here. Netlist waited until May 2020 to notice numerous breaches of section 6.2 of the JDLA that allegedly began in May 2017, when Netlist claims Samsung failed to supply NAND and DRAM products upon Netlist's request causing Netlist to incur losses by having to pay a higher price to a substitute supplier. In the notice of breach, Netlist did not specifically identify any of the alleged breaches or describe how Samsung could cure them. Had Netlist given timely and informative notice of those alleged breaches when they occurred, Samsung would have had the opportunity to cure by fulfilling the requests before Netlist incurred cover damages.

Netlist similarly failed to meet its burden of showing that it properly terminated the JDLA based on Samsung's withholding of taxes in 2015. The JDLA permitted Samsung to withhold taxes from an $8 million non-recurring engineering ("NRE") fee if required under applicable law, which Samsung did shortly after the agreement was signed. Netlist executives shortly thereafter discussed whether to notify Samsung of their view that this was a breach of the JDLA. But they decided against it, instead deciding to reap the benefits of the JDLA including the potentially

"game changing" joint development project. Netlist then abruptly reversed course five years later and sent formal notice to Samsung claiming that withholding the taxes and failing to cooperate in Netlist's effort to obtain a refund were breaches. But by that time, Netlist was already deep into the process of petitioning the Korean tax authority for a refund, which it then received soon thereafter. At a minimum, disputed issues of material fact exist as to whether, by waiting to give notice until long after the alleged breaches and failing to explain in the notice the cure it was seeking, Netlist failed to satisfy the conditions precedent to terminating the JDLA.

***Third***, the Court failed to consider material facts showing triable issues with respect to whether Netlist waived its right to terminate the JDLA. The Court found the no-waiver clause in the JDLA—section 16.2— essentially dispositive of this question, but failed to consider that the no-waiver clause reasonably can be read as only applying to prospective breaches, not retrospective breaches. In other words, the clause reasonably can be read as saying that if a party fails to assert its rights based on preceding breaches of a contract term, the party does not waive its rights based on subsequent breaches of the same term. The clause cannot be reasonably read as allowing a party to resurrect a past breach and avoid waiver where the party made a calculated decision not to assert the breach and to leave it dormant for an extended period. In addition, the Court failed to consider that, even under a broad interpretation of the no-waiver clause, there are material facts raising a triable issue as to whether the clause was waived, including the fact that Netlist not only waited three plus years after the alleged breaches before seeking to terminate, but Netlist's delay denied Samsung a reasonable opportunity to cure, and during this entire time Netlist continued to accept the benefits of the JDLA including millions of dollars of NAND and DRAM products that Samsung supplied at Netlist's request at competitive prices.

Samsung therefore respectfully asks the Court to reconsider these findings and reverse its grant of partial summary judgment in favor of Netlist on its third

claim for relief.

## II. THE COURT'S SUMMARY JUDGMENT ORDER

On October 14, 2021, the Court issued its order deciding Netlist's and Samsung's cross-motions for summary judgment. (Order, Dkt. 186, filed provisionally under seal on October 14, 2021). In granting partial summary judgment in favor of Netlist on its third claim for relief, which sought a declaratory judgment that Netlist had properly terminated the JDLA, the Court made three critical rulings. First, the Court found that Samsung had materially breached the JDLA by (a) withholding taxes from the NRE fee, and (b) not fulfilling Netlist's "requests" for NAND and DRAM components. (*Id.* at 19:1–27.) Second, the Court found that Netlist had validly terminated the JDLA by complying with the JDLA's termination provision when on May 27, 2020 Netlist notified Samsung of its purported breaches and subsequently sent a notice of termination on July 15, 2020. (*Id.* at 18:12–27.) And third, the Court found that Netlist did not waive its right to terminate the JDLA because the JDLA included a no-waiver provision. (*Id.* at 20:1–24.) The effect of these rulings was a determination as a matter of law that the JDLA was terminated, forfeiting all of Samsung's rights under the JDLA. As discussed below, the Court, in making these findings, manifestly failed to consider material facts demonstrating that genuine issues of material fact are central to all three issues.

## III. LEGAL STANDARD

District courts "have inherent power to modify their interlocutory orders before final judgment." *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989); Fed. R. Civ. P. 54(b). This includes the authority to reconsider an order on a "motion for summary judgment at any time before entry of final judgment." *Metro. Life Ins. Co. v Trujillo*, 2020 WL 2838528, at *2 (C.D. Cal. June 1, 2020) (citing *United States v. Desert Gold Mining Co.*, 433 F.2d 713, 715 (9th Cir. 1970)). Courts may reconsider their orders based on "clear error or [if] the initial decision

Case 8:20-cv-00993-AG-ADS Document 21-10 Filed 11/20/23 Page 103 of 368 PageID #: 11873

was manifestly unjust." *Orange County Water Dist. v Unocal Corp.*, 2018 WL 6133719, at *4 (C.D. Cal. Apr. 10, 2018). In addition, under the Central District's Local Rules, reconsideration is appropriate if the movant makes "a manifest showing of a failure to consider material facts presented to the Court before such decision," C.D. Cal. L.R. 7-18, which includes situations where the Court does not fully address issues previously presented. *Pegasus Satellite Tel., Inc. v DirecTV, Inc.*, 318 F. Supp. 2d 968, 979 (C.D. Cal. 2004) (Because court's summary judgment order "did not fully address [] issues[]," movant had "demonstrated a manifest showing that the Court has failed to consider material facts presented to the court") Here, reconsideration is appropriate for at least three reasons, as discussed below.

## IV. THE COURT FAILED TO CONSIDER MATERIAL FACTS SHOWING TRIABLE ISSUES AS TO WHETHER SAMSUNG'S ALLEGED BREACHES WERE MATERIAL

The Court should reconsider its ruling that, as a matter of law, Samsung's breaches of the JDLA were material. Under controlling New York law, whether a breach is material depends on a number of fact-specific factors, and here, the Court manifestly failed to consider material facts showing that there were triable issues of fact with respect to whether Samsung's alleged breaches of the JDLA—by withholding taxes from the NRE fee in violation of section 3.2 and by not fully meeting certain of Netlist's requests for product in violation of section 6.2—were material.

### A. <u>Materiality Is a Multi-Factor Test That Almost Always Presents Questions of Fact for the Jury</u>

Netlist's third claim for relief seeks a declaration that Netlist "terminated the JDLA pursuant to Section 13.2 and that Samsung's licenses and rights under the agreement have ceased." (First Amend. Compl., Dkt. 23, at 8 ¶(b).) Because the JDLA could only be terminated upon notice of a "material breach," (Order at 18:14–

19, citing JDLA, Dkt. 144-1 § 13.2), Netlist had the burden of showing that there were no genuine disputes of material fact as to whether the claimed breaches of the JDLA were "material." Fed. R. Civ. Pro. 56(a). To make that showing, Netlist was required to satisfy a multi-part, fact-specific test. Specifically, under New York law, materiality turns on "the absolute and relative magnitude of the default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefited under the contract." *Process America Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016).

The case on which the Court relies in its Order—*Bear, Stearns Funding v. Interface Group-Nevada* (Order at 19:2–14)—explains that whether a breach is material turns on five factors:

a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and
e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Bear, Stearns Funding, Inc. v Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 296 (S.D.N.Y. 2005).

Given the fact-intensive nature of these factors, "the determination whether a material breach has occurred is generally a question of fact" that must be resolved by the jury. *Advanced Water Tech v. Amiad USA*, 2019 WL 4805330, at *5

(S.D.N.Y. Sept. 30, 2019).[3] Failure to make an adequate assessment of these materiality factors in deciding a summary judgment motion is reversible error. *Merrill Lynch & Co. Inc. v Allegheny Energy, Inc*., 500 F.3d 171, 187 (2d Cir. 2007) (reversing district court's grant of summary judgment because the court did not conduct "an adequate assessment of the pertinent factors to determine whether the broken warranties amounted to a material breach").[4] The district court may not grant a summary judgment motion "without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir 2004). Moreover, the court should deny a motion for summary judgment if the movant's papers "themselves demonstrate the existence of a material issue of fact." *Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 (9th Cir. 1994).

Here, the Order does not analyze any of the factors going to materiality to determine whether Netlist met its burden. (*See* Order at 19.) Had the Court considered the material facts in the record bearing on the materiality factors, drawing all reasonable inferences in Samsung's favor as the non-moving party,

---

[3] *See also Bear, Stearns Funding, Inc*., 361 F. Supp. 2d at 296 ("The application of each of these elements requires fact-intensive analysis not appropriate for summary disposition."); *F. Garofalo Elec. Co., Inc. v New York Univ.*, 300 A.D.2d 186, 189 (1st Dept 2002) ("The question of whether there has been substantial performance—or a breach—is to be determined, whenever there is any doubt, by the trier of fact."); *Kuhbier v McCartney, Verrino & Rosenberry Vested Producer Plan*, 239 F. Supp. 3d 710, 735 (S.D.N.Y. 2017) ("The determination whether a material breach has occurred is generally a question of fact.").

[4] *Crowley v. Epicept Corp*., 547 Fed. App'x 844, 846 (9th Cir 2013) (reversing district court's grant of summary judgment because whether "Plaintiffs' purported breach was material is a question of fact, making summary judgment improper") (citations omitted); *see also F. Garofalo Elec. Co., Inc*., 300 A.D.2d at 189 ("In the face of such unresolved factual issues [over materiality], it was error for the court to grant NYU's motion for summary judgment on plaintiff's breach of contract cause of action.").

Case 8:20-cv-00993-MCS-ADS Document 210 Filed 11/22/21 Page 16 of 33 Page ID #:11390

*Newmaker v. City of Fortuna*, 842 F.3d 1108, 1111 (9th Cir 2016), the Court would have had to conclude there are genuine issues of material fact.

### B. The Court Failed to Consider Material Facts Showing Triable Issues as to Whether the Withholding of Taxes Was a Material Breach of the JDLA

Under the JDLA, Samsung was required to pay Netlist an $8 million NRE fee, and "to the extent that any withholding taxes are required," the JDLA permitted Samsung to "deduct any applicable withholding taxes due or payable under the laws of Korea in remitting" the payment to Netlist. (Order at 4:3–9, citing JDLA §§ 3.1, 3.2; Samsung's Statement of Genuine Disputes of Material Fact, Dkt. 168-1 ("Samsung SGDF") Nos. 27, 28.) Samsung paid the full NRE fee except $1.32 million (16.5%), which Samsung paid to the Korean tax authority. (Order at 4:12–13.) The Court found that Samsung committed a material breach because Samsung was "not required by applicable law to withhold" (*id.* at 16:7–9) and it is "axiomatic that failure to pay is a material breach of contract." (*Id.* at 19:23–27.) But the mere fact that the tax withholding involved the non-payment of money does not *per se* amount to a material breach under New York's multi-factor test. *Septembertide Publishing v. Stein and Day, Inc.*, 884 F.2d 675, 679 (2d Cir. 1989) (failure to pay final one-third of a royalty payment was "a far cry from a total failure to pay"). Here, Samsung only withheld 16.5% of the NRE fee, and, therefore, even if one puts aside the fact that it was part of a much larger, multi-faceted agreement, the "relative magnitude of the default" was small. *Process America Inc.*, 839 F.3d at 136.[5]

[5] The two cases on which the Court relied are inapplicable because neither involved the payment of incidental taxes as part of a larger agreement. *Taub v Marchesi di Barolo S.p.A.*, 480 Fed. App'x 643, 645 (2d Cir. 2012) (taking an improper set-off by a wine importer from a wine producer); *ARP Films, Inc. v Marvel Entertainment Group, Inc.*, 952 F.2d 643, 650 (2d Cir. 1991) (failure to make licensing payments, which were the "most important obligations").

Evidence in the record also showed that the tax withholding had no effect
more broadly "on the contract's purpose," *Process America Inc.*, 839 F.3d at 136,
which included to allow Samsung and Netlist to jointly develop a NVDIMM-P
computer memory component that Netlist billed as a "game changer" in the
industry. (Netlist's Statement of Genuine Disputes of Fact, Dkt. 171-1, ("Netlist
SGDF") No. 10, 14, 15.) Samsung and Netlist also cross-licensed their patents and
released claims against each other. (*Id.* No. 16; Samsung SGDF No. 24.) Netlist
received $15 million in financing at a 2% interest rate (Netlist SGDF No. 17) and
the purported supply rights under section 6.2. (Samsung SGDF No. 111.) Samsung
in no way interfered with any of these aspects of the JDLA by withholding taxes.
Indeed, far from "defeat[ing] the object of the parties making the contract,"
*Septembertide Publishing*, 884 F.2d at 679, seeking a refund of withheld taxes was
part of the JDLA—section 3.2 provided that Netlist may "claim a credit or refund or
exemption with respect to any such withholding taxes." (Order at 4:7–9; JDLA §
3.2.)

The Court dismissed the fact that Netlist fully recouped the withheld tax on
the basis that the "time for measuring materiality is when the breached occurred."
(Order at 19:19–23).[6] But what the Court failed to consider is "the extent to which
the injured party can be adequately compensated." *Bear, Stearns Funding*, 361 F.

---

[6] The Court relied on *KLS Diversified Master Fund, L.P. v McDevitt*, 507 F. Supp.
3d 508 (S.D.N.Y. 2020) for the proposition that materiality is determined at the time
of the breach. (Order at 19:21–22.) That case involved a distressed debtor who
failed to pay taxes after entering into a financing agreement to keep his business
afloat, *McDevitt*, 507 F. Supp. 3d at 515, and then failed to make tax payments to
federal and state authorities, *id.* at 546. The court found this was a material breach
despite the debtor's efforts to later settle his tax liabilities. But that case, where the
failure to pay taxes in breach of a financing agreement could jeopardize the
financing, bears no resemblance to the situation here in that Samsung's payment of
taxes was part of a much larger agreement that had nothing to do with taxes.

Supp. 2d at 296. Here, when noticing the breach, Netlist stood to receive a full refund plus interest. (Netlist SGDF No. 78.)

The Court also failed to consider that Samsung had a reasonable and good faith basis to withhold taxes. *See Bear, Stearns Funding*, 361 F. Supp. 2d at 296; (Netlist SGDF No. 74; Samsung SDGF No. 49.) Indeed, the Korean tax agency initially determined the tax was properly withheld. (Samsung SGDF No. 52.) Netlist then appealed, and it was determined that the tax was not required. (Samsung SGDF No. 53; Netlist SGDF No. No. 78.) While the Court considered this evidence in finding that a breach occurred (Order at 15:27–16:4), it did not consider whether Samsung had a reasonable and good faith basis to withhold taxes for purposes of materiality.

The Court additionally failed to consider that termination of the JDLA would result in a forfeiture of Samsung's valuable patent license, as discussed below.

In short, evidence in the record shows Netlist did not meet its initial burden to show no genuine issues of material fact as to whether the tax withholding was a material breach. The Court manifestly failed to consider material facts in light of the materiality factors and should therefore reconsider its ruling.

### C. <u>The Court Failed to Consider Material Facts Showing Triable Issues as to Whether Samsung's Purported Breach of the Supply Provision Was Material</u>

The Court also failed to consider material facts showing that Netlist did not meet its burden of showing as a matter of law that Samsung had materially breached the supply provision. The JDLA includes a provision that "Samsung will supply NAND and DRAM products to Netlist on Netlist's request a competitive price." (Order at 4:1–3; JDLA § 6.2.) The Court found that as a matter of law Samsung's breach of this provision was material because, "[b]egining in 2017, Samsung declined to fulfill Netlist's forecasts, requests, and orders for NAND and DRAM products" (Order at 4:20–22) and, "[u]nder the unambiguous meaning of the

provision, the term is an integral part of the parties' agreement, one that Netlist valued highly, as demonstrated by its negotiation and post-execution conduct." (Dkt. 186 at 19:15–19.) The Order indicates that the Court focused on evidence tending to show that Netlist believed the supply ***provision*** was important—e.g., "the term is an integral part of the parties' agreement, one that Netlist valued highly"—without determining whether any particular ***breach was material***. *Kuhbier*, 239 F. Supp. 3d at 735 ("The determination whether ***a material breach*** has occurred is generally a question of fact") (emphasis added).

For example, the Court did not consider evidence in the record showing triable issues of fact as to the "relative magnitude of the default." *Process America Inc*., 839 F.3d at136. The Order makes no findings about the extent to which Netlist was harmed aside from pointing out that Netlist believed the supply provision was important. Here, the evidence showed that the extent of harm to Netlist was in fact a disputed issue. In support of its motion, Netlist argued that in 2017, Samsung began "drastically cutting back the NAND and DRAM that it would provide." (Netlist MSJ Mot., Dkt. 145, at 7:25–27.) Netlist relied on email traffic that Samsung was "rejecting new orders" and "directed the company to minimize sales to Netlist." (Netlist MSJ, Dkt. 145, at 8:1–14.) But other evidence showed that the amount of purported lost sales was not as dramatic as Netlist suggested and that Netlist had in fact purchased a substantial amount of NAND and DRAM products from Samsung in each quarter from 2015 through the date of contract termination, (Netlist's SGDF No. 58), and there was only one month (February 2018) where Netlist did not purchase product from Samsung. (Netlist Summary of Invoices, Choi Ex. 51, Dkt. 187-53 at Page ID# 9508.)

To be sure, the amount that Netlist purchased from Samsung decreased in mid-2017 through mid-2018, but the amount that Netlist purchased from mid-2018 through 2019 ***increased***, with Netlist purchasing more than $3 million of products in January of 2020 alone, which was Netlist's second highest amount of purchases for

one month during the term of the JDLA. (Netlist Summary of Invoices, Choi Ex. 51, Dkt. 187-53 at Page ID# 9509.) Netlist's own damages expert opined that Netlist received 67% of the dollar volume of its orders from Samsung between the second quarter of 2017 and July 15, 2020. (Akemann Opening Report, LaMagna Ex. 76, Dkt. 171-4 ¶ 123; Netlist SGDF No. 58). But Netlist failed to demonstrate the amount of damages it allegedly suffered as a result of these shortfalls. Was it able to cover? At what price? The evidence adduced by Netlist is woefully unclear on these important questions. There was at the very least a triable issue of fact over whether this purported harm was material. *See Septembertide Publishing*, 884 F.2d at 679 (satisfying 67% of royalty payment was not a material breach).

Because of material issues of fact as to whether the allocation of product to Netlist was reasonable, the evidence adduced by Netlist is further unclear as to the extent to which it was deprived of a benefit that it reasonably expected. *Bear, Stearns Funding*, 361 F. Supp. 2d at 296. Relying on *RES Exhibit Services, LLC v. Genesis Vision, Inc.*, 155 A.D.3d 1515, (4th Dept 2017), the Court found the JDLA was sufficiently definite to be enforceable because it established a "framework by which the parties would engage in such transactions." (Order at 11:10–22.) But that turns on whether the parties' obligations could be measured by "objective criteria[, which] may be found in the agreement itself, commercial practice, or other usage and custom." *Id.* at 1519. Here, Netlist made no showing that all of its "requests" for NAND and DRAM product under the JDLA were reasonable based on the commercial practice in the memory chip industry or whether its expectations for an unlimited supply were commercially reasonable. And how can the Court say on the record before it that it is clear and substantially uncontradicted that the allocation to Netlist was unreasonable in light of commercial practice? That is a material issue of fact that must be left for trial.

The Court also did not consider "the extent to which [Netlist could] be adequately compensated" for Samsung's purported breaches. *Bear, Stearns*

*Funding*, 361 F. Supp. 2d at 296.  Netlist admits that it was able to "seek Samsung NAND and DRAM on the secondary market rather than purchasing directly from Samsung." (Netlist MSJ, Dkt. 145, at 9:14–18.)  Netlist asserted that its end users could not replace a Samsung product with a Micron or Hynix product. (*Id.* at 9 n. 3.)  But Samsung submitted evidence that in fact end users could interchange products, and that Netlist could even source Samsung products from other divisions within Samsung. (*See* Samsung SGDF No. 10, 82.)  The fact that Netlist was able to cover its purported lost sales is evidence that Netlist could be adequately compensated for Samsung's alleged breaches without resorting to the extreme remedy of terminating the JDLA.

Further, as mentioned above, terminating the JDLA would be an extreme remedy, resulting in Samsung's forfeiture of valuable license rights, which the Court also failed to consider. *Bear, Stearns Funding*, 361 F. Supp. 2d at 296.  The JDLA granted Samsung a license to Netlist's patents, which Netlist contended was worth $85 million. (Netlist MSJ, Dkt. 145, at 22:24–27.)  And the record is clear that Netlist sought a declaration that the JDLA had been terminated specifically so that it can get a ruling that "Samsung's licenses and rights under the Agreement have ceased." (First Amend. Compl., Dkt. 23, at 8 ¶(b).)  Termination of the agreement would invalidate Samsung's patent licenses, exposing Samsung to potential infringement claims from Netlist.  The Court failed to consider how this forfeiture of Samsung's valuable patent license under the JDLA weighed against a finding of materiality.

In short, the Court manifestly failed to consider material facts demonstrating genuine issues of material fact as to whether Samsung's alleged breaches of section 6.2 were material.  The Court should therefore reconsider that ruling.

## V. THE COURT FAILED TO CONSIDER MATERIAL FACTS SHOWING GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER NETLIST SATISFIED THE CONDITIONS PRECEDENT TO TERMINATING THE JDLA

In the Order, the Court ruled that Netlist showed as a matter of law that it complied with the JDLA's termination provision because "Netlist sent Samsung a letter terminating the JDLA on July 15, 2020," and that as a result, "Netlist's termination comports with the JDLA's termination method." (Order at 18:12–27.) Under section 13.2, to terminate the agreement, Netlist had to provide notice to Samsung that it was "in material breach of [the] Agreement" and show that such breach "is not cured within thirty (30) days from [Netlist's] written demand." (Order at 18:14–19, citing JDLA § 13.2.) Under New York law, the notice of breach also had to meet timeliness and content requirements. Netlist failed to meet its burden as the moving party of showing no triable issues as to whether it met those requirements, and the Court manifestly failed to consider material facts showing that triable issues exist as to whether Netlist met those requirements and thus satisfied the conditions precedent to terminating.

Netlist had to provide timely notice of breach in order to terminate. The purpose of section 13.2 is to give the alleged breaching party notice of the alleged material breach in a manner that indicates that the other party is moving toward terminating and to give the alleged breaching party a period to cure. That purpose is defeated, however, if the party asserting a material breach delays giving notice of the breach and thereby deprives the other party of a reasonable opportunity to cure. Under New York law, "[i]mplicit in every contract is a covenant of good faith and fair dealing which encompasses any promise that a reasonable promisee would understand to be included." *Elmhurst Dairy, Inc. v Bartlett Dairy, Inc.*, 97 A.D.3d 781, 784 (2d Dept 2012). And it prohibits a contracting party from taking actions that "deprive the other party of the fruit or benefit of its bargain." *Id.* Here, Samsung negotiated for and had the right to avoid termination of the JDLA, including its license rights, by curing any claimed breach, and it had the right to

notice of any breach to allow it 30 days to cure. The implied covenant required Netlist, as a condition precedent to termination of the JDLA, to give such notice in a timely manner, and at a minimum there are triable issues of fact as to whether Netlist did. *See In re Gotham Silver Co.*, 91 F. Supp. 520, 524 (S.D.N.Y.1950) ("Notice following a lapse of over thirteen months after acceptance, and of over eighteen months from the time [the] buyer ought to have known of the breach is not, in the absence of unusual circumstances, given within a reasonable time"). Thus, in seeking to terminate the JDLA, Netlist could not satisfy the conditions precent by delaying giving notice of breach such that Samsung was deprived of a reasonable opportunity to cure.

Netlist also had to provide an informative notice of breach in order to terminate. It is "fundamental" that "contractually-required notices of breach must provide sufficient information for the noticed party to determine what steps were necessary to cure the alleged breaches." *In re 4Kids Entertainment*, 463 B.R. 610, 682 (Bankr. S.D.N.Y 2011). For example, in *Ulla-Maija, Inc. v Kivimaki*, the court found as a matter of law that a license agreement ***had not*** been terminated because the breach and termination letter "was stated in terms so general as to be meaningless insofar as providing an opportunity to cure" and therefore "wholly lacking in the essential feature required by the License Agreement—i.e., providing a 30-day period to cure defects." 2005 WL 2429490, at *4–5 (S.D.N.Y. Sept. 30, 2005).[7]

Here, the Court did not consider material issues of disputed fact as to whether Netlist met its burden to show that it gave timely and informative notice of breach

[7] *See also City of Amsterdam Indus. Dev. Agency v. Safari Enterprises Inc.*, 279 A.D.2d 865, 866 (3d Dept. 2001) (summary judgment on whether plaintiff complied with notification provision terminating lease overturned because notices of breach failed to specify delinquent amount of rent due and failed to notify defendant of the payment that was required under the agreement).

when seeking to terminate.  With respect to Samsung's alleged breach of the tax withholding provision of section 3.2, Samsung paid those taxes in 2015 shortly after the JDLA was signed.  (Order at 4:12–13.)  Netlist executives internally discussed whether to provide notice of breach over the tax withholding dispute on March 4, 2016, but decided not to send a breach notice because Netlist wanted to reap the benefits of its business relationship with Samsung, which it then did for several years.  (Netlist SGDF No. 84.)  Netlist then sent a notice of breach nearly four years later in 2020.  (Samsung SGDF No. 125.)  But by that time, Netlist had been working with PricewaterhouseCoopers since 2015 to handle the case for Netlist. (Sasaki Decl., Dkt. 145-1, ¶ 3.)  Had Netlist provided timely notice of breach, Samsung would have had an opportunity to avoid that expense.  The content of the notice of breach was also deficient because it failed to demand what Samsung needed to do to cure.  In the Order, the Court manifestly failed to consider these material facts.  Had the Court done so, it would have had to conclude there are genuine issues of material fact over whether Netlist met the conditions precedent to termination based on breaches of section 3.2.

Similarly, the Court manifestly failed to consider material facts showing genuine issues of material fact over whether Netlist provided timely and informative notice of the breaches of the supply obligation as required to meet the conditions precedent to termination.  Netlist contends that Samsung began breaching the supply obligation in the JDLA in 2017.  (Netlist MSJ, Dkt. 145, at 7:25–10:17.)  But Netlist did not provide notice to Samsung that it was in breach until May 2020.  (*See* Samsung SGDF No. 125.)  By then, Netlist had already purportedly incurred cover damages by purchasing NAND and DRAM products from alternate suppliers at a higher price.  (Netlist MSJ, Dkt. 145, at 9:14–10:4.)  Had Netlist given timely notice of these purported breaches, Samsung would have had an opportunity to cure by meeting the unfulfilled product requests.  While the JDLA does not by its terms include a time limit on notifying the other party of a breach, the parties were under

an "obligation to help facilitate the other's performance." *Ixe Banco, S.A. v. MBNA America Bank*, 2009 WL 3124219, at *5 (S.D.N.Y. Sept. 29, 2009). But here, at a minimum, material disputed facts exist as to whether Netlist's failure to provide timely notice deprived Samsung of a fair opportunity to cure any purported breaches.

Nor did Netlist identify in the notice any specific breaches that it demanded that Samsung cure. Netlist's May 27, 2020 notice of breach vaguely states that Samsung "repeatedly failed to fulfill Netlist's requests for NAND and DRAM products throughout the term of the Agreement." (Dkt. 145-41, LaMagna Ex. 41 at Page ID# 3054.) But its letter does not identify any specific breaches, when or how they occurred, or any action that Samsung could take to cure.[8] As a result of Netlist's failure to identify any specific breaches or a potential cure in the notice of breach, there are additional triable issues as to whether Netlist met the conditions precent to terminating.

In its motion for partial summary judgment, it was Netlist's burden to explain, and adduce evidence showing, that there were no genuine issues of material fact that it met the conditions precedent to terminating. Fed. R. Civ. Pro. 56(a); *Cristobal v. Siegel*, 26 F.3d at 1494-95. Netlist failed to address the requirements for timeliness and content under New York law despite its burden. The Order indicates that the Court manifestly failed to consider material facts showing the existence of genuine issues of material fact as to whether Netlist met those requirements. Accordingly,

---

[8] The notification letter states that it was enclosing "a Copy of the Complaint" that had been filed in this case. But that in no way means that Netlist had provided Samsung sufficient detail to determine what steps it could take to cure. First, the initial complaint in this case also lacked sufficient detail, merely alleging in general and vague terms that "in 2018, Samsung began not to fulfill Netlist's requests"—the complaint does not identify any specific requests or what Samsung could have done to cure. (Compl., Dkt. 1.) Second, and in any event, the summary judgment record does not reflect that the complaint was actually enclosed with the letter.

the Court should reconsider the Order on this ground.

## VI. THE COURT FAILED TO CONSIDER MATERIAL FACTS SHOWING TRIABLE ISSUES AS TO WHETHER NETLIST WAIVED ITS RIGHT TO TERMINATE THE JDLA

In its Order, the Court found as a matter of law that Netlist had not waived its right to terminate the JDLA "by delaying until years after the initial breaches." (Order at 20:2–3.) In coming to this conclusion, the Court primarily relied on the fact that the JDLA included a "no-waiver provision." The Order points out that there was evidence in the record that "Netlist had not complained about NAND and DRAM supply issues and had not acted on the purported breach for years." (*Id.* at 20:17–20.) The Court found, however, that these "facts might be probative of a wavier absent the [no-waiver] provision, but they do not evince an 'unmistakably manifested intent to waive the no-waiver provision." (*Id.* at 20:21–24.) The Court should reconsider this ruling as well.

As a threshold matter, Netlist only argued that the no-waiver provision applied in this case ***in its opposition*** to Samsung's motion for summary judgment. (Netlist Opp., Dkt. 171, at 25:13–25.) Netlist did not raise the no-wavier clause in its opening brief in support of its motion for summary judgment (Netlist MSJ Mot., Dkt. 145) or its reply in support of its summary judgment motion (Netlist Reply, Dkt. 178). Netlist did not therefore even attempt to establish its burden that the no-wavier provision applied as a matter of law—only that there were questions of triable fact that defeated Samsung's summary judgment motion. In Samsung's brief in opposition to summary judgment, Samsung argued that the no-waiver clause was waived in anticipation that Netlist would raise the clause, (Samsung Opp., Dkt. 168 at 30:22–31:2), but Netlist did not do so. Yet the Court on its own still found as matter of law that the no-wavier provision applied, (Order at 20:2–24), and as a result did not consider evidence showing that there were at the very least issues of material fact for the jury to decide.

First, the Court did not consider that the language of the no-waiver provision

indicates that it only applies to prospective breaches, not retrospective breaches. The no-waiver provision states that the "the failure by either party to enforce any of the terms and conditions of this Agreement shall not constitute a waiver of such Party's right thereafter to enforce that or any other terms and conditions of this Agreement." (Order at 20:8–11, JDLA §16.2.) This provision reasonably can be read as saying that a party's failure to enforce the termination provision in the JDLA when there was a past material breach would not waive that party's right to enforce the termination provision when there was a future material breach. But here, the Court allowed Netlist to use purported breaches of the JDLA from 2017 as a basis to terminate the JDLA in 2020. The Court failed to consider that the no-waiver provision is narrow and does not avoid a waiver of retrospective breaches.

New York courts consistently apply this same narrow interpretation to similar no-waiver clauses. For example, in *Macarthur Properties I, LLC v. Galbraith*, the court found that while a similar no-waiver provision may have applied prospectively, the parties' "extended court of conduct" created an issue of fact over whether the condominium board waived the right to recover past due fees. 2018 WL 3412830, at *5 (N.Y. Sup. Ct. July 13, 2018); *see also Conant v. Alto 53, LLC*, 21 Misc. 3d 1147(A), at *8, 880 N.Y.S.2d 223 (Sup. Ct. 2008) (plaintiff may have "retain[ed] the option to terminate the contract for future breaches even where [he] waived the payment provisions as to past breaches").

Second, even if the no-waiver provision were broadly construed and applicable in this case, the Court's ruling still failed to consider material facts creating at the very least a triable issue over whether Netlist waived the right to terminate. Waiver "is the voluntary and intentional relinquishment of a contract right" and may be "accomplished by affirmative conduct or failure to act so as to evince an intent not to claim the purported advantage." *Stassa v Stassa*, 123 A.D.3d 804, 806 (2d Dept. 201). Generally, "the existence of an intent to forgo such a right is a question of fact." *Fundamental Portfolio Advisors, Inc. v Tocqueville Asset*

*Mgt., L.P.*, 7 N.Y.3d 96, 104 (2006). Importantly, the "mere existence of a nonwaiver clause does not preclude waiver of a contract clause." *Stassa*, 123 A.D.3d at 806; *Long Is. Med. & Gastroenterology Assoc., P.C. v Mocha Realty Assoc., LLC,* 191 A.D.3d 857 (2d Dept 2021) (a nonwaiver clause does not preclude a finding of waiver"). For example, in *Kamco Supply Corp. v. On the Right Track, LLC*, the court found that a seller of construction equipment could not rely on a no-waiver clause in a supply contract because of the buyer's "persistent and repeated failure to meet minimum purchase requirements, coupled with the [seller's] continued acceptance of such conduct without any reservation or protest until a few weeks before the expiration of the agreements (by which time it was of course too late to insist upon strict compliance with the terms of the agreements)." 149 A.D.3d 275, 285–86 (2017).

Here, Netlist should similarly not be permitted to rely on the no-waiver provision to shield it from its clear choice to forego notifying Samsung of its purported breaches. As for of the alleged breach of the tax withholding provision section 3.2, the evidence showed that Netlist executives decided not to send a notice of breach as early as March 2016 so that Netlist could continue benefiting from the JDLA, which it then did for years. (Netlist SGDF No. 84.) As for the supply obligation, Netlist apparently believed Samsung had breached in 2017, but did not take any legal action—whether to terminate the JDLA or notify Samsung that Netlist intended to sue for damages—until 2020. All the while Netlist had for years accepted the benefits of the JDLA, including, according to Netlist's interpretation of section 6.2, by regularly purchasing NAND and DRAM products from Samsung at a competitive price, adding to millions of dollars in purchases. (Netlist Summary of Invoices, Choi Ex. 51, Dkt. 187-53.) The Court found that because there was a no-wavier provision, these facts were not "probative." But the "mere existence of a nonwaiver clause does not preclude waiver of a contract clause." *Stassa*, 123 A.D.3d at 806. Because the Court manifestly did not consider the scope of the no-

waiver clause or these other material facts, which create genuine issues of material fact as to whether Netlist waived the right to terminate, the Court should reconsider this ruling.

## VII. CONCLUSION

For all the foregoing reasons, the Court should reconsider and reverse its grant of summary judgment in favor of Netlist on its third claim for relief, for declaratory relief.

DATED: October 25, 2021

O'MELVENY & MYERS LLP

By: /s/ *Michael G. Yoder*

Michael G. Yoder
Attorneys for Defendant Samsung Electronics Co., Ltd.

# Exhibit 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC.<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. and SAMSUNG SEMICONDUCTOR, INC.,<br><br>Defendants. | Civil Case No. 2:21cv463-JRG<br><br>**JURY TRIAL DEMANDED** |

**SAMSUNG'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT THAT ALL ACCUSED PRODUCTS SOLD BEFORE JULY 15, 2020 ARE LICENSED (Dkt. 196)**

**TABLE OF CONTENTS**

I. RESPONSE TO NETLIST'S ADDITIONAL FACTS ..... 1

II. ARGUMENT ..... 1

A. The Court Should Disregard Netlist's Untimely Arguments That HBM Products Are Not Licensed ..... 1

B. The JDLA's License Provision Is Not Limited to the NVDIMM-P Joint Development Project ..... 2

C. The Accused HBM Products Are Not Foundry Products ..... 3

D. Netlist Is Barred from Arguing Its New Early Repudiation Theory ..... 5

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Chrimar Sys., Inc. v. Adtran, Inc.*,
No. 6:15-cv-618-JRG-JDL, 2017 WL 131587 (E.D. Tex. Jan. 13, 2017)................................6

*Image Processing Techs., LLC v. Samsung Elecs. Co.*,
No. 2:16-CV-00505-JRG, 2017 WL 10185856 (E.D. Tex. Oct. 24, 2017)..............................4

*Jethroe v. Omnova Sols., Inc.*,
412 F.3d 598 (5th Cir. 2005) ..........................................................................................6

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
140 S. Ct. 1589 (2020)..........................................................................................6

*South Ionian Shipping Co. v. Hugo Neu & Sons Int'l Sales Corp.*,
545 F. Supp. 323 (S.D.N.Y. 1982) ..........................................................................2, 4

*Spathos v. Smart Payment Plan, LLC*,
No. A-16-CV-00898-SS, 2018 WL 11373014 (W.D. Tex. Apr. 6, 2018) ........................2, 3, 4

**Other Authorities**

Fed. R. Civ. P. 37(c) ..........................................................................................2

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 42. | Excerpts from Netlist's amended complaint, *Netlist Inc. v. Samsung Electronics Co., Ltd.*, No. 8:20-cv-00993-MCS (C.D. Cal.), Dkt. No. 23 |
| 43. | Excerpts from Netlist Opp. To Samsung Motion for Summary Judgment, *Netlist Inc. v. Samsung Electronics Co., Ltd.*, No. 8:20-cv-00993-MCS (C.D. Cal.), Dkt. No. 190 |
| 44. | Samsung's First Brief on Cross-Appeal (Opening Brief), *Netlist Inc. v. Samsung Elecs. Co., Ltd.*, Nos. 22-55209, 22-55247 (9th Cir.) |
| 45. | Excerpts from C.D. Cal. Order re: Motions for Summary Judgment, *Netlist Inc. v. Samsung Electronics Co., Ltd.*, No. 8:20-cv-00993-MCS (C.D. Cal.), Dkt. No. 186 |

The scope of Samsung's license under the JDLA is ripe for summary judgment. The license covers all Samsung semiconductor products, except for Foundry Products. The Court should reject Netlist's belated arguments that the license is limited to the NVDIMM-P joint development project, and does not license HBM products because they are Foundry Products. Further, Netlist's late-disclosed "early repudiation" theory, the same one it brings in its "As Of" Motion, Dkt. No. 201, is barred by issue preclusion, judicial estoppel, and claim preclusion.

## I. RESPONSE TO NETLIST'S ADDITIONAL FACTS

Netlist's "Response to Samsung's Statement of Undisputed Facts" is improper because it denies facts without basis. For example, Netlist disputed Fact No. 1, which merely cites the JDLA's November 12, 2015 effective date. Many of Netlists so-called "disputes" are equally baseless: Nos. 2-5, 7-10, Nos. 13-15, and No. 18. Netlist also includes additional facts related to its arguments that HBM products are Foundry Products, and its early repudiation theory. Dkt. No. 264 at 4-8. Samsung disputes the procedurally improper "additional facts" in ¶¶ 7-9, and 13-19. Where necessary, Samsung will address the specific evidence Netlist cites in these paragraphs throughout its argument. Those in ¶¶ 10-12 are admitted, but irrelevant.

## II. ARGUMENT

### A. The Court Should Disregard Netlist's Untimely Arguments That HBM Products Are Not Licensed[1]

Samsung directly asked Netlist to identify which, if any, of the accused products were not licensed under the JDLA in Interrogatory No. 16. Dkt. No. 196-38 at 7-9. ***Netlist did not identify a single Accused Product that it contended qualified as a Foundry Product or was***

[1] Netlist's opposition focuses on HBM products, as those are the only ones for which Netlist is impermissibly seeking damages prior to July 15, 2020. If Samsung's Ninth Circuit Appeal is successful, the JDLA will be restored, and the scope of the license as covering ***all*** the accused products in this case will be relevant. *See* Dkt. No. 196 at 11-17.

***otherwise unlicensed.*** *Id.* This fact, alone, should be dispositive of Netlist's belated theories that the JDLA license provision does not cover HBM products for any reason. *See, e.g.*, Fed. R. Civ. P. 37(c); *Spathos v. Smart Payment Plan, LLC*, No. A-16-CV-00898-SS, 2018 WL 11373014, at *2 (W.D. Tex. Apr. 6, 2018) (excluding reliance on agreements not disclosed in contention interrogatory response, where the untimely disclosure was "not harmless given the new legal issues these previously undisclosed oral agreements raise two months before trial"). Netlist never mentions or otherwise attempts to justify its deficient interrogatory response.

Even if this deficiency were excused, Netlist's arguments about the scope of the JDLA's license and whether HBM products are Foundry Products also fail on the merits.

### B. The JDLA's License Provision Is Not Limited to the NVDIMM-P Joint Development Project

The plain language of the JDLA unambiguously licenses all semiconductor products except Foundry Products and is not limited to the Joint Development Project. *See* Dkt. No. 196 at 11-13. Netlist provides ***no explanation*** based in the language of the JDLA to support a contrary finding. Instead, Netlist relies on *dicta* from a Korean tax tribunal (not a tax court), focused on a Korean law issue, where Samsung was not even a party to the proceedings.[2] Netlist forgets that contract interpretation is a question of law (here New York law) and a U.S. court is far better equipped for this task than a tax tribunal in a foreign country.[3] The Court should

[2] Netlist asserts that Samsung "submitted its position to the Korean Tax Court," Dkt. No. 264 at 15, but this submission is Samsung's response to specific, limited inquiries from a lower tax tribunal, and not the tribunal that issued the decision on which Netlist relies. Dkt. No. 264-28. Samsung was never a party to those proceedings. Dkt. No. 196-41 (appellant is "Netlist, Inc").

[3] Although courts in limited circumstances might recognize a foreign decision, that is appropriate only where the judgment was rendered after a ***fair trial*** in a ***court*** of competent jurisdiction, which means a ***contested proceeding*** concerning the ***immediate parties after due citation or voluntary appearance of the defendant***, and the ***same underlying cause of action***. *South Ionian Shipping Co. v. Hugo Neu & Sons Int'l Sales Corp.*, 545 F. Supp. 323, 325 (S.D.N.Y. 1982); *see also* Rest. 2d Confl. § 98. The Korean tax tribunal's decision meets literally none of these requirements. Dkt. No. 196 at 16-17.

disregard the Korean tax tribunal opinion. *See* Dkt. No. 196 at 16-17.

Moreover, Netlist is barred by issue preclusion and judicial estoppel from arguing that the JDLA license provision is limited to the Joint Development Project. *Id.* at 13-16. Netlist relies on (and seriously misquotes) the CDCA Court's statement declining to find estoppel in that case to defeat Samsung's estoppel argument here. But the CDCA Court was evaluating a ***different estoppel argument:*** whether Netlist's arguments regarding the license grant of § 8 of the JDLA in Korea had preclusive effect on Netlist's arguments regarding the supply provision of § 6 of the JDLA in CDCA. Dkt. No. 196-5 at 9. The CDCA Court's full statement was "***Netlist's prior position on*** the scope of the patent licenses is immaterial to the breach theory in this litigation and to the reasons the Court will grant summary judgment as to liability." Dkt. No. 264-23, 14-15 (emphasized portion misleadingly omitted from Netlist's brief, Dkt. No. 264 at 17). The question here is different: whether the CDCA judgment, where the Court ***specifically relied on § 8*** to grant summary judgment in Netlist's favor, has preclusive effect on Netlist's contrary arguments in this Court regarding the same section, § 8. *See* Dkt. No. 196 at 13-16. The Court should find that it does.

### C. The Accused HBM Products Are Not Foundry Products

A Foundry Product under the JDLA must be [REDACTED] Dkt. No. 196-1 at 2. A product that fails either of these tests is not a Foundry Product.

Netlist does not identify any accused product that Samsung does not sell to customers as a Samsung product. This fact alone is dispositive. To manufacture a dispute, Netlist relies on the standard terms and conditions in [REDACTED] and Samsung's general confidentiality agreement with [REDACTED] Dkt. No. 264 at 12. The obvious missing link here is

[redacted]

any evidence that the accused HBM products were built to [redacted] specifications and design (or the design of any third party). Netlist also relies on supposed discrepancies between Samsung's off-the-shelf HBM product numbers and the sales record product numbers, *id.*, but never once served an interrogatory or asked a deposition question to understand those product numbers. These "unsubstantiated assertions" do not create a genuine issue of material fact. *Image Processing Techs., LLC v. Samsung Elecs. Co.*, No. 2:16-CV-00505-JRG, 2017 WL 10185856, at *2 (E.D. Tex. Oct. 24, 2017) ("[Evidence offered] by the nonmovant to defeat a properly supported motion for summary judgment, may not consist entirely of conclusory allegations or unsubstantiated assertions." (internal citations, quotations omitted)).

Netlist stretches even further to try to dispute the other Foundry Product criteria. But the documents Netlist cites prove the opposite. For example, Netlist unconscionably describes a graphic as "listing 'Foundry' under 'HBM Business Model,'" Dkt. No. 264 at 5, when in fact the graphic unambiguously shows that HBM products are ***Samsung*** products, not Foundry Products. Dkt. No. 264-6 at 513633.

[redacted]

The evidence Netlist cites shows that Samsung advertises its HBM products, including that Samsung's Foundry Division has a [redacted] *See* Dkt. No. 264-4 at 7 (emphasis added);[4] *see also* Dkt. No. 264-7 at 482729, 482731 ([redacted]

[4] Netlist misleadingly quotes this page to imply that the [redacted] was related to Foundry production ***of*** HBM. Dkt. No. 264 at 4, ¶ 7. The ellipses encompass nearly half a page of text explaining how the Samsung Foundry Division services ***use*** the Samsung HBM2. *Id.*

[redacted]

[redacted] Another Netlist-cited document, Dkt. No. 264-5 at 532174 (cited at 5), even provides a helpful graphic [redacted]

Netlist also takes impermissible liberties with the March 2016 statement that the [redacted] Dkt. No. 264-8 at 23. Such [redacted] used to make HBM memory is insufficient to support even an inference that any of the ***accused products***, sold under Samsung's brand, were customized using third-party designs, as required by the JDLA's definition of Foundry Product.

**D. Netlist Is Barred from Arguing Its New Early Repudiation Theory**

Netlist's argument that the JDLA was not in force before its termination on July 15, 2020 contradicts its own prior representations to this Court, the CDCA Court, the Ninth Circuit, and the ITC regarding whether and how long the JDLA was in effect. *See, e.g.,* Dkt. No. 23 at 17, ¶ 50 ("Netlist terminated the JDLA ***on*** July 15, 2020."); Ex. 42 at ¶ 39 (CDCA complaint: "As a result of termination, all licenses and other rights previously granted to Samsung ceased ***on*** July 20 [sic, 15], 2020."); Ex. 43 at 11 (conceding in CDCA briefing that the JDLA ***governed*** from November 2015 to its termination in July 2020); Dkt. No. 196-2 at 3 (SK Hynix ITC action: "Samsung ***is authorized by cross-license*** to sell RDIMMs and LRDIMMs").

As explained in Samsung's Opposition to Netlist's "As Of" Motion, issue preclusion, judicial estoppel, and claim preclusion all bar Netlist from arguing that the JDLA was not in

force before its termination on July 15, 2020.  Dkt. No. 255.[5]  None of Netlist's cases (at 9) support its theory that it can re-litigate the date of termination after the fact; rather, they simply stand for the unremarkable fact that a material breach excuses performance.

Regarding issue preclusion,  Netlist argued it properly terminated the JDLA on July 15, 2020, and the CDCA Court granted Netlist its requested judgment on this basis.  Thus the identical issue—whether and when the JDLA was terminated—was fully and fairly litigated. This determination was necessary to the resulting summary judgment, as the CDCA Court specifically referenced the termination date when granting judgment.  Ex. 45 at 18, 20-21.  No special circumstances render preclusion inappropriate or unfair.  *See Chrimar Sys., Inc. v. Adtran, Inc.*, No. 6:15-cv-618-JRG-JDL, 2017 WL 131587, at *1 (E.D. Tex. Jan. 13, 2017) (listing issue preclusion factors).  For similar reasons, judicial estoppel also bars Netlist's theory. *See Jethroe v. Omnova Sols., Inc.*, 412 F.3d 598, 600 (5th Cir. 2005) (listing factors).  Over and over, Netlist deliberately represented and argued that Netlist terminated the JDLA on July 15, 2020.  Indeed, Netlist's entire CDCA Case is premised on the fact that the JDLA was in force until July 15, 2020, and that Samsung breached its obligations to Netlist during that time period.

Claim preclusion also applies because the exact same transaction was at issue in the CDCA breach/termination action and Netlist's as-yet unpled early repudiation claim here.  *See Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594-95 (2020) (listing factors).  Netlist points to the same JDLA contract, the same conduct by the parties, and seeks the same outcome—ending the JDLA.

---

[5] Samsung also disputes Netlist's early repudiation theory on its merits, for example, because Samsung did not materially breach the JDLA.  *See generally*, Ex. 44.  Given the constraints of issue preclusion against Samsung, *see* Dkt. No. 196 at 21 n.9, Samsung limits its arguments against Netlist's theory to judicial estoppel, issue preclusion, and claim preclusion.

Date: February 24, 2023

Respectfully submitted,

*/s/ Lauren A. Degnan*

Ruffin B. Cordell
TX Bar No. 04820550
cordell@fr.com
Michael J. McKeon
D.C. Bar No. 459780
mckeon@fr.com
Lauren A. Degnan
D.C. Bar No. 452421
LAD@fr.com
Brian Livedalen
D.C. Bar No. 1002699
livedalen@fr.com
Daniel A. Tishman
D.C. Bar No. 1013923
tishman@fr.com
Matthew Mosteller
CA Bar No. 324808
mosteller@fr.com
FISH & RICHARDSON P.C.
1000 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

Katherine Reardon
NY Bar No. 5196910
kreardon@fr.com
Sara C. Fish
GA Bar No. 873853
sfish@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree St., NE, 21st Floor
Atlanta, GA 30309
Telephone: (404) 892-5005
Facsimile: (404) 892-5002

Francis J. Albert
CA Bar No. 247741
albert@fr.com
FISH & RICHARDSON P.C.

12860 El Camino Real, Ste. 400
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Thomas H. Reger II
Texas Bar No. 24032992
reger@fr.com
Matthew Colvin
Texas Bar No. 24087331
colvin@fr.com
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
Facsimile: (214) 747-2091

Karolina Jesien
New York Bar No. KJ7292
FISH & RICHARDSON P.C.
Times Square Tower
20th Floor
New York, NY 10036
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

Melissa Richards Smith
melissa@gillamsmith.com
GILLAM & SMITH, LLP
303 South Washington Ave.
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

Alice J. Ahn
CA 271399 / DC 1004350
aahn@cov.com
COVINGTON & BURLING LLP
415 Mission Street, Ste. 5400
San Francisco, CA 94105
Telephone: (415) 591-7091
Facsimile: (415) 591-6091

Brian R. Nester
D.C. Bar No. 460225
bnester@cov.com

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202)-662-6000

*Attorneys for Defendants Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; and Samsung Semiconductor, Inc.*

9

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule CV-5 on February 24, 2023.  As of this date, all counsel of record have consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3)(A) and by electronic mail.

*/s/ Lauren A. Degnan*

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I certify that the following document is authorized to be filed under seal pursuant to the Protective Order entered in this case.

*/s/ Lauren A. Degnan*

# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| NETLIST, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., and SAMSUNG SEMICONDUCTOR, INC.,<br><br>Defendants. | Civil Action No. 2:21-cv-00463-JRG<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANTS' COMBINED RULE 50(B) MOTION**
**FOR JUDGMENT AS A MATTER OF LAW AND**
**RULE 59 MOTION FOR A NEW TRIAL**

**TABLE OF CONTENTS**

Background ........ 4

I. Netlist attempts to prove infringement by ignoring the Court's claim constructions and the claim language........ 4

A. The '339 patent ........ 4

B. The '060 and '160 patents........ 6

C. The '918 and '054 patents........ 7

D. Willfulness ........ 8

II. Netlist seeks over $400 million in damages for a period of 16 months........ 8

III. Samsung moves for JMOL, and the jury returns a $303 million verdict........ 10

Applicable Legal Standard........ 11

Argument ........ 11

I. Samsung is entitled to JMOL, or alternatively a new trial, on non-infringement. ........ 11

A. Samsung is entitled to JMOL of non-infringement of the '339 patent because Netlist failed to prove that the accused products have multiple "byte-wise data paths" or "actively drive a byte-wise section of the N-bit wide write data." ........ 12

1. The buffers used in Samsung's DDR4 LRDIMM products do not have two or more "byte-wise data paths." ........ 13

2. The buffers in Samsung's LRDIMM products do not "enabl[e] only one of the data paths while the other possible paths are disabled." ........ 17

B. Samsung is entitled to JMOL of non-infringement of the '060 and '160 patents. ........ 19

1. Netlist failed to prove that the accused products have "array dies" that are not "DRAM circuits." ........ 19

2. Netlist failed to prove that the accused products have "die interconnects" that are "not in electrical communication with" certain "array dies." ........ 23

C. Samsung is entitled to JMOL of non-infringement of the ’918 patent because Netlist failed to prove that the accused products have the required “converter circuit.” ..... 24

D. Samsung is entitled to JMOL of non-infringement of the ’054 patent because the accused products do not transition to a “second operable state.” ..... 28

E. Samsung is entitled to JMOL of non-infringement of the ’918, ’054, and ’339 patents because Netlist failed to present evidence that any single Samsung product satisfies every limitation of any of the asserted claims. ..... 30

1. Netlist’s infringement arguments for the ’918 and ’054 patents rely on features of different PMICs used in different Samsung products. ..... 31

2. Netlist’s infringement argument on the ’339 patent improperly relied on datasheets for third-party buffers without any evidence that those buffers are used in the accused Samsung LRDIMMs. ..... 33

F. In the alternative, the Court should order a new trial on infringement. ..... 36

II. Samsung is entitled to JMOL, or alternatively a new trial, on invalidity with respect to the ’918, ’054, and ’339 patents. ..... 37

A. Samsung is entitled to JMOL that the asserted claims of the ’918 and ’054 patents are invalid for lack of written description support. ..... 38

1. The asserted claims of the ’918 and ’054 patents extend beyond the hybrid memory module required by the specification. ..... 38

2. The specification fails to describe the “converter circuit” under Netlist’s overbroad interpretation of that claim limitation. ..... 46

B. The asserted claims of the ’339 patent are invalid for lack of written description under Netlist’s infringement theory. ..... 47

C. Alternatively, the Court should grant a new trial on written description. ..... 48

III. Samsung is entitled to JMOL, or alternatively a new trial, on the issue of damages ..... 48

A. Samsung is entitled to JMOL of no damages. ..... 49

1. The award is premised on the flawed and unsupported assumption that Samsung would agree to pay 100% of the revenue supposedly conferred by the asserted patents. ..... 49

2. JMOL of no damages is required because Mr. Kennedy failed to apportion as required by law. ..... 53

3. The damages award is flawed because Mr. Kennedy failed to take account of the highly comparable Samsung and SK hynix licenses. ..... 55

4. Netlist failed to show that Mr. Kennedy's alternatives are non-infringing, available, and commercially acceptable. ..... 58

5. JMOL of no damages on the DDR5 products is additionally required because there is no substantial evidence to support the award. ..... 60

B. Alternatively, the Court should grant JMOL that damages are no more than $19.3 million. ..... 62

C. If the Court does not grant JMOL, Samsung is entitled to a new trial on damages. ..... 63

1. The excessive damages award is against the weight of the evidence. ..... 64

2. Mr. Kennedy's unreliable testimony should have been excluded. ..... 64

D. Alternatively, the Court may condition the new trial on a remittitur. ..... 65

IV. Samsung is entitled to JMOL of no willful infringement. ..... 65

A. Netlist failed to provide substantial evidence of deliberate or intentional infringement. ..... 66

B. No reasonable jury could have found that Samsung was willfully blind. ..... 70

V. Alternatively, Samsung is entitled to a new trial. ..... 71

A. Netlist's improper conduct at trial unfairly prejudiced Samsung. ..... 71

B. The erroneous exclusion of JEDEC-related evidence prejudiced Samsung. ..... 74

Conclusion ..... 75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ansell Healthcare Prod. LLC v. Reckitt Benckiser LLC*,
2018 WL 620968 (D. Del. Jan. 30, 2018)....70

*Aqua-Aerobic Sys., Inc. v. Aerators Inc.*,
211 F.3d 1241 (Fed. Cir. 2000)....43

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
377 U.S. 476 (1964)....52

*ATEN Int'l Co. v. Uniclass Tech. Co.*,
932 F.3d 1364 (Fed. Cir. 2019)....36

*Atl. Rsch. Mktg. Sys. v. Troy*,
659 F.3d 1345 (Fed. Cir. 2011)....41, 42, 48

*Bayer Healthcare LLC v. Baxalta Inc.*,
989 F.3d 964 (Fed. Cir. 2021)....66

*BE & K Const. Co. v. United Bhd. of Carpenters & Joiners of Am., AFL-CIO*,
90 F.3d 1318 (8th Cir. 1996)....73

*Bonin v. Sabine River Auth. of Texas*,
2022 WL 19731177 (E.D. Tex. Nov. 9, 2022)....61, 62

*Broadcom Corp. v. Qualcomm Inc.*,
543 F.3d 683 (Fed. Cir. 2008)....19, 25

*Cates v. Creamer*,
431 F.3d 456 (5th Cir. 2005)....11, 36

*Contour IP Holding, LLC v. GoPro, Inc.*,
2020 WL 5106845 (N.D. Cal. Aug. 31, 2020)....50

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*,
291 F.3d 1317 (Fed. Cir. 2002)....38, 48

*Cortland Line Co. v. Orvis Co.*,
203 F.3d 1351 (Fed. Cir. 2000)....31

*Cowart v. Erwin*,
837 F.3d 444 (5th Cir. 2016)....11

*CytoLogix Corp. v. Ventana Med. Sys.*, 424 F.3d 1168 (Fed. Cir. 2005) ..... 37

*Delahoussaye v. Performance Energy Servs., L.L.C.*, 734 F.3d 389 (5th Cir. 2013) ..... 65

*Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F. App'x 980 (Fed. Cir. 2018) ..... 16, 30

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002) ..... 61

*Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276 (5th Cir. 1975) ..... 73, 74

*Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201 (Fed. Cir. 2014) ..... 53

*Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009) ..... 20, 22, 36

*Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518 (5th Cir. 2013) ..... 61

*Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018) ..... 53

*Flash-Control, LLC v. Intel Corp.*, 2021 WL 2944592 (Fed. Cir. July 14, 2021) ..... 46

*Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766 (Fed. Cir. 1996) ..... 16

*Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998) ..... 41, 42

*Geovector Corp. v. Samsung Elecs. Co.*, 2017 WL 76950 (N.D. Cal. Jan. 9, 2017) ..... 33

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) ..... 70, 71

*Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999) ..... 60

*Gustafson Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508 (Fed. Cir. 1990) ..... 66

*Halliburton Oil Well Cementing Co. v. Walker*,
329 U.S. 1 (1946)....26

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
340 F.3d 1314 (Fed. Cir. 2003)....27

*Huawei Techs. Co. v. T-Mobile US, Inc.*,
2017 WL 11638984 (E.D. Tex. Sept. 29, 2017)....69

*ICU Med., Inc. v. Alaris Med. Sys.*,
558 F.3d 1368 (Fed. Cir. 2009)....41

*Intell. Ventures II LLC v. Sprint Spectrum, L.P.*,
2019 WL 1987172 (E.D. Tex. Apr. 12, 2019)....67

*IP Innovation L.L.C. v. Red Hat, Inc.*,
705 F. Supp. 2d 687 (E.D. Tex. 2010)....56

*Ironburg Inventions Ltd. v. Valve Corp.*,
64 F.4th 1274 (Fed. Cir. 2023)....66

*Kim v. ConAgra Foods, Inc.*,
465 F.3d 1312 (Fed. Cir. 2006)....16, 30

*Labyrinth Optical Techs. LLC v. Alcatel-Lucent USA, Inc.*,
2015 WL 12696081 (C.D. Cal. Sept. 2, 2015)....51, 52

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
2011 WL 197869 (E.D. Tex. Jan. 20, 2011)....59

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012).... *passim*

*In re Lew*,
257 F. App'x 281 (Fed. Cir. 2007)....44

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
449 F.3d 1209 (Fed. Cir. 2006)....20

*LizardTech, Inc. v. Earth Res. Mapping, PTY, Inc.*,
424 F.3d 1336 (Fed. Cir. 2005)....41, 42

*Looksmart Grp., Inc. v. Microsoft Corp.*,
2019 WL 4009263 (N.D. Cal. Aug. 5, 2019)....50

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)....50

*Medtronic Vascular, Inc. v. Boston Sci. Corp.*,
2008 WL 2744909 (E.D. Tex. July 11, 2008) ....................32, 34

*Montano v. Orange Cnty., Tex.*,
842 F.3d 865 (5th Cir. 2016) ....................11

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
30 F.4th 1339 (Fed. Cir. 2022) ....................55

*Nordock, Inc. v. Systems, Inc.*,
2013 WL 989864 (E.D. Wis. Mar. 13, 2013) ....................50

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
723 F.3d 1336 (Fed. Cir. 2013)....................45, 46

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................37

*Oiness v. Walgreen Co.*,
88 F.3d 1025 (Fed. Cir. 1996)....................64

*Packet Intelligence LLC v. NetScout Sys., Inc.*,
2019 WL 2375218 (E.D. Tex. June 5, 2019), *rev'd in part on other grounds*,
965 F.3d 1299 (Fed. Cir. 2020)....................66

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007)....................45

*PIN/NIP, Inc. v. Platte Chem. Co.*,
304 F.3d 1235 (Fed. Cir. 2002)....................42

*Polanco v. City of Austin, Tex.*,
78 F.3d 968 (5th Cir. 1996) ....................11

*Potter Voice Techs., LLC v. Apple Inc.*,
24 F. Supp. 3d 882 (N.D. Cal. 2014) ....................70

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
843 F.3d 1315 (Fed. Cir. 2016)....................48

*Promega Corp. v. Life Techs. Corp.*,
875 F.3d 651 (Fed. Cir. 2017)....................49, 63

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000)....................37

*Purdue Pharma L.P. v. Recro Tech., LLC*,
694 F. App'x 794 (Fed. Cir. 2017) ....................45

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010)....56

*Rivera v. Int'l Trade Comm'n*,
857 F.3d 1315 (Fed. Cir. 2017)....46

*Robison v. Cont'l Cas. Co.*,
2022 WL 336900 (E.D. Tex. Jan. 6, 2022)....61, 62

*Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*,
2017 WL 1319553 (E.D. Tex. Apr. 10, 2017)....61

*Sherwin-Williams Co. v. PPG Indus., Inc.*,
2020 WL 1283465 (W.D. Pa. Mar. 18, 2020)....60

*Shows v. Jamison Bedding, Inc.*,
671 F.2d 927 (5th Cir. 1982)....63

*Smith v. Transworld Drilling Co.*,
773 F.2d 610 (5th Cir. 1985)....11

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
930 F.3d 1295 (Fed. Cir. 2019)....69

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011)....69, 71

*Swipe Innovations, LLC v. NCR Corp.*,
2013 WL 6080439 (N.D. Ga. Nov. 18, 2013)....66

*Tronzo v. Biomet, Inc.*,
156 F.3d 1154 (Fed. Cir. 1998)....42

*Tronzo v. Biomet, Inc.*,
236 F.3d 1342 (Fed. Cir. 2001)....62, 63

*Ultravision Techs, LLC v. GoVision LLC*,
2021 WL 2144788 (E.D. Tex. May 26, 2021)....22

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)....52, 53

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
69 F.3d 512 (Fed. Cir. 1995)....56

*United States v. Brownlee*,
741 F.3d 479 (7th Cir. 2014)....61

*Vas-Cath Inc. v. Mahurkar*,
935 F.2d 1555 (Fed. Cir. 1991)....................38

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)....................52, 53

*Westbrook v. Gen. Tire & Rubber Co.*,
754 F.2d 1233 (5th Cir. 1985)....................71, 73

*Whitehead v. Food Max of Miss., Inc.*,
163 F.3d 265 (5th Cir. 1998)....................74

*Whitserve, LLC v. Comput. Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012)....................52, 58

*Wi-LAN Inc. v. Sharp Elecs., Corp.*,
992 F.3d 1366 (Fed. Cir. 2021)....................61

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) (en banc)....................26

*Wis. Alumni Rsch. Found. v. Apple Inc.*,
905 F.3d 1341 (Fed. Cir. 2018)....................16

*Zegers v. Zegers, Inc.*,
458 F.2d 726 (7th Cir. 1972)....................51

**Statutes**

35 U.S.C. § 112....................36, 37

35 U.S.C. § 284....................11, 52

**Other Authorities**

Federal Rule of Civil Procedure 50.................... *passim*

Federal Rule of Civil Procedure 59....................1

Federal Rule of Civil Procedure 60....................1

Federal Rule of Evidence 703....................61

Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc. (collectively, "Samsung") move pursuant to Rules 50(b), 59, and 60 for judgment as a matter of law ("JMOL"), for a new trial, to set aside or reduce damages, and/or to reconsider, correct, or amend the judgment.

***First***, Samsung is entitled to JMOL of non-infringement for each of the asserted patents. The facts concerning the structure and operation of the accused products were not in dispute at trial. For three of the asserted patents—U.S. Patent Nos. 10,949,339 (the "'339 patent"), 8,787,060 (the "'060 patent"), and 9,318,160 (the "'160 patent")—the Court's claim construction rulings made it impossible for Netlist to prove infringement based on those undisputed facts. For the remaining two patents—U.S. Patent Nos. 11,016,918 (the "'918 patent") and 11,232,054 (the "'054 patent")—Netlist did not present any evidence that the products meet the plain language of the claims. Instead, Netlist's experts repeatedly ignored or contradicted the claim language, as construed by the Court, and their opinions thus do not support the verdict.

As to the '339 patent, all asserted claims require a "plurality of byte-wise buffers." The Court construed the claims as limited to buffers with a "fork-in-the-road" configuration requiring multiple data paths, as opposed to a "straight-line" arrangement with only a single data path. Because Netlist failed to present any evidence that the buffers in the accused products have a "fork-in-the-road," Samsung is entitled to JMOL of non-infringement.

The '060 and '160 patents are directed to memory modules in which multiple "array dies" are stacked vertically, one on top of another. Samsung is entitled to JMOL of non-infringement for two independent reasons. First, based on Netlist's disclaimer of DRAM memory during prosecution, the Court construed the term "array die" in the asserted claims to mean an "array die that is different from a DRAM circuit." Netlist's expert agreed that the accused products include

DRAM memory, and therefore they do not infringe the claims as a matter of law. Second, Netlist failed to show that the accused Samsung products contain "die interconnects" that are "not in electrical communication with" certain array dies, as required by the claims.

The '918 and '054 patents are directed to a fundamentally different type of memory module than the accused products. The claimed memory module of the '918 patent requires a "converter circuit," whereas the accused products use low drop out ("LDO") regulators. Netlist's expert admitted that his infringement opinion was based on the legally erroneous position that an LDO satisfies this limitation solely because it performs the *function* of converting a voltage. Because Netlist did not offer any evidence that an LDO has the *structure* of a "converter circuit," Samsung is entitled to JMOL of non-infringement.

The '054 patent requires that the memory module transition "from a first operable state to a second operable state" when the voltage to the module fluctuates. The purpose of the second state is to back up data to non-volatile memory on the module. Netlist's expert agreed that when the accused products experience a voltage fluctuation, all data is lost, and the memory ceases to function. Netlist thus failed to show that the products have a "second *operable* state."

Samsung is also entitled to JMOL as to the '339, '918, and '054 patents for the independent reason that Netlist failed to prove that any accused product meets all of the limitations of any asserted claim. Having elected not to argue that standard-compliant products necessarily infringe, Netlist had to show that *every* accused product meets all claim limitations. Netlist failed to do so.

***Second***, Samsung is entitled to JMOL of invalidity as to the '918, '054, and '339 patents because the asserted claims lack written description support. The Federal Circuit has held that JMOL of invalidity is required where any reasonable juror would conclude that the patent claims have a broader scope than the invention described in the specification. Here, through continuation

practice and overbroad, litigation-driven claim interpretations, Netlist has stretched the asserted claims of these three patents far beyond the alleged inventions disclosed in the specification. No reasonable juror could find otherwise.

***Third***, Samsung is entitled to JMOL on the issue of damages. The jury's award of $303,150,000 in damages—for a period of only 16 months—is not based on any legally and economically reliable evidence. Netlist's damages expert, Mr. Kennedy, offered a fundamentally flawed theory in which Samsung, in a hypothetical negotiation, would agree to give Netlist ***100%*** of the ***revenue*** corresponding to the patented technology, calculated as the price difference between the accused products and alleged non-infringing alternative products. Courts have repeatedly rejected similar theories as untethered to economic reality. Mr. Kennedy's analysis also failed to properly apportion the value of the allegedly patented features. Mr. Kennedy compounded the errors in his analysis by (i) ignoring the only real-world licenses to the asserted patents, while relying on a non-comparable agreement that covers thousands of third-party patents, many of which are unrelated to memory technology, (ii) failing to establish that the alternatives were non-infringing, available, and acceptable to customers, and (iii) for the accused DDR5 products, basing his calculations on an unreliable hedonic regression analysis performed by a different expert who did not testify (Dr. Groehn)—even though the Court specifically noted the need for cross-examination in denying Samsung's *Daubert* motion against Dr. Groehn, *see* Dkt. 203.

Mr. Kennedy's improper testimony led to a deeply flawed $303 million damages award that equated to between 14.2% and 28.7% of the ***total revenues*** of the accused products. It is well established that a court may grant JMOL of no damages where a plaintiff has chosen to rely on a legally flawed theory. The Court should do so here. In the alternative, the Court should award damages of no more than $19.3 million—the maximum amount calculated by Samsung's expert.

***Fourth***, Samsung is entitled to JMOL that any infringement of the asserted patents was not willful. Netlist failed to provide sufficient evidence that, following Netlist's purported termination of Samsung's license to the asserted patents (which Samsung maintains was ineffective to terminate the license), Samsung engaged in any deliberate or intentional infringement.

***Fifth***, in the alternative, a new trial is warranted for multiple reasons, including improper claim construction argument from Netlist's experts, erroneous jury instructions, the exclusion of critical evidence bearing on multiple issues, and improper argument by Netlist's counsel that inflamed the jury and prejudiced Samsung.

## BACKGROUND

Netlist's amended complaint in this action alleged infringement of six patents. Dkt. 23. After dropping one of those patents from the case (U.S. Patent No. 10,860,506), Netlist proceeded to trial on the '339, '060, '160, '918, and '054 patents (the "asserted patents").

### I. Netlist attempts to prove infringement by ignoring the Court's claim constructions and the claim language.

#### A. The '339 patent

The '339 patent, titled "Memory Module with Controlled Byte-Wise Buffers," is directed to memory modules containing multiple memory chips, arranged in different "ranks." JTX2 at 1. The memory module includes buffers that "drive" the data from the computer to the desired rank of memory chips. As Netlist explained during claim construction, there are two fundamentally different types of buffers: those having a "Fork-in-the-Road" configuration and those having a "Straight-Line" arrangement. Dkt. 76 at 4. As illustrated in the following figure from Netlist's claim construction brief, in a "Fork-in-the-Road" configuration, there are two different paths through the data buffer ("path A" and "path B").



*Id.* Half of the memory ranks are connected to "path A," and half are connected to "path B." When data is written to memory, the buffer enables only one path to "drive" the data to the correct rank. By contrast, "[i]n the 'Straight Line' arrangement, ranks of memory devices are on the *same data path* without any 'Fork in the Road.'" *Id.* (emphasis in original).

In its *Markman* Order, the Court held that the claims of the '339 patent are limited to memory modules having buffers with a "fork-in-the-road" configuration. Dkt. 114 at 10. Accordingly, the Court construed the term "drive," as used in all of the asserted claims, to mean "enabling only one of the data paths while the other possible paths are disabled." *Id.*

Netlist contended that Samsung's DDR4 LRDIMM products infringe claims 1, 8, and 9. The parties' experts agreed that under the "fork-in-the road" construction, the claims require at least two byte-wise data paths for driving write data to the appropriate memory chips. Tr. 449:12–17 (Mangione-Smith); Tr. 1036:16–1037:5, 1037:25–1038:2 (McAlexander). Both experts also agreed that the accused products have "only a single byte-wise data path in the byte-wise buffer" for writing data. Tr. 448:25–449:4, 451:11–18 (Mangione-Smith); Tr. 924:9–12 (McAlexander).

Despite this admission, Netlist's expert testified that a single 1-byte (8-bit) data path could be viewed as an upper "nibble" of four bits and a lower "nibble" of four bits. Tr. 392:1–16

[redacted]

(Mangione-Smith). Netlist did not offer evidence that different ranks of memory are connected to these 4-bit data paths or that the buffers ever switch data between different 4-bit paths. The only "fork-in-the-road" that Netlist's expert purported to identify was a "fork" *outside* the accused memory module. Tr. 387:6–14, 396:24–397:5 (Mangione-Smith).

### B. The '060 and '160 patents

The '060 and '160 patents are directed to memory modules in which multiple silicon chips are stacked vertically, one on top of another. Claim 1 of the '060 patent, for example, requires "a plurality of stacked array dies," which contain the actual memory, and a "control die" to determine which array die to write data to or read data from. JTX5 at 22.

Netlist accused Samsung's HBM products of infringing claims 1, 5, and 7 of the '060 patent and claim 5 of the '160 patent. During claim construction, the Court held that Netlist had "clearly and unambiguously" disclaimed the use of "DRAM circuits" in attempting to distinguish the prior art "Rajan" reference, and the Court therefore construed "array die" in the asserted claims to mean "array die that is different from a DRAM circuit." Dkt. 114 at 31–32. Netlist filed, but later withdrew, objections to Judge Payne's *Markman* order. Dkt. 133, 192, 194.

At trial, Netlist's expert, Dr. Brogioli, agreed that the accused products contain "millions of DRAM cells," Tr. 582:1–6, and that the DRAM cells "have circuit components," Tr. 583:4–6. Yet he opined that the DRAM circuits in Samsung's products are "array dies" by asserting (notwithstanding the claim construction) that Netlist had not disclaimed the use of DRAM. Tr. 618:24–619:5. Although Netlist had previously recognized that the disclaimer in the Court's construction is not "limited to Rajan's 'DRAM circuits 206A–D'"—but rather extends "broadly to any DRAM circuits," Dkt. 133 at 1—Dr. Brogioli testified [redacted]

Regarding the claim requirement that the "die interconnects" are "not in electrical communication with" certain "array dies," Dr. Brogioli admitted that the signal path in the accused products travels across each and every core die. Tr. 606:3–608:7, 609:8–12. His infringement opinion was based on his view that the claims require avoiding electrical communication with only "data ports" or "receivers" on the dies—terms that do not appear in the relevant claim limitations. Tr. 493:25–494:9, 519:14–20, 520:4–18, 623:8–19.

**C. The '918 and '054 patents**

The '918 and '054 patents are the sixth and seventh continuations, respectively, in a chain of patent applications and are titled "Flash-DRAM Hybrid Memory Module[s]." *E.g.*, JTX3 at 1. Their specification describes a hybrid memory module that can transfer data between volatile DRAM memory and non-volatile flash memory on the module. *Id.* at 28–29 (1:65–4:27).

At trial, Netlist asserted that Samsung's DDR5 RDIMM memory modules infringe claims 1, 5, 13, 16, 18, and 19 of the '918 patent, each of which requires, *inter alia*, a "converter circuit configured to provide a fourth regulated voltage." *E.g.*, JTX3 at 46 (38:31–32). Netlist's expert testified that an LDO regulator in the accused products satisfies the "converter circuit" limitation, Tr. 335:4–14 (Mangione-Smith), but he admitted that he "did not look for any structural element beyond the functional requirement that something reduced the voltage," Tr. 416:21–24.

Netlist asserted that Samsung's DDR5 SODIMM, UDIMM, and RDIMM memory modules infringe claims 16 and 17 of the '054 patent. These claims require the module to "transition[] from a first operable state to a second operable state" in response to voltage changes. JTX4 at 47 (40:19–20). The purpose of the second state is to transfer data from volatile memory to non-volatile memory on the module, thereby preventing the data loss that would ordinarily occur when volatile memory loses power. *See id.* at 29 (3:59–62), 39–40 (24:60–25:7). Netlist's expert Dr. Mangione-Smith testified that the accused products are in a "second operable state" after an

overvoltage condition, but he conceded that in this state, the "DRAMs are turned off" and "don't operate," and the data "gets wiped out." Tr. 379:7–8, 431:21–432:9.

Samsung's expert testified that the asserted claims of both patents are invalid for lack of written description because they do not recite a memory module containing both volatile and non-volatile memory able to transfer data to each other. Tr. 899:7–23 (McAlexander).

### D. Willfulness

The Court ruled that Samsung did not infringe (and thus did not willfully infringe) before Netlist's purported termination of Samsung's license to the asserted patents in July 2020. Dkt. 432 at 2 (granting summary judgment that non-HBM products did not infringe prior to July 15, 2020); *id.* at 4 (granting summary judgment of no willful infringement for non-HBM products prior to July 15, 2020); Tr. 1266:4–1267:1 (granting JMOL of no infringement by HBM products prior to July 15, 2020). Netlist, however, argued that Samsung willfully infringed following the alleged license termination. Netlist offered no evidence that Samsung knew about four of the asserted patents before the filing of this case. As to the fifth patent (the '060 patent), Netlist's argument centered on a communication from 2016—when Samsung was licensed and four years before the purported termination. PX446.

## II. Netlist seeks over $400 million in damages for a period of 16 months.

Netlist presented its damages case through its expert, David Kennedy, who testified about damages in the form of a reasonable royalty. Mr. Kennedy opined that the parties would agree, at a hypothetical negotiation, to a royalty equating to 100% of the revenue associated with the patented technology, which he calculated as the difference between the price of the accused products and the price of alleged "non-infringing alternative[s]." Tr. 703:16–25. Mr. Kennedy contended that such an award was appropriate because "without Netlist's technology, [Samsung] would lose the sale." Tr. 695:16–17. He calculated damages for the asserted patents as follows:

***DDR5 products***. Mr. Kennedy testified that the '918 and '054 patents enable a 30% increase in power efficiency without reducing speed. Tr. 693:15–694:9. He testified that without those patents, Samsung would have to sell a 20% slower product at a 28.8% price reduction, resulting in $196.3 million in lost revenues, all of which Samsung would pay to Netlist. Tr. 696:12–699:5. Mr. Kennedy's DDR5 damages calculations relied on a regression analysis performed on DDR4 products by a different expert, Andreas Groehn, who did not testify. Tr. 696:12–699:5.

***DDR4 products***. Mr. Kennedy testified that the '339 patent enables the use of two DDR4 LRDIMMs per channel, and that without the patent Samsung would have to sell a single, larger LRDIMM at a reduced price. Tr. 700:6–17. He opined that the revenue corresponding to this price difference was $44.2 million, all of which Samsung would pay to Netlist. Tr. 701:4–14.

***HBM products***. Mr. Kennedy testified that the '060 and '160 patents enable the sale of HBM products with DRAMs stacked 8-high or higher, and that without those patents Samsung would have to sell 4-high products at a lower price. Tr. 701:15–702:22. Mr. Kennedy testified that the aggregate difference in price—all of which would be paid to Netlist—equated to $163.7 million in revenue. Tr. 702:10–18.

Based on these calculations, Mr. Kennedy opined that a royalty for the asserted patents would amount to $404.2 million for a period of 16 months (from December 2021 to May 2023). In support of his opinion, Mr. Kennedy relied on the Rambus license—a non-comparable agreement covering thousands of third-party patents—to show that "Samsung agreed to pay $1.1 billion" after a prior license was terminated and Samsung was accused of infringement. Tr. 691:15–23; *see also* Tr. 741:20–23. Mr. Kennedy disregarded the only licenses to the asserted patents (to Samsung and SK hynix). Tr. 692:15–19.



[redacted]

Samsung responded to Netlist's damages case through its expert Paul Meyer. Mr. Meyer analyzed the Samsung and SK hynix licenses, among other evidence, and [redacted] Specifically, Mr. Meyer opined [redacted] When multiplied by the accused product sales, Mr. Meyer testified [redacted]

## III. Samsung moves for JMOL, and the jury returns a $303 million verdict.

At the close of evidence, Samsung moved for JMOL on several issues pursuant to Rule 50(a). Tr. 1232:9–21; Dkt. 477. The Court granted Samsung (a) JMOL of no damages for the '054 patent before January 25, 2022, Tr. 1266:1–3; and (b) JMOL of no infringement prior to July 15, 2020, Tr. 1266:4–1267:1. The Court denied Samsung's motion for JMOL of non-infringement for each of the asserted patents, Tr. 1237:16–1243:9, 1265:6–9; Samsung's motion for JMOL of invalidity for the '918, '054, and '339 patents, Tr. 1250:9–1252:21, 1265:19–25; Samsung's motion for JMOL of no willful infringement, Tr. 1245:22–1249:18, 1265:10–13; and Samsung's motion for JMOL of no damages, Tr. 1265:14–18; Dkt. 477.

On April 21, 2023, the jury returned its verdict, finding that Samsung infringed at least one claim within each of the three patent families (*i.e.*, the '339 patent, the '918 and '054 patents, and the '060 and '160 patents). Dkt. 479 at 4. The jury found that the asserted claims of the '339, '918, and '054 patents were not invalid, *id.* at 5, and that Samsung's infringement was willful, *id.* at 6. The jury awarded $33,150,000 for infringement of the '339 patent, $147,225,000 for infringement of the '918 and '054 patents, and $122,775,000 for infringement of the '060 and '160 patents—for a total of $303,150,000. *Id.* at 7.

Following a bench trial on Samsung's defenses of equitable estoppel, prosecution laches, and unclean hands, the Court declined to find any of those defenses applicable. Dkt. 550. On August 11, 2023, the Court entered final judgment. Dkt. 551. The Court determined that enhancement of damages pursuant to 35 U.S.C. § 284 was not appropriate. *Id.* at 3.

## APPLICABLE LEGAL STANDARD

"When a case is tried to a jury, a motion for judgment as a matter of law is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Cowart v. Erwin*, 837 F.3d 444, 450 (5th Cir. 2016) (cleaned up). "JMOL should be granted when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 873 (5th Cir. 2016) (cleaned up). The Court may grant a new trial if the verdict is against the weight of the evidence, the damages are excessive, the trial was unfair, or prejudicial error occurred. *See Smith v. Transworld Drilling Co*., 773 F.2d 610, 612–13 (5th Cir. 1985); *Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005). Additionally, "when the award is deemed merely 'excessive,' the district court may remit the award." *Polanco v. City of Austin, Tex.*, 78 F.3d 968, 981 (5th Cir. 1996).

## ARGUMENT

Samsung is entitled to JMOL on the issues of non-infringement as to all asserted patents, invalidity as to the '918, '054, and '339 patents, damages as to all patents, and willful infringement as to all patents. In the alternative, a new trial should be granted.

### I. Samsung is entitled to JMOL, or alternatively a new trial, on non-infringement.

Netlist failed to present evidence that the accused Samsung memory modules infringe any of the asserted patents. Samsung is therefore entitled to JMOL for the reasons discussed below. Each of these grounds was raised in Samsung's Rule 50(a) motion. Tr. 1237:16–1243:9.

A. **Samsung is entitled to JMOL of non-infringement of the ’339 patent because Netlist failed to prove that the accused products have multiple “byte-wise data paths” or “actively drive a byte-wise section of the N-bit wide write data.”**

Claim 1 of the ’339 patent recites a memory module comprising, among other things, “a plurality of byte-wise buffers.”[1] JTX2 at 32 (19:40–52). Each buffer must have a “first side” coupled to the computer and a “second side” coupled to multiple “ranks” of DDR DRAM devices. *Id.* When data is written to the memory module, the buffer must “actively drive a respective byte-wise section” of the data from the first side of the buffer to the second side of the buffer. *Id.*

The Court construed the phrase “to drive” to mean “enabling only one of the data paths while the other possible paths are disabled.” Dkt. 114 at 10. The buffers in the ’339 patent have multiple data paths, shown in Figure 5 as “path A” and “path B” (reproduced below), that connect the “first side” of the buffer to different ranks of DDR DRAM devices on the “second side” of the buffer. JTX2 at 30 (16:7–25); Dkt. 114 at 8–9; Dkt. 82 at 21–22. The claim thus requires what Netlist itself describes as a “Fork-in-the-Road,” Dkt. 76 at 4, where the memory module switches between these two paths depending on the rank to which the data is to be written.

[1] Samsung is accused of infringing claims 1, 8, and 9 of the ’339 patent. Claims 8 and 9 depend from claim 1. Since Samsung does not infringe claim 1, it does not infringe claim 8 or 9.

Dkt. 82 at 22. After reviewing both the specification and the prosecution history, "the Court adopt[ed] the so-called fork-in-the-road approach" in its claim construction. Dkt. 114 at 10.

The accused Samsung LRDIMM products do not satisfy the "drive" limitation because the buffers used in Samsung's products do not have the required "fork-in-the-road." The experts agree there is only a single data path through the buffer. Tr. 448:25–449:4, 451:11–18 (Mangione-Smith); Tr. 924:9–12 (McAlexander). In an attempt to obscure this fact, Netlist's expert arbitrarily divides the single data path in half and calls each half a separate path. But Netlist's sophistry does not constitute substantial evidence of infringement, for at least two independent reasons.

*First,* the claim requires multiple "byte-wise data paths." A byte is 8 bits. When Netlist's expert attempts to characterize a single 8-bit data path as two separate paths, each path is only half as wide, *i.e.*, 4 bits. A 4-bit data path is not a "byte-wise data path."

*Second*, even if a 4-bit data path could be considered a "byte-wise data path," Samsung still does not infringe because there is no "fork-in-the-road"—that is, the buffer does not have the option of driving 4 bits of data down one half of the path or the other. All 8 bits are driven down the same path. The accused products thus do not satisfy the requirement that the buffers "enabl[e] only one of the data paths while the other possible paths are disabled." Dkt. 114 at 10.

**1. The buffers used in Samsung's DDR4 LRDIMM products do not have two or more "byte-wise data paths."**

Under the Court's "fork-in-the-road" claim construction, there must be multiple data paths through the buffer. Indeed, the *entire* dispute during claim construction was whether the claims are limited to a "fork-in-the-road" configuration or instead encompass what Netlist called a "'Straight-Line' arrangement." Dkt. 76 at 4. Netlist described the difference as follows:

> In a "Fork-in-the-Road" configuration, switching between the multiple data paths may occur. In the "Straight-Line" arrangement, ranks of memory devices are on the *same data path* without any "Fork-in-the-Road."

Dkt. 76 at 4 (citations omitted) (emphasis in original). The Court rejected Netlist's argument that the claims encompass buffers having a "straight-line" arrangement and "adopt[ed] the so-called fork-in-the road approach." Dkt. 114 at 10. At trial, Netlist's expert, Dr. Mangione-Smith, admitted that, under the Court's "fork-in-the-road" construction, the claims require at least "[t]wo write paths" from the first side of the buffer to the second side of the buffer. Tr. 449:12–17.

The buffers in the accused DDR4 LRDIMM products indisputably do *not* have multiple data paths. Dr. Mangione-Smith admitted that the buffers in Samsung's LRDIMM products have only a single data path. Tr. 392:16–22 ("Q . . . Is that green line there that's annotated on the figure, is that a single data path? A. Yes."). But despite this admission, Dr. Mangione-Smith opined that the claim was satisfied because he could *think* of the single data path, which is 8 bits wide, as being two data paths, each of which is 4 bits wide. He opined that a single byte can be thought of as being made up of two 4-bit "nibbles":

> If we zoom in on this figure a little bit more, hopefully it becomes apparent that in the bottom right-hand edge, it refers to a lower nibble and an upper nibble. A nibble is just half of a byte.
>
> And if you look on the right-hand side of that blow-up, hopefully it's apparent that there's two sets of these circuits stacked on top of each other. So there's actually one circuit for the upper half byte and one for the lower half byte.

Tr. 392:2–10. But renaming "one byte" as "two nibbles" does not alter the fact that the buffers in Samsung's modules have only a single data path.

Netlist's attempt to mischaracterize a single data path as two data paths runs afoul of the language of claim 1. The claim recites "a plurality of byte-wise buffers." JTX2 at 32 (19:40). Each "byte-wise buffer" is required to have a "byte-wise data path" and to "actively drive a respective byte-wise section of the N-bit wide write data . . . from the first side to the second side" of the buffer. *Id.* at 32 (19:56–60). The term "drive" requires *paths*, plural, because it was construed as

"enabling only one of the data *paths* while the other possible *paths* are disabled."[2] Dkt. 114 at 10. Moreover, it is undisputed that a byte is eight bits. *See* Tr. 443:9–12 (Mangione-Smith).

On cross examination, Netlist's expert admitted that he had identified two 4-bit data paths—*not* that Samsung's LRDIMM products have two 8-bit data paths:

> Q . . . But we can agree so there's -- so the record is clear on this, that if the claim requires eight bits in the byte-wise buffer, you've only shown the jury here . . . one path of four bits and another separate path with four bits. Isn't that right?
>
> A. Yes. Yeah, I agree.

Tr. 455:3–9 (Mangione-Smith). Two 4-bit (or "nibble-wise") data paths do not satisfy the claim's requirement of "byte-wise" data paths. *See* Tr. 473:20–474:3 (Mangione-Smith admitting that the claim "does not recite actively driving a nibble-wise section of the write data along a nibble-wise data path").

Netlist's entire infringement case rests on the flawed argument that a "byte-wise data path" can have only four bits. According to Netlist, a "byte-wise data path" requires only that "the width is measured in terms of bytes." Tr. 453:25–454:5 (Mangione-Smith). So, under Netlist's theory, a 4-bit data path is still a "byte-wise data path" because 4 bits is "half of a byte." Tr. 453:17–19 (Mangione-Smith). Not only is Netlist's argument contrary to the plain meaning of "byte-wise," but it reads that term out of claim 1. Under Netlist's construction, *any* data path, no matter the size, would be a "byte-wise data path" because *any* data path can be measured in terms of bytes. A 1-bit data path would be one-eighth of a byte; a 2-bit data path would be one-fourth of a byte; and a 15-bit data path would be one and seven-eighths of a byte.

Netlist's argument is also contrary to the specification, which makes clear that a 4-bit buffer or data path is not "byte-wise." For example, the patent explains that the "data transmission circuit"

[2] All emphasis added unless otherwise noted.

(*i.e.*, the buffers) of Figures 4A and 4B "has a bit width of 8 bits," and, as such, the circuit "serve[s] as a 'byte-wise' buffer." JTX2 at 29 (13:43–53, 13:57–14:8, 14:15–18). The specification also distinguishes between 4-bit data paths and 8-bit data paths. *See id.* at 31 (17:30–32) ("The data transmission circuits 416 may each control, for example, a nibble-wide data path or a bytewide-data path."). But while the specification may contemplate using 4-bit data paths, claim 1 is expressly limited to "byte-wise" data paths—which the patent makes clear are different from and larger than a nibble. *Id.* at 32 (20:6–8) ("to drive a ***first nibble*** of the respective ***byte-wise*** section of the N-bit wide write data"); *id.* (20:13–14) ("to drive a ***second nibble*** of the respective ***byte-wise*** section of the N-bit wide write data"). Netlist's interpretation therefore conflicts with the plain and ordinary meaning of "byte-wise." *See, e.g.*, *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (rejecting claim interpretation "which was inconsistent with the specification and drawings and rendered superfluous the claim requirement"); *see also Wis. Alumni Rsch. Found. v. Apple Inc.*, 905 F.3d 1341, 1348 (Fed. Cir. 2018) ("Giving a term its plain and ordinary meaning does not leave the term devoid of any meaning whatsoever.").

Netlist has not offered any evidence to support its claim that a 4-bit data path is a "byte-wise" data path. Dr. Mangione-Smith did not identify any support in the specification or prosecution history for his interpretation, nor was he able to identify even a single instance where anyone had referred to a 4-bit data path as a "byte-wise data path." His conclusory testimony that a 4-bit data path satisfies the claims is insufficient to sustain the verdict. *See, e.g.*, *Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F. App'x 980, 986 (Fed. Cir. 2018) (expert testimony that is "conclusory, unsupported, [or] contrary to the evidence" is not "substantial evidence to support the jury's verdict"); *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) ("conclusory testimony" from an expert not sufficient to defeat JMOL).

**2.    The buffers in Samsung's LRDIMM products do not "enabl[e] only one of the data paths while the other possible paths are disabled."**

Even if a 4-bit data path could be a "byte-wise data path," Samsung would still be entitled to JMOL because Netlist failed to prove that, during a write operation, the buffers "actively drive a respective byte-wise section" of the data. Under the Court's claim construction, to "drive" the data requires "enabling only one of the data paths while the other possible paths are disabled." Dkt. 114 at 10. As the Court explained, the data paths in question are the paths *within* the buffer. *Id.* at 7 ("[T]he claims also require logic configurable to enable a data path to 'actively drive' write data *from one side of the buffer to the other side.*" (citing JTX2 at 32 (19:53–67))); *id.* at 9 (same).

Netlist failed to produce any evidence that the accused products enable only one data path from one side of the buffer to the other with the other possible paths disabled. Unable to prove that the paths *within* the buffers satisfy this requirement, Netlist's expert instead cited the data paths *from the controller in the computer to the LRDIMMs*. Specifically, Dr. Mangione-Smith offered the following diagram showing four different memory modules, each containing buffers represented by the turquoise rectangles at the bottom of the modules:



PDX4.157.

Relying on this figure, he argued that the "fork in the road" requirement was satisfied because when the buffers on one DIMM are on (*i.e.*, the DIMM denoted by the green checkmark), the buffers on the other DIMMs are off (*i.e.*, the DIMMs denoted by the red X):

> Q. Yes. Can you show what figure 3A, what you just discussed about one data buffer being turned on and the other off, what are you showing there with your illustration?
>
> A. I put a green checkmark next to the data buffers on the first DIMM and a red X on the other three DIMMs because they are turned off.
>
> Q. So for a given data transmission, there's only a single path for the data?
>
> A. That's correct.
>
> * * * *
>
> Q. So just going back to your diagram, so when the first four bits get driven through the buffer, the buffers on all the other DIMMs are off. Is that right?
>
> A. That's right. Only the buffer on DIMM 1 is on.
>
> Q. And does this fork in the road approach actually work in the products?
>
> A. Yes. This is exactly how the product works.

Tr. 387:6–14, 396:24–397:5; *see also* Tr. 385:20–21.

Dr. Mangione-Smith never contended that the 4-bit data paths within the buffer—*i.e.*, the data paths discussed in Section I.A.1—meet the selectively enabling requirement of the claims. Indeed, he admitted that what he had identified as the alleged "fork-in-the road" was "off of the module." Tr. 473:1–10. But the plain language of the claims requires multiple byte-wise data paths "between the first side and the second side" of the buffer *on a single memory module*, JTX2 at 32 (19:48–49)—as Dr. Mangione-Smith himself was forced to concede, Tr. 473:15–19 (agreeing that "everything that's required in the claim. . . has to be on the module"). Netlist's reliance on multiple data paths between the controller in the computer and the memory modules installed in the computer is contrary to the claim language and therefore cannot support the verdict.

**B. Samsung is entitled to JMOL of non-infringement of the ’060 and ’160 patents.**

Netlist accused Samsung of infringing claims 1, 5, and 7 of the ’060 patent and claim 5 of the ’160 patent. Samsung is entitled to JMOL of non-infringement because Netlist failed to provide sufficient evidence that the accused HBM products meet two distinct limitations of the claims.

**1. Netlist failed to prove that the accused products have “array dies” that are not “DRAM circuits.”**

The asserted claims require “a plurality of stacked array dies” (’060 patent, claim 1) or “stack array dies” (’160 patent, claim 1), which contain the actual memory, and a “control die” that manages how data is read from and written to the array dies. The Court held that Netlist disclaimed the use of “DRAM circuits” during prosecution and therefore construed “array die” to mean an “array die that is different from a DRAM circuit.” Dkt. 114 at 32. At trial, Netlist failed to present any evidence that the accused products contain an “array die that is different from a DRAM circuit,” under the plain meaning of that phrase. Samsung is therefore entitled to JMOL.

**a. The Court construed “array die” to exclude “DRAM circuits.”**

The meaning and scope of the term “array die” was thoroughly considered during claim construction. Netlist argued in its *Markman* brief that, to the extent it disclaimed anything during prosecution, it disclaimed only the use of the *specific* DRAM circuits in Rajan. Dkt. 76 at 28–29. The Court disagreed, holding that Netlist had “clearly and unambiguously” disclaimed the use of DRAM circuits, without limitation. Dkt. 114 at 32. Netlist then filed objections to the Court’s *Markman* order, again arguing that any disclaimer should be “limited to Rajan’s ‘DRAM circuits 206A–D’” and should not extend “broadly to any DRAM circuits,” Dkt. 133 at 1, but it later withdrew its objections, Dkt. 192, 194, thereby allowing the “broad” disclaimer to stand.

The Court did not further construe the term “DRAM circuit.” As a result, this term must be given its plain and ordinary meaning. *See, e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d

683, 696 (Fed. Cir. 2008) (when a term is not construed by the Court, "the ordinary meaning control[s]").

**b. The memories in the accused HBM products are "DRAM circuits."**

It is undisputed that the accused HBM products have memory dies that contain DRAM. Netlist's expert, Dr. Brogioli, agreed that the accused products contain "millions of DRAM cells . . . in those DRAM cores," Tr. 582:1–6, and that the DRAM cells "have circuit components," Tr. 583:4–6. Samsung's expert, Dr. Robins, likewise testified that the "DRAM dies of the Samsung products contain lots of DRAM circuits and DRAM circuitry." Tr. 1055:4–5. In view of this evidence, no reasonable jury could find the accused products do not contain "DRAM circuits" under the plain and ordinary meaning of that term.

**c. The testimony of Netlist's expert is legally insufficient to support the verdict.**

Netlist's expert, Dr. Brogioli, [REDACTED] His opinions do not constitute substantial evidence for at least two independent reasons.

*First*, Dr. Brogioli's opinions do not support the jury verdict because he failed to apply the plain and ordinary meaning of "DRAM circuit." *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("No party may contradict the court's construction to a jury."); *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) ("expert opinion evidence" was "irrelevant because it was based on an impermissible claim construction").

Dr. Brogioli explicitly drew a distinction between a "DRAM circuit" and "a DRAM circuit as that term is used in the Court's claim construction":

> Q. Does the fact that a memory die contains DRAM make that memory die a DRAM circuit?

A. Yes.

Q. Does the mere fact that one of these array dies contains DRAM, does that turn it into a DRAM circuit as that term is used in the Court's claim construction?

A. Oh, the array dies have DRAM cells in them, but that's not the DRAM circuit that the claim construction's talking about.

Tr. 617:23–618:6. Dr. Brogioli further explained what he meant by "the DRAM circuit that the claim construction's talking about":

Q. Did Netlist tell the Patent Office that its patents don't cover DRAM?

A. No, that's not what they said.

Q. What did they say?

A. They said that the Rajan is just talking about these DRAM circuits in its reference, and that's different from what the array dies of the patents are.

Tr. 618:24–619:5. Thus, according to Netlist's own expert, the plain meaning of a "DRAM circuit" is any "memory die [that] contains DRAM," but "the DRAM circuit that the claim construction's talking about" is limited to the particular DRAM circuits used in Rajan.

Dr. Brogioli's faux distinction between a "DRAM circuit" and "the DRAM circuit that the claim construction's talking about" was central to his infringement opinion. The sole basis for his opinion that the accused products contain [REDACTED] But any similarities or differences between Samsung's products and Rajan are irrelevant. Although Netlist expressly asked the Court to limit the disclaimer to just the DRAM circuits in Rajan, Dkt. 76 at 28–29; Dkt. 133 at 1, the Court did not do so, Dkt. 114 at 31–32. Dr. Brogioli's alleged distinction between a "DRAM circuit" and "the DRAM circuit that the claim construction's talking about" is therefore contrary to the Court's claim construction order and does not support the verdict. *See, e.g.*,

*Ultravision Techs, LLC v. GoVision LLC*, 2021 WL 2144788, at *2 (E.D. Tex. May 26, 2021) ("The Court is the sole arbiter of claim construction disputes. An expert is bound by the claim construction set forth by the Court." (citations omitted)); *see also Exergen*, 575 F.3d at 1321 (reversing jury finding of infringement).

*Second*, Dr. Brogioli erroneously suggested that the distinction between the claimed "array dies" and the disclaimed "DRAM circuits" is the type of die interconnect used. According to Dr. Brogioli, [REDACTED] *See* Tr. 495:3–9, 506:2–13; *see also* PDX3.22 (quoting JTX31), PDX3.23 (quoting JTX31 and Jihwan Kim Dep. Tr. 22:5–9). There is no legal or factual basis for this opinion.

Dr. Brogioli's assertion that all "array dies" must use TSVs, not wire bonding, not only lacks any supporting evidence but is contrary to the express teachings of the '060 and '160 patents. The asserted claims require that the "array dies" be connected using two or more "die interconnects." *E.g.*, JTX5 at 22 (23:65–66). The patents unequivocally state that wire bonding is a perfectly acceptable "die interconnect": "Examples of die interconnects include, but are not limited to, through-silicon vias (TSV), conducting rods, *wire bonds*, and pins." *Id.* at 13 (5:51–54); *see also id.* at 14 (8:22–27) ("[T]he die interconnects 220 may include any type of structure for enabling electrical communication between the data conduits 232 and the data ports of the array dies 210," including "*a wire*, a conducting rod, or a conducting trace, to name a few."). While dependent claim 5 of the '060 patent requires the use of TSVs, JTX5 at 22 (24:27–30), the very fact that TSVs are specified as an *additional* limitation of a dependent claim only reinforces the point that the "array dies" in claim 1 do not require the use of TSVs.

Similarly, Dr. Brogioli offered no evidence to support his contention that all "DRAM circuits" use wire bonding. He did not cite a single document that stated—or even suggested—that the definition of a "DRAM circuit" requires that it be connected to other circuits using wire bonding. He only testified that *in Rajan*, the DRAM circuits were [redacted] But Rajan did not coin the term "DRAM circuit." In fact, Dr. Brogioli conceded that the terms "DRAM" and "DRAM circuit" were used in numerous documents, *none of which* required wire bonding, or even mentioned whether they were wire bonded or had TSVs. *See, e.g.*, Tr. 559:8–10 (admitting that Netlist "use[s] DRAM and DRAM circuit interchangeably" in its SEC filings), 559:19–564:6 (admitting several of his own publications related to DRAM do not mention how the dies are connected).[3]

Even accepting all of the evidence presented by Netlist's expert, the most that a reasonable jury could conclude is that Samsung's DRAM circuits are different from the specific DRAM circuits used by Rajan. But that is irrelevant, because the Court rejected Netlist's argument that it disclaimed only Rajan's specific DRAM circuits. Samsung is therefore entitled to JMOL of non-infringement of the '060 and '160 patents.

**2. Netlist failed to prove that the accused products have "die interconnects" that are "not in electrical communication with" certain "array dies."**

All claims of the '060 and '160 patents require "die interconnect[s]" that are "*not* in electrical communication with" certain "array dies." *E.g.*, JTX5 at 22 (23:66–24:5). Dr. Brogioli admitted that the signal path in the accused products travels across each and every core die. Tr. 606:3–608:7, 609:8–12; *see also* Tr. 1057:18–1064:8 (Robins); JTX16 at 7; JTX15 at 2. Yet he

[3] Dr. Brogioli's testimony is also contrary to Rajan. Far from requiring the use of wire bonding, Rajan explicitly states that the DRAM circuits may be "integrated in any desired manner." JTX63 at 20 (¶ 23); *see also* Tr. 1052:24–1054:10 (Robins).

argued that the claims permit electrical communication to all array dies so long as there was no electrical communication to specific *portions* of the array dies—namely, "data ports" or "receivers." Tr. 493:25–494:9, 519:14–20, 520:4–18, 623:8–19. That argument fails as a matter of law in view of the plain claim language and the specification.

The specification refers to die interconnects being in electrical communication with various parts of a memory product. In some instances, the specification describes electrical communication with the "array dies" themselves. *E.g.*, JTX6 at 13 (4:25–57), 14 (6:26–30), 15 (8:30–32), 16 (9:55–60). In other instances, the specification states that the "die interconnects" are in electrical communication with specific components of the array dies, such as "data ports," "chip select conduits," and "memory cells." JTX6 at 1 (Abstract), 12 (2:22–33), 14 (5:18–20, 5:57–6:22), 15 (8:40–45, 8:63–65), 16 (9:51–55). Although Netlist knew how to describe electrical communication with "data ports," the claims of the '060 and '160 patents specify that the "die interconnects" are "not in electrical communication" with "*array dies*" themselves. The testimony of Netlist's expert that the "die interconnects" are not in electrical communication with "data ports" or "receivers" is therefore insufficient as a matter of law to prove infringement. Because Netlist failed to provide any evidence that the "die interconnects" are not in electrical communication with the alleged "array dies" in the accused products, Samsung is entitled to JMOL.

### C. Samsung is entitled to JMOL of non-infringement of the '918 patent because Netlist failed to prove that the accused products have the required "converter circuit."

Netlist asserted that Samsung's SODIMM, UDIMM, and RDIMM products infringe claims 16, 18, and 19 of the '918 patent and that Samsung's RDIMM products also infringe claims 1, 5, and 13. All asserted claims require a "converter circuit" configured to "provide a fourth regulated voltage." JTX3 at 46 (38:31–32), 47 (39:63–64). Samsung is entitled to JMOL of non-infringement because Netlist failed to prove that the accused products have the required "converter circuit."

Because the Court did not construe the term "converter circuit," the plain and ordinary meaning applies. *Broadcom*, 543 F.3d at 696; *see also* Tr. 1301:4–10 (jury instructions). Although Netlist contended that a low drop out ("LDO") regulator in the accused products was the required "converter circuit," Tr. 336:1–2 (Mangione-Smith), Netlist failed to present any evidence that the plain and ordinary meaning of "converter circuit" encompasses an LDO regulator. Instead, Netlist improperly treated the "converter circuit" as a purely functional limitation, arguing that the limitation is satisfied by *anything* that performs the function of converting a voltage. Netlist's expert, Dr. Mangione-Smith, admitted that, when performing his infringement analysis, he "did not look for any structural element beyond the functional requirement that something reduced the voltage." Tr. 416:21–24. Under his purely functional analysis, a "converter circuit" does not require any particular structure or class of structures. He testified that even "a wire can be a converter circuit." Tr. 416:9–12. As long as the circuit "has resistance"—which *every* circuit does—it would be a "converter circuit." *Id. See also* Tr. 1234:22–23 (arguing in Rule 50(a) conference that "[t]he claims impose no structural limitation on the claimed converter circuit").

Throughout the trial, Netlist misled the jury into believing that any circuit that performs the function of converting a voltage satisfies the claim limitation. For example, Dr. Mangione-Smith erroneously stated that a Samsung engineer, Kyunsoo Park, had testified that an LDO regulator is a converter circuit. Tr. 336:18–21. In fact, Mr. Park was never asked about a "converter circuit" and never testified that an LDO regulator is a "converter circuit." Tr. 640:24–644:23. Similarly, during closing arguments, Netlist told the jury that another Samsung engineer, Hun-Joo Lee, "admitted as well that the LDO is a converter." Tr. 1330:11–12. But he said no such thing. To the contrary, Mr. Lee consistently and repeatedly distinguished between converter circuits and LDO regulators:

Q. Which voltage converter on the PMIC provides the supply voltage for the I2C/I3C communication lines in DDR5 DIMMs?

A. The power that you're referring to is not provided by the voltage converter. It is provided by PMIC by way of the LDO linear regulator.

Tr. 672:4–8. At most, this testimony establishes that an LDO "converts" a voltage. Tr. 644:20–23 (Park); *see also* Tr. 668:10–12 (Lee). But that is insufficient to show that an LDO has the structure of a "converter circuit."[4]

Netlist's assertion that "[t]he claims impose no structural limitation on the claimed converter circuit," Tr. 1234:22–23, is wrong as a matter of law. The Supreme Court has held that purely functional limitations fail to comply with the Patent Act's requirement that the inventor "particularly point out and distinctively claim the part, improvement, or combination which he claims as his invention or discovery." *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 9–10 (1946). Although Congress subsequently amended the Patent Act to permit means-plus-function claims, in so doing, it "struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc). If Netlist wanted to argue that

[4] The record establishes that there are structural differences between a "converter circuit" and an LDO regulator. A "converter circuit" includes a combination of an inductor and a switch in which the switch "is continually switching on and off" the voltage "to provide charge to an inductor." Tr. 889:23–890:17 (McAlexander). The "buck-converters," "boost converters," and "buck-boost converters" disclosed in the patent all have this structure. Tr. 889:23–892:19 (McAlexander). By contrast, a "linear regulator works by throwing away the extra energy, and it does that by basically expending that energy through a resistor—a set of resistors which creates [] thermal radiation, if you will. So the energy is discarded in the form of heat." Tr. 889:9–22. Even Netlist's expert admitted that "buck converters and LDOs have fundamentally different characteristics as well as operational benefits and limitations." Tr. 415:5–8.

the "converter circuit" is a functional limitation, it was required to seek a means-plus-function construction and accept the restrictions that such a construction would impose. It did not do so.[5] And in attempting to rely on an impermissible functional construction, Netlist failed to present any evidence that the accused products have the required "converter circuit."

Netlist has likewise failed to prove infringement under the doctrine of equivalents. The sum total of testimony on this issue was a single, conclusory sentence by Dr. Mangione-Smith: "[an LDO is] equivalent because it does the same function which is to convert; it does it the same way, which is to reduce the input voltage; and it achieves the exact same result, which is a regulated output voltage." Tr. 337:15–18. His testimony is facially deficient. For example, Dr. Mangione-Smith does not properly address the "way" prong of the function-way-result test. Instead, he merely repeats the function, replacing "convert" with the synonym "reduce." Such conclusory testimony is insufficient as a matter of law to prove infringement under the doctrine of equivalents. *See Hewlett-Packard*, 340 F.3d at 1322–23.

Moreover, Dr. Mangione-Smith's own testimony contradicts any claim that an LDO regulator is equivalent to a converter circuit. The only converter circuits described in the specification are buck converters, boost converters, and buck-boost converters. JTX3 at 42 (29:23–27). Dr. Mangione-Smith admitted that "buck converters and LDOs have fundamentally different characteristics as well as operational benefits and limitations." Tr. 415:5–8. Among the differences, "a buck converter takes up more space because it requires the use of comparatively bulky passive components such as inductors and capacitors." Tr. 414:21–254. In addition, "a buck

[5] It is too late to construe the term as a means-plus-function limitation. "When issues of claim construction have not been properly raised in connection with the jury instructions, it is improper for the district court to adopt a new or more detailed claim construction in connection with [a] JMOL motion." *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1320 (Fed. Cir. 2003).

converter is more complicated to implement, is more costly to implement, and is more noisy than an LDO." Tr. 415:1–4. He also admitted that LDO regulators and buck converters are not interchangeable. Tr. 421:10–13 (admitting that "a person of skill in the art would understand that you cannot use one or more LDOs as the buck converter[s]" in Figure 16 of the patent). *Id.* These admissions negate his conclusory and unsupported doctrine of equivalents opinion.

**D. Samsung is entitled to JMOL of non-infringement of the '054 patent because the accused products do not transition to a "second operable state."**

The '054 patent is directed to memory modules containing both volatile memory (*i.e.*, DRAM) and non-volatile memory (*i.e.*, flash). As the patent explains, "[v]olatile memory generally maintains stored information only when it is powered." JTX4 at 29 (3:53–54). In contrast, "[n]on-volatile memory can generally maintain stored information while power is not applied." *Id.* (3:59–60). In order to prevent the loss of data when the power goes out, the memory module of the '054 patent includes a "voltage monitor circuit." When the monitor circuit detects a change in voltage, the memory enters a "second state" in which "data is read from the volatile memory subsystem 1030 and is transferred to the non-volatile memory subsystem 1040." *Id.* at 40 (25:8–31); *see also id.* at 39–40 (24:60–25:7). When power is restored, "the memory system 1010 re-enters the first state," and "data may be transferred back from the non-volatile memory subsystem 1040 to the volatile memory subsystem 1030." *Id.* at 40–41 (26:66–27:1).

Netlist asserted claims 16 and 17 of the '054 patent against Samsung's DDR5 SODIMM, UDIMM, and RDIMM memory modules. Independent claim 16 recites a "memory module comprising," among other things:

> a voltage monitor circuit coupled to an input voltage received from the host system via the interface, the voltage monitor circuit configured to detect an amplitude change in the input voltage, wherein, in response to the voltage monitor detecting an amplitude change in the input voltage, the memory module transitions from a first operable state to a second operable state.

JTX4 at 47 (40:14–20). Claim 17 depends from claim 16.

Samsung is entitled to JMOL of non-infringement because none of the accused Samsung products has the required "second operable state." The parties agreed to construe "operable state" as a "state in which the memory module is operated." The "first operable state" is the "state in which the memory module is operated before transition," and the "second operable state" is the "state in which the memory module is operated after transition." Dkt. 91-1, Ex. A at 4.

The facts are not in dispute. Both sides' experts agreed that in the event of "an amplitude change in the input voltage," the DRAM on the module is disabled. While some low-level circuitry on the module receives power, Dr. Mangione-Smith conceded that "after an overvoltage condition, for example, the DRAMs are turned off." Tr. 379:7–8; *see also* Tr. 378:16–379:10, 436:20–437:6; Tr. 894:5–896:6 (McAlexander). The experts further agreed that, in this state, it is impossible to either write data to, or read data from, the memory, and any data that was stored in the memory is lost forever. Tr. 431:21–432:9 (Mangione-Smith agreeing that the data "gets wiped out" and that the DRAMs "certainly don't operate"); Tr. 896:7–24, 896:25–897:7 (McAlexander).

Despite agreeing that the DRAM memory is completely "turned off" and inaccessible after an overvoltage condition, Dr. Mangione-Smith offered legally flawed testimony that the memory module has entered a "second operable state." His opinion, however, does not provide sufficient evidence to support the verdict. According to Dr. Mangione-Smith, the memory module is in an "operable state" as long as any component in the memory module receives power. Tr. 378:25–380:6 (explaining that the registering clock driver, SPD, temperature sensor, and power management integrated circuit receive power). But the fact that lower-level circuitry still receives power does not mean that the memory module is in a "second operable state," or "is operated," as the Court's construction requires.

Dr. Mangione-Smith's conclusory testimony that "operated" means nothing more than "powered" does not amount to substantial evidence. *See Kim*, 465 F.3d at 1320 (affirming JMOL of non-infringement where "conclusory [expert] testimony" was the basis for infringement); *Dominion Energy*, 725 F. App'x at 986 (reversing denial of JMOL motion). Notably, he presented no explanation as to why "powered" means "operated" under the term's plain meaning. Nor does the specification support such an interpretation, as every embodiment of the '054 patent shows that, in each "operable state," the memory module takes affirmative actions—namely, it transfers data to or from the memory subsystems. JTX4 at 40 (25:58–66); *see also id*. at 39–42 (24:35–29:64). No reasonable jury could have found that the memory module is in an "operable state" when the memory is turned off, thereby erasing the contents and rendering the memory unusable.

The record uniformly shows that in the alleged "second operable state," the module simply listens for a command to turn on the module. Dr. Mangione-Smith confirmed that the low-level components receive power only because "otherwise, there would be no way for the host processor to turn the DIMM back on." Tr. 379:20–380:1; *see also* Tr. 968:18–21, 970:13–971:1 (McAlexander). Far from being evidence of infringement, his testimony *confirms* that in the putative "second operable state," the memory module is, in fact, turned off. Because Netlist failed to provide substantial evidence that the accused products have a "second operable state," Samsung is entitled to JMOL of non-infringement.

**E. Samsung is entitled to JMOL of non-infringement of the '918, '054, and '339 patents because Netlist failed to present evidence that any single Samsung product satisfies every limitation of any of the asserted claims.**

As the Court has observed, Netlist declined to rely on the standards to show infringement of the '918, '054, and '339 patents and instead "asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products." Dkt. 550 at 23–25. Having made this decision, Netlist had to prove "that every limitation recited in the claim appear[s] in the

accused device, *i.e.*, that the properly construed claim reads on the accused device exactly." *Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1358 (Fed. Cir. 2000). Netlist did not do so. Instead, it took a mix-and-match approach, alleging that one product meets *some* limitations only to argue that a different product satisfies *other* limitations of the same claim. The parties did not stipulate that Netlist could rely on different products to satisfy the same claim, or that any one product was representative of all other products, and Netlist deliberately chose not to offer evidence that all products are the same because they comply with the standards. Because Netlist did not prove that any single accused product—let alone *all* accused products—satisfies each limitation of any asserted claim, Samsung is entitled to JMOL.

**1. Netlist's infringement arguments for the '918 and '054 patents rely on features of different PMICs used in different Samsung products.**

Netlist's infringement theories for the '918 and '054 patents focused primarily on the Power Management Integrated Circuits ("PMICs") used in the accused DDR5 products. Across its entire line of DDR5 memories, consisting of 143 different product models, *see* JTX23, Samsung uses numerous different PMICs, supplied by at least four different companies: Samsung, Texas Instruments, Renesas, and Monolithic Power Solutions. Tr. 422:19–423:10 (Mangione-Smith). But Netlist only introduced evidence as to three PMICs: the Samsung S2FPD01, Samsung S2FPC01, and Renesas P8911. *See generally* Tr. 331:16–347:1, 349:9–350:10, 372:18–376:10, 378:5–381:5 (Mangione-Smith). Netlist's approach suffered from at least two fatal errors.

*First*, Netlist presented no infringement evidence whatsoever for accused products that contain PMICs other than the three noted above. For example, even though Dr. Mangione-Smith admitted that some of the accused products use Texas Instruments or Monolithic Power Solutions chips, Tr. 422:19–423:10, he did not offer any testimony regarding the structure or operation of these PMICs. "A patentee . . . cannot simply assume that all of the accused products are like the

one plaintiff's expert tested and thereby shift to the accused infringer the burden to show that is not the case." *Medtronic Vascular, Inc. v. Boston Sci. Corp.*, 2008 WL 2744909, at *3 (E.D. Tex. July 11, 2008) (cleaned up). Netlist thus failed to prove that all accused products infringe. This failure requires vacating the damages award, which was based on sales of all accused products.

*Second*, even as to the three PMICs that were discussed at trial, Netlist's expert relied on different PMICs to satisfy different limitations. Dr. Mangione-Smith began his opinions with claim 16 of the '918 patent, which requires, among other things:

> first, second, and third buck converters configured to receive a pre-regulated input voltage and to produce first, second and third regulated voltages, respectively;
>
> a converter circuit configured to reduce the pre-regulated input voltage to provide a fourth regulated voltage,

JTX3 at 47 (39:60–64). Dr. Mangione-Smith opined that the Samsung S2FPD01 PMIC has the required buck converters and an LDO regulator that meets the requirement of the "converter circuit." Tr. 334:24–335:7 (citing JTX11, the datasheet for the S2FPD01). But when discussing whether the PMIC was "configured to receive a pre-regulated input voltage," Dr. Mangione-Smith relied on a different PMIC, the Samsung S2FPC01, to support his opinion. Tr. 335:19–25 (citing JTX12, the datasheet for the S2FPC01). He never opined that either PMIC had the required "buck converters" *and* was "configured to receive a pre-regulated input voltage."

Dr. Mangione-Smith's opinions regarding the Renesas P8911 PMIC were similarly deficient. He opined that the Renesas PMIC has an LDO regulator that satisfies the "converter circuit" limitation. Tr. 337:2–10. But he never asserted that the Renesas PMIC has the required buck converters or that it is "configured to receive a pre-regulated input voltage." Netlist therefore failed to prove that any of the accused DDR5 products infringe claim 16 or dependent claims 17 and 18. *See Geovector Corp. v. Samsung Elecs. Co.*, 2017 WL 76950, at *4 (N.D. Cal. Jan. 9,

2017) ("This hodgepodge of different attributes from various different accused products and third-party sources is insufficient to chart a single product against all elements of Claim 1.").

Netlist's failure of proof also infects the remaining asserted claims of the '918 patent and the '054 patent. For claim 1 of the '918 patent, Dr. Mangione-Smith referred back to his opinions with respect to claim 16. Tr. 342:7–344:16. Netlist alleged that Samsung's RDIMM products infringe claim 1, Tr. 342:7–9, but Netlist failed to offer any evidence as to which PMICs are used in the RDIMM products.[6] Netlist therefore failed to prove that Samsung infringes claim 1 or dependent claims 5 and 13. Similarly, Dr. Mangione-Smith's opinions with respect to claims 16 and 17 of the '054 patent were nearly identical to his opinions concerning claim 16 of the '918 patent. Tr. 345:13–346:4. He testified that "quite a bit" of the evidence overlapped and he had already "talked about the first, second, and third buck converters" and "the converter circuit as well." *Id.* But as with the '918 patent, he did not identify a single Samsung product having the specific PMIC on which his opinions depended. Netlist has therefore failed to present any evidence that any of the accused DDR5 products infringes any asserted claim of the '918 and '054 patents.

**2. Netlist's infringement argument on the '339 patent improperly relied on datasheets for third-party buffers without any evidence that those buffers are used in the accused Samsung LRDIMMs.**

Netlist took the same improper mix-and-match approach to the '339 patent. Claim 1 recites an "N-bit-wide memory module" comprising, among other things, "a printed circuit board," "double data rate dynamic random access memory (DDR DRAM) devices," "a module controller," and "a plurality of byte-wise buffers." JTX2 at 32 (19:9–67). As a threshold matter, Netlist failed

[6] Dr. Mangione-Smith cited a datasheet to support his opinions regarding Samsung's RDIMM products. Tr. 337:23–338:4, 343:8–18. But the datasheet shows that different models of RDIMMs, with different part numbers, use different PMICs. JTX9 at 6 n.1. The evidence thus shows that not all of the accused products have the specific PMIC on which Dr. Mangione-Smith relied.

to offer *any* evidence as to most of the accused products. Netlist accused at least 90 different DDR4 LRDIMM models of infringing the ’339 patent. *See* JTX23. But Netlist presented evidence as to only two models: the M386A8K40BM1 and M386A8K40BM2. Tr. 387:17–390:25, 394:20–395:12 (Mangione-Smith citing JTX28, the M386A8K40BM1 and M386A8K40BM2 datasheet). Samsung is therefore entitled to JMOL that no other model infringes the asserted claims of the ’339 patent. *See Medtronic Vascular*, 2008 WL 2744909, at *3. Because the damages award was based on all DDR4 LRDIMMs being found to infringe, the award must be vacated.

Netlist’s evidence also fails as to the M386A8K40BM1 and M386A8K40BM2 because Netlist failed to present any evidence that these products have the claimed “data buffers.” Dr. Mangione-Smith relied on the datasheets for these products to support his opinions that the products satisfy the printed circuit board, DDR DRAM, and module controller limitations. Tr. 387:17–390:25, 394:20–395:12 (citing JTX28). When it came to whether the products have the required “data buffers,” however, he pointed to an integrated circuit manufactured by third-party Renesas, the 4DB0232KC2. Tr. 391:1–394:19, 395:13–398:4 (referencing JTX20). But Netlist did not present any evidence that the M386A8K40BM1 or M386A8K40BM2—or any other accused product—contains a Renesas 4DB0232KC2 data buffer.

Netlist’s failure of proof is evident from Dr. Mangione-Smith’s demonstratives. For example, the following slide purported to show how Samsung’s LRDIMM products have the required “buffers” disposed on the PCB:



PDX4.152; *see also* Tr. 394:21–395:12 (discussing same). Dr. Mangione-Smith highlighted the alleged "buffers" in turquoise rectangles. But Dr. Mangione-Smith's own slide shows that the module does *not* have Renesas 4DB0232KC2 buffers.



PDX4.152 (magnified and rotated). As can be clearly seen, this module has IDTDB0124B data buffers. Dr. Mangione-Smith, however, did not offer any opinions regarding the IDTDB0124B buffer, nor did Netlist proffer any other evidence as to how the IDTDB0124B buffer meets the requirements of claim 1 of the '339 patent.

Without any evidence that the Samsung M386A8K40BM1 and M386A8K40BM2 products contain Renesas 4DB0232KC2 buffers, Dr. Mangione-Smith's testimony regarding those buffers is irrelevant. Without any evidence that the buffers actually used in Samsung's products

[redacted]

satisfy the requirements of claim 1, Netlist has failed to carry its burden of proof. Since asserted claims 8 and 9 depend from claim 1, Netlist has failed to prove that any Samsung product infringes any asserted claim of the ’339 patent.

**F. In the alternative, the Court should order a new trial on infringement.**

If the Court does not grant JMOL of non-infringement, it should, in the alternative, grant a new trial because the verdict was “against the great weight of the evidence” and was based on Netlist’s improper and highly prejudicial arguments. *Cates*, 431 F.3d at 460. “It is beyond dispute that claim construction issues are to be decided by the court. It is thus improper for an expert witness to testify before the jury regarding claim construction.” *ATEN Int’l Co. v. Uniclass Tech. Co.*, 932 F.3d 1364, 1370 (Fed. Cir. 2019). Moreover, the parties and their experts are required to apply the Court’s constructions. *Exergen*, 575 F.3d at 1321 (“No party may contradict the court’s construction to a jury.”). As described above, Netlist repeatedly violated both of these principles.

With respect to the ’339 patent, Netlist ignored the Court’s “fork-in-the-road” construction of the term “drive” and failed to apply the plain meaning of “byte-wise data path.” For the ’060 and ’160 patents, Netlist’s expert explicitly offered claim construction opinions by testifying about what the Netlist told the patent office about the Rajan reference. Tr. 618:24–619:5 (Brogioli). By arguing that “DRAM circuit” should be limited to the specific circuits used in Rajan, [redacted]

For the ’918 patent, Netlist treated “converter circuit” as a purely functional limitation without adhering to the requirements of 35 U.S.C. § 112, ¶ 6, and otherwise failed to show that an LDO is a “converter circuit” under the term’s plain meaning. Finally, for the ’054 patent, Netlist failed to apply the construction of “operable state.”

Netlist's improper arguments were highly prejudicial. As the Federal Circuit has explained, "[t]he risk of confusing the jury is high when experts opine on claim construction before the jury." *CytoLogix Corp. v. Ventana Med. Sys.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005). This prejudice cannot be cured merely by instructing the jury to apply the Court's constructions. *Id.* Here, the cumulative effect of Netlist's repeated and consistent failures to apply the Court's claim constructions undercuts any presumption that the jury followed the Court's instructions and applied the Court's constructions and, to the contrary, strongly suggests that the jury was confused by the different constructions used by Netlist and its experts. *See O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1358 (Fed. Cir. 2008) (reversing where claim construction arguments "were improperly submitted to the jury"). With respect to the '339 patent, for example, Netlist's expert admitted that if "byte-wise" means eight bits, he had not shown that the accused products have multiple byte-wise data paths. Tr. 455:3–9 (Mangione-Smith). Netlist's failure to apply the Court's construction was therefore outcome determinative, requiring, at a minimum, a new trial.

## II. Samsung is entitled to JMOL, or alternatively a new trial, on invalidity with respect to the '918, '054, and '339 patents.

Samsung proved by clear and convincing evidence that the asserted claims of the '918, '054, and '339 patents are invalid because they fail to comply with the written description requirement of 35 U.S.C. § 112, ¶ 1. Netlist failed to present any rebuttal case on invalidity, and the record does not otherwise contain sufficient evidence to support the verdict of no invalidity.

A patent's written description "must convey with reasonable clarity to those skilled in the art that [the inventor] was in possession of the invention." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000) (cleaned up). "Adequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his

future claims can be determined to be encompassed within his original creation." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991). As a result, "a broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope." *Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*, 291 F.3d 1317, 1323 (Fed. Cir. 2002).

**A. Samsung is entitled to JMOL that the asserted claims of the '918 and '054 patents are invalid for lack of written description support.**

The asserted claims of the '918 and '054 patents lack written description support as a matter of law because the claims do not cover the hybrid volatile and non-volatile memory module that is the singular focus of the specification. In addition, the claims of the '918 patent are independently invalid because the specification fails to support the overbroad interpretation of the "converter circuit" term required by Netlist's infringement arguments.

**1. The asserted claims of the '918 and '054 patents extend beyond the hybrid memory module required by the specification.**

In 2008, Netlist filed a patent application for a hybrid memory module that transfers data between volatile DRAM memory and non-volatile flash memory on the same module. In December 2020 and May 2021, after observing the development of DDR5 products, Netlist filed the sixth and seventh continuations of that application in an attempt to claim memory modules without any non-volatile memory at all. Those continuations issued as the '918 and '054 patents, respectively. As the evidence at trial clearly demonstrated, the asserted claims of these patents are not supported by the written description.

**a. According to the specification, the alleged invention is a hybrid memory module.**

The '918 and '054 patents are both titled "Flash-DRAM Hybrid Memory Module," JTX3 at 1; JTX4 at 1, and their shared specification describes the technical field as related "particularly[] to devices that employ different types of memory devices such as combinations of flash and

random access memories"—*i.e.*, hybrid memory modules. JTX3 at 28 (1:66–2:2); *see also* Tr. 899:24–900:3 (McAlexander) ("Both patents are directed to a hybrid memory module that includes both flash and DRAM on that module."); Tr. 900:7–14 (McAlexander). The specification explains that "[v]olatile memory [e.g., DRAM] generally maintains stored information only when it is powered," JTX3 at 29 (3:53–54), but that "[n]on-volatile memory [e.g., flash] can generally maintain stored information while power is not applied," *id.* (3:59–61). The hybrid module proposed in the patents enables the efficient transfer of data from volatile memory to non-volatile memory when needed (*e.g.*, in the event of a power failure). *See id.* (3:61–62) ("[I]t can therefore be useful to backup volatile memory using non-volatile memory"); *id.* at 29–31 (3:66–8:50); Tr. 871:12–16, 873:10–875:24 (McAlexander).

The specification makes plain that this "Flash-DRAM Hybrid Memory Module" is more than the title of the patents—it *is* the alleged invention. The patents identify a single problem in the prior art: the difficulty of rapidly transferring data between volatile and non-volatile memory. JTX3 at 28–29 (2:6–3:52); Tr. 873:10–875:24, 900:15–903:25 (McAlexander). The specification explains that prior art approaches suffered from an "information transfer bottleneck due to the inability of the high speed CPU . . . to efficiently transfer data" between volatile DRAM memory and non-volatile memory elsewhere in the computer, JTX3 at 28 (2:27–33), and these bottlenecks become problematic, for instance, when data stored in the DRAMs must be transferred to non-volatile memory during power failures or other exigencies, *id*. at 29 (3:46–62), 33 (11:15–23).

As Mr. McAlexander testified, the specification proposes a flash-DRAM hybrid memory module as the singular solution to this problem:

> What it describes as the solution to that bottleneck is three-fold: One, move the flash memory onto the same module as the DRAM. As a result of moving them closer together, you are able to have a more direct communication of data between the two so that you can then, under a controller that controls this data flow

operation, you are able to do a back-up of that information in the case of a pending power loss.

Tr. 874:8–14; *see also* JTX3 at 32 (10:52–57) (describing "arrangements for improving memory access rates" and, in particular, a "Flash-DRAM hybrid DIMM . . . with integrated Flash and DRAM"), 32–33 (10:58–12:24); Tr. 902:14–903:5 (McAlexander). In contrast to the prior art (below, left), which had non-volatile memory (*e.g.*, a hard drive) separate and apart from a DIMM consisting of volatile DRAM memory, the specification proposes (below, right) a single DIMM with integrated non-volatile flash (302) and volatile DRAM (304) memories, and a controller (306) for facilitating fast data transfer (308) between these different types of memory. JTX3 at 28 (2:28–54), 33 (11:11–40); Tr. 900:15–903:5 (McAlexander); Tr. 244:12–245:18 (Milton).

JTX3 at 6 (Figs. 1 and 3A) (annotated).

Mr. Milton, the only named inventor to testify, admitted that "[t]he concept [he] invented was putting that all on one module." Tr. 244:22–24. He further conceded that this hybrid module is a "focus of the patent," Tr. 239:23–240:2, and "the vast proportion of this specification is directed to that invention," Tr. 247:25–248:9; *see also* Tr. 242:2–243:6.

**b. Netlist improperly broadened the claims of the '918 and '054 patents beyond the invention described.**

The '918 and '054 patents do not claim the hybrid memory module described in the specification. Their claims, added more than a decade after the application to which they claim priority, instead recite a new alleged invention, which Netlist has described as "intelligent on-

module power management" and which does not require a hybrid module capable of transferring data between volatile and non-volatile memory. *See, e.g.*, Tr. 195:3–21 (Milton). Only one asserted claim even mentions non-volatile memory (claim 19 of the '918 patent), but Netlist contends this claim is satisfied by writing configuration information to the PMIC in the accused products, rather than writing user data to discrete non-volatile memory, as described in the specification. Tr. 431:1–15 (Mangione-Smith agreeing that the embedded flash in the PMIC "does not back up the information in the DRAM chips"); *see also* Tr. 341:3–342:6, 375:4–18 (Mangione-Smith). Thus, under Netlist's interpretation, even claim 19 does not reflect the hybrid memory module required by the specification. Tr. 1035:1–1036:16 (McAlexander).

By dropping the hybrid memory structure required by the written description, Netlist improperly expanded the scope of the asserted claims to cover non-hybrid devices. The claims are therefore invalid because they "exceed in scope the subject matter that [the] inventor [] chose to disclose to the public in the written description." *Atl. Rsch. Mktg. Sys. v. Troy*, 659 F.3d 1345, 1355 (Fed. Cir. 2011); *see also, e.g.*, *ICU Med., Inc. v. Alaris Med. Sys.*, 558 F.3d 1368, 1377–79 (Fed. Cir. 2009) (rejecting "contention that the figures and descriptions that include [a feature] somehow demonstrate that the inventor possessed a medical valve that operated without [the feature]"); *LizardTech, Inc. v. Earth Res. Mapping, PTY, Inc.*, 424 F.3d 1336, 1344–45 (Fed. Cir. 2005) (holding invalid claim "directed to creating [image compression] coefficients generically" because specification was "directed at [] a particular method for creating a [compression coefficient]"); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (holding invalid claims that did not place recliner controls on the console because "[t]he original disclosure clearly identifie[d] the console as the only possible location for the controls").

Courts routinely hold that claims lack written description support as a matter of law, including in cases where the claims have been improperly broadened. *See, e.g.*, *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1247 (Fed. Cir. 2002) (reversing district court's denial of JMOL for invalidity based on lack of written description); *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998) (reversing district court's denial of JMOL, as the "patent's specification describes only one cup—a conical cup—and thus does not provide sufficient support for claims . . . which are generic as to the shape of the cup"); *see also LizardTech*, 424 F.3d at 1346–47 (affirming summary judgment); *Atl. Rsch. Mktg.*, 659 F.3d at 1355 (affirming summary judgment). In *PIN/NIP*, for instance, "nothing in the specification [of the asserted patent] indicate[d] that the invention [wa]s anything other than a *mixture* of two chemicals" used in cultivating potatoes. 304 F.3d at 1247 (emphasis in original). But the patentee had added a claim in a continuation patent "to encompass separate applications" of those chemicals. *Id.* The Federal Circuit held the claim invalid, explaining that "the originally filed application, which is devoid of any mention or even implication that the two chemicals can be applied" separately, "does not support the later-added claim." *Id.* at 1247–48.

Here, the specification of the '918 and '054 patents is similarly devoid of support for claims that do not require both volatile and non-volatile memory on a DIMM for purposes of data transfer between the two. In fact, as discussed above, the specification teaches *against* prior art embodiments without non-volatile memory on the DIMM due to data transfer bottlenecks. Where, as here, "the specification specifically distinguishes the prior art as inferior and touts the advantages of the [invention] . . . [s]uch statements make clear that the [] patent discloses *only* [the invention] and nothing broader." *Tronzo*, 156 F.3d at 1159 (emphasis in original); *see also Gentry*

*Gallery*, 134 F.3d at 1479 (holding claims invalid where they were contrary to "the stated purpose of the invention").

**c. Netlist's evidence fails as a matter of law to sustain the verdict.**

Netlist failed to identify any embodiments in the written description on which the jury could reasonably rely as support for the non-hybrid module recited in the asserted claims. Instead, Netlist offered testimony that contradicted the shared specification of the '918 and '054 patents. Such testimony is legally insufficient to sustain the verdict. *See Aqua-Aerobic Sys., Inc. v. Aerators Inc.*, 211 F.3d 1241, 1245 (Fed. Cir. 2000) ("Expert testimony . . . may not correct errors or erase limitations or otherwise diverge from the description of the invention as contained in the patent documents.").

*First*, Netlist argued that the specification supports its characterization of the claimed invention as an "intelligent on-module power management" system. Tr. 306:18–307:5 (Milton); Tr. 1376:25–1377:2 (closing). But the portion of the specification on which Netlist relies describes the memory system 1010 shown in Figure 12, annotated and reproduced to the right, which includes on-module non-volatile memory 1040. JTX3 at 39 (23:1–27). Therefore, this passage cannot possibly provide support for a non-hybrid memory module.

JTX3 at 16 (Fig. 12) (annotated)

*Second*, Netlist's witnesses testified that Figures 15A and 15B of the specification do not show non-volatile memory. Tr. 307:12–22 (Milton); Tr. 470:2–16 (Mangione-Smith). The specification, however, explains that these figures depict only the "volatile memory subsystem" portion of a complete hybrid module:

> In certain embodiments, *the volatile memory subsystem 1030* can comprise a registered DIMM subsystem comprising one or more registers 1160 and a plurality of DRAM elements 1180, *as schematically illustrated by FIG. 15A* . . . . The memory system 1010 further comprises one or more switches 1170 coupled to the one or more registers 1160 and to the plurality of DRAM elements 1180 as schematically illustrated by FIG. 15A . . . . In certain other embodiments, *as schematically illustrated by FIG. 15B*, the one or more switches 1174 are also coupled to the one or more registers 1160 and to a power source 1162 for the one or more registers 1160 . . . thereby selectively operatively *coupling the volatile memory subsystem 1030* to the host system . . . .

JTX3 at 39 (23:41–64). Because this "volatile memory subsystem" 1030 is a *component* of a memory module 1010 that also includes "a non-volatile memory subsystem 1040," JTX3 at 38 (21:14–20), Figures 15A and 15B are entirely consistent with the requirement that the alleged invention have both volatile and non-volatile memory. Tr. 878:17–880:2 (McAlexander).

Indeed, Netlist's witnesses did *not* contest that Figures 15A and 15B show only a volatile memory subsystem of a hybrid memory module. Tr. 307:12–17 (Milton agreeing that Figures 15A and 15B are "designs in which flash is not present on the memory *subsystem*"); Tr. 470:2–16 (Mangione-Smith asserting only that there is no non-volatile memory shown in Figures 15A and 15B, without addressing the full memory module). Given the clear language of the specification and Mr. McAlexander's unrebutted testimony, *see* Tr. 878:17–880:2, a jury could not reasonably conclude that Figures 15A and 15B provide written description support for the claims.[7]

*Third*, Netlist's witnesses testified that the specification discloses an embodiment in which the non-volatile memory is a hard disk separate from the memory module. Tr. 196:24–197:22

[7] Netlist questioned Mr. McAlexander about a one-sentence synopsis of these figures in the "Brief Description of the Drawings" that does not mention non-volatile memory. Tr. 988:5–989:11. But this sentence is consistent with the subsequent, more detailed descriptions that make clear the figures depict the volatile memory subsystem of a hybrid module that also includes a non-volatile memory subsystem. JTX3 at 32 (9:35–38) (referring to "memory systems having volatile memory subsystems"). Moreover, this one-sentence description does not control over those more detailed descriptions. *See In re Lew*, 257 F. App'x 281, 285 (Fed. Cir. 2007) (noting that "detailed descriptions of [] figures" in the specification control over the "brief description of the drawings").

(Milton) (discussing JTX3 at 41 (27:41–58)); Tr. 469:13–24 (Mangione-Smith). But as Mr. McAlexander testified, this excerpt actually discloses that a hybrid memory module (*i.e.*, memory system 1010) with both volatile and non-volatile memory may be operated as a cache that writes to an off-module hard disk, which would be needed for storing larger files. Tr. 1033:11–1034:2; JTX3 at 41 (27:41–46). This passage does not indicate that the off-module hard disk replaces the non-volatile flash memory 1040 on the memory module 1010. To the contrary, the excerpt states this "non-volatile storage" is "not part of the memory system 1010," JTX3 at 41 (27:45–46), and discloses that "the memory system 1010 will still be able to recover the data efficiently in the event of a power outage because of the backup and restore capabilities described herein," *id.* (27:53–56)—that is, the backup capabilities provided by the on-module flash memory. Because the plain text of the specification contradicts Netlist's testimony that the excerpt discloses a memory module without non-volatile memory, this testimony does not constitute substantial evidence that the asserted claims have written description support. *See PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1361 (Fed. Cir. 2007) (reversing denial of motion for JMOL of invalidity where the expert testimony "cannot be reconciled with statements made by the inventors in the joint specification").

None of the excerpts discussed above supports the jury verdict for an additional reason: Netlist failed to present evidence that any of these alleged non-hybrid embodiments included all claim limitations or could otherwise be combined with other disclosures in the specification to form the claimed memory modules. As the Federal Circuit has held, a patentee cannot "derive written description support from an amalgam of disclosures plucked selectively" from the specification. *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1349 (Fed. Cir. 2013); *see also Purdue Pharma L.P. v. Recro Tech., LLC*, 694 F. App'x 794, 797 (Fed. Cir.

2017) ("To the extent that [the patent-holder] contends that a person of skill in the art would isolate and combine aspects from various embodiments in the specifications . . . to obtain the claimed invention, [the patent-holder] relies upon the wrong test."). Rather, the specification must contain "'blaze marks' that would lead an ordinarily skilled investigator toward" the combination of those disclosures. *Novozymes A/S*, 723 F.3d at 1349. Because Netlist offered no evidence that a person of ordinary skill in the art ("POSITA") would know to combine the alleged non-hybrid embodiments with other disclosures in the manner required by the asserted claims, the jury could not reasonably find that those embodiments provide written description support. *Id*. at 1348–51 (affirming JMOL that asserted claims were invalid for lack of written description); *Flash-Control, LLC v. Intel Corp.*, 2021 WL 2944592, at *4 (Fed. Cir. July 14, 2021) (affirming summary judgment that claims were invalid for lack of written description and noting that a "patent owner cannot show written description support by picking and choosing claim elements from different embodiments that are never linked together in the specification").

**2. The specification fails to describe the "converter circuit" under Netlist's overbroad interpretation of that claim limitation.**

Substantial evidence does not support the jury's finding of no invalidity on the '918 patent for a second, independent reason: the trial evidence conclusively establishes that the specification does not convey use of an LDO as the "converter circuit" required by the asserted claims. JTX3 at 46 (38:31–32), 47 (39:63–64). As set forth above, Dr. Mangione-Smith testified that the "converter circuit" term is broad enough to capture "something [that] converts voltage," Tr. 416:25–417:2, including an LDO. While this opinion fails to support the verdict as a matter of law, *see supra* § I.C, if the Court accepts Netlist's infringement theory, all of the asserted claims of the '918 patent must fail for lack of written description. *See Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1319 (Fed. Cir. 2017) (analyzing written description argument based on plaintiff's claim interpretation).

As Dr. Mangione-Smith conceded, the specification does not disclose the use of an LDO for voltage regulation. Tr. 419:5–12. Instead, the specification describes *only* buck-converters, boost converters, and buck-boost converter circuits for voltage regulation. JTX3 at 42 (29:28–32) (referring to "converter circuits such as buck-converters, boost converters, and buck-boost converter circuits"); *id.* at 21 (Fig. 16); Tr. 876:4–877:13 (McAlexander); Tr. 419:16–420:22 (Mangione-Smith). With respect to these disclosed buck, boost, and buck-boost converters, Dr. Mangione-Smith acknowledged that a POSITA "would understand you ***cannot*** use an LDO in place of the buck-boost converter," Tr. 421:17–20, and that "buck converters and LDOs have fundamentally different characteristics as well as operational benefits and limitations," Tr. 415:5–7. *See also* Tr. 422:1–6 (Mangione-Smith admitting that a POSITA "*would not* be able to reach a conclusion regarding whether you can or cannot replace any one of [the disclosed] buck converters shown with an LDO"). Thus, there is no substantial evidence for the jury's finding of no invalidity with respect to the '918 patent.

**B. The asserted claims of the '339 patent are invalid for lack of written description under Netlist's infringement theory.**

The asserted claims of the '339 patent require data buffers that "actively drive" data through a "fork-in-the-road," JTX2 at 32 (19:53–61), but Netlist accuses products that do not "actively drive" and that lack any "fork-in-the-road." While Netlist's attempt to stretch the claims over the accused products fails as a matter of law, *see supra* § I.A, Netlist's construction of the claims—if accepted—renders those claims invalid for lack of written description.

Dr. Mangione-Smith asserted that the claims are met by "a single byte-wise data path in the byte-wise buffer," without a "fork-in-the-road." Tr. 448:25–449:4. But in "adopt[ing] the so-called fork-in-the-road approach," the Court recognized that "the ***sole embodiment*** describing path selection during a write operation disables one path within the buffers when the other path is

enabled." Dkt. 114 at 10 (citing JTX2 at 29–31 (14:59–15:4, 16:1–18, 17:30–44)). Since that sole embodiment clearly does not contemplate performance by a single data path, a reasonable jury could conclude only that "the specification for the '339 patent does not support a practice by a single data path." Tr. 925:1–4 (McAlexander); *see also* Tr. 928:11–14 (McAlexander).

Netlist failed to offer any support for its assertion that the '339 patent discloses embodiments without a "fork-in-the-road." Nor did Netlist provide any evidence that the written description supports "actively driving" data outside the data buffer, despite alleging infringement on that basis. *See supra* § I.A.2. Accordingly, under Netlist's infringement theory, the asserted claims are invalid because they "exceed in scope the subject matter that [the] inventor [] chose to disclose to the public in the written description." *Atl. Rsch. Mktg.*, 659 F.3d at 1355.

**C. Alternatively, the Court should grant a new trial on written description.**

If the Court does not grant Samsung JMOL on written description, the Court should grant a new trial. First, for the reasons explained above, the jury's verdict stands against the clear weight of the evidence. Second, Samsung asked the Court to instruct the jury that a "broad claim is invalid when the specification clearly indicates that the invention is of a much narrower scope," following the Federal Circuit's language in *Cooper Cameron Corp.*, 291 F.3d at 1322, but the Court rejected that request. Tr. 1280:22–1281:15 (closing). Because this error prevented the jury from adequately considering a dispositive issue in the case, a new trial on invalidity is necessary. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1329 (Fed. Cir. 2016) (vacating induced infringement verdict because "the district court's jury instruction misstated the law . . . in a way that prejudiced [defendants].").

**III. Samsung is entitled to JMOL, or alternatively a new trial, on the issue of damages.**

Netlist presented evidence of alleged damages through its expert Mr. Kennedy. He asserted that Samsung would agree, at a hypothetical negotiation, to pay Netlist a royalty equating to 100%

of the revenue associated with the allegedly infringing features, which he calculated as the difference between [REDACTED] Mr. Kennedy told the jury that such a royalty would amount to $404,200,000. Tr. 715:11–18. To support this extraordinary sum, Mr. Kennedy relied on the non-comparable Rambus license to show that "Samsung agreed to pay $1.1 billion" after Rambus terminated a license and accused Samsung of infringement. Tr. 691:15–23; *see also* Tr. 741:20–23. Remarkably, Mr. Kennedy disregarded comparable licenses to the asserted patents (as part of a portfolio license) for much lower sums to Samsung and Samsung's competitor SK hynix. *See, e.g.*, Tr. 692:15–19. The jury awarded $303,150,000, or 75% of Netlist's request. Dkt. 479 at 7.

For the reasons discussed below, the jury's damages award is premised on fundamentally flawed and facially unreasonable assumptions and arguments. As a result, the Court should grant Samsung JMOL that Netlist is entitled to no damages. *See Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) ("[A] patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory."). Alternatively, the Court should grant JMOL that the only legally proper award supported by the evidence is $19.3 million—the figure offered by Samsung's expert Mr. Meyer—or should grant a new trial conditional on remittitur of the damages award to that amount.

**A. Samsung is entitled to JMOL of no damages.**

The jury's $303 million damages award is unsupported for multiple independent reasons, each of which was raised in Samsung's Rule 50(a) motion. Dkt. 477.

**1. The award is premised on the flawed and unsupported assumption that Samsung would agree to pay 100% of the revenue supposedly conferred by the asserted patents.**

The hypothetical negotiation is a legal construct that "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before

infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The "basic question" asked by the hypothetical negotiation is "if, on the eve of infringement, a willing licensor and licensee had entered into an agreement instead of allowing infringement of the patent to take place, what would that agreement be?" *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012).

No reasonable jury could find that Samsung would have agreed to Netlist's proposed royalty. Mr. Kennedy admitted [REDACTED] He claimed Samsung would have agreed to this one-sided arrangement in a negotiation because customers would simply not buy Samsung's products without the patented technology. *See, e.g.*, Tr. 695:16–17. Mr. Kennedy's unsupported and conclusory assumption that Samsung would agree to such an arrangement—in which Samsung would bear all of the risk and do all of the work to implement the patented technology, and then hand all of the revenue to Netlist—is facially unreasonable and legally untenable.

Courts have consistently held that awarding a patentee 100% of the alleged infringer's profits associated with the patented technology is "unreasonable" and "insupportable." *See Contour IP Holding, LLC v. GoPro, Inc.*, 2020 WL 5106845, at *14 (N.D. Cal. Aug. 31, 2020) ("[I]t would be unreasonable and unreliable for [the patentee's damages expert] to conclude that 100% of profits associated with the infringing technology would go to Contour."); *Looksmart Grp., Inc. v. Microsoft Corp.*, 2019 WL 4009263, at *3 (N.D. Cal. Aug. 5, 2019) (rejecting expert's assignment of 100% of cost savings to one side because it was "insupportable" to assume that one side would leave a hypothetical negotiation with no gain); *Nordock, Inc. v. Systems, Inc.*, 2013 WL 989864, at *8 (E.D. Wis. Mar. 13, 2013) (excluding opinions of patentee's expert because his "reliance on the 100% royalty figure does not reflect . . . any balancing of the parties' interests");

*see also Zegers v. Zegers, Inc.*, 458 F.2d 726, 728 n.8 (7th Cir. 1972) ("It would, of course, be most unlikely that a licensee would be willing to pay 100% of his profits to the patentee in exchange for a license.").

If it is "unreasonable" and "insupportable" to award the patentee 100% of the alleged infringer's ***profits*** attributable to the patented technology, it should go without saying that awarding 100% of the ***revenues*** associated with that technology cannot be justified. *See Labyrinth Optical Techs. LLC v. Alcatel-Lucent USA, Inc.*, 2015 WL 12696081, at *4 (C.D. Cal. Sept. 2, 2015) (excluding opinions of patentee's expert that parties would have agreed to royalty payment amounting to 100% of revenue associated with patented technology). In *Labyrinth Optical*, the patentee's expert opined that the alleged infringer would pay 100% of the revenue associated with the patented chromatic dispersion compensation technology as a royalty, on the ground that the patentee's "bargaining position is strong enough that it would hold out for the full economic value" of that technology. 2015 WL 1269608, at *3. The district court excluded the testimony as "too attenuated to be reliable." *Id.* In rejecting the expert's opinion that the alleged infringer would have "handed all of its chromatic dispersion compensation revenues" to the patentee, the district court noted that the expert "present[ed] no facts or data demonstrating that anyone has ever agreed to pay 100% of its revenues from a patent process under similar circumstances," and there was "no evidence that [the alleged infringer] or anyone else has ever agreed to pay 100% or even 25% royalty, nor evidence that [the patentee] has ever received such a royalty." *Id.*

Similar to *Labyrinth Optical*, neither Mr. Kennedy nor Netlist presented any facts or data demonstrating that anyone has ever agreed to pay 100% of the revenue associated with the patented technology for any license, much less under circumstances similar to those here. More to the point, there is no evidence that Samsung has ever agreed to pay a 100% royalty, or that Netlist has ever

received one. Mr. Kennedy's opinion that the parties would have agreed to 100% of the revenue attributable to the patented technology as a royalty thus is "too attenuated to be reliable." *Labyrinth Optical*, 2015 WL 1269608, at *3. Indeed, by assigning 100% of revenue, [REDACTED] There is no credible evidence whatsoever that Samsung would have been a "willing licensee" to that proposal, which would leave Samsung with nothing (at best).

In reality, Mr. Kennedy's damages theory amounts to a demand that Samsung disgorge not only its profits, but all of its revenues, allegedly attributable to using the patented features—a remedy that Congress long ago eliminated for utility patents. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 505 (1964) (holding that Congress amended Section 284 "precisely to eliminate the recovery of [the infringer's] profits . . . and allow recovery of damages only"). Given the lack of evidence showing that a licensee would agree to such disgorgement in the real world, Mr. Kennedy's theory cannot support the damages award because it is "untethered from the patented technology at issue and the many licenses thereto and, as such, [is] arbitrary and speculative." *LaserDynamics*, 694 F.3d at 81; *see also Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 30–31 (Fed. Cir. 2012) (vacating jury's damages award where patentee's damage expert's testimony was "conclusory, speculative and, frankly, out of line with economic reality").

Mr. Kennedy's 100% award also goes well beyond the 25% profit split rule-of-thumb and the 50% (Nash) rule-of-thumb that the Federal Circuit has rejected. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332–34 (Fed. Cir. 2014). For example, in *Uniloc* the Federal Circuit rejected "as fundamentally flawed," 632 F.3d 1315, the so-called "25% Rule," a rule of thumb assuming that

the alleged infringer should pay 25% of its profits to the patent owner as a royalty but "should retain a majority (i.e. 75 percent) of the profits, because it has undertaken substantial development, operational and commercialization risks, contributed other technology/IP and/or brought to bear its own development, operational and commercialization contributions," *id.* at 1313 (citation omitted). Likewise, in *VirnetX*, the Federal Circuit held that reliance on the 50% starting point was improper even though the patent owner's expert adjusted the split (in the defendant's favor) based on the facts of the case and applied the split to incremental profits. 767 F.3d at 1333–34. Here, Mr. Kennedy made no adjustment to his 100% start (and end) point and applied the 100% to *revenue*, not profits. As in *VirnetX*, this flawed analysis "provides a baseline from which juries might hesitate to stray, even if the evidence supported a radically different split." *Id.* at 1333. Samsung is entitled to JMOL of no damages for this reason alone.

**2.      JMOL of no damages is required because Mr. Kennedy failed to apportion as required by law.**

Damages must be tied directly to the incremental value of the asserted patent. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014) ("[T]he patent holder should only be compensated for the approximate incremental benefit derived from his invention."); *LaserDynamics*, 694 F.3d at 67 (reasonable royalty damages must "separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features"); *see also VirnetX*, 767 F.3d at 1329. Mr. Kennedy's calculations were purportedly based on a comparison between the accused products and alleged non-infringing alternatives. Such an analysis required Netlist to establish that the differences between the accused products and the alternatives are limited to incremental benefits provided by the asserted patents. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1310 (Fed. Cir. 2018). Netlist failed to do so.

[redacted]

For the DDR5 products, Dr. Mangione-Smith opined based on one Samsung marketing document that DDR5 could offer an increase of 30% power efficiency over the prior generation DDR4 products, which did not include an on-board power management chip. Tr. 381:8–383:12. Yet neither he nor any other Netlist witness offered any evidence or analysis connecting this purported 30% improvement solely to the claims of the ’918 and ’054 patents.

As to the DDR4 products, Netlist offered no evidence or analysis connecting the purported improvement (the ability to use two DIMMs per channel) to the specific type of buffer claimed in the ’339 patent, nor did Dr. Mangione-Smith address the benefits of the claimed buffer as compared to other types of buffers that would not infringe the patent. In fact, Netlist never offered ***any*** evidence of the precise non-infringing alternative—to the contrary, Mr. Kennedy was openly confused about what was, and what was not, accused. *Compare* Tr. 387:15–16 (Mangione-Smith testimony that Samsung’s “DDR4 LRDIMM products,” without qualification, “use the ’339 inventions”), *with* [redacted] As such, Netlist’s claim that Samsung would have been unable to offer any two-DIMMs-per-channel configuration without the ’339 patent was not supported by any substantial evidence.

As to HBM, Dr. Brogioli asserted that [redacted] But Dr. Brogioli failed to address other prior art with 8-high stacks, and neither he nor Mr. Kennedy provided specific evidence to demonstrate why the later ’060 and ’160 patents were supposedly necessary for 8-high stacks. *Id.*; Tr. 701:15–703:13 (Kennedy).[8]

[8] Mr. Kennedy cited JTX27, which shows, at most, an industry trend of increasing stack height over time without indicating the reason for that trend.

In fact, Netlist failed to present any evidence accounting for the benefits already provided by the prior art. Tr. 408:23–409:4 (Mangione-Smith admitting he failed to consider prior art, or what was "new or unique," in assessing incremental benefits of the '054 and '918 patents); Tr. 608:10–609:23 (Brogioli admitting he failed to consider prior art in assessing the incremental benefits of the '060 and '160 patents); *see also* Tr. 195:9–11 (Milton confirming "today's memory modules . . . have a lot of advancements" and components). Moreover, Netlist ignored—and intentionally sought to exclude—the JEDEC standards, precisely to avoid having to explain to the jury the difference between the JEDEC standards and the purported incremental benefit provided by the asserted patents. These failures further demonstrate that Mr. Kennedy's damages analysis did not isolate the alleged benefit of the patents. *See Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022) ("Whether one refers to this as failure to 'apportion' . . . or as failing to limit damages to a reasonable approximation of actual infringing uses of the claimed method, Mr. Carlson's failure to account for non-infringing uses of the sold devices was legally improper.").[9]

**3. The damages award is flawed because Mr. Kennedy failed to take account of the highly comparable Samsung and SK hynix licenses.**

Comparable licenses must, as a matter of law, be considered in determining damages. "Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *LaserDynamics*, 694 F.3d at 79. Consequently, prior licenses to the asserted patents "carry considerable weight in calculating a reasonable royalty

[9] On cross examination, Mr. Kennedy [redacted] Tr. 775:8–20.

rate." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995). In *LaserDynamics*, the Federal Circuit held that a damages award cannot stand when the patentee's expert disregards comparable licenses. 694 F.3d at 79–81. The court explained that where "the licenses to the patents-in-suit were all for lump[] sum amounts not exceeding $1 million," *id.* at 80, the patentee's "6% running royalty theory cannot be reconciled with the actual licensing evidence, which is highly probative of the patented invention's economic value in the marketplace, and of the form that a hypothetical license agreement would likely have taken," *id.* at 79.

Mr. Kennedy improperly discarded the two unquestionably comparable license agreements: the Samsung license (the JDLA) and the SK hynix license. Both of these agreements are arms-length licenses negotiated by Netlist that include the asserted patents, and the Samsung license is a non-litigation license. But [REDACTED] Mr. Kennedy disregarded them as "strategic," *see, e.g.*, Tr. 692:15–19, 749:1–2.

While ignoring the only licenses to the asserted patents, Mr. Kennedy knowingly presented the jury with a non-comparable high-dollar agreement—the Rambus license—even though [REDACTED]. Tr. 742:17–22. Mr. Kennedy candidly acknowledged that his reliance on the Rambus license was [REDACTED]." Tr. 741:20–23; *see also* Tr. 691:15–23. That is an improper use of a license agreement. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (a patentee may not "inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question"); *IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 691 (E.D. Tex. 2010) (excluding expert testimony that "improperly inflate[d]

[redacted]

both the royalty base and the royalty rate by relying on irrelevant or unreliable evidence"). Unlike the Samsung and SK hynix licenses, the Rambus license does not involve Netlist—let alone the asserted patents. [redacted] And, as Mr. Kennedy admitted, [redacted].

Mr. Kennedy's failure to properly consider the comparable Samsung and SK hynix licenses—in favor of the incomparable Rambus license—resulted in an excessive royalty. As seen in the table below, in the real world Netlist ***perpetually*** licensed 87 patents to Samsung, including the asserted patents, in an agreement where Samsung paid $8 million. Tr. 720:11–721:2, 729:8–21 (Kennedy). Similarly, Netlist licensed 120 patents to SK hynix, including the asserted patents, for five years for $40 million. Tr. 729:24–730:5, 738:18–20, 739:7–9 (Kennedy). Mr. Kennedy opined, however—in the non-real-world litigation context—that Samsung would have agreed to a $400+ million royalty payment for only the ***five*** asserted patents and for only ***16*** months. Tr. 732:10–13. While Mr. Kennedy argued that these licenses included other consideration, including a "highly valuable supply obligation," *e.g.*, Tr. 692:20–21, he admitted that [redacted], which provides that [redacted]

[10] Mr. Kennedy testified that [redacted].

[redacted]

| License | # Patents | Term | License Fee |
|---|---|---|---|
| Samsung (JDLA) | 87 | perpetual | $8 million |
| SK hynix | 120 | 5 years | $40 million |
| Kennedy Proposal | 5 | 16 months | $400+ million |

Mr. Kennedy thus proposed a royalty 20 to 70 times higher than the effective royalty of the SK hynix portfolio license, [redacted]—and which would be even higher than the effective royalty of the JDLA—demonstrating the unreliability and unreasonableness of his analysis. Indeed, the Federal Circuit has rejected a multiple of just three times an actual license amount, much smaller than the 20–70X multiple here. *Whitserve*, 694 F.3d at 30–31 ("[T]here is little evidentiary basis under *Georgia–Pacific* Factor 2 for awarding roughly three to four times the average amount in the lump-sum agreements in evidence." (cleaned up)). Because Mr. Kennedy disregarded the only comparable licenses in the record—in favor of a non-comparable license offered only "to show that Samsung had paid significant amounts" for a prior litigation-related license—Samsung is entitled to JMOL. *See LaserDynamics*, 694 F.3d at 79–81.

**4. Netlist failed to show that Mr. Kennedy's alternatives are non-infringing, available, and commercially acceptable.**

Mr. Kennedy calculated damages for every asserted patent by awarding Netlist the difference between the price of the accused products and the supposed "non-infringing alternatives" to those products. Tr. 703:16–25. But as the Court instructed the jury, for Mr. Kennedy to rely on any such alternatives, they must be non-infringing, available, and commercially acceptable. Tr. 1325:19–1326:13. Netlist failed to make these showings at trial.

At the outset, Netlist failed to offer evidence that the alternatives were both non-infringing and available. Instead, some alleged non-infringing alternatives were, according to Netlist, infringing products. With respect to the DDR4 LRDIMM and HBM products, Netlist's technical experts suggested prior to trial that modifications to those accused products would be required to

render them non-infringing. But neither the technical experts nor Mr. Kennedy testified about a modified product at trial. Mr. Kennedy instead relied on Samsung's sales of ***unmodified*** DDR4 LRDIMM and four-high HBM products—*i.e.*, products that Netlist had accused of infringement. Mr. Kennedy's "non-infringing" alternative for the DDR4 LRDIMMs was a single LRDIMM with double the capacity, Tr. 700:6–25, 757:22–758:2, but [REDACTED] .[11] For the HBM products, the alternative was a four-high HBM product, Tr. 701:15–25, but Dr. Brogioli was clear that "all" HBM products infringe, Tr. 478:24–479:3, 485:16–486:2; *see also* PDX3.5 ("All Samsung HBM Products Infringe"). Mr. Kennedy's reliance on unmodified, accused products is fatal to his entire damages model. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 2011 WL 197869, at *3 (E.D. Tex. Jan. 20, 2011).

With respect to the DDR5 products, Mr. Kennedy relied on a hypothetical, slower LRDIMM as an alternative. Tr. 695:18–696:11. Netlist did not, however, offer any evidence that this hypothetical product was available during the damages period. *See LaserDynamics*, 2011 WL 197869, at *3 (rejecting availability of non-infringing alternative because the accused infringer failed to show that the alternative was actually on the market or that it would have had the capability to develop the alternative for its use during the damages period), *objections overruled*, *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 2011 WL 13196509 (E.D. Tex. Jan. 28, 2011).

Mr. Kennedy also admitted [REDACTED] For example, he did not (i) identify evidence of demand for the specific patented features; (ii) conduct market

[11] Mr. Kennedy assumed at trial that the DDR4 products only infringed when used in pairs. Tr. 757:3–21. That assumption, however, is irreconcilable with the testimony of Dr. Mangione-Smith, who agreed that all of the claim limitations have "to be on the module" to infringe. Tr. 473:15–19.

studies or customers surveys to value those features; (iii) interview any potential customers; or (iv) identify any instances of customers accepting the alternatives. Tr. 701:15–703:13; *see also* Tr. 400:24–401:2 (Mangione-Smith agreeing that DDR4 LRDIMM customers would *not* "purchase modules that are not capable of running at DDR4 speeds with two or more modules per channel").

Because there is no evidence that the alleged alternatives are non-infringing, available, and commercially acceptable, Mr. Kennedy's opinions do not support the damages award. *See Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350–51 (Fed. Cir. 1999); *Sherwin-Williams Co. v. PPG Indus., Inc.*, 2020 WL 1283465, at *9 (W.D. Pa. Mar. 18, 2020) (granting summary judgment of no non-infringing alternatives where there was "no evidence to support the availability or acceptability of an alternative product during the damages period").

**5. JMOL of no damages on the DDR5 products is additionally required because there is no substantial evidence to support the award.**

Mr. Kennedy's damages calculations for the DDR5 products—which were accused of infringing the '918 and '054 patents—relied on a fundamentally flawed hedonic regression analysis performed by Dr. Groehn, a separate expert who did not testify at trial. Samsung challenged the reliability and admissibility of Dr. Groehn's hedonic regression analysis on numerous grounds, including because he manipulated sales data for the DDR4 products, failed to select the proper variables to analyze that manipulated data, used a flawed methodology for the cherry-picked variables he did select, and chose not to verify his manipulated results. *See* Dkt. 203 at 2–8. As just one example, Netlist did not dispute before trial that Dr. Groehn removed over ***25%*** of the sales data for the DDR4 products. *See* Dkt. 296. As Samsung argued in its motion to exclude Dr. Groehn's opinions, numerous courts (including the Eastern District of Texas) have excluded hedonic regressions like Dr. Groehn's. *Id.* at 8–10. In opposition, Netlist argued "any disputes that Samsung has with his methodologies or his results are classic material for cross examination and

not for exclusion." 3/29 PTC Tr. 12:5–8. The Court agreed with Netlist, holding that the issues with Dr. Groehn's regression analysis "don't rise to the level of warranting outright exclusions" but were "appropriate for vigorous cross examination." 3/29 PTC Tr. 18:12–18.

Remarkably, however, Netlist did not present Dr. Groehn for cross-examination at trial, even though Netlist put him on the witness list every day (including rebuttal). Mr. Kennedy's testimony based on the regression analysis was thus legally untenable, because "[a]n expert cannot parrot the opinions and conclusions of other experts whose testimony is not subject to cross-examination." *Bonin v. Sabine River Auth. of Texas*, 2022 WL 19731177, at *6 (E.D. Tex. Nov. 9, 2022) (quoting *Robison v. Cont'l Cas. Co.*, 2022 WL 336900, at *9 (E.D. Tex. Jan. 6, 2022)), *adopted*, 2022 WL 19731176 (E.D. Tex. Dec. 20, 2022); *see also Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) ("Rule 703 was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." (cleaned up)); *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, 2017 WL 1319553, at *9 (E.D. Tex. Apr. 10, 2017) ("An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." (quoting *United States v. Brownlee*, 741 F.3d 479, 482 (7th Cir. 2014))); *Wi-LAN Inc. v. Sharp Elecs., Corp.*, 992 F.3d 1366, 1374 (Fed. Cir. 2021) ("Rule 703 does not authorize admitting inadmissible evidence on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the inadmissible evidence other than transmitting it to the jury." (cleaned up)); *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

"In this District, 'the crucial issue' is whether the testifying expert has 'independently evaluated or verified the opinions upon which he relies.'" *Bonin*, 2022 WL 19731177, at *5 (quoting *Robison*, 2022 WL 336900, at *9) (cleaned up). Mr. Kennedy admitted, [redacted] Mr. Kennedy's opinions based on the regression analysis are therefore "inherently unreliable." *Robison*, 2022 WL 336900, at *9 ("Expert testimony based solely or primarily on the opinions of other experts is inherently unreliable. It is only when the expert undertakes some independent investigation of the underlying opinions that his testimony may be considered reliable." (cleaned up)).

Mr. Kennedy's reliance on Dr. Groehn's regression analysis suffered from another fundamental error. As Mr. Kennedy admitted, the regression analysis did not involve DDR5 products, but instead was based on data for a different set of accused products (the DDR4 products). Tr. 698:8–9. That reliance flies in the face of his testimony that DDR5 was [redacted] The Court should thus grant JMOL of no damages for the DDR5 products.

**B. Alternatively, the Court should grant JMOL that damages are no more than $19.3 million.**

The Federal Circuit has held that a new trial is not appropriate, and reduction of the damages award as a matter of law is required, where the plaintiff has produced no evidence in support of a legally viable damages theory that could allow for an award greater than what the defendant proposed. For instance, in *Tronzo v. Biomet, Inc.*, 236 F.3d 1342 (Fed. Cir. 2001), the Federal Circuit upheld the reduction of a damages award from $7,134,000 to $520, holding that it should not be treated as a remittitur and a new trial on damages was not otherwise permitted. The court in *Tronzo* explained that "the district court did not reweigh any evidence, nor did it exercise

its discretion in computing the damages award[,]" and instead "awarded the maximum damages possible given the lack of competent evidence" for an award greater than $520. *Id.* at 1351. While the plaintiff argued for more based on "lost business opportunities," the evidence "that Dr. Tronzo attempted to rely on was too remote and inconclusive to reflect the actual injury incurred by Dr. Tronzo or to measure his damages." *Id.*

This case falls squarely within the rationale of *Tronzo*. Netlist made a choice to pursue a damages theory that is unsupportable as a matter of law and eschewed any alternative damages theory that could be supported by the law and the evidence. There is no legal or logical basis to allow Netlist a second bite at the apple. *See Promega*, 875 F.3d at 666 (plaintiff may not be entitled to damages or a new trial where it fails to put on a legitimate damages case). The only reliable evidence of damages in the record came from Mr. Meyer, who testified, based on comparable licenses that involved Netlist and the asserted patents, that a hypothetical negotiation would have resulted in a reasonable royalty of no more than $19.3 million. Tr. 1165:6–1177:7. Specifically, Mr. Meyer analyzed the real-world SK hynix license including the asserted patents and concluded that [redacted] Thus, if the Court does not grant JMOL of no damages, it should grant JMOL of $19.3 million in damages.

**C. If the Court does not grant JMOL, Samsung is entitled to a new trial on damages.**

If the Court does not grant Samsung's motion for JMOL on damages, it should grant a new trial. *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982) (holding that new trial may be granted even if there is substantial evidence that would preclude JMOL).

### 1.   The excessive damages award is against the weight of the evidence.

The Court should grant Samsung a new trial on damages because the jury's award was unduly excessive and against the great weight of the evidence. *See Oiness v. Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996). As discussed above, Netlist's damages evidence, among other things: (1) was based on an arbitrary and unsound assumption that Samsung would have agreed to a royalty of 100% of the revenue associated with the patented technology; (2) failed to apportion the value of the allegedly patented features; (3) ignored the only real-world licenses to the asserted patents to Samsung and SK hynix, while relying on a non-comparable license to Rambus to show that Samsung had paid a large sum of money when accused of infringement; (4) failed to establish that the alternatives that form the basis for Mr. Kennedy's damages calculations were non-infringing, available, and commercially acceptable to customers; and (5) for the DDR5 products, relied on an improper hedonic regression analysis performed by an expert who did not testify. Mr. Kennedy's flawed damages analysis misled the jury into awarding a "reasonable royalty" of more than $300 million, equivalent to 14.2% (DDR4), 18.1% (HBM), and 28.7% (DDR5) of the ***total revenues*** of the accused products—even though the only licenses for the asserted patents involved lump-sum payments. As discussed above, the evidence of Netlist's real-world licensing activities showed that a reasonable royalty should not have exceeded $19.3 million.

### 2.   Mr. Kennedy's unreliable testimony should have been excluded.

Mr. Kennedy's damages opinions were unreliable and should have been excluded. *See* Dkt. 205. Specifically, Mr. Kennedy's opinions were improper because they:

- relied on an arbitrary and economically unsound assumption that a hypothetical negotiation would result in Samsung agreeing to give Netlist 100% of the revenues associated with the patented technology, *id.* at 9–10;

- failed to properly apportion the value of the patented features, *id.* at 3–5;

- failed to account for the comparable Samsung and SK hynix licenses and instead were based on the non-comparable Rambus license, *id.* at 11–12;
- were based on alleged alternatives to the accused products without any evidence that the alternatives would have been non-infringing, available, and commercially acceptable, *id.* at 8–9; and
- were based on Dr. Groehn's hedonic regression analysis, which was fundamentally unreliable, Dkt. 203 at 2–14, and was based on DDR4 products instead of the accused DDR5 products, Dkt. 203 at 10–11; Dkt. 205 at 10–11.

The failure to exclude Mr. Kennedy's damages opinions was prejudicial and erroneous, and led to a grossly excessive damages award that is against the great weight of the evidence. 3/28 PTC Tr. 199:17–18 (denying motion to strike Kennedy opinions); 3/29 PTC Tr. 18:12–18 (denying motion to strike Groehn opinions).

### D. Alternatively, the Court may condition the new trial on a remittitur.

The Court may order a new trial conditioned upon remittitur of "the maximum amount the trier of fact could properly have awarded." *Delahoussaye v. Performance Energy Servs., L.L.C.*, 734 F.3d 389, 394–95 (5th Cir. 2013). For the reasons discussed above, Mr. Kennedy's damages calculations are fundamentally unreliable and cannot support any damages award. The only reliable evidence of damages in the record came from Mr. Meyer, who testified, based on comparable licenses that involved Netlist and the asserted patents, [REDACTED] [REDACTED].

Consequently, if the Court remits the damages award, it should reduce it to the highest amount a jury could have properly awarded for the alleged infringement: $19.3 million.

## IV. Samsung is entitled to JMOL of no willful infringement.

Netlist failed to provide evidence that Samsung had knowledge of the asserted patents and engaged in "deliberate or intentional infringement," as required for a claim of willful infringement.

*Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1296 (Fed. Cir. 2023). Samsung is therefore entitled to JMOL of no willful infringement.

**A. Netlist failed to provide substantial evidence of deliberate or intentional infringement.**

The Court has ruled that Samsung did not infringe (and thus did not willfully infringe) before Netlist's purported termination of Samsung's license to the asserted patents in July 2020. *See* Dkt. 432 at 2, 4; Tr. 1266:4–1267:1. Netlist thus had to show that Samsung's conduct following the attempted termination (which Samsung maintains was ineffective) rose to the level of deliberate or intentional infringement. The mere fact that Samsung continued sales of the accused products after this date is insufficient as a matter of law. *See Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021) ("Knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness.").

Netlist had no evidence of deliberate or intentional infringement after the purported license termination. As an initial matter, there was no evidence that Samsung even knew of four of the asserted patents (all but the '060 patent) before Netlist filed this action. Samsung thus cannot be liable for willful infringement of these patents, at least before the action was filed.[12] *See Gustafson Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990) ("[A] party cannot be found to have 'willfully' infringed a patent of which the party had no knowledge.").

More important, Netlist offered no evidence that Samsung took any actions, with respect to *any* asserted patent, after the alleged license termination or the filing of this action beyond

[12] While Samsung recognizes that this Court has not held that pre-suit knowledge of a patent is required to establish post-suit willfulness, *Packet Intelligence LLC v. NetScout Sys., Inc.*, 2019 WL 2375218, at *8 (E.D. Tex. June 5, 2019), *rev'd in part on other grounds*, 965 F.3d 1299 (Fed. Cir. 2020), other courts have adopted such a requirement, *see, e.g.*, *Swipe Innovations, LLC v. NCR Corp.*, 2013 WL 6080439, at *2 (N.D. Ga. Nov. 18, 2013). Samsung respectfully submits that the cases adopting this requirement should be followed and that Samsung should therefore be granted JMOL of no willfulness for the '339, '918, '054, and '160 patents.

continuing to sell the accused products. Netlist's case instead rested on vague documents from before the alleged license termination, but Netlist presented no evidence that Samsung had reason to investigate Netlist's patents, let alone formed a belief that the patents were infringed, while Samsung was licensed—especially given that four of the asserted patents did not even exist at the time Samsung entered into the JDLA. No reasonable jury could find willfulness on this record.

**The '339 patent.** For the '339 patent, Netlist relied on a 2015 Netlist presentation (PX464) discussing a potential partnership with Samsung and mentioning a parent to the '339 patent. Tr. 216:24–217:23 (Milton). But PX464 does not mention the '339 patent, which had not even been filed at the time. Knowledge of one patent in a family does not establish knowledge of a related patent. *See Intell. Ventures II LLC v. Sprint Spectrum, L.P.*, 2019 WL 1987172, at *2 (E.D. Tex. Apr. 12, 2019) ("[K]nowledge of other patents in the same portfolios, with some of those being within the same family as the asserted patents, [is] insufficient to defeat a motion for summary judgment for pre-suit willfulness."), *adopted by* 2019 WL 1979866 (E.D. Tex. May 2, 2019).

Netlist also relied on two documents from 2019 discussing Netlist and the JDLA. PX1756 at 4; PX1663. *See* Tr. 147:5–25, 151:12–21 (opening); Tr. 206:9–20, 218:25–220:6 (Milton); Tr. 1332:12–1333:8 (closing). But neither document mentions the '339 patent, which had not issued at the time, or any other asserted patent. Far from demonstrating willfulness, PX1756 shows that Samsung had "***not*** checked" whether it used any Netlist patents because the JDLA obviated any need to investigate this issue. PX1756 at 7 ("The patent issue was resolved by signing the perpetual cross-licensing agreement, so Netlist, Inc.'s patent list and our company's use (Yes/No) of the technologies was not checked.").

**The '918 and '054 patents**. Netlist pointed to PX586—an email from 2019 discussing a request from Samsung to discuss DDR5 technology—to support its argument on the '918 and '054

patents. Tr. 200:14–201:6, 290:23–291:2 (Milton); Tr. 1244:20–24 (Rule 50(a) argument). But this email does not discuss Netlist's patents, and there is no evidence that any of Netlist's patents were discussed in connection with the email. Indeed, the applications for the '918 and '054 patents had not even been filed when this email was sent. *See* JTX3 at 1; JTX4 at 1. Netlist's reference in closing to PX621, a 2014 presentation including the words "Inelligent [sic] On-Module power distribution: US Pat.Pending [sic]," is similarly inadequate. PX621 at 28; Tr. 1329:1–8 (closing). Netlist asserted that the '918 and '054 patents cover this technology, Tr. 149:17–150:12 (opening), but the document does not mention the '918 or '054 patents, which had not been filed at the time.

**The '160 and '060 patents**. Netlist's argument for the '060 and '160 patents centered on PX446, a patent list sent to Samsung in November 2016. Tr. 1244:24–1245:3 (Rule 50(a) argument). But this document does not support the jury verdict. PX446 does not mention the '160 patent at all (even though it had issued) and thus cannot show willfulness as to that patent. While it does identify the '060 patent, Samsung was licensed to all of Netlist's patents, including the '060 patent, at the time of the document. Tr. 301:13–304:24 (Milton); Tr. 1143:17–19 (Ji). This forecloses any inference that PX446 led to Samsung believing the accused HBM products infringe.

Further, Samsung provided unrebutted testimony that Netlist's sharing of PX446 had nothing to do with Samsung. Mr. Hyun Ki Ji explained that Netlist sent PX446 a few months after a dinner meeting between himself and Netlist's Jibum Kim in June 2016, while the JDLA was in force. *See* PX1662 at 2 (discussing the dinner). Mr. Ji testified that, during the dinner, Mr. Kim did not say that Samsung was infringing any of Netlist's patents. Tr. 1142:18–1143:8. Rather, Netlist sent PX446 to Samsung because Netlist was having issues with SK hynix, a competitor of Samsung. Tr. 1143:20–1144:3 (Ji); Tr. 1171:4–8 (Meyer). No reasonable jury could find that PX446 evidences deliberate or intentional infringement by Samsung four years after it was sent.

Netlist also identified a presentation that Netlist alleges was given orally to Samsung in 2015. *See* PX1778; Tr. 152:18–153:5 (opening); Tr. 220:17–221:19 (Milton); Tr. 1334:14–21 (closing). But this email thread is entirely internal to Netlist, and Netlist produced no documentary evidence that the presentation was ever shown to Samsung. And though a slide mentions the '060 patent, it does not reference the accused HBM products or allege that they infringe the '060 patent.

More generally, Netlist presented no evidence that it told Samsung it was infringing the asserted patents before filing suit. Chuck Hong, Netlist's CEO, confirmed that Netlist did not inform Samsung of any alleged infringement—for any asserted patent—*before* Netlist purported to terminate the JDLA. Tr. 1130:4–7. And there was no evidence that Netlist informed Samsung of the alleged infringement *after* the purported license termination until Netlist filed suit.

Nor did Netlist point to any affirmative post-suit conduct by Samsung beyond continuing to sell the accused products—which, as explained above, is legally insufficient to demonstrate willfulness. Netlist argued in closing that Samsung employees failed to investigate infringement, Tr. 1338:3–11, but this Court has held that a failure to investigate "is unquestionably insufficient to support a finding of willfulness." *Huawei Techs. Co. v. T-Mobile US, Inc.*, 2017 WL 11638984, at *5 (E.D. Tex. Sept. 29, 2017); *see also SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019) (engineers' failure to read patents did not support a willfulness finding).

Additionally, Netlist never showed that any Samsung employee with knowledge of the asserted patents or alleged infringement was involved in the continued sales of the accused products—let alone anyone with sufficient actual or apparent authority such that his acts and knowledge can be imputed to Samsung. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 418 (2011) ("The Restatement of Agency suggests that the malicious mental state of one agent cannot generally be combined with the harmful action of another agent to hold the principal liable for a

tort that requires both."); *Potter Voice Techs., LLC v. Apple Inc.*, 24 F. Supp. 3d 882, 886 (N.D. Cal. 2014) ("In the context of willful infringement, it is safe to say that the employees required to have knowledge of the asserted patent must have some connection to the decision willfully to infringe.").

**B. No reasonable jury could have found that Samsung was willfully blind.**

The Court instructed the jury, over Samsung's objection, that it could substitute the willful blindness standard for the "deliberate or intentional" standard required for a finding of willful infringement. Tr. 1277:3–15, 1310:11–17. While willful blindness is a basis for an inducement claim under § 271(b), *see Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765–66 (2011), neither the Supreme Court nor the Federal Circuit has recognized this theory for a claim of willful infringement. Further, *Global-Tech* held only that willful blindness could substitute for a showing of actual knowledge of a patent, not that it could satisfy the *mens rea* requirement, as the Court's instruction permitted here. *See Ansell Healthcare Prod. LLC v. Reckitt Benckiser LLC*, 2018 WL 620968, at *7 (D. Del. Jan. 30, 2018) ("[I]nsofar as willful blindness does apply in willful infringement cases, it only substitutes for actual knowledge, as opposed to egregious behavior.").

Even if this were a viable theory, Samsung would be entitled to JMOL. Willful blindness requires that "(1) [t]he defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."[13] *Global-Tech*, 563 U.S. at 769. As discussed above, there was no evidence that Netlist informed Samsung of the alleged infringement until filing suit, and none of the communications from before or during the license period was sufficient to show that anyone at Samsung believed years later

[13] The Court's instruction incorrectly allowed willful blindness to be found through mere indifference to another's rights. Tr. 1310:13–17.

that infringement was highly likely and took deliberate steps to avoid this knowledge—let alone that any such individual had responsibility for the alleged infringement. *See Staub*, 562 U.S. at 418. Evidence that Samsung did not investigate possible infringement of Netlist patents as they issued is insufficient to show that Samsung took "***active efforts*** . . . to avoid knowing about the infringing nature" of the accused products. *Global-Tech*, 563 U.S. at 770.

## V. Alternatively, Samsung is entitled to a new trial.

To the extent JMOL is not granted, a new trial is warranted for multiple independent reasons. In particular, a new trial on infringement, invalidity, and damages should be granted for the specific grounds set forth above. *See supra* §§ I.F, II.C, III.C, & III.D. In addition, the Court should order a new trial because, as discussed below, (a) Netlist's improper conduct throughout the trial influenced and inflamed the jury, and (b) the erroneous exclusion of evidence relating to JEDEC prejudiced Samsung's ability to present its case.

### A. Netlist's improper conduct at trial unfairly prejudiced Samsung.

Netlist's counsel committed multiple material violations of this Court's rulings and Standing Order on Motions *in Limine* ("MILs"), including by (1) improperly arguing that the Court already approved of Netlist's infringement position; (2) violating the Court's prohibition on quantifying the alleged value of the SK hynix supply agreement; and (3) improperly commenting on the national origin of Samsung and its witnesses. Having "exceeded the limits of advocacy as to cause a prejudicial verdict," counsel's statements justify a new trial. *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1238 (5th Cir. 1985).

***First***, Netlist's counsel invaded the province of the jury by improperly suggesting that the Court already decided issues in Netlist's favor. For example, with respect to the '060 and '160 patents, Netlist sought to resurrect its failed claim construction argument that the disclaimer reflected in the construction of "array die" is limited to the DRAM circuits of Rajan. *See, e.g.*, Tr.

495:3–9, 512:17–20, 618:1–619:5 (Brogioli); *see also* Tr. 495:10–505:15, 507:18–21, 510:16–511:22, 512:21–514:15, 515:22–25 (Samsung's objections). As explained above, it was improper for Netlist and its expert to argue claim construction before the jury. *See supra* § I.F. But Netlist's counsel compounded the error during closing argument by suggesting that the jury *must* accept Netlist's erroneous construction of the term "DRAM circuit," because the Court would not let Netlist "break [its] agreement with the Patent Office." Tr. 1375:1–4 ("They said and accused us of lying to the Patent Office, of going back on our agreement with the Patent Office. Do you think Judge Gilstrap would let us break our agreement with the Patent Office?").

***Second***, Netlist's counsel violated the Court's order excluding any evidence or argument quantifying the alleged value of the SK hynix supply agreement. With respect to the SK hynix agreement and the JDLA, the Court specifically instructed:

During closing arguments, however, Netlist's counsel told the jury that the "supply agreement" with SK hynix is worth over $450 million:

> The SK hynix agreement was signed after we were no longer able to obtain supply pursuant to the supply agreement with Samsung, and that agreement has been a lifeline for this company. It's going to net us over ***$450 million in revenue***. Samsung says SK hynix is a comparable agreement? It's going to net us ***$450 million in revenue***.

Tr. 1379:20–25.

These improper statements necessarily contaminated the verdict. Samsung's expert, Mr. Meyer, carefully explained that the comparable SK hynix license amounted to $40 million. Tr. 1165:1–16, 1166:7–25. Yet with one statement in closing, Netlist inappropriately inflated the

perceived value of the SK hynix agreement by tenfold and thereby influenced the jury to render a large, unsupported damages award.

***Third***, Netlist's counsel made jingoistic comments in closing arguments to inflame the jury against Samsung on the basis of national origin. Netlist's counsel deliberately juxtaposed the Korean nationality of Samsung's witness against the collective U.S. nationality of the jury:

> They spoke about flying 7,000 miles or 6,000 miles. [Mr. Ji] flew 6,000 miles to tell us that they needed access to our patents and to not say one explanation for why they don't infringe. It doesn't matter what country you are from; ***in this country, you follow the law***.

Tr. 1370:20–25.

This statement violates the Court's Standing Order on MILs No. 2, which prohibits a party "from introducing evidence, testimony, or argument that raises . . . national origin . . . of a party, witness, attorney, or law firm." Such an "us-against-them plea can have no appeal other than to prejudice by pitting 'the community' against a nonresident corporation." *Westbrook*, 754 F.2d at 1238. An improper "community conscience" plea is not limited to "specific words; it extends to all impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty and expectation. Such appeals serve no proper purpose and carry the potential of substantial injustice when invoked against outsiders." *Id.* at 1238–39. The remarks of Netlist's counsel served no purpose but to inflame the jury against a foreign corporation.[14] *See BE & K Const. Co. v. United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 90 F.3d 1318, 1331 (8th Cir. 1996) (remanding

---

[14] The Court admonished counsel that their closing arguments must "conform to the Court's rulings and admitted evidence" and "[i]f somebody strays intentionally across that line, I will view it as an intentional act." Tr. 1229:9–13. The Court further instructed: "I don't want there to be objections to the other one's closing unless there is absolutely no alternative." Tr. 1229:17–18. The Court's statements serve as a *de facto* objection to any violation of the Court's previous rulings and Standing Order on MILs. Moreover, an objection was unnecessary, as Netlist's misconduct "was of such magnitude . . . particularly in the circumstances of this case, as to have seriously prejudiced [Samsung's] right to a fair trial." *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir. 1975).

for a new trial where plaintiff's attorney "asked the jury to send a message to 'these large unions who go around the country doing things like International Falls that the publicity campaign and the type of interference that they are doing is not permitted ***in this country***.'" (cleaned up)).

Netlist's improper closing arguments, coupled with the excessive verdict, indicate that passion and prejudice infected jury deliberation. A new trial is therefore required. *See Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 278 (5th Cir. 1998) (granting new trial on damages based on improper closing argument followed by large jury verdict); *Edwards*, 512 F.2d at 282–83 (granting new trial on liability and damages based in part on improper closing argument).

**B. The erroneous exclusion of JEDEC-related evidence prejudiced Samsung.**

Before trial, the Court precluded Samsung from presenting important evidence relating to the JEDEC memory standards, including evidence that (1) the accused DDR4 and DDR5 products comply with the standards, (2) those standards are the result of a collaboration between hundreds of companies in the industry, and (3) Netlist's participation in JEDEC obligates it to license any essential patents on reasonable and non-discriminatory ("RAND") terms. *See, e.g.*, Tr. 994:17–22 (McAlexander); 3/28 PTC Tr. 228:1–18; 3/29 PTC Tr. 146:10–147:9, 188:15–16; Dkt. 432 at 4–5, 8, 11; Dkt. 465; Dkt. 468; Dkt. 470; Dkt. 476. Evidence that the products implement the standards—and thus incorporate a significant amount of non-accused technology—as well as evidence of a RAND royalty, was highly relevant to the issues in dispute for the '339, '918, and '054 patents, including damages. The exclusion of this evidence prejudiced Samsung, particularly in light of Netlist's arguments suggesting that it was solely responsible for developing DDR4 LRDIMM and DDR5 technology and in light of the excessive (non-RAND) jury award. Tr. 151:3–24 (statement during opening that Samsung knew Netlist "created LRDIMM technology"); Tr. 150:5–7 ("DDR5 has power management control on-module, which is exactly the technology that they've been tracking at Netlist since 2014."); *see also* Tr. 1332:16–1333:8, 1370:5–12 (closing);

Tr. 218:25–219:11 (Milton). The Court should grant a new trial for the ’339, ’918, and ’054 patents so that Samsung may present this crucial evidence.[15]

## CONCLUSION

For the foregoing reasons, Samsung’s motion should be granted. Judgment of non-infringement should be entered in favor of Samsung on all patents; judgment of invalidity should be entered in favor of Samsung on the ’339, ’918, and ’054 patents; judgment of no willful infringement should be entered in favor of Samsung on all patents; and judgment should be entered that Netlist is entitled to no damages or, in the alternative, that the only damages award supported by the evidence is $19.3 million. In the alternative, a new trial should be granted on non-infringement, invalidity, and damages for the reasons discussed above.

Dated: September 8, 2023

Respectfully submitted,

By: */s/ Michael J. McKeon*

Melissa Smith
GILLAM & SMITH LLP
303 S. Washington Ave.
Marshall, Texas 75670
Telephone: (903) 934-8450
melissa@gillamsmithlaw.com

Katherine Reardon
NY Bar No. 5196910
kreardon@fr.com
Sara C. Fish
GA Bar No. 873853

Ruffin B. Cordell
TX Bar No. 04820550
cordell@fr.com
Michael J. McKeon
D.C. Bar No. 459780
mckeon@fr.com
Lauren A. Degnan
D.C. Bar No. 452421
degnan@fr.com
Brian Livedalen
D.C. Bar No. 1002699
livedalen@fr.com

[15] Although Netlist took the position in this Court that the ’339 patent is not essential, 3/28 PTC Tr. 142:23–24, and Netlist vigorously opposed any reference to Netlist’s RAND obligations during trial, *see, e.g.*, Dkt. 214 at 5, Netlist subsequently relied on the damages award in the present case as evidence before the District Court of Dusseldorf, Germany, that Netlist complied with its obligation to license any DDR4 LRDIMM standard essential patents on RAND terms. According to Netlist, the “per-unit license fee of $54.34” implied by the damages award for DDR4 LRDIMM products “is significantly higher” than the $6 per unit license fee offered by Netlist in June 2022. McKeon Decl., Ex. 1 at 6 (translation); *see also* Dkt. 214-12 at 2 (Netlist’s June 2022 offer letter).

sfish@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree St., NE, 21st Floor
Atlanta, GA 30309
Telephone: (404) 892-5005
Facsimile: (404) 892-5002

Francis J. Albert
CA Bar No. 247741
albert@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Ste. 400
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Karolina Jesien
NY Bar No. KJ7292
jesien@fr.com
FISH & RICHARDSON P.C.
Times Square Tower
20th Floor
New York, NY 10036
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

Alice Ahn (Admitted *Pro Hac Vice*)
California State Bar No. 271399
aahn@cov.com
COVINGTON & BURLING LLP
415 Mission Street, Ste. 5400
San Francisco, CA 94105
Telephone: (415) 591-7091
Facsimile: (415) 591-6091

Daniel A. Tishman
D.C. Bar No. 1013923
tishman@fr.com
Matthew Mosteller
CA Bar No. 324808
mosteller@fr.com
FISH & RICHARDSON P.C.
1000 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

Thomas H. Reger II
Texas Bar No. 24032992
reger@fr.com
Matthew Colvin
Texas Bar No. 24087331
colvin@fr.com
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
Facsimile: (214) 747-2091

Brian R. Nester (Admitted *Pro Hac Vice*)
bnester@cov.com
D.C. Bar No. 460225
Peter Swanson
pswanson@cov.com
D.C. Bar No. 497348
R. Jason Fowler
D.C. Bar No. 990358
jfowler@cov.com
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

*Attorneys for Defendants Samsung Electronics Co., Ltd.;
Samsung Electronics America, Inc.; and Samsung Semiconductor, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically in compliance with Local Rule CV-5 on September 8, 2023. As of this date, all counsel of record have consented to electronic service and are being served with a copy of this document through the Court's CM/ECG system under Local Rule CV-5(a)(3)(A) and by electronic mail.

/s/ *Michael J. McKeon*

# Exhibit 8

Case 2:21-cv-00463-JRG Document 432 Filed 04/05/23 Page 1 of 24 PageID #: 54008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| NETLIST, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG SEMICONDUCTOR, INC.,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:21-CV-00463-JRG |

**ORDER ON PRETRIAL MOTIONS AND MOTIONS *IN LIMINE***

The Court held a Pretrial Conference in the above-captioned matter on Tuesday, March 28, 2023 and Wednesday, March 29, 2023 regarding pending pretrial motions and motions *in limine* ("MILs") filed by Plaintiff Netlist, Inc. ("Netlist") and Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc. (together, "Samsung") (collectively with Netlist, the "Parties"). (Dkt. Nos. 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 284, 379, 380, 399, 404 and 409.) This Order memorializes the Court's rulings on the aforementioned pretrial motions and MILs as announced from the bench and into the record, including additional instructions that were given to the Parties. While this Order summarizes the Court's rulings as announced into the record during the pretrial hearing, this Order in no way limits or constrains such rulings from the bench. Accordingly, it is hereby **ORDERED** as follows:

**PRETRIAL MOTIONS**

**1. Netlist's Motion for Partial Summary Judgment on Samsung's License Affirmative Defenses (Dkt. No. 201)**

The motion was **DENIED**. (Dkt. No. 426 at 56:8–11.) The Court found that Netlist had not shown there was a clear basis under Federal Rule of Civil Procedure 56 to grant the motion.

**2. Samsung's Motion for Summary Judgment that All Accused Products Sold Before July 15, 2020 Are Licensed (Dkt. No. 196)**

The motion was **GRANTED-IN-PART** to the extent it seeks a declaration that Samsung had a license until July 15, 2020. (Dkt. No. 426 at 56:12–24.) The Court found that there are fact issues with respect to whether the High Bandwidth Memory ("HBM") products are "Foundry Products" under the Joint Development and License Agreement ("JDLA"), which would determine whether they did or did not fall within the license that existed up until July 15, 2020 and **DENIED** the motion in that respect. (*Id.* at 58:8–18) The Court recognized the representations made by both Parties in open Court that after July 15, 2020, Samsung does not have a license defense and as of that date the JDLA was terminated, which terminated any license created thereunder. (*Id.* at 19–22.)

**3. Samsung's Motion for Summary Judgment of Non-Infringement of U.S. Patent Nos. 8,787,060 and 9,318,160 (Dkt. No. 197).**

The motion was **DENIED**. (Dkt. No. 426 at 80:25–5.) The Court found that there are outstanding issues of material fact that preclude a grant of summary judgment.

**4. Netlist's Partial Motion for Summary Judgment Finding JEDEC Materials Are Not Publicly Accessible (Dkt. No. 209)**

The motion was **DENIED**. (Dkt. No. 426 at 104:13–16.) The Court found there to be fact questions including who would be the relevant public having access to the JEDEC materials.

**5. Netlist's Motion for Partial Summary Judgment on Samsung's Invalidity Defenses (Dkt. No. 211)**

With regard to JEDEC materials, the Court **GRANTED** the motion. (Dkt. No. 426 at 130:19–20.) With regard to admitted prior art ("APA"), the Court **GRANTED** the motion. (*Id.* at 130:21–22.) With regard to quad band memory ("QBM"), the Court **DENIED** the motion. (*Id.* at 130:23–24.) The Court **GRANTED-AS-UNOPPOSED** the motion as to Samsung having no anticipation defense as to the '918 and '054 Patents. (*Id.* at 130:25–131:1.)

**6. Samsung's Motion for Summary Judgment of No Pre-Suit Damages (Dkt. No. 198)**

The motion was **GRANTED** as to the '506, '339, and '918 Patents. (Dkt. No. 426 at 148:4–11.) The Court was persuaded that Samsung met its burden under *Artic Cat*, and that Netlist had not shown actual or constructive notice prior to filing the original complaint on December 20, 2021. As a result, the Court **GRANTED** summary judgment of no damages prior to December 20, 2021 for the '506, '339, and '918 Patents.

The motion was **GRANTED-IN-PART** as to the '054 Patent. (*Id.* at 148:12–21.) The Court was persuaded there remain issues as to the potential for pre-suit damages prior to the filing of the first amended complaint filed May 3, 2022 but not subsequent to the original complaint. As a result, the Court **GRANTED** summary judgment of no damages prior to December 20, 2021 for the '054 Patent and **DENIED** the motion otherwise. As to the period of time between December 20, 2021 and May 3, 2022, the motion was **DENIED** as to the '054 patent.

The motion was **GRANTED** as to the '060 and '160 Patents. (*Id.* at 148:22–149:4; 150:17–20.) The Court found there was no notice prior to the first amended complaint. As a result, the Court **GRANTED** summary judgment of no damages prior to May 3, 2022 for the '060 and '160 Patents.

**7. Netlist's Motion for Partial Summary Judgment on Samsung's Affirmative Defenses (Dkt. No. 199)**

The motion was **DENIED** as to Samsung's Marking Defenses. (Dkt. No. 426 at 149:5–6.) The motion was **GRANTED** as to Samsung's Exhaustion Defense and Samsung's Implied License Defense. (*Id.* at 149:7–12.)

**8. Samsung's Motion for Summary Judgment of No Pre-Suit Damages (Dkt. No. 200)**

The motion was **GRANTED-IN-PART** as to the period prior to July 15, 2020. (Dkt. No. 426 at 168:17–169:4.) As to the period of time after July 15, 2020, the Court found there to be genuine issues of material fact under the totality of circumstances standard for willfulness that preclude the entry of summary judgment and **DENIED** the motion in that respect.

**9. Samsung's *Daubert* Motion and Motion to Strike Expert Testimony of David Kennedy (Dkt. No. 205)**

The motion was **GRANTED-IN-PART** as to Mr. Kennedy's opinions regarding Texas Instruments, which are outside the scope of the case. (Dkt. No. 426 at 217:12–20.) The motion was also **GRANTED-IN-PART** as to Mr. Kennedy's RAND opinions. (*Id.* at 217:21–4.) The Court **DENIED** the balance of the motion. (*Id.* at 217:5–6.)

**10. Netlist's Motion to Strike Certain Opinions of Defendants' Expert John B. Halbert (Dkt. No. 207)**

The motion was **DENIED**. (Dkt. No. 426 at 229:12–14.) The Court provided guidance with reference to the Court's standing order on motions *in limine* ("MILs"), such as Court MIL nos. 9 and 11, which preclude pejorative or disparaging language (*id.* at 223:10–11), and Court MIL no. 13, which precludes reference to other litigation (*id.* at 225:1–15).

**11. Netlist's Motion to Strike Portions of the Rebuttal Expert Report of Paul K. Meyer (Dkt. No. 214)**

The motion was **GRANTED-IN-PART**. The Court struck paragraphs 289 through 305, concerning the market comparables approach. (Dkt. No. 426 at 247:25–248:5.) The Court

**GRANTED** the motion as to any references to RAND. (*Id.* at 248:6–11.) The Court further **GRANTED** the motion as to other litigation and IPRs. (*Id.* at 248:14–18.) The Court further **GRANTED** the motion as to settlement discussions. (*Id.* at 249:5–10.) The Court further **GRANTED** the motion as to ITC proceedings. (*Id.* at 249:11–15.) The Court further **GRANTED** the motion as to Netlist's market cap. (*Id.* at 249:16–19.)

The motion was **DENIED** as to non-infringing alternatives ("NIAs") (*id.* at 248:12–13), the alleged JEDEC contributions (*id.* at 248:19–25), references to Samsung's patent portfolio (*id.* at 249:20–22), and references to unaccused products (*id.* at 249:23–250:2).

**12. Netlist's Motion to Strike Portions of the Rebuttal Expert Report of Philip Kline (Dkt. No. 206)**

The motion was **GRANTED-IN-PART**. (Dkt. No. 426 at 255:14–256:7.) The Court instructed that Mr. Kline is not permitted to convey to the jury that the data used by Dr. Andreas Groehn was "inaccurate." (*Id.* at 254:23–255:2.) The Court explained that the motion was granted to the extent that Mr. Kline indicates that he and Dr. Groehn did not start with the same underlying data. The balance of the motion was **DENIED**. (*Id.* at 256:9–10.)

**13. Samsung's *Daubert* Motion and Motion to Strike Expert Testimony of Dr. Andreas Groehn (Dkt. No. 203)**

The motion was **DENIED**. (Dkt. No. 427 at 21:13–18.) The Court found that Samsung's arguments go to the weight of Dr. Groehn's testimony, not to admissibility.

**14. Samsung's *Daubert* Motion and Motion to Strike Expert Testimony of Dr. William Henry Mangione-Smith (Dkt. No. 204)**

The motion was **GRANTED-IN-PART**.

Concerning untimely theories, the Court found the corrected and redacted submission of Dr. Mangione-Smith to be adequate and **DENIED** the motion to the extent it seeks to further strike Dr. Mangione-Smith's testimony on this topic. (Dkt. No. 427 at 229:12–14.)

Concerning late-disclosed conception materials, the Court **DENIED** the motion. (*Id.* at 46:10–13.) The Court acknowledged the parties' agreement that paragraphs 77 and 313 would not be presented. (*Id.* at 48:3–21.)

Concerning new infringement theories for the '918 and '054 Patents, the Court accepted the parties' representations that the issue was moot in light of the Court's prior rulings. (*Id.* at 46:14–18.)

Concerning untimely doctrine of equivalents opinions for the '918 and '054 Patents, the Court **DENIED** the motion. (*Id.* at 46:19–22.)

Concerning Samsung's alleged state of mind, the Court **GRANTED** the motion. (*Id.* at 46:23–5.) The witness will not opine on Samsung's state of mind. (*Id.* at 40:3–12.)

Concerning references to the errata of Mr. Jung's testimony, the Court **DENIED** the motion. (*Id.* at 47:6–14.)

Concerning technical valuation opinions, the Court **DENIED** the motion. (*Id.* at 47:15–20.)

**15. Netlist's Motion to Strike Portions of the Rebuttal Expert Report of Joseph C. McAlexander III (Dkt. No. 208)**

The motion was **GRANTED-IN-PART**.

The Court acknowledged that Netlist's challenges to paragraphs 122 through 145 have been withdrawn. (Dkt. No. 427 at 78:17–24.)

Concerning improper claim construction opinions, specifically, the term "pre-regulated input voltage," the Court struck paragraphs 366 and 367 of Mr. McAlexander's Rebuttal Report. (*Id.* at 81:20–82:9.) Concerning the term "converter circuit" and paragraphs 402 and 406–408, the Court **DENIED** the motion. (*Id.* at 82:13–18.) Concerning the term "non-volatile memory" and paragraphs 529–534 and 537–538, the Court **DENIED** the motion. (*Id.* at 82:19–20.) Concerning

the term "updating of the bits of registers" and paragraphs 530, 533, and 540, the Court **DENIED** the motion. (*Id.* at 82:21–22.) Concerning the term "operable state" and paragraphs 492–495 and 504, the Court **DENIED** the motion. (*Id.* at 23–25.) Concerning the term "determine"/"determining" and paragraphs 167–172, the Court **GRANTED** the motion and struck paragraphs 167–172. (*Id.* at 83:1–5.)

As to previously undisclosed alleged non-infringing alternatives, including paragraphs 666, 677–678, 682, and 685, the Court limited the use of the paragraphs concerning technical valuation and benefits by prohibiting their use beyond rebuttal to Dr. Mangione-Smith's opinions concerning technical valuations and benefits. The paragraphs will not be used as support for any ultimate damages opinions. (*Id.* at 83:13–25.)

As to non-infringement arguments based on the specification and paragraphs 169, 235–236, and 251–262, the Court **GRANTED** the motion and struck paragraphs 169, 235–236, and 251–262. (*Id.* at 84:1–5.)

As to other improper infringement opinions and paragraphs 326–327, 88–99, and 115–121, the Court limited their use to background information only. (*Id.* at 84:6–10.) Further, the Court **ORDERED** that Mr. McAlexander use the term "asserted invention" rather than "alleged invention." (*Id.* at 76:6–15; *id.* at 84:10–12.)

As to other prior proceedings and paragraphs 103–110 and 336–337, this portion of the motion was **GRANTED**, and the Court precluded their use before the jury. (*Id.* at 84:13–24.)

As to prosecution history estoppel and paragraphs 146–148, the Court **GRANTED** the motion to the extent the paragraphs assert legal conclusions. (*Id.* at 85:7–11.) The Court clarified that the factual portion of the witness's testimony is not excluded. (*Id.* at 85:11–18.)

As to the issue of relative technical value and paragraphs 655–659, the motion was **DENIED**. (*Id.* at 85:22–86:1.)

**16. Samsung's *Daubert* Motion and Motion to Strike Expert Testimony of Dr. Michael Brogioli (Dkt. No. 202) and Netlist's Motion to Strike Portions of the Rebuttal Expert Report of Gabriel Robins (Dkt. No. 210)**

Both motions were **DENIED**. (Dkt. No. 427 at 123:14–18.)

**17. Netlist's Motion to Strike Portions of the Opening Expert Report of Joseph McAlexander (Dkt. No. 212)**

The motion was **GRANTED-IN-PART**.

As to the issue of allegedly improper claim construction, the motion was **GRANTED** as to paragraphs 178–196, 198–209, and 210–220, which were struck, but the motion was **DENIED** otherwise. (Dkt. No. 427 at 144:18–25.)

As to equitable defenses, the Court **GRANTED** the motion with regard to legal conclusions, legal terms and language that is inherently legal in nature. (*Id.* at 145:4–6.) With regard to factual underpinnings that stop short of making a legal assertion, the Court **DENIED** the motion. (*Id.* at 154:6–13.) The witness was instructed not to use the terms "laches" or "estoppel." (*Id.* at 145:14–146:4.)

As to Netlist's relationship with JEDEC, the Court **GRANTED** the motion and struck paragraphs 170–174. (*Id.* at 146:10–14.) However, the motion was **DENIED** otherwise. (*Id.*)

The Court noted that the issue regarding printed publications is moot in light of the Court's prior rulings. (*Id.* at 147:9–11; *see also id.* at 135:14–15.)

As to written description, the Court **DENIED** the motion. (*Id.* at 147:12–13.)

As to other litigations, the Court **DENIED** Netlist's request to strike paragraphs 222, 242–244, and exhibits E and F. (*Id.* at 147:17–19.)

As to invalidity arguments not disclosed during discovery, the Court limited their use to background only. (*Id.* at 147:20148:3.)

**18. Netlist's Motion to Strike Portions of Dr. Gabriel Robins' Opening Expert Report (Dkt. No. 213) and Netlist's Motion to Preclude Certain Trial Testimony of Dr. Gabriel Robins Due to Violation of Magistrate's Ruling on Deposition Conduct (Dkt. No. 399)**

The motion to strike (Dkt. No. 213) was **DENIED**. (Dkt. No. 427 at 171:1.) However, the Court **ORDERED** that only Mr. Matthew Colvin examine Dr. Robins at trial on behalf of Defendants. (*Id.* at 170:18–25; *see also id.* at 161:8–16.)

The motion for sanctions (Dkt. No. 399) was **DENIED**. (Dkt. No. 427 at 172:22–25.) However, the Court **ORDERED** that a new deposition of Dr. Robins be taken by Mr. Samuel F. Baxter or Ms. Jennifer Truelove, with Mr. Colvin solely defending Dr. Robins, on the premises (Sam B. Hall Jr. Federal Building and United States Courthouse, 100 E Houston St, Marshall, TX 75670) and with Magistrate Judge Roy Payne acting as a hotline resource to address any issues arising during the deposition, such deposition to be taken at a time consistent with Judge Payne's schedule. (*Id.* at 171:20–172:13.)

**19. Samsung's Motion to Bifurcate Willfulness (Dkt. No. 404)**

The motion was **DENIED**. (Dkt. No. 427 at 173:15–25.)

**20. Netlist's Motion for Leave to Supplement Expert Reports (Dkt. No. 284)**

The motion was **GRANTED-IN-PART**.

The Court acknowledged that the issue of the first and third supplements to Mr. Kennedy's report was moot. (Dkt. No. 427 at 175:1–10; *see also id.* at 179:17–20.)

The Court **GRANTED** the motion with respect to the second supplement to Mr. Kennedy's report and to the supplement to Dr. Brogioli's report. (*Id.* at 181:1–10.) The Court also allowed

a responsive report from the two appropriate Defense experts of not more than five pages each. (*Id.*)

**21. Netlist's Motion to Compel Compliance with Trial Subpoena of Indong Kim (Dkt. No. 409)**

The motion was **DENIED** and the Court QUASHED the subpoena of Mr. Indong Kim. (Dkt. No. 427 at 186:9–187:7.)

**MOTIONS *IN LIMINE***

Further to the Court's Standing Order on Motions *In Limine* issued December 14, 2022, it is **ORDERED** that the Parties, their witnesses, and counsel shall not raise, discuss, or argue the following before the venire panel or the jury without prior leave of the Court:

**I. PLAINTIFF'S MOTIONS *IN LIMINE* (Dkt. No. 379)**

Plaintiff's MIL 1 **Preclude Samsung from presenting any evidence or argument regarding RAND obligations or any alleged failure to license Patents-in-Suit on RAND terms.**

The MIL was **DENIED-AS-MOOT**. (Dkt. No. 427 at188:15–16.)

Plaintiff's MIL 2 **Preclude Samsung from Presenting any evidence or argument that SK hynix's supply obligation to Netlist is not legal binding on SK hynix.**

The MIL was **GRANTED**. (Dkt. No. 427 at 190:6–12.)

Plaintiff's MIL 3 **Preclude Samsung from presenting any argument or evidence that contradicts the findings of the Central District of California's Summary Judgment and Final Judgment.**

The MIL was **DENIED**. (Dkt. No. 427 at 196:3–8; *id.* at 198:21–23.) The Court noted that the MIL is subsumed by the Court's standing MIL no. 13. The Court announced its intention that the Court, and not the parties, instruct the jury regarding the prior Central District of California ("CDCA") action. (*Id.* at 198:13–18.) The Court invited suggested instructions from the counsel for the parties.

Plaintiff's MIL 4      **Preclude Samsung from presenting any allegation that Netlist has failed to comply with JEDEC obligations.**

The MIL was **GRANTED**. (Dkt. No. 427 at 200:14–25.) The Court will be an active gatekeeper before the jury as to JEDEC materials.

Plaintiff's MIL 5      **Preclude Samsung from presenting evidence, argument, or testimony that practicing a standard is a defense to infringement or willfulness.**

The MIL was **GRANTED-IN-PART** to the extent that Samsung shall not communicate to the jury that practicing a standard is a defense to infringement. (Dkt. No. 427 at 206:13–18.) The balance of the MIL was **DENIED**. (*Id.* at 206:24–207:2.)


## II.    DEFENDANT'S MOTIONS *IN LIMINE* (Dkt. No. 380)

Defendants' MIL 1      **Improper argument or evidence regarding Samsung's alleged failure to supply memory to Netlist.**

The MIL was **GRANTED**. (Dkt. No. 427 at 212:19–24.) The Court will be an active gatekeeper on the issue. (*Id.* at 213:1–10.)

Defendants' MIL 2      **Improper argument or evidence regarding the alleged value of the supply agreement to Netlist under the JDLA.**

The MIL was **DENIED-IN-PART** as to Mr. Kennedy and Mr. Meyer. (Dkt. No. 427 at 216:24–217:4; *id.* at 217:23–218:3.) The Court **GRANTED** the MIL as to anyone aside from Mr. Kennedy and Mr. Meyer on the topic of the value of the supply agreement to Netlist under the JDLA. (*Id.* at 217:5–13; *id.* at 218:2–3.)

Defendants' MIL 3      **Improper argument or evidence regarding the Korean Tax Tribunal opinion.**

The MIL was **GRANTED**. (Dkt. No. 427 at 225:1–6.) The Court noted that this MIL is subsumed by the Court's standing MIL no. 13, but for clarity, the Court **GRANTED** the MIL so as to facilitate the Court's role as a gatekeeper.

Defendants' MIL 4 **Improper allegations of price fixing or other illegal activities.**

The MIL was **DENIED**. (Dkt. No. 427 at 228:21.) The Court directed the parties to the Court's standing MIL no. 9.

Defendants' MIL 5 **No argument, evidence, or questions suggesting a party's corporate representative at trial is obligated to prepare on any particular topic or is charged with knowledge of others within the company.**

The MIL was **DENIED-IN-PART** as to any particular 30(b)(6) witness who has previously been designated on any topic or topics and has been noticed on those topics. (Dkt. No. 427 at 232:20–22; *id.* at 233:23–234:4.) As to any witness testifying on behalf of Samsung who was never noticed or deposed as a 30(b)(6) witness, the Court **GRANTED** the MIL. (*Id.* at 232:23–233:2; *id.* at 234:5–12.) The Court clarified that if Netlist seeks to cross examine the latter type of witness on a lack of knowledge regarding Samsung or any aspect of its operations, advance leave is required. (*Id.* at 234:5–12.)

If the Parties desire to introduce any evidence or argument or otherwise raise or mention any of the foregoing subjects addressed by the MILs set forth herein and before the jury, they must first approach the bench and obtain leave from the Court. This also includes all MILs in the Court's Standing Order on Motions *In Limine*.

All remaining MILs not addressed herein or otherwise addressed by the Court on the record are **DENIED-AS-MOOT**.

**RESOLUTION OF REMAINING PRETRIAL ISSUES**

At the conclusion of the pre-trial conference, the Court referred the pre-admission of exhibits to Magistrate Judge Payne to be scheduled in compliance with Judge Payne's schedule. (Dkt. No. 427 at 19–23.)

**So ORDERED and SIGNED this 5th day of April, 2023.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

# Exhibit 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC.<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD, et al.<br><br>Defendants. | Civil Case No. 2:22cv00293-JRG<br>(Lead Case)<br><br>**JURY TRIAL DEMANDED** |
| NETLIST, INC.<br><br>Plaintiff,<br><br>v.<br><br>MICRON TECHNOLOGY TEXAS, LLC, et al.<br><br>Defendants. | Civil Case No. 2:22cv-00294-JRG<br>(Member Case)<br><br>**JURY TRIAL DEMANDED** |

**SAMSUNG'S MOTION TO STAY PENDING RESOLUTION OF THE C.D. CAL. CASE REVERSED AND REMANDED BY THE NINTH CIRCUIT REGARDING SAMSUNG'S LICENSE**

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ........ iv
TABLE OF EXHIBITS ........ v
I. INTRODUCTION ........ 1
II. FACTUAL BACKGROUND ........ 2
A. Samsung and Netlist Entered into the JDLA in 2015 ........ 2
B. The C.D. Cal. Held that Netlist Terminated the JDLA in 2020 ........ 3
C. After the C.D. Cal. Summary Judgment Order, This Court Held That Samsung Was Licensed Until July 15, 2020 ........ 3
D. The Ninth Circuit Reversed and Remanded the C.D. Cal.'s Erroneous Decision .. 5
III. LEGAL STANDARD ........ 6
IV. ARGUMENT ........ 7
A. A Stay Will Simplify, and Likely Eliminate, the Case ........ 7
B. Netlist Is Unlikely To Prove That Samsung Breached the JDLA, or That Any Breach Was Material ........ 9
C. Fifth Circuit Law Compels This Court To Stay This Case ........ 10
D. Netlist Would Not Be Unduly Prejudiced by a Stay ........ 12
E. The Stage of the Case Weighs in Favor of a Stay ........ 13
V. CONCLUSION ........ 14

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Astec Am., Inc. v. Power-One, Inc.*,
No. 6:07-CV-464, 2008 WL 11441994 (E.D. Tex. July 15, 2008) ....................8

*Customedia Techs. v. Dish Network Corp.*,
No. 2:16-CV-129,2017 ....................6

*Cywee Grp. Ltd. v. Samsung Elecs. Co.*,
No. 2:17-CV-140, 2019 WL 11023976 (E.D. Tex. Feb. 14, 2019) ....................14

*EchoStar Techs. Corp. v. TiVo, Inc.*,
No. 5:05-CV-81, 2006 WL 2501494 (E.D. Tex. July 14, 2006) ....................6

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
No. 2:15-CV-00011, 2016 WL 1162162 (E.D. Tex. Mar. 23, 2016) ....................6

*Glass Equip. Dev., Inc. v. Besten, Inc.*,
174 F.3d 1337 (Fed. Cir. 1999) ....................11

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) ....................9

*Lochner Techs., LLC v. Lenovo Inc.*,
No. 2:10-CV-430-JRG, 2013 WL 12172638 (E.D. Tex. July 24, 2013) ....................6, 8

*Michael v. Ghee*,
325 F. Supp. 2d 829 (N.D. Ohio 2004) ....................9

*NFC Tech. LLC v. HTC Am., Inc.*,
No. 2:13-CV-1058, 2015 WL 1069111 (E.D. Tex. Mar. 11, 2015) ....................13

*Nichia Corp. v. Mary Elle Fashions, Inc.*,
No. 2:16-CV-615-JRG, 2016 WL 9558954 (E.D. Tex. Dec. 22, 2016) ....................8

*Nken v. Holder*,
556 U.S. 418 (2009) ....................9

*Norman IP Holdings, LLC v. TP-Link Techs., Co.*,
No. 6:13-CV-384, 2014 WL 5035718 (E.D. Tex. Oct. 8, 2014) ....................14

*Stafford v. Rite Aid Corp.*,
No. 3:17-CV-01340-AJB-JLB, 2020 WL 4366014 (S.D. Cal. July 30, 2020) ....................8

*Trinity Indus., Inc. v. 188 L.L.C.*,
No. 3:02-CV-405-H, 2002 WL 1315743 (E.D. Tex. 2002)........................................................8

*VirtualAgility Inc. v. Salesforce.com, Inc.*,
759 F.3d 1307 (Fed. Cir. 2014)...............................................................................12, 13

*West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*,
751 F.2d 721 (5th Cir. 1985) ............................................................................... *passim*

*Wolf Designs, Inc. v. Donald McEvoy Ltd. Inc.*,
341 F. Supp. 2d 639 (N.D. Tex. 2004) ..........................................................................6

**TABLE OF ABBREVIATIONS**

| Abbreviation | Meaning |
|---|---|
| C.D. Cal. | U.S. District Court for the Central District of California |
| C.D. Cal. Case | *Netlist Inc. v. Samsung Elecs. Co.*, No. 8:20-CV-00993 (C.D. Cal.) |
| JDLA | Joint Development and License Agreement |
| Netlist/Samsung EDTX1 | *Netlist Inc. v. Elecs. Co.*, No. 2:21-CV-463 (E.D. Tex.) |
| Ninth Circuit Appeal | *Netlist Inc. v. Samsung Elecs. Co.*, No. 22-55247 (9th Cir.) |

**TABLE OF EXHIBITS**

| Ex. | Description |
|---|---|
| 1 | *Netlist Inc. v. Samsung Elecs. Co.*, No. 22-55247, Dkt. 77-1 (9th Cir. Oct. 17, 2023) |
| 2 | Joint Development and License Agreement (JDLA) |
| 3 | *Netlist Inc. v. Samsung Elecs. Co.*, No. 22-55247, Dkt. 11 (9th Cir. June 6, 2022) |
| 4 | *Netlist Inc. v. Samsung Elecs. Co.*, No. 8:20-CV-00993, Dkt. 276 (C.D. Cal. Dec. 3, 2021) |

## I. INTRODUCTION

The time has now come that this case be stayed in light of an order issued by the Ninth Circuit last week that reversed and remanded the order of the Central District of California that erroneously and summarily found that Netlist's license to Samsung had been terminated. *See* Ex. 1 (Ninth Circuit's October 17, 2023 decision). The Court is well aware of this issue relating to the parties' Joint Development and License Agreement. Indeed, Samsung previously sought a stay pending the resolution of the Ninth Circuit Appeal regarding the license issues in both this case and in *Netlist/Samsung EDTX1*, arguing that it would be wholly inefficient and a waste of party and judicial resources to move forward in those actions in light of the pending Ninth Circuit Appeal related to an issue that was an absolute bar to the patent assertion claims. The Court denied Samsung's repeated requests. The situation is now indisputably different. The Ninth Circuit order has issued and its mandate is abundantly clear. And this Court has previously held Samsung's memory products were fully licensed through July 15, 2020, the date that Netlist purportedly terminated the license as found by the now-reversed C.D. Cal ruling. Under the circumstances and at this point in the litigation it would be a clear abuse of discretion for this Court to move forward with this case—it must stay this action under controlling Fifth Circuit law.

Netlist's refusal to allow its breach of contract and license termination claims to proceed in its chosen forum (the C.D. Cal.) before proceeding with its infringement claims here is no surprise given Netlist's erratic, forum shopping conduct throughout the parties' dispute. Having achieved a legally precarious decision in the C.D. Cal. terminating the parties' license agreement, it rushed its Texas litigations against Samsung hoping to obtain a judgment on its infringement claims before the inevitable reversal of the C.D. Cal. decision. The day has come, however, for Netlist to face the consequences of its own actions. The Ninth Circuit has reversed

[redacted]

the C.D. Cal.'s judgment that Netlist properly terminated the parties' JDLA. Thus, Samsung is licensed to Netlist's asserted patents unless Netlist prevails in the remanded C.D. Cal. case—where it has the burden to prove a material breach of the JDLA. This entire case is now moot.

Netlist continues to litigate the validity of Samsung's license in the C.D. Cal. Case, which pre-dates this case by two years. Accordingly, the central question in this case—one that resolves the entire dispute—is already being litigated in front of another court. Thus, the Court, at a minimum, should stay this case pending resolution of the proceedings in the C.D. Cal.

## II. FACTUAL BACKGROUND

The Court is well familiar with the history of Samsung and Netlist's JDLA, the C.D. Cal. Case regarding Netlist's erroneous termination of the JDLA in 2020, and Samsung's Ninth Circuit Appeal. *See, e.g.*, Dkt. 121 (denying Samsung's motion to stay pending the Ninth Circuit Appeal). The facts changed materially last week—the Ninth Circuit reversed the C.D. Cal.'s erroneous decision erroneous judgment that the JDLA was terminated and remanded the case for further proceedings. Ex. 1 at 5, 8. As a result, ***Samsung's license to the asserted patents is in full force and effect***. A summary of the pertinent facts is provided below.

### A. Samsung and Netlist Entered into the JDLA in 2015

In 2015, Samsung and Netlist entered into the JDLA, Ex. 2, [redacted]

[redacted]

### B. The C.D. Cal. Held that Netlist Terminated the JDLA in 2020

Five years after entering into the agreement, Netlist purported to terminate the JDLA on July 15, 2020, and filed an action in C.D. Cal. (1) alleging that Samsung had breached two provisions of the JDLA, and (2) seeking a declaration that the license had been terminated. *See* Dkt. 121 at 2-3. In 2021, the district court granted summary judgment in favor of Netlist, finding that Samsung violated § 6.2 of the JDLA (relating to supply of certain NAND and DRAM products to Netlist) and § 3 (a tax provision). Ex. 1 at 2-7. As a result, the court granted Netlist a declaratory judgment that Netlist terminated Samsung's license on July 15, 2020. The case then proceeded to a jury trial on only the element of damages for the breach of § 6.2 of the JDLA, and a jury found that Netlist did not prove that it suffered any damages as a result of Samsung's purported breach of § 6.2. Ex. 4. Separately, the C.D. Cal. Court ruled from the bench that Netlist likewise suffered no recoverable damages as a result of Samsung's purported breach of § 3. Samsung appealed. *See Netlist, Inc. v. Samsung Elecs. Co., Inc.*, No. 22-55247 (9th Cir.).

### C. After the C.D. Cal. Summary Judgment Order, This Court Held That Samsung Was Licensed Until July 15, 2020

After the C.D. Cal. summary judgment order, Samsung filed a declaratory judgment action in Delaware on October 15, 2021, and Netlist filed a patent infringement case (*Netlist/Samsung EDTX1*) on December 20, 2021, followed by this case on August 1, 2022, Dkt. 1. In each of these patent litigations, Samsung has asserted that it is licensed to Netlist's patent portfolio under the JDLA.

In *Netlist/Samsung EDTX1*, the Court held on summary judgment that Samsung was licensed to all accused products sold before July 15, 2020. *See Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-CV-00463-JRG, Dkt. 196. In Samsung's summary judgment motion, Samsung explained that, although it believes that ***all*** accused products continue to be licensed today, issue preclusion, arising from the C.D. Cal.'s judgment that Netlist had terminated the JDLA on July 15, 2020, prevented Samsung from making that argument before this Court. *Id.* at 21 n.9; *see also id.*, Dkt. 290 at 1 n.1; *id.*, Dkt. 255 at 1, 5; *id.*, Dkt 345 at 1 & n.1. On April 5, 2023, the Court entered partial summary judgment that all accused products sold before July 15, 2020, were licensed under the JDLA, recognizing that the JDLA presented a bar to relief here for covered sales during the JDLA's active term. *Id.*, Dkt. No. 432 at 2. In *Netlist/Samsung EDTX1*, the Court rejected Netlist's argument to the contrary, and held that Samsung's license was in force through July 15, 2020, but found a question of fact regarding whether the accused HBM products (which are not at issue in this case) were "Foundry Products," and therefore unlicensed under the terms of the JDLA. *Id.* at 2; *id.*, March 28, 2023 Tr. at 56:4-24, 58:3-60:1. At the *Netlist/Samsung EDTX1* trial, Samsung presented evidence that the accused HBM products are not "Foundry Products," and Netlist failed to rebut this evidence. *Id.*, Trial Tr. at 814:15-820:22. The Court, therefore, granted Samsung's motion for judgment as a matter of law that the accused HBM products are not "Foundry Products," thus confirming that all of Samsung's accused products were fully licensed through July 15, 2020. *Id.* at 1266:4-1267:1.

Accordingly, the Court found that Samsung had a license to Netlist's patents, but relied on the C.D. Cal.'s judgment that the license terminated on July 15, 2020. As summarized below, that judgment has now been reversed, and remanded for further proceedings. *See, e.g.*, Ex. 1 at 8.

### D. The Ninth Circuit Reversed and Remanded the C.D. Cal.'s Erroneous Decision

On October 17, 2023, the Ninth Circuit issued an order holding that the district court erred in granting summary judgment to Netlist on its breach of contract and license termination claims, reversing the determination that Samsung breached the JDLA, and that those breaches were material. Ex. 1 at 1-8. More specifically, the Ninth Circuit held as follows:

1. "The district court erred in granting Netlist summary judgment on its claim that Samsung violated § 6.2 [the supply provision] of the Joint Development and License Agreement ('JDLA'), because the provision is ambiguous as to whether Samsung's supply obligation is limited to the now-failed joint development project (the 'JDP') or applies more broadly to the parties' overall business relationship." Ex. 1 at 2. The Ninth Circuit remanded this claim to allow the "district court to consider in the first instance whether the extrinsic evidence 'creates a genuine issue of material fact' as to the provision's meaning." *Id.* at 5.

2. "The district court erred in granting Netlist judgment on its claim that Samsung breached § 3 of the JDLA by erroneously withholding $1.32 million of its $8 million payment to Netlist and paying that sum to the Korean tax authority." *Id.* at 5-6. The Ninth Circuit thus "reverse[d] the district court's entry of judgment in Netlist's favor on the § 3 breach of contract claim and remand[ed] with instructions to enter judgment for Samsung." *Id.* at 6-7.

3. "The district court erred in granting a declaratory judgment that Netlist properly terminated the JDLA because disputed fact issues precluded summary judgment on the materiality of Samsung's alleged breach of § 6.2." *Id.* at 7. The Ninth Circuit remanded the declaratory judgment claim "for further proceedings." *Id.* at 8.

The remand to C.D. Cal. will address Netlist's continued assertion that Samsung breached § 6.2 of the JDLA and that, as a result, Netlist properly terminated Samsung's license

on July 15, 2020.  Absent a final resolution of whether Netlist validly terminated Samsung's license, Samsung remains licensed to the Netlist patents asserted here.

## III.     LEGAL STANDARD

The Court "has the inherent power to control its own docket, including the power to stay proceedings before it."  *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-00011, 2016 WL 1162162, at *1 (E.D. Tex. Mar. 23, 2016).  Exercising this authority is especially appropriate where issues presented in one action will be resolved in an earlier-filed action pending in another court.  *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) (finding it was an abuse of discretion for a Texas district court to issue a preliminary injunction on an issue overlapping with a contract dispute pending in an earlier filed New York action); *Wolf Designs, Inc. v. Donald McEvoy Ltd. Inc.*, 341 F. Supp. 2d 639, 642-46 (N.D. Tex. 2004) (entering stay, noting "a stay pending the outcome of litigation in another court between the same parties, involving the same or controlling issues, is an appropriate means of avoiding unnecessary waste of judicial resources").

In determining how to manage its docket, the district court "must weigh competing interests and maintain an even balance."  *Customedia Techs. v. Dish Network Corp.*, No. 2:16-CV-129,2017 WL 3836123. at *1 (E.D. Tex. Aug. 9, 2017) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)); *EchoStar Techs. Corp. v. TiVo, Inc.*, No. 5:05-CV-81, 2006 WL 2501494, at *1 (E.D. Tex. July 14, 2006) ("Essentially, courts determine whether the benefits of a stay outweigh the inherent costs based on these factors.").  For example, in deciding whether to stay litigation for a pending appeal in a parallel action, this Court has considered factors such as "whether a stay will simplify issues in question and trial of the case," "whether a stay will unduly prejudice or present a clear tactical advantage to the nonmoving party," and "whether discovery is complete and whether a trial date has been set."  *Lochner Techs., LLC v. Lenovo Inc.*, No.

2:10-CV-430-JRG, 2013 WL 12172638, at *1 (E.D. Tex. July 24, 2013).

## IV. ARGUMENT

The Court should stay this case so that the C.D. Cal. can address whether Samsung continues to be licensed to Netlist's asserted patents, thereby mooting this entire case. Here, a stay will simplify the issues in question because Samsung maintains that it is fully licensed to Netlist's patents unless Netlist prevails in the remanded C.D. Cal. Case, where it has the burden to prove a material breach of the JDLA; a stay will not unduly prejudice Netlist because it has licensed its patents to others (including Samsung) such that money damages are sufficient; and the stage of this case (e.g., no depositions have occurred yet) weighs in favor of a stay. Indeed, continuing the present case before the first-filed C.D. Cal. Case resolves Netlist's breach of contract claims would be an abuse of discretion. *West Gulf*, 751 F.2d at 728-29.

### A. A Stay Will Simplify, and Likely Eliminate, the Case

A stay will simplify the issues in this case, given the extensive overlap. Allowing this case to move forward while the parallel C.D. Cal. Case is not fully resolved would require this Court to address the same issues as those pending in California.

Specifically, Samsung's license is an overlapping issue—Samsung has pled a license defense in this case. *See, e.g.*, Dkt. 145 at 24-27 (Seventh Additional Defense: Express License). As such, the C.D. Cal.'s resolution of Netlist's claim that the JDLA has been terminated will either eliminate the entire case, or eliminate an affirmative defense (after the date of alleged termination, and pending any appeals). Indeed, the Court already held in *Netlist/Samsung EDTX1* that Samsung's memory products are licensed up to alleged termination on July 15, 2020. *Netlist Inc. v. Elecs. Co.*, No. 2:21-CV-463, Dkt. 432 at 2 (E.D. Tex. Apr. 5, 2023). Thus, the remaining question as to Samsung's license defense is whether products are licensed after the alleged termination. The JDLA provides that a party may terminate the agreement

[redacted]

[redacted] The C.D. Cal. Case is a case for "Breach of Contract," and seeks declaratory relief as to whether or not Netlist's alleged termination was effective. *See, e.g.*, *Netlist Inc. v. Samsung Elecs. Co.*, No. 8:20-CV-00993, Dkt. 1 (C.D. Cal. May 28, 2020). Thus, the issues in the C.D. Cal. Case are exactly the same as those that this Court would have to address in deciding whether Samsung remains licensed, absent a stay.

Needless to say, if the C.D. Cal. agrees with Samsung, then the license would render Netlist's infringement suit moot. Because the C.D. Cal. Case could resolve this case in its entirety, this Court should stay this action until C.D. Cal. resolves Netlist's allegation that the JDLA was terminated. In the unlikely event that Netlist prevails, issue preclusion would apply to bar Samsung's license defense for sales after July 15, 2020, again (pending any appeal). Either way, the most efficient approach is to stay this case. Indeed, this and other courts have stayed proceedings in similar contexts. *Lochner*, 2013 WL 12172638, at *1-2 (staying pending an appeal in a parallel action); *Nichia Corp. v. Mary Elle Fashions, Inc.*, No. 2:16-CV-615-JRG, 2016 WL 9558954, at *2 (E.D. Tex. Dec. 22, 2016) (staying pending an appeal involving the same patent); *Astec Am., Inc. v. Power-One, Inc.*, No. 6:07-CV-464, 2008 WL 11441994, at *3 (E.D. Tex. July 15, 2008) (staying pending an appeal involving the same patents); *Trinity Indus., Inc. v. 188 L.L.C.*, No. 3:02-CV-405-H, 2002 WL 1315743, at *3 (E.D. Tex. 2002) (staying pending an appeal dealing with the same contract, noting "[i]t would be inefficient to proceed with this case only to find that the Illinois case was later remanded and that the parties were litigating the same issues in two separate cases"); *see also Stafford v. Rite Aid Corp.*, No. 3:17-

CV-01340-AJB-JLB, 2020 WL 4366014, at *5 (S.D. Cal. July 30, 2020); *Michael v. Ghee*, 325 F. Supp. 2d 829 (N.D. Ohio 2004).

### B. Netlist Is Unlikely To Prove That Samsung Breached the JDLA, or That Any Breach Was Material

Although the Court need not resolve the likelihood that Netlist will prevail on its claims in the C.D. Cal. at this stage,[1] Netlist is unlikely to prevail there, meaning that Samsung's license will continue to remain in effect. To prevail in the C.D. Cal. Case, Netlist must establish that:

[REDACTED], meaning it goes to the root of the agreement. Netlist is unlikely to prevail on either of these issues, let alone both.

***First***, as explained in Samsung's Ninth Circuit brief, the extrinsic evidence demonstrates that Samsung's supply obligation (Ex. 2, § 6.2) was tied to the NVDIMM-P joint-development

[1] In its opposition to Samsung's motion to sever, transfer, and stay, Netlist argued that Samsung was required to show a "strong showing that it is likely to succeed on the merits." Dkt. 21 at 11 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). However, *Nken* is inapposite because it relates to a stay of enforcement of an order pending the appeal of the legality of that order, ***not*** a stay of one case when a decision in another may profoundly affect the case's outcome, *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936), as is the case for the C.D. Cal. Case. Holding otherwise would greatly complicate the stay decision and make this Court analyze the same issues before the C.D. Cal., and preview what it thinks the C.D. Cal. (and a jury there) will do. Far from saving judicial resources, that would duplicate effort and intrude on the first filed court's authority. *Cf. West Gulf*, 751 F.2d at 730-31 ("[The first filed action's] Judge Sand was in the better position to know what was needed, if anything, to preserve the status quo, as well as the likelihood of the parties to prevail that underlies issuance or not of a preliminary injunction."). That is not the point of *Landis*, which authorizes this Court to stay this case when a decision in another case may profoundly affect the outcome here, so long as it does not cause undue prejudice. As explained below, a stay here has the potential to save the Court, jury, and parties substantial work, while causing Netlist no undue prejudice.

project ("JDP"). *See* Ex. 3 at 30-35. For example, the Ninth Circuit explained several ways in which, "[r]ead as an integrated whole," the contract supports an interpretation that the supply obligation was tied to the NVDIMM-P project, including: (1) the stated purposes of the contract (developing NVDIMM-P product and patent cross-licensing); (2) the title and structure of § 6, which requires "Supply of Components" for both parties, and ties Netlist's obligations to any NVDIMM-P controller; and (3) the overall agreement, in which "all other substantive provisions . . . concern either the JDP or cross-licensing." Ex. 1 at 3-5.

***Second***, even if there were a breach, Netlist cannot prove that any such alleged breach was material—which is required for Netlist to terminate the JDLA. *See, e.g.*, Ex. 1 at 7-8 (listing out disputed facts relevant to materiality); Ex. 2, § 13.2. "Under New York law, for a breach of a contract to be material, it must 'go to the root of the agreement between the parties.'" Ex. 1 at 7 (quoting *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)). The Ninth Circuit held that factors impacting whether any alleged breach was material hinge on disputed facts, including whether § 6.2's supply provision (assuming the district court correctly construed it) was the "centerpiece" of the agreement. *Id.* at 7-8. Netlist will not be able to prove that the supply provision was the "centerpiece" of the agreement. Indeed, the C.D. Cal. jury's finding that Netlist suffered no damages from the alleged breach illustrates that the supply provision was not material. *See, e.g.*, Ex. 4 (Jury Verdict); Ex. 3 at 47-48 (arguing that a harmless breach is not material as a matter of law); *id.* at 47-56.

**C. Fifth Circuit Law Compels This Court To Stay This Case**

Not only is a stay advisable in this case, Fifth Circuit law forecloses the business-as-usual approach to this case that Netlist advances. In *West Gulf*, the Fifth Circuit held it was an abuse

of discretion for a Texas district court to resolve issues that overlapped with the same contract-related issues presented in an earlier-filed New York case. 751 F.2d at 728-32.

In that case, the first-filed New York action involved petitions to enforce and vacate the decision of panel that interpreted a provision in a union contract. *Id*. at 723, 728. The Texas action involved a declaratory and injunctive relief request regarding issues surrounding that same provision. *Id*. at 728. Despite the overlap, the Texas court issued a preliminary injunction. *Id*. at 731. Under the principals of comity, the Fifth Circuit held that the Texas court "should have stayed, dismissed, or transferred West Gulf's action." *Id*. at 730. In so doing, the Fifth Circuit held that the district court abused its discretion "in permitting the Texas action to proceed and in issuing the injunction." *Id.* n.2. As the Fifth Circuit explained, "[t]he central point" of the comity analysis "is that it was up to [the New York court] to determine whether an injunction was necessary" and "[i]nevitably the district court's injunction intruded on [the New York court's] authority." *Id.* at 730-31.

Here, it is beyond dispute that the C.D. Cal. Case relates to whether Samsung breached the JDLA and whether any such breach was material such that Netlist could properly terminate it and deprive Samsung of its license to the asserted patents in this case. This issue—whether Samsung has continued to hold a license covering the accused products after July 15, 2020—is at the heart of this case, as Samsung's license is a complete defense to Netlist's infringement claims. *See Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1341-42 (Fed. Cir. 1999). The C.D. Cal. Case undisputedly pre-dates this action because Netlist filed the C.D. Cal. action on May 28, 2020, two years before initiating this case. *Netlist Inc. v. Samsung Elecs. Co.*, No. 8:20-CV-00993, Dkt. 1 (C.D. Cal. May 28, 2020).

Due to the significant overlap between this case and the first-filed C.D. Cal. Case, under

Fifth Circuit law, the C.D. Cal. court must address the core issue of Samsung's license defense. The C.D. Cal. judgment finding Netlist terminated the JDLA has been reversed, leaving Samsung licensed, yet Netlist continues to assert that the Samsung is not licensed because the JDLA was terminated. However, it is up to the C.D. Cal. court to determine whether the JDLA (and Samsung's license) is still in force. *See West Gulf*, 751 F.2d at 730-31. A determination of this Court on the validity of the license after July 15, 2020, here risks trampling on the C.D. Cal. court's authority. Thus, under Fifth Circuit law, this Court must stay the case pending resolution of the C.D. Cal. Case.

**D. Netlist Would Not Be Unduly Prejudiced by a Stay**

A stay would not unduly prejudice Netlist or present a clear tactical advantage to Samsung. "[W]hether the patentee will be unduly prejudiced by a stay in the district court proceedings . . . focuses on the patentee's need for an expeditious resolution of its claim." *VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1318 (Fed. Cir. 2014).

Here, Netlist decided to split its claims between two different courts, and cannot claim prejudice from the natural and required result of its decision. Netlist chose to litigate its contract claims in C.D. Cal. separate from its patent infringement claims in E.D. Tex. (which it filed two years after filing its complaint in the C.D. Cal.). It is not unduly prejudicial to first allow the resolution of Netlist's contract claims in its chosen forum—which will determine whether Samsung holds a license and therefore has a complete defense to patent infringement—before resolving whether liability attaches in the absence of a license in this Court. Indeed, Netlist waited until the C.D. Cal. found , in 2021, that Netlist's had terminated Samsung's license ***before*** initiating any patent infringement actions against Samsung in the first place because even Netlist understood that resolution of the JDLA was a predicate to pursuing infringement claims

Money damages are plainly sufficient because Netlist has licensed its patents to others,

including to Samsung.  If Netlist prevails in the C.D. Cal. Case, this case could be re-started (assuming any of its claims survive IPRs) and Netlist could proceed with its claims seeking damages.  Monetary relief will sufficiently compensate Netlist for any purported damages in the (unlikely) event of liability, and a "stay will not diminish the monetary damages to which [Netlist] will be entitled if it succeeds in its infringement suit—it only delays realization of those damages . . . ."  *Virtua/Agility*, 759 F.3d at 1318.  A delay of the vindication of patent rights alone is insufficient to defeat a motion to stay.  *See, e.g.*, *NFC Tech. LLC v. HTC Am., Inc.*, No. 2:13-CV-1058, 2015 WL 1069111, at *2-3 (E.D. Tex. Mar. 11, 2015) (granting stay where "that monetary relief will be sufficient to compensate [the plaintiff] for any injury to its patent rights").

In contrast, Samsung will suffer undue prejudice without a stay by incurring the burden of continuing to defend against infringement allegations to patents to which it ***currently holds a license***.  Without a stay, this case will advance toward trial, and the parties and the Court will continue to invest significant time and resources in preparing the case, including scheduling dozens of depositions in multiple continents.  Moreover, absent a stay, Samsung will have no choice (in order to avoid waiver) but to litigate the same issue that is being litigated in the C.D. Cal.—Samsung's license after July 15, 2020—requiring inefficient and duplicative efforts by the parties, the Court, and the jury, as well as the risk of conflicting rulings.

### E.    The Stage of the Case Weighs in Favor of a Stay

Finally, the stage of the case weighs in favor of a stay (to the extent the Court considers this factor, despite the mandate to stay under *West Gulf*).  Although the parties have exchanged written discovery, no depositions have taken place, and many remain to be scheduled.  In fact, despite Samsung's serving deposition notices over a month ago, Netlist has not provided dates for any of its witnesses.  Further, Netlist has served 24 individual deposition notices on Samsung and has accepted only 3 of the deposition dates offered by Samsung.  Netlist's conduct is not

consistent with that of a party who wishes to complete discovery within the limits provided by the Court.

In any event, at this point, "[t]he most burdensome parts of the case . . . all lie in the future." *Cywee Grp. Ltd. v. Samsung Elecs. Co.*, No. 2:17-CV-140, 2019 WL 11023976, at *1 (E.D. Tex. Feb. 14, 2019). Several months of work remain for the parties and the Court, including ***imminent depositions in multiple continents***, expert reports, and pre-trial motions, which favors granting Samsung's request for a stay. *See, e.g., Norman IP Holdings, LLC v. TP-Link Techs., Co.*, No. 6:13-CV-384, 2014 WL 5035718, at *3 (E.D. Tex. Oct. 8, 2014) ("Courts often find the stage of litigation weighs in favor of a stay if there remains a significant amount of work ahead for the parties and the court, even when the parties and/or the court have already devoted substantial resources to the litigation." (citations omitted)). Under the circumstances, the best course of action is to stay this case before the parties (and the Court) engage in further burdensome discovery and pre-trial efforts.

## V. CONCLUSION

Accordingly, the Court should stay this case pending resolution of the remanded the C.D. Cal. Case, which will decide whether Samsung is still licensed to Netlist's patents.

Date: October 23, 2023

Respectfully submitted,

*/s/ Michael J. McKeon*

Ruffin B. Cordell
TX Bar No. 04820550
cordell@fr.com
Michael J. McKeon
D.C. Bar No. 459780
mckeon@fr.com
Lauren A. Degnan
D.C. Bar No. 452421
degnan@fr.com

Brian Livedalen
DC Bar No. 1002699
livedalen@fr.com
Daniel A. Tishman
DC Bar No. 1013923
tishman@fr.com
Christopher Dryer
D.C. Bar No. 1022460
dryer@fr.com
Matthew P. Mosteller
CA Bar No. 324808
mosteller@fr.com
FISH & RICHARDSON P.C.
1000 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

Francis J. Albert
CA Bar No. 247741
albert@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Ste. 400
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Katherine H. Reardon
NY Bar No. 5196910
kreardon@fr.com
Jonathan B. Bright
GA Bar No. 256953
FISH & RICHARDSON P.C.
1180 Peachtree St., NE, 21st Floor
Atlanta, GA 30309
Telephone: (404) 892-5005
Facsimile: (404) 892-5002

Kathryn Quisenberry
TX Bar No. 24105639
quisenberry@fr.com
FISH & RICHARDSON P.C.
909 Fannin Street Suite 2100
Houston, TX 77010
Telephone: (713) 654-5300

Thomas H. Reger II
reger@fr.com
Texas Bar No. 24032992
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
Facsimile: (214) 747-2091

James Huguenin-Love
MN Bar No. 0398706
huguenin-love@fr.com
FISH & RICHARDSON P.C.
60 South 6th Street, Suite 3200
Minneapolis, MN 55402
Telephone: (612) 335-5070
Facsimile: (612) 288-9696

Karolina Jesien
NY Bar No. 4626180
jesien@fr.com
FISH & RICHARDSON P.C.
7 Times Square, 20th Floor
New York, NY 10036
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

Melissa Richards Smith
melissa@gillamsmith.com
GILLAM & SMITH, LLP
303 South Washington Ave.
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

J. Travis Underwood
Texas Bar No. 24102587
travis@gillamsmithlaw.com
GILLAM & SMITH, LLP
102 North College Avenue, Suite 800
Tyler, Texas 75702
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

Brian R. Nester
DC Bar No. 460225

bnester@cov.com
COVINGTON & BURLING LLP
One CityCenter 850 Tenth Street, N
Washington, DC 20001-4956
Telephone: (202)-662-6000

Alice J. Ahn
CA Bar No. 271399/DC Bar No. 1004350
aahn@cov.com
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone:  (415) 591-7091
Facsimile:   (415) 955-6571

*Attorneys for Defendants Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; and Samsung Semiconductor, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule CV-5 on October 23, 2023.  As of this date, all counsel of record have consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3)(A) and by electronic mail.

*/s/ Michael J. McKeon*

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rules CV-7(h) and (i), counsel for the parties met and conferred on October 18, 2023, October 20, 2023, and October 23, 2023.  On October 23, 2023, Sam Baxter participated for Plaintiff; Ruffin Cordell participated for Defendants.  The parties discussed their positions on this motion.  At the time of the call, Netlist did not agree to stay the case, and indicated that the motion is opposed.

*/s/ Michael J. McKeon*

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I certify that the following document is authorized to be filed under seal pursuant to the Protective Order entered in this case.

*/s/ Michael J. McKeon*

# Exhibit 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| NETLIST, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SEMICONDUCTOR INC.,<br><br>Defendants. | ) | Case No. 2:22-cv-293-JRG<br><br>JURY TRIAL DEMANDED<br>(Lead Case) |
| NETLIST, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MICRON TECHNOLOGY, INC.; MICRON SEMICONDUCTOR PRODUCTS, INC.; MICRON TECHNOLOGY TEXAS LLC,<br><br>Defendants. | ) | Case No. 2:22-cv-294-JRG<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF NETLIST, INC.'S OPPOSITION TO SAMSUNG'S MOTION TO STAY (DKT. 187)**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 4

A. Samsung's License Defense Will Resolve All Issues ..... 4

B. The Central District Action ..... 6

C. Samsung's Delaware Action ..... 7

D. The First Eastern District Of Texas Action ..... 8

E. Samsung's Ninth Circuit Appeal Of The Central District's Ruling ..... 8

III. ARGUMENT ..... 11

A. A Stay Would Substantially Prejudice Netlist ..... 11

B. A Stay Will Not Simplify The Issues For Trial ..... 12

C. The Stage Of This Case Weighs Against A Stay ..... 13

D. This Court Is The Only Court That Can Decide The Entire Dispute ..... 14

E. The First-To-File Rule Does Not Require A Stay ..... 14

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Encore Wire Corp. v. Copperweld Bimetallics, LLC*, 2023 WL 123506 (E.D. Tex. Jan. 6, 2023) ..... 15

*Eragen Biosciences v. Necleic Acids Licensing, LLC*, 447 F. Supp. 2d 930 (W.D. Wisc. 2006) ..... 14

*Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391 (5th Cir. 2003) ..... 9

*Intell. Ventures v. FedEx Corp.*, 2017 WL 6559172 (E.D. Tex. Dec. 22, 2017) ..... 12

*Invensys Sys. v. Emerson Elec.*, 2014 WL 4477393 (E.D. Tex. July 25, 2014) ..... 12

*Quadrant Structured Prod. Co. v. Veritin*, 23 N.Y. 3d 549 (2014) ..... 10

*Realtime Data LLC v. Actian Corp.*, 2016 WL 3277259 (E.D. Tex. June 14, 2016) ..... 11, 12

*Saint Lawrence Comms. v. ZTE Corp.*, Case No. 2:15-CV-349-JRG, 2017 WL 3396399 (E.D. Tex. Jan. 17, 2017) ..... 11, 12

*Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, 2018 WL 2722051 (E.D. Tex. June 6, 2018) ..... 12

*In re Toyota Hybrid Brake Litig.*, 2020 WL 6161495 (E.D. Tex. Oct. 21, 2020) ..... 15

*Trover Grp. v. Dedicated Micros USA*, 2015 WL 1069179 (E.D. Tex. Mar. 11, 2015) ..... 11

*West Gulf Maritime v. ILA Deep Sea Local 24*, 751 F.2d 721 (5th Cir. 1985) ..... 15

*Wiley v. Trendwest Resorts, Inc.*, 2005 WL 1910934 (N.D. Cal. Aug. 10, 2005) ..... 15

# I. INTRODUCTION

Samsung's second attempt at a stay should be denied. This Court is the *only* forum that can decide the entire dispute between the parties, i.e. whether (1) the Accused Products infringe; (2) the Accused Products are covered by the license in the Joint Development and License Agreement ("JDLA"); and (3) Netlist properly terminated the JDLA as a result of Samsung's breach of its mandatory supply obligation. All of these questions are squarely before this Court because Samsung has pled as an affirmative defense that it was licensed under the JDLA, and termination was improper.

The Central District of California (the "Central District") is only considering number (3) above, whether the termination is effective. Samsung wants to get away from East Texas because it has adopted opposite positions in the Ninth Circuit and this Court regarding the scope of Netlist's license grant in the JDLA. Granting the stay will allow Samsung to perpetuate this tactic. Three sections of the JDLA are at issue. First, the recitals, which are produced in their entirety below, include

Ex. 1 (JDLA) at 1. Second, the Samsung supply obligation, which makes no reference to the collaboration. Netlist took the position that the supply obligation was not limited to the collaboration; and, therefore, when Samsung refused to supply, it was in material breach. The literal language of Samsung's supply obligation is not limited to the collaboration:



*Id.* at 6. In the Ninth Circuit, Samsung claimed that, in light of the recitals, the supply obligation was limited to the collaboration. Specifically, Samsung quoted recital four:

*Id.* at 1.

> "[T]he recitals are very clear -- and parties put recitals in agreements to make sure language isn't tortured down the road by lawyers and courts, right? Here's what our purpose is, interpret this agreement consistent with our purpose. And when you look at the recitals, what does it say about the licenses? Whereas in connection with their collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents***. The licenses are being given in connection with the collaboration. That's the joint development project.***"

Ex. 2 (9th Cir. Hearing Tr.) at 15:10-19. This specific argument was relied on by the Ninth Circuit to find the supply obligation ambiguous: "Read as an integrated whole, however, the contract's apparent purpose as derived from its title, structure, and related provisions make § 6.2 'reasonably susceptible of more than one interpretation.' . . . [W]e remand to the district court to consider in the first instance whether the extrinsic evidence 'creates a genuine issue of material fact' as to the provision's meaning." *Netlist Inc. v. Samsung Elecs. Co.*, 2023 WL 6820683, at *2 (9th Cir. Oct. 17, 2023).[1]

The third implicated section of the JDLA, the license grant, like the supply clause, makes no reference to the collaboration.

[1] As the dissent noted, Samsung never asserted that its supply obligation was ambiguous until after it lost summary judgment in the Central District. *Id.* at 3, n.1 ("The majority's decision relies on Samsung's made-for-litigation theory that § 6.2 is ambiguous.").



Ex. 1 (JDLA) at 8. In Case No. 2:21-CV-463-JRG ("*Samsung I*"), filed in this Court by Netlist, Samsung argued that the license grant should be read plainly without reference to the recitals to apply to all Samsung products, not simply the collaboration products. "The plain language of the JDLA unambiguously licenses all semiconductor products except Foundry Products and is not limited to the Joint Development." *Samsung I*, Dkt. 328 at 2. Samsung counsel confirmed this at the March 28, 2023 pretrial conference:

Ex. 3 (*Samsung I,* Pretrial Conference Tr.) at . This interpretation is the opposite of the successful argument Samsung made before the Ninth Circuit less than three months later: "'Whereas, in connection with their collaboration hereunder, the Parties wish to grant to each other a cross license under each party's patents.' **The licenses are being given in connection with the collaboration. That's the joint development project**." Ex. 2 (9th Cir. Hearing Tr.) at 15:17-21, referring to JDLA Recital No. 4, p. 1 (emphasis added). To be clear, pointing out the change in positions between what

Samsung told this Court in *Samsung I* and what it told the Ninth Circuit is not an attack on the integrity of counsel in either forum. Samsung made the strategic decision to change its position. But having now succeeded in the Ninth Circuit based on the new position, there are consequences.

The JDLA defines the Joint Development Product as NVDIMM-P. Ex. 1 (JDLA) at § 2 ([REDACTED])). The Accused Products in this case (DDR4 LRDIMMs and RDIMMs) and in *Samsung I* (DDR4 LRDIMMs, DDR5 SoDIMMs, UDIMMs, RDIMMs, and HBMs) are not licensed because none of them are [REDACTED] Samsung's corporate representative has admitted that [REDACTED]

The scope and enforceability of the JDLA are expressly pled as an affirmative defense in this case. All discovery necessary to try this defense is either completed or has been requested. In light of the above, the recognized factors for granting a discretionary stay favor denial. First, a stay would substantially prejudice Netlist by preventing it from timely enforcing its patent rights and profoundly disadvantage Netlist by allowing Samsung to take entirely inconsistent positions regarding the scope of the license and supply clause in different courts, given that the jury in California will not be deciding Samsung's license defense. Second, a stay will not simplify this case, because Samsung can "win" the Central District action on supply scope but still lose its license defense here based on its admissions about license scope. Third, a trial date has been set in this case, and none has been set in the Central District. Finally, this Court is the only one that can decide the parties' *entire* dispute.

## II. FACTUAL BACKGROUND

### A. Samsung's License Defense Will Resolve All Issues

This action was filed on August 1, 2022, and it is set for trial on April 15, 2024. The products accused of infringement are DDR4 LRDIMMs and RDIMMs (the "Accused Products"). Fact discovery is set to close on November 13, 2023, and the Deadline to Substantially Complete

Document Production was over two months ago on August 24, 2023. Dkt. 55. Netlist has invested significant resources and has diligently prosecuted this Action. Netlist has produced 50,712 documents spanning 426,326 pages, subpoenaed 12 third parties, and expended significant resources in preparing opening expert reports (due November 13, 2023). Sheasby Decl., ¶ 2. The Court has also expended material judicial resources by holding a several-hour claim construction hearing on September 26, 2023 and deciding summary judgment on the issue of intervening rights Dkt. 184.

Samsung has asserted an "express license" affirmative defense in this action. Dkt. 145 at 24-27. Samsung asserts that the JDLA covers the Accused Products:

> Netlist granted SEC and its subsidiaries, including SSI, a perpetual, paid-up, worldwide, non-exclusive license to all patents owned or controlled by Netlist or any of its subsidiaries having an effective first filing date on or prior to November 12, 2020. All of the Patents-In-Suit have effective first filing dates prior to November 12, 2020. The license extends through the expiration of the last to expire of the licensed patents.

*Id.* at 25. Samsung asserts in this Court that the consideration for this license was an $8 million payment. *Id.* However, in the Ninth Circuit, Samsung disclaimed this position, stating that the $8 million was not a license fee, but was instead a part of the joint development project even though it makes no reference to the collaboration:

> There's other provisions in the contract that clearly relate to the joint development project, that don't also say in connection with the joint development project. That's why you have to look at the structure of the agreement in order to interpret specific language. For example, in Section 3.1, there's an $8 million NRE [non-recurring engineering] fee that's paid. It's clearly for the joint development project, but it doesn't say it's specifically for the joint development project.

Ex. 2 (9th Cir. Hearing Tr.) at 8:16-24. This is also the exact opposite of what Samsung argued to this Court in *Samsung I*, when it repeatedly asserted that the $8 million payment was compensation for a broad license grant. *See, e.g., Samsung I,* Dkt. 566 at 57 ("Netlist ***perpetually*** licensed 87 patents to Samsung, including the asserted patents, in an agreement where Samsung paid $8 million."). Samsung also alleges that the agreement was improperly terminated:

> SEC maintains that it did not breach the Agreement, that the Agreement has not been terminated, and that it continues to hold a paid-up, worldwide, non-exclusive license to Netlist's patents, including the Patents-In-Suit.

Dkt. 145 at 27. Despite the question of the scope and termination of the JDLA being squarely before this Court based on Samsung's pled affirmative defense, shortly after filing its motion to stay, Samsung unilaterally refused to provide any further discovery on this affirmative defense. Samsung filed a motion for a protective order seeking to block JDLA discovery as a fig leaf to excuse its practice. Dkt. 193. In effect, Samsung unilaterally stayed the case as to its affirmative defense by refusing discovery, and argues the fact that discovery is not complete as a basis for granting the stay.

**B. <u>The Central District Action</u>**

In August 2021, Netlist and Samsung both moved for summary judgment on whether Samsung had committed material breach by its failure to supply product (something Samsung admitted it had failed to do). C.D. Cal., Dkt. 187 at 13 ("Samsung accepted and fulfilled some of the purchase orders, put some on backlog, and rejected others.") [REDACTED] Ex. 5 (C.D. Cal., Samsung SSUF (Dkt. 157-02)), fact #21.

The Central District held that § 6.2 is unambiguously a mandatory supply obligation that is not limited to either the joint development project or the product that was intended to come out of that development (*i.e.* NVDIMM-P). In doing so, the Central District expressly noted that the JDLA is specific in its reference to the joint development project and/or joint product when it intends to be, and that the provisions of the JDLA that do not reference those terms (such as Samsung's mandatory supply obligation) cannot be read to include the supposed unstated limitation: "The coexistence of project-specific provisions and project-nonspecific provisions signals that the parties intended not to restrict the NAND and DRAM supply obligation to the NVDIMM-P project by omitting any mention

of it in § 6.2." *Netlist Inc. v. Samsung Elecs. Co.*, 2021 WL 7186853, at *5 (C.D. Cal. Oct. 14, 2021). Moreover, because Samsung admitted that it had failed to supply product that Netlist had requested, breach was undisputed, as was materiality, given that Samsung's sole materiality argument was that its proffered interpretation was correct. The Central District then held a trial solely on the issue of the cost of cover damages (the Central District held that Netlist was precluded from recovering for the substantial consequential damages and other harm it suffered as a result of Samsung's failure to comply with its supply obligation because of a damages limitation provision in the JDLA (§ 12.5)). The jury did not award the cost of cover damages. The Central District then awarded Netlist nominal damages and entered judgment in Netlist's favor.

### C. Samsung's Delaware Action

The day after the Central District granted summary judgment, and before the Central District jury trial, Samsung rushed to the Delaware District Court and filed a preemptive declaratory relief action seeking a declaration of non-infringement as to several patents. *Samsung Elecs. Co. v. Netlist, Inc.*, Case No. 1:21-cv-01453, Dkt. 1 (D. Del. Oct. 15, 2021). One of those patents was the '912 patent at issue in this case (the '912 patent was dismissed from the Delaware action by Judge Andrews). Despite the summary judgment ruling against it, Samsung's complaint asserted that "Netlist has, without justification, unilaterally attempted to terminate a November 2015 Joint Development and License Agreement ('Agreement') in which Netlist granted Samsung a perpetual, paid-up, worldwide license to, among others, the Patents-in-Suit." *Id.* at ¶ 2 (emphasis added). Samsung has also asserted a license defense. *Id.,* Dkt. 62 at 26-27. While Samsung speaks of judicial economy, Samsung's behavior confirms that it is appropriate for another court adjudicating patent infringement to assess Samsung's license defense while the Central District case is ongoing. Indeed, just a few weeks ago, Samsung filed a new declaratory judgment action in Delaware on a recently issued Netlist patent, once again asserting that it is licensed. *Samsung Elecs. Co., Ltd. v. Netlist, Inc.*, No. 1:23-cv-1122-UNA (October 9, 2023).

### D. The First Eastern District Of Texas Action

After Samsung filed its Delaware declaratory judgment action, Netlist filed an action in this Court ("*Samsung I*"). In *Samsung I*, Samsung took the position that the license grant in the JDLA is broad: "The plain language of the JDLA unambiguously licenses all semiconductor products except Foundry Products and is not limited to the Joint Development Project." *Samsung I*, Dkt. 290 at 2 (emphasis added). Samsung also claimed that the consideration for this "broad" license was an $8 million payment under the JDLA. *Samsung I,* Dkt. 566 at 57 ("Netlist ***perpetually*** licensed 87 patents to Samsung, including the asserted patents, in an agreement where Samsung paid $8 million."). On April 5, 2023, this Court held—consistent with the Central District's holding that the JDLA rights grants (e.g., supply) that made no explicit reference to the collaboration should be interpreted without limitation to the collaboration project—that "Samsung had a license until July 15, 2020," i.e. the date on which Netlist terminated the JDLA. *Samsung I,* Dkt. 432 at 2.

### E. Samsung's Ninth Circuit Appeal Of The Central District's Ruling

Samsung appealed the Central District's summary judgment ruling to the Ninth Circuit. In that appeal, Samsung reversed course on multiple issues.

For example, in the Central District (and this Court), Samsung represented (as an undisputed fact) that "it considered the $8 million as consideration for Netlist's grant of patent licenses . . . ." C.D. Cal., Samsung SSUF (Dkt. 168-2), fact #62. However, in the Ninth Circuit, Samsung represented that "there's an $8 million NRE fee that's paid. It's clearly for the joint development project, but it doesn't say it's specifically for the joint development project." Ex. 2 (9th Cir. Hearing Tr.) at 8:16-24. As another example, Samsung told the Central District that the absence of reference to collaboration in a grant of rights clause means the clause is not limited to the collaboration: "Sections 7 [release] and 8 [license] do not deal with the JDLA and the joint development. . . So I very clearly will say to the jury in this case, if I get there, your Honor, Section 7 and Section 8 don't apply to joint development."

C.D. Cal. Dkt. 213 (September 20, 2021 MSJ Hearing Tr.) at 23:16-23. Whereas, in the Ninth Circuit, Samsung made the opposite argument, asserting that the fourth recital discussing the license grant in reference to the collaboration meant that the clause was limited to collaboration:

> [T]he recitals are very clear -- and parties put recitals in agreements to make sure language isn't tortured down the road by lawyers and courts, right? Here's what our purpose is, interpret this agreement consistent with our purpose. And when you look at the recitals, what does it say about the licenses? Whereas in connection with their collaboration hereunder, the parties wish to grant to each other a cross-license under each party's patents. **The licenses are being given in connection with the collaboration. That's the joint development project.**

Ex. 2 (9th Cir. HT) at 15:10-21 (emphasis added). In other words, Samsung's argument to the Ninth Circuit was that the JDLA provisions that do not expressly refer to the joint development project should still be interpreted as being limited to that project in light of recital four.

Samsung partially succeeded. In an unpublished 2-1 decision, the majority upheld multiple rulings of the Central District, but reversed the grant of summary judgment on the supply clause, § 6.2. The Ninth Circuit conceded that the Central District's initial assessment made sense *Netlist Inc.*, 2023 WL 6820683, at *1 ("Standing alone, the plain language of § 6.2 favors Netlist's interpretation: that Samsung must fulfill all NAND and DRAM orders by Netlist for whatever purpose."), but, nevertheless, remanded for the Central District to consider in the first instance whether extrinsic evidence would create an issue of material fact on supply clause interpretation. The Ninth Circuit also reversed and remanded as to the materiality of Samsung's breach, finding that a disputed fact issue existed. *Netlist Inc.*, 2023 WL 6820683, at *3; *see also, e.g., Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) ('Statements made in a previous suit by an attorney before the court can be imputed to a party and subject to judicial estoppel.").

Samsung's Motion here overstates the scope and implications of the Ninth Circuit's holding. Samsung claims that as a result of the Ninth Circuit's order, "Samsung's license to the asserted patents is in full force and effect." Mot. at 2. The Ninth Circuit held no such thing. The JDLA has a prescribed

process for termination. Netlist followed that process to the letter (as Judge Scarsi held, and as an issue that Samsung never appealed) by sending Samsung written notice of breach and giving Samsung 30 days to cure. *Netlist Inc.*, 2021 WL 7186853, at *10. Although Samsung has contended here that the termination was "erroneous" (Mot. at 2), that is an issue to be tried to the jury in April if the Court finds that the extrinsic evidence creates a material dispute of fact.

Moreover, Samsung's license defense is unlikely to succeed at trial. First, even though the Ninth Circuit held that the scope of Samsung's supply obligation is ambiguous, Samsung's attempt to add an implicit joint development project limitation where the parties chose not to include it remains improper under New York law. *Quadrant Structured Prod. Co. v. Veritin*, 23 N.Y. 3d 549, 560 (2014) ("***Even where there is ambiguity***, if the parties to a contract omit terms—particularly terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission.") (emphasis added). It is precisely for this reason that the Ninth Circuit noted that, even with ambiguity, it still remains to be determined "whether the extrinsic evidence 'creates a genuine issue of material fact' as to the [supply] provision's meaning." *Netlist Inc.*, 2023 WL 6820683, at *1. And, even if the supply clause is found to be limited to the collaboration, based on Samsung's arguments before the Ninth Circuit, then so too would the license clause be limited.

Second, Samsung's breach of the supply provision was clearly material. Samsung has already admitted: "[I]f [§] 6.2 is construed as Netlist is saying, that would have been the most important part of this contract by far. It would have outweighed anything else in the contract." C.D. Cal. Dkt. 213 (September 20, 2021 MSJ Hearing Tr.) at 17:22-25. And Samsung has repeatedly acknowledged that its conduct would substantially harm Netlist. An internal Samsung email stated that [REDACTED]

[REDACTED] During his deposition, [REDACTED]

[REDACTED]



## III. ARGUMENT

As this Court has held, the party seeking a discretionary stay (here, Samsung) bears the burden of proving it is appropriate. *Saint Lawrence Comms. v. ZTE Corp.*, Case No. 2:15-CV-349-JRG, 2017 WL 3396399, at *1 (E.D. Tex. Jan. 17, 2017). The factors are: "(1) whether a stay will unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issue in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Id.* As demonstrated below, all three factors favor not staying this case.

### A. A Stay Would Substantially Prejudice Netlist

Netlist has a "right to timely enforcement of its patent rights." *Id.* at *2; *see also Trover Grp. v. Dedicated Micros USA*, 2015 WL 1069179, at *2 (E.D. Tex. Mar. 11, 2015) (noting "the general right of patent owners to timely enforcement of their patent rights."); *Realtime Data LLC v. Actian Corp.*, 2016 WL 3277259, at *2 (E.D. Tex. June 14, 2016) (same). Staying this case at this juncture would cause Netlist substantial prejudice.

*First*, Netlist's complaint seeks injunctive relief. Dkt. 100 at 65. Netlist's '215 and '417 patents-in-suit expire in 2025, and the '912 patent expires in early 2026. Because Samsung seeks a stay of indeterminate length, Samsung's requested stay would dramatically limit any injunctive relief Netlist

could seek. *Second*, the Accused Products in this case are DDR4 LRDIMMs and RDIMMs, which are now at the end of their life due to the rollout of next generation DDR5 DIMMs. Sheasby Decl. ¶ 3. A stay will thus eliminate the impact of an injunction and any possibility of Netlist recapturing DDR4 market share. *Third*, while Samsung argues that "Netlist has licensed its patents to others" (Mot. at 12), Netlist has never granted a bare patent license because its primary focus is product sales. All of Netlist's licenses have been part of strategic agreements providing Netlist with major supply sources. Ex. 7 (SK Hynix Agreement); Ex. 1 (JDLA). In addition, this district has repeatedly recognized a patentee's "right to timely enforcement of its patent rights" and its "right to conduct its business." *Saint Lawrence*, 2017 WL 3396399, at *2. This would be true "even if [Netlist] could be made whole by money damages," which it cannot. *Intell. Ventures v. FedEx Corp.*, 2017 WL 6559172, at *4 (E.D. Tex. Dec. 22, 2017) (denying stay). *Fourth,* the prejudice is especially strong because Samsung seeks a stay of indeterminate length which undermines the "public interest in the 'speedy resolution of disputes.'" *Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, 2018 WL 2722051, at *4 (E.D. Tex. June 6, 2018) (citation omitted); *Invensys Sys. v. Emerson Elec.*, 2014 WL 4477393, at *3 (E.D. Tex. July 25, 2014) ("Firm trial settings resolve cases and reduce litigation costs.").

Finally, a stay would present a "clear tactical disadvantage to [Netlist]." *Realtime Data*, 2016 WL 3277259, at * 1. While a jury in *this case*—where the license is front and center—will have the opportunity to weigh the implications of Samsung's inconsistencies on its license defense, Samsung can disguise this inconsistency in the Central District where its license defense is not being directly addressed.

**B. <u>A Stay Will Not Simplify The Issues For Trial</u>**

As demonstrated above, the issue in the Central District is whether Samsung breached its supply obligation, and, therefore, the license was properly terminated. The issue in *this case* is whether Samsung has a license defense. That means that Netlist can prevail in this case if the clauses in the

JDLA that do not expressly mention the joint development project (including the license and Samsung's supply obligation) are interpreted consistently with each other. That is true regardless of whether they are interpreted narrowly (to only encompass the joint development project and thus omit the patents here) or broadly (to extend beyond the joint development project and thus confirm the materiality of Samsung's breach). Samsung can prevail in California but still lose here. For instance, [redacted] Ex. 8 (C.D. Cal., Ho-Jung Kim Depo. Tr.) at 22:11-17 (emphasis added). If Samsung were to prevail at trial on a limited scope of the supply clause by proffering this position, it would just mean Samsung loses its license defense here. Consequently, resolution of the Central District case will not resolve the issues in this case.

### C. <u>The Stage Of This Case Weighs Against A Stay</u>

Contrary to Samsung's assertions, the stage of this case does not favor a stay. As noted above, fact discovery closes on November 13, 2023, and trial is set for April 15, 2024; the deadline to substantiallyc document production passed on August 24, 2023 (Dkt. 55); Netlist has produced 50,712 documents spanning 426,362 pages, subpoenaed 12 third parties, and expended significant resources in preparing opening expert reports which are due November 13. Sheasby Decl. ¶ 2. The Court held a several-hour claim construction hearing on September 26, 2023 and has already ruled on summary judgment as to intervening rights (Dkt. 184).

Samsung's suggestion that the parties have taken no depositions and that Netlist's conduct "is not consistent with that of a party who wishes to complete discovery" (Mot. at 13-14) does not reflect the reality of this case. The parties have been negotiating over the use of deposition transcripts from prior litigation to potentially obviate the need for the vast majority of witnesses to be re-deposed. The

parties exchanged deposition transcripts from *Samsung I* so that "the parties [could] review these transcripts over the next week and provide their position by October 20, 2023, as to whether they believe that a second deposition of these witnesses is required in light of the transcripts." Ex. 9 (Tishman October 13, 2023 email). Samsung also has unilaterally refused to provide depositions on its affirmative license defense.

**D. <u>This Court Is The Only Court That Can Decide The Entire Dispute</u>**

According to Samsung, this Court should "stay this case pending resolution of the remanded [] C.D. Cal. Case, which will decide whether Samsung is still licensed to Netlist's patents" Mot. at 14. The only forum that can definitively decide whether Samsung is licensed is this Court, because the scope of the license grant is only present before this Court. Samsung's arguments and proffered evidence on the scope of the supply clause (that it is limited to collaboration products) would apply with equal force to the license grant. The court that can definitively decide whether Samsung is licensed should proceed first. That court is East Texas.

Samsung prefers to litigate the scope of its supply obligation (§ 6.2) in a vacuum in California, where Samsung believes it can take inconsistent positions on the JDLA's scope. That is not a basis for a stay. If Samsung is truly concerned about efficiency and "a waste of party and judicial resources" (Mot. at 1), Samsung can stipulate (subject to court approval) to a stay or a transfer of the Central District action to this Court. *See, e.g., Eragen Biosciences v. Necleic Acids Licensing, LLC,* 447 F. Supp. 2d 930, 933 (W.D. Wisc. 2006) ("If defendants are concerned that this court's rulings may conflict with rulings made by the Florida district court, they may move for a transfer of the Florida case to this court, where the two cases may be consolidated and the claims tried in one suit.").

**E. <u>The First-To-File Rule Does Not Require A Stay</u>**

Samsung incorrectly argues that the "first to file" rule compels a stay. As an initial matter, the first to file rule is inapplicable because, as explained above, this case is "broader in scope" than the

Central District action. *See, e.g., Encore Wire Corp. v. Copperweld Bimetallics, LLC*, 2023 WL 123506, at *5 (E.D. Tex. Jan. 6, 2023). The Central District action addresses a narrow question: whether Netlist properly terminated the JDLA due Samsung's breach of the supply provision. This case, however, will address not only that question, but also whether Samsung infringes and whether the JDLA license covers the Accused Products. In sum, given that this case is clearly "broader in scope," the Central District case is not the "first-filed" action. *Encore Wire Corp.,* 2023 WL 123506, at *5.

Moreover, Netlist filed the Central District action. Netlist is thus the first-filer if the Central District is treated as the first-filed forum. The first to file rule is "invoked to protect the *plaintiff's* choice of forum in cases where the *defendant* has subsequently filed an identical or related suit in a different forum." *Wiley v. Trendwest Resorts, Inc.,* 2005 WL 1910934, at *5 (N.D. Cal. Aug. 10, 2005) (emphasis in original). It thus does not apply to cases in which a "*plaintiff* has filed [different cases] in two different jurisdictions." *Id.* (emphasis in original).

Regardless, even if the first to file rule applied, a stay would still not be warranted. The first to file rule "is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration." *In re Toyota Hybrid Brake Litig.*, 2020 WL 6161495, at *7 (E.D. Tex. Oct. 21, 2020) (internal quotation marks omitted). Consequently, whether to stay is within this Court's discretion. Samsung relies on *West Gulf Maritime v. ILA Deep Sea Local 24*, 751 F.2d 721 (5th Cir. 1985), but that case does not hold otherwise. There, a mere four days after a New York court denied the plaintiff's motion to transfer the first-filed suit to Texas, the plaintiff nonetheless filed suit in Texas anyway, seeking a preliminary injunction that would have interfered with the New York court's authority. *Id.* at 724-25. In contrast, here, it is unclear when the Central District will resume its case, and the Central District cannot resolve the entire dispute. Thus, unlike in *West Gulf*, the "conservation of judicial resources and comprehensive disposition of litigation" (*In re Toyota Hybrid Brake Litig.*, 2020 WL 6161495, at *7) firmly weigh against a stay.

Dated: November 2, 2023

Respectfully submitted,

*/s/ Jason Sheasby*
Jason G. Sheasby

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Jason G. Sheasby (*pro hac vice*)
jsheasby@irell.com
Annita Zhong, Ph.D. (*pro hac vice*)
hzhong@irell.com
Andrew J. Strabone (*pro hac vice*)
astrabone@irell.com
Thomas C. Werner (*pro hac vice*)
twerner@irell.com
Yanan Zhao (*pro hac vice*)
yzhao@irell.com
Michael W. Tezyan (*pro hac vice*)
mtezyan@irell.com

**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

***Attorneys for Plaintiff Netlist, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 2, 2023, a copy of the foregoing was served to all counsel

of record via email.

*/s/ Yanan Zhao*
Yanan Zhao

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that the foregoing document and exhibits attached hereto are authorized to be filed under seal pursuant to the Protective Order entered in this Case

*/s/ Yanan Zhao*
Yanan Zhao

# Exhibit 11

Ekwan E. Rhow - State Bar No. 174604
erhow@birdmarella.com
Marc E. Masters - State Bar No. 208375
mmasters@birdmarella.com
David I. Hurwitz - State Bar No. 174632
dhurwitz@birdmarella.com
Kate S. Shin - State Bar No. 279867
kshin@birdmarella.com
Christopher J. Lee - State Bar No. 322140
clee@birdmarella.com
Jong-min Choi - State Bar No. 329474
jmchoi@birdmarella.com
Joyce J. Choi - State Bar No. 256165
jchoi@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant
Samsung Electronics Co., Ltd.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

NETLIST INC., a Delaware corporation,

Plaintiff,

vs.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,

Defendant.

CASE NO. 8:20-cv-00993-MCS-ADS

**DEFENDANT SAMSUNG ELECTRONICS CO., LTD.'S SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS**

[Filed Concurrently with (1) Defendant's Opposition; (2) Defendant's Statement of Genuine Dispute of Material Facts; (3) Defendant's Evidentiary Objections to Declarations; (4) [Proposed] Order (5) Declaration of Hyeoksang Yoo and (6) Lee Declaration].

Assigned to Hon. Mark C. Scarsi
Courtroom 7C

| DEFENDANT'S ADDITIONAL MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 1. In early 2015, Netlist approached Samsung to discuss a strategic partnership involving joint development of a product based on a new standard called NVDIMM-P and licensing of Netlist's patents. | Dkt. 150-1 (Declaration of Joyce J. Choi in Support of Samsung's Motion for Summary Judgment ("Choi Decl.")) ¶ 15, Exh. 14 at RFA No. 18. |
| 2. The NVDIMM-P-related product was a "game changer" according to Chuck Hong and, based on presentation materials, was designed to take market share in a $15 billion industry. | Choi Decl. ¶ 8, Exh. 7 at 139:7-25; ¶ 17, Exh. 16 at SEC008159. |
| 3. At that time, Netlist also raised a licensing component and the potential that Samsung would be subject to an injunction for infringement of Netlist's patents. | Choi Decl. ¶ 18, Exh. 17 at NL107807; ¶ 8, Exh. 7 at 42:4-14. |
| 4. Netlist's first proposal to Samsung in April 2015 focused on the cash consideration, and did not mention a long term supply agreement. ("Q Now, at least on this proposal, Netlist didn't list supply as a component of the deal; correct? A Yes, it's not here.") | Choi Decl. ¶ 18, Exh. 17 at NL107807; ¶ 8, Exh. 7 at 51:3-52:18. |
| 5. When Netlist sent Samsung the first draft of the term sheet on April 21, 2015, | Choi Decl. ¶ 23, Exh. 22; ¶ 24, Exh. 23 at § II. |

| | |
|---|---|
| Netlist proposed, as part of the "Joint development and marketing" for the "Technology Collaboration," that Samsung supply NAND and DRAM product. | |
| 6. In Netlist's June 9, 2015 revision to the term sheet, under the heading "Technology Collaboration," Netlist proposed: "Raw Materials: Samsung will supply NAND, DRAM on mutually agreed terms." | Choi Decl. ¶ 25, Exh. 24, § II.5. |
| 7. Netlist CEO Chuck Hong testified that "Technology Collaboration" in Netlist's revised term sheet referred to the parties' joint efforts to standardize NVDIMM-P, and that "Raw Materials" referred to various DRAM and NAND flash components necessary to support the NVDIMM-P commercialization. | Choi Decl. ¶ 8, Exh. 7 at 91:4-17; 92:4-12. *See also* 101:25-102:7 ("Q. And so those were raw materials that were provided in connection with commercialization of the dash P product; correct? A. That's correct.") |
| 8. In Netlist's June 25, 2015 updated term sheet, under the heading "Phase 2: Technology Productization," Netlist proposed: "1. Parties will work together to bring an NVDIMM-P product to market. Details of the technical collaboration to be negotiated at a later date" and "Raw Materials: Samsung will | Choi Decl. ¶ 26, Exh. 25 at NL005090, NL005092. |

| | |
|---|---|
| supply NAND and DRAM on mutually agreed terms." | |
| 9. In the drafts leading up to the final and executed MOU, Netlist understood that Samsung's supply obligations would only arise in the event of commercialization of the NVDIMM-P product subject to the parties' joint development but this never occurred. | Choi Decl. ¶ 8, Exh. 7 at 104:6-24. |
| 10. Netlist CEO Chuck Hong testified that Netlist's intent underlying the MOU was to get Samsung's commitment to supply NAND and DRAM products for the NVDIMM-P product so that Netlist would have sufficient supply if and when it was able to commercialize the technology. | Choi Decl. ¶ 8, Exh. 7 at 109:9-110:1. |
| 11. According to Chuck Hong, NVDIMM-P was "industry changing" technology and Netlist's attempt to standardize a NVDIMM-P product was a significant business opportunity and one that Netlist had invested more than $10 million in engineering costs into. | Choi Decl. ¶ 8, Exh. 7 at 79:13-80:23, 139:7-141:6. |
| 12. The MOU reflected both parties' intent on the important points of the parties' agreement. | Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 80:13-23, 92:4-12, 109:9-110:1, 116:3-9; ¶ 22, Exh. 21 at NL069668-69. |

| | |
|---|---|
| Section 6 of the MOU states in full (emphasis added):<br>6. Most Favored Nation (MFN): Netlist will provide Samsung any NVDIMM-P* controller at a price lower than the price Netlist provides to any other buyer. Either party may produce NVDIMM-P controller using its own technology and has no obligation to buy from the other party. *Raw Materials: Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM products.*<br>As to the MOU, Chuck Hong again testified in deposition that section 6.2 limited Samsung's supply obligation to the NVDIMM-P development and that this obligation would arise only if and to the extent that the NVDIMM-P product was ever commercialized. | |

| | |
|---|---|
| 13. On October 8, 2015, when the parties began drafting the JDLA from the MOU, Samsung proposed the following language to Netlist: "6.2 Supply by Samsung. Samsung will supply NAND and DRAM to Netlist on Netlist's request at a competitive price similar to the customers purchasing similar volumes of similar products. For the avoidance of doubt, any of the provisions under this Agreement will not be deemed to require Netlist to purchase any products from Samsung or to require Samsung to supply any products to Netlist." | Choi Decl. ¶ 27, Exh. 26 at NL049006; ¶ 28, Exh. 27 at NL049012, § 6.2. |
| 14. Whitley was Netlist's main contributor to the JDLA. | Choi Decl. ¶ 8, Exh. 7 at 130:6-24. |
| 15. On October 14, 2015, as to the new Section 6.2 of its proposed JDLA, Whitley wrote in bold "**Conflicts with MOU**" and "Samsung states that nothing in this agreement will 'require Samsung to supply any products to Netlist.' Netlist removed this qualification and returned the language to reflect what was agreed to in the MOU." Samsung agreed to this change. | Choi Decl. ¶ 29, Exh. 28 at NL045877; ¶ 30, Exh. 29 at NL049026; ¶ 31, Exh. 30 at NL049033; ¶ 32, Exh. 31 at NL118147 and NL118149. |

| | |
|---|---|
| 16. As expressed by Whitley, it was Netlist's position that the MOU should govern the supply term.  As set forth in SUF nos. 20 and 31, the MOU only required that Samsung supply product in the event that the NVDIMM-P product was ever commercialized. | Choi Decl. ¶ 29, Exh. 28 at NL045877; ¶ 8, Exh. 7 at 130:6-132:10. |
| 17. Netlist wanted Samsung's assurance that it would supply NAND and DRAM to support NVDIMM-P sales if the joint development proved successful, and demand for the product took off. | Choi Decl. ¶ 8, Exh. 7 at 80:13-23. |
| 18. During the contract negotiations, Netlist's CFO Gail Sasaki wrote to Samsung: "Both sides understood from the outset that this was a strategic deal, not a financial one. *The value that would be transferred and created resided in the patents and the technology.*" | Choi Decl. ¶ 33, Exh. 32 at NL048993. |
| 19. On November 12, 2015, after months of negotiations, Samsung and Netlist entered into the JDLA. | Choi Decl. ¶ 20, Exh. 19 at p.1. |
| 20. The structure and terms of the JDLA reflect that the parties intend "to work together to jointly develop an interface and associated technologies for certain memory modules and promote such | Choi Decl. ¶ 20, Exh. 19 at p.1. |

| | |
|---|---|
| interface to standards-setting organizations." | |
| 21. The "Developed Product" in the JDLA means an NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications. | Choi Decl. ¶ 20, Exh. 19 at p.2. |
| 22. The JDLA also includes a grant of cross-licenses and a release of threatened claims. | Choi Decl. ¶ 20, Exh. 19 at p.7, § 7. |
| 23. The JDLA states that Netlist was to receive $8 million for non-recurring engineering on the NVDIMM-P development work, and concurrently with the JDLA, provide an additional $15 million convertible loan at 2% interest that allowed Netlist to pay off existing debt with less favorable financial terms. | Choi Decl. ¶ 20, Exh. 19 at p.5, § 3.1; ¶ 21, Exh. 20 at p.2; ¶ 22, Exh. 21 at NL069669, § II.7. |
| 24. In addition to its receipt of cash and financing from Samsung, Netlist stood to benefit from the relationship, especially if the parties were able to develop this "game changing" standard for NVDIMM-P and produce a commercially feasible product under this standard. | Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 33:12-34:6, 79:6-80:23, 139:7-25. |

| | |
|---|---|
| 25. The terms of the JDLA seek to implement these objectives, including terms for the collaborative development work in accordance with product specification and development milestones and a Statement of Work (Section 2, Appendices A and B); development costs (Section 3); IPR ownership (Section 4); schedule for standardization and productization (Section 5); supply (Section 6); a mutual release of claims (Section 7); and licensing of intellectual property (Section 8). | Choi Decl. ¶ 20, Exh. 19 at pp.4-8. |
| 26. Pursuant to the JDLA, Samsung and Netlist agreed to supply components to each other for the NVDIMM-P product which they had agreed to jointly develop and therefore did not yet exist. Specifically, Section 6.1 states: "Supply by Netlist. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." Section 6.2, the parallel provision, states: "Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a | Choi Decl. ¶ 20, Exh. 19 at p.6, §§ 6.1, 6.2. |

| | |
|---|---|
| competitive price (i.e., among customers purchasing similar volumes of similar products)." | |
| 27. Samsung's supply obligations would only arise if and to the extent that the NVDIMM-P product was commercialized but this never occurred. | Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 80:13-23, 92:4-12, 109:9-110:1, 116:3-9; ¶ 22, Exh. 21 at NL069668-69. |
| 28. Netlist received all of the chips it needed to complete the initial phase of the NVDIMM-P product under the JDLA. | Choi Decl. ¶ 8, Exh. 7 at 88:10-89:5. |
| 29. The NVDIMM-P product was never commercialized. | Choi Decl. ¶ 8, Exh. 7 at 109:21-110:1. |
| 30. Netlist disclosed an agreement with SK Hynix on April 5, 2021, stating that contract "entitles Netlist to purchase up to $600,000,000 of SK Hynix memory products during the term . . ." | Choi Decl. ¶ 34, Exh. 33 at p.2. |
| 31. Netlist CEO Chuck Hong's presentation to the Board in November 2015, prepared by Netlist CFO Gail Sasaki, describes the technology collaboration and the cross-licensing of patents but makes no mention of Netlist's supposed broad supply agreement. | Choi Decl. ¶ 35, Exh. 34 at NL117923; ¶ 36, Exh. 35 at p.1. |

| | |
|---|---|
| 32. In its first annual report following the JDLA, Netlist disclosed the risks associated with not having a supply contract: "Our ability to fulfill customer orders or produce qualification samples is dependent on a sufficient supply of field programmable gate arrays ("FPGAs"), DRAM ICs and NAND flash, which are essential components of our memory subsystems. There are a relatively small number of suppliers of FPGAs, DRAM ICs and NAND flash, and we purchase from only a subset of these suppliers. *We have no long-term FPGA, DRAM or NAND flash supply contracts*." (emphasis added) | Choi Decl. ¶ 19, Exh. 18 at p.13. |
| 33. Netlist repeatedly and consistently disclosed the risks associated with not having a long-term supply contract for DRAM and NAND in its annual reports before and after execution of the JDLA, each time stating that Netlist had "no long-term supply contracts" for these products. | Choi Decl. ¶ 74, Exh. 73 at p.18; ¶ 75, Exh. 74 at p.22; ¶ 4, Exh. 3 at p.14; ¶ 37, Exh. 36 at p.14; ¶ 19, Exh. 18 at p.13; ¶ 38, Exh. 37 at p.19; ¶ 7, Exh. 6 at p.20; ¶ 5, Exh. 4 at p.22; ¶ 39, Exh. 38 at p.20; ¶ 40, Exh. 39 at p.15. |
| 34. A November 2, 2015 press release announcing the JDLA that Netlist was | Choi Decl. ¶ 41, Exh. 40 at pp.2-5. |

| | |
|---|---|
| preparing had a headline stating "Netlist and Samsung Announce Strategic Alliance To Commercialize the First Unified Memory-Storage Architecture" and makes no mention of a supply agreement. | |
| 35. At a February 21, 2017 meeting, Netlist asked Samsung for a "New Partner Type" relationship that would require Samsung to provide "Product Allocation support for Netlist" and an "Official-Distributor Partnership Agreement." When Netlist made this ask, Samsung told Netlist that the JDLA was not an avenue to support Netlist's standard products. | Choi Decl. ¶ 17, Exh. 16 at SEC008148, SEC008169; ¶ 42, Exh. 41 at SEC000474; ¶ 43, Exh. 42 at 43:22-45:3. |
| 36. Netlist has been a customer of Samsung since at least 2001, purchasing over $200 million of products, including NAND and DRAM components. | Choi Decl. ¶ 2, Exh. 1 at SEC008161; ¶ 3, Exh. 2 at 11:21-12:12, 13:10-20, 14:8-15. |
| 37. Both before and after the JDLA and to the present, Samsung has been a significant and continuous supplier of NAND and DRAM to Netlist, as reflected in Netlist's annual reports. | Choi Decl. ¶ 4, Exh. 3 at p.6; ¶ 5, Exh. 4 at p.8; ¶ 6, Exh. 5 at 294:4-18; ¶ 7, Exh. 6 at F-36; ¶ 3, Exh. 2 at 185:10-186:1, 187:21-188:5. |
| 38. Netlist also purchased NAND and DRAM products from SK Hynix and | Choi Decl. ¶ 4, Exh. 3 at p.6; ¶ 6, Exh. 5 at 194:2-22, 294:4-18; |

| Micron, as well as from sellers who purchased the products from the manufacturers for resale. | ¶ 3, Exh. 2 at 205:23-206:18, 207:21-208:10. |
|---|---|
| 39. The amount of NAND and DRAM product that Samsung can manufacture for sale is limited and demand for its products oftentimes exceeds available supply. | Choi Decl. ¶ 8, Exh. 7 at 121:24-122:13; Dkt. 89-21 at ¶ 4. |
| 40. Due to the nature of the industry, Netlist, like other customers, provides Samsung with forecasts of the amount of product it wishes to purchase, and Samsung lets Netlist know how much product it can allocate to Netlist for purchase. | Choi Decl. ¶ 9, Exh. 8; ¶ 10, Exh. 9; ¶ 3, Exh. 2 at 35:10-36:13, 37:9-22, 61:25-62:5. |
| 41. Following these discussions regarding allocations and availability, Netlist issued purchase orders for specific amounts of product that Samsung approved beforehand. | Choi Decl. ¶ 12, Exh. 11 at 23:23-24:5; ¶ 3, Exh. 2 at 62:6-14; ¶ 13, Exh. 12 at 28:4-25. |
| 42. Samsung accepted and fulfilled some of the purchase orders, put some on backlog, and rejected others, just as it did with other customers. | Choi Decl. ¶ 12, Exh. 11 at 36:8-11; Choi Decl. ¶ 3, Exh. 2 at 45:2-46:8, 62:6-14. |
| 43. This business protocol—the use of backlogs, forecasts, allocations, and purchases orders—remained the same | Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 62:6-14; ¶ 14, Exh. 13 at NL004680. |

| | |
|---|---|
| throughout the parties' long standing business relationship and even after the JDLA was executed. | |
| 44. After the JDLA, Samsung continued to supply Netlist with NAND and DRAM outside of the joint development context. | Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 54:24-55:10, 183:3-15, 184:8-20. |
| 45. Samsung's sales to Netlist have continued from 2001 to the present day, according to the same course of dealing that existed before the JDLA, after the JDLA, and continue to this day after Netlist purported to terminate the JDLA and filed this lawsuit. | Choi Decl. ¶ 21, Exh. 11 at 25:6-25, 201:9-18; ¶ 3, Exh. 2 at 27:21-28:12, 35:23-36:13, 37:18-22, 47:24-50:4, 183:3-15, 184:8-20. |
| 46. Netlist understood that the JDLA did not guarantee it access to all of the Samsung product it requested, but only the product that Samsung actually agreed to sell. | Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 54:24-55:10, 91:10-93:24, 94:6-21, 183:3-15, 184:8-20; ¶ 53, Exh. 52 at NL002024-2027; ¶ 54, Exh. 53; ¶ 46, Exh. 45; ¶ 49, Exh. 48. |
| 47. Due to Samsung needing lead time for production, Netlist submitted forecasts of its requests, and discussed with Samsung how much material would be allocated and made available to it. | Choi Decl. ¶ 3, Exh. 2 at 48:10-12.; ¶ 13, Exh. 12 at 152:5-153:24. |
| 48. Netlist only submitted purchase orders for specific quantities of product after Samsung indicated that such | Choi Decl. ¶ 12, Exh. 11 at 23:23-24:5; ¶ 3, Exh. 2 at 62:6-14, 93:18-24; ¶ 13, Exh. 12 at 154:3-20. |

| | |
|---|---|
| product would be available. | |
| 49. Netlist purchased a substantial amount of NAND and DRAM from Samsung in each quarter from November 2015 to the present, although the amounts varied over time. | Choi Decl. ¶ 51, Exh. 50 at F-36, F-34, F-36, F-36, F-36, 77; ¶ 52, Exh. 51; ¶ 3, Exh. 2 at 186:16-188:5; ¶ 7, Exh. 6 at p.8. |
| 50. According to their own terms, Netlist's purchase orders superseded any prior agreements or discussions with Samsung, such as forecasts and informal e-mail or oral requests to purchase product. | Choi Decl. ¶ 55, Exh. 54 at pp.3, 6, 9, § 28; ¶ 53, Exh. 52 at NL002029. |
| 51. In 2017, Netlist asked Samsung for Embedded MultiMediaCard (eMMC) supply. | Choi Decl. ¶ 3, Exh. 2 at 195:10-12. |
| 52. Samsung does not normally sell eMMC to channel distributors like Netlist, but, after CEO Chuck Hong asked President Jun for support, Samsung agreed to support Netlist's requests. | Choi Decl. ¶ 11, Exh. 10 at 63:17-64:16, 85:17-87:2. |
| 53. Samsung allocated a significant amount of EMMC product to Netlist for 2017, much of which been allocated to another customer. | Choi Decl. ¶ 11, Exh. 10 at 85:17-87:2. |
| 54. After purchases orders had been submitted and prices for eMMC dropped | Choi Decl. ¶ 3, Exh. 2 at 194:8-196:10; ¶ 59, Exh. 58 at NL000091; ¶ 11, Exh. |

| | |
|---|---|
| unexpectedly in the second half of 2017, Netlist cancelled half of its eMMC order. Netlist CEO Chuck Hong testified that cancelling a purchase order constitutes non-performance under the JDLA. | 10 at 85:17-87:2; ¶ 8, Exh. 7 at 164:11-21. |
| 55. Netlist argued in its Korean tax appeal that: "the granting of cross licenses under the [JDLA] is limited to the joint research and development, and hence in cases where Samsung Electronics uses intellectual property rights of [Netlist] in the course of its own research and development, it does not constitute something that can be subject to the [JDLA]." | Choi Decl. ¶ 60, Exh. 59 at p.4. |
| 56. The Korean tax tribunal relied on Netlist's position that the license was limited in making its ruling. | Dkt. 88-7 at p.7. |
| 57. Section 3.2 of the JDLA states, in pertinent part: "Taxes. . . . To the extent that any withholding taxes are required by applicable law for the payment set forth in this Agreement, Samsung may deduct any applicable withholding taxes due or payable under the laws of Korea . . . provided that Samsung shall pay such | Choi Decl. ¶ 20, Exh. 19 at p.5, § 3.2. |

| | |
|---|---|
| withholding taxes to the Korean tax authorities and promptly provide Netlist with a certificate of payment for such withholding tax, as required by applicable law or treaty, and reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes. | |
| 58. On November 5, 2015, shortly before the JDLA was signed, Samsung sent Netlist a tax form for Netlist to apply for a reduced tax rate as a foreign corporation. | Choi Decl. ¶ 61, Exh. 60; ¶ 6, Exh. 5 at 140:23-141:22, 143:14-24. ¶ 15, Exh. 14 at RFA No. 17; ¶ 61, Exh. 60 at NL046086-89. |
| 59. The form indicated that the tax rate on royalties pursuant to a treaty with the US was 16.5%. | Choi Decl. ¶ 61, Exh. 60 at p. 3; ¶ 15, Exh. 14 at RFA No. 17; ¶ 61, Exh. 60 at NL046086-89. |
| 60. Netlist CFO Gail Sasaki reviewed, signed, and returned the form to Samsung. | Choi Decl. ¶ 61, Exh. 60 at pp.1, 3; ¶ 6, Exh. 5 at 144:1-145:4. |
| 61. According to Netlist's CEO Chuck Hong, Sasaki had the authority to approve and sign such tax form without his approval. In her capacity as Netlist's CFO, Sasaki was expected to consult with a tax expert before executing the form to ensure it was appropriate for Netlist to sign. | Choi Decl. ¶ 8, Exh. 7 at 175:9-176:14. |

| | |
|---|---|
| 62. Samsung withheld 16.5% tax and paid it to the Korean National Tax Service because it considered the $8 million as consideration for Netlist's grant of patent licenses, and Korean law requires withholding of payments on such royalties. | Choi Decl. ¶ 63, Exh. 62 at p.1; ¶ 61, Exh. 60 at p. 3; Dkt. 88-7 at p.4. |
| 63. What Netlist wanted was for Samsung to deny that the $8 million was for patent royalties, which Samsung did not believe to be true. | Choi Decl. ¶ 63, Exh. 62 at p.1; ¶ 61, Exh. 60 at p.3; Dkt. 88-7 at p.4; ¶ 67, Exh. 66 at NL118556; ¶ 6, Exh. 5 at 123:19- 124:24 |
| 64. Netlist executives internally discussed whether to provide notice of breach over the tax withholding dispute in March 4, 2016, but decided not to send a breach notice because it wanted to reap the benefits of its business relationship with Samsung. | Choi Decl. ¶ 70, Exh. 69 at p.1; ¶ 6, Exh. 5 at 57:4-64:2. |
| 65. As to the supply claim, Netlist asserts that "starting as early as the second quarter of 2017, Samsung began to refuse and/or cancel orders from Netlist. | Choi Decl. ¶ 71, Exh. 70 at p.13, ROG No. 8. |
| 66. Instead, Netlist waited to provide notice of alleged breach until May 27, 2020, more than *four years* after it first considered doing so. | Dkt. 18-2 at ¶ 19 (First Amended Complaint); Choi Decl. ¶ 72, Exh. 71. |

| | |
|---|---|
| 67. In consideration for the JDLA, Samsung provided a $15 million convertible note that offered the potential that Samsung would take an equity stake in Netlist. The $15 million note is due December 31, 2021. | Choi Decl. ¶ 73, Exh. 72 at NL000342 § 4; Choi Decl. ¶ 20, Exh. 19 at p. 1 ("WHEREAS, the Parties are concurrently executing an agreement for convertible note financing")<br><br>For note due date, *see* Choi Decl. ¶ 73, Exh. 72 at NL000339 § 2. |
| 68. Section 8.1 of the JDLA grants to Netlist and its subsidiaries "a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Samsung's Licensed Patents to make and have made (subject to Section 8.4) Netlist's Licensed Products, and to use, sell, offer for sale, import, and otherwise transfer or dispose of such products." | Choi Decl. ¶ 20, Exh. 19 at p. 8, § 8.1 |
| 69. Section 16.7 of the JDLA provides that any amendment "requires the signatures of the authorized representatives of the Parties." | Choi Decl. ¶ 20, Exh. 19 at p.14, § 16.7 |
| 70. Around the time the JDLA was being negotiated, Netlist was having cash flow issues. | Choi Decl. ¶ 19, Exh. 18 at F-7. |

| | |
|---|---|
| 71. Chuck Hong's close friend, YH Jun, who had been President of Samsung's memory division, moved to a separate company in 2017. Up until that point, Chuck Hong had been able to use this relationship to "push through" certain orders and obtain red-carpet treatment. | Choi Decl. ¶ 8, Exh. 7 at 119:6-120:7. |

DATED: August 30, 2021

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: */s/ Ekwan E. Rhow*
Ekwan E. Rhow
Attorneys for Defendant Samsung Electronics Co., Ltd.

# Exhibit 12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MARK C. SCARSI

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

Netlist, Inc., PLAINTIFF,

VS. NO. CV 20-993 MCS

Samsung Electronics Co., Ltd., DEFENDANT,

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, SEPTEMBER 20, 2021

KATIE E. THIBODEAUX, CSR 9858
U.S. Official Court Reporter
Suite 4311
350 West 1st Street
Los Angeles, CA 90012

APPEARANCES OF COUNSEL:

FOR PLAINTIFF:

GIBSON, DUNN & CRUTCHER LLP
BY: JASON LO
-and- RAYMOND LA MAGNA
333 South Grand Avenue
Los Angeles, CA 90071

FOR DEFENDANT:

BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG RHOW PC
BY: EKWAN E. RHOW
-and- MARC MASTERS
1875 Century Park East
Twenty-Third Floor
Los Angeles, CA 90067

Case 8:20-cv-00993-MCS-ADS Document 213 Filed 10/07/21 Page 3 of 68 PageID #:13819

LOS ANGELES, CALIFORNIA; MONDAY, SEPTEMBER 20, 2021

9:05 A.M.

- - - - -

THE CLERK: Calling Item No. 1, SA 20-993 Netlist, Inc. versus Samsung Electronics, LTD.

Counsel, state your appearances, please.

MR. LO: Good morning, your Honor. Jason Lo from Gibson, Dunn and Crutcher and Ray La Magna also from Gibson, Dunn and Crutcher on behalf of the plaintiff Netlist, and also in the courtroom today is three representatives from Netlist: Gale Sasaki, S-A-S-A-K-I Blake Welcher, W-E-L-C-H-E-R, and Tobin Hobbs, H-O-B-B-S.

THE COURT: Good morning.

MR. RHOW: Good morning, your Honor. Ekwan Rhow and Marc Masters on behalf of Samsung.

THE COURT: Good morning. Okay. Well, we have been through the papers. We are on cross motions for summary judgment, and I have got a few questions for the parties.

Let me start with Samsung. So if you want to come up.

So we are dealing with a contract here under New York law; right?

MR. RHOW: Correct, your Honor.

THE COURT: And as I understand New York law, the Court needs to determine whether or not the contract provision is ambiguous without the aid of extrinsic evidence; right?

MR. RHOW: I think that is the initial -- the initial inquiry, and to the extent your Honor believes there is an ambiguity, then it is possible to look at extrinsic evidence.

THE COURT: So let me ask you then. So in looking at the supply term here, the supply provision, which part of that is ambiguous just looking at the four corners of the contract itself?

MR. RHOW: Well, first, I think we would contend that it is not ambiguous but that given the four corners of the contract and this was a joint development contract of an NVDIMM new standard product, that 6.2 read in the context of 6, 1 read in the context of the headings and the overall purpose of the agreement as set forth in the preambles and the four corners of the document would indicate that 6.2 is a supply obligation only as to the NVDIMM joint development which never materialized.

THE COURT: And what is the best evidence from the

contract that that supply provision was only for the NVDIMM project?

MR. RHOW: I think when you look at -- I think the case law also indicates when you look at individual sections in isolation, that probably doesn't give you a view and a scope of the entire contract. So when you look at the preambles to the agreement. The preambles talk about specifically the notion of joint development and if you look at the second "whereas," for example, it says, the parties intend to work together to jointly development an interface and associated technologies for certain memory modules and promote such interface to standard setting organizations.

That is the only "whereas" provision, and that is the preamble to the entire contract. If you look at even just the headings to the contract and just take those headings without anything else, you can see that that is consistent with the preamble: Section 1, of course, is definition; section 2, though, is collaborative development work. That is in connection with the NVDIMM product. 3 is development costs in connection with the NVDIMM product. Section 4 is IPR ownership in connection, again, with the NVDIMM product and so on and so forth.

So each section in that agreement applies when

 read as a whole to this NVDIMM game-changing product which was the whole reason that Netlist presented it to get Samsung's attention, to get more love from Samsung for lack of a better phrase so that there could be a joint development that could justify supply in the future, a joint development, of course, that never materialized.

THE COURT: Right. But there is nothing in the contract that says that the supply is only for -- in the specific language of the contract, it just says in 6.2, Samsung is required to supply NAND and DRAM products to Netlist on Netlist's request at competitive price. It doesn't say in 6.2, right, that it is only for the NVDIMM project?

MR. RHOW: It does not say that there. Your Honor, your clerk said that I could ask, do you require masks at the lecturn?

THE COURT: It is up to you. As long as you are not right next to somebody and you feel comfortable.

MR. RHOW: My glasses are starting to fog which is a problem.

THE COURT: I have the same problem.

MR. RHOW: Well, 6.2 standing alone, it does not mention NVDIMM, but, again, look at 6.1 which was in the same section and you look at the purpose of 6.2 vis-a-vis

6.1, you look at references to raw materials and the like. When read as a whole, we believe the unambiguous read of 6.2 is that it was designed to provide the raw materials necessary for the NVDIMM product. It is undisputed that to make an NVDIMM product you need the two sides of the equation that Netlist and Samsung provided.

So, again, I am not moving into the extrinsic evidence which I think is dispositive here but, just even within the contract, we think it is unambiguous, read as a whole, read within the four corners that the joint development of the NVDIMM is what should modify and what is the context in which 6.2 sits.

THE COURT: So you would argue that 6.2 is not ambiguous when it is read in the context of the whole contract. It is clear that 6.2 is only referring to DRAM and NAND for the NVDIMM project?

MR. RHOW: Correct.

THE COURT: Let me ask you another question. Samsung has a theory of nonperformance with respect to Netlist, and I know Netlist indicated that this was first raised in an amended interrogatory response sent the day of the filing of the motion.

Did Samsung raise this theory of nonperformance at the prefiling conference on the

motions?

MR. RHOW: I can say it like this. There was a general denial of the breach of contract claim. One of the elements of the claim is performance. The specifics of that in terms of what you are referencing, I don't know if those exact phrases were used, but, clearly, we had a general denial that existed of the entire claim. And one of the elements would be their performance.

THE COURT: But did you discuss their performance in the prefiling conference?

MR. RHOW: I am looking at Mr. Masters just for guidance. I don't know if we specifically raised it. I can tell you the history of the document. If you mind, your Honor, if I confer?

THE COURT: Sure.

(Counsel confer.)

MR. RHOW: So I think during the prefiling conference -- and I am taking this from Mr. Masters -- there were general discussions of the claim. I don't think either side went into specifics of the evidence or all the evidence that would or would not support it. In terms of the timing, though, of the specifics of this, this was raised in either the first or second deposition that was taken of the Samsung employees.

But I have to stress the key facts on this

really came from the 30(b)(6) deposition of Mr. Hong's brother who was the supply person most knowledgable from Netlist. And we didn't take that deposition frankly until very late, but it was during that deposition that we got a lot of the foundational evidence for that.

But, again, it was raised earlier in the second overall deposition taken I think of Mr. Indong Kim. He raised it, and I am not casting any aspersions when I say there was no follow-up from Netlist on that, but when I deposed -- and a lot of the evidence you see, your Honor, does come from those last two depositions, all the extrinsic evidence SUF No. 32, all Mr. Chun Hong's testimony. I got 14 hours with them in the last two days of the discovery cutoff, and a lot of this evidence comes from that.

I obviously did not know that evidence prior to that date, and I didn't know to what extent I could use it in MSJ until I took that evidence. And you see a lot of it frankly in the MSJ papers.

THE COURT: Okay. What specific obligations of the contract do you contend that Netlist did not perform by abandoning the NVDIMM project?

MR. RHOW: So I think because the fundamental purpose of the agreement was to go forward with an NVDIMM-P standard. The evidence that they switched to a

different standard and did it with someone else would be an abandonment of one of the core purposes behind the contract. That is our basis for nonperformance.

And so it really infects the entirety of the contract, the preambles, all the various sections which whether it is a direct contractual obligation or just based on the concept of good faith and fair dealing, they were supposed to partner with us on this game changing NVDIMM-P standard, and, when they abandoned it for a different NVDIMM concept with other folks out there, that became -- that is the breach. That is the nonperformance at its core.

THE COURT: And what is the specific -- what is the specific provision in the contract? Like, can you point me to the provisions by section number of this was a duty and obligation, and this was the breach.

MR. RHOW: So I would first argue the preamble. The second "whereas" preamble which talks about the intent of the contract which is to jointly develop this interface, and, then, in Section 2, there is a section on collaborative development work. And that is under Section 2.1, and Section -- actually, all of Section 2.1 would cover that.

THE COURT: Then, what are the specific obligations in Section 2.1 that Netlist did not perform?

MR. RHOW: I think they did not follow through with the various product specifications and milestones and did not follow it to fruition. So there are two phases to be clear. There is an initial phase where you are working together to get initial approval for lack of a better term that then moves to a subsequent phase. They never finished that initial phase, and so we never got to the subsequent phase.

And, your Honor, let me quickly add on Section 5, and this is when I went through before the various sections of the agreement, all of this does relate to joint development. Section 5 is entitled Technology Standardization and Productization. And if you look at Section 5.1, et al., it talks about working together. The parties will work together to standardize the NVDIMM-P product specifications. And so that just didn't happen.

And, by the way, I would note, your Honor, and I am being open in saying that this is not in the record, but the NVDIMM-P protocol just got approved in early 2021 by JITC. So it was not an impossibility to finish that standardization. If Netlist had continued to do that, had continued to work with us on that, that is something that was achievable and by empirical evidence could have been done and just was never done.

It really was on them to do that because that NVDIMM-P, product side, that is going to be a product. We are supplying the raw materials for that, but we rely on them -- that is why we paid the $10 million, I'm sorry, the $8 million in NRE. We are paying them to take that to fruition, take that to the end zone, and that did not happen.

THE COURT: I want to move on to claim 2 and talk about the NRE fee. Samsung's argument, I think, here is it acted reasonably in withholding part of the fee, and I am wondering whether the reasonableness of Samsung's conduct matters if it was -- if it was allowed to withhold only if required by applicable law.

MR. RHOW: So understanding a little bit about the Korean tax system here, I think is important. The applicable law is, as with all courts of law, what the judge or jury ultimately decides going into the dispute. And so at the time that the amounts were withheld, I think both sides -- and we have this from Ms. Sasaki's own signing of the form which is in the papers -- both sides reasonably believed that that tax should be -- that amount should be withheld.

And so that conduct, I think, justifies what Samsung did originally and also justifies what Samsung did subsequently. As to your specific question, first,

when I read that section on applicable law, and I took a look at it last night, the the part -- the part that -- the part that Netlist cites to is the second as required by applicable law or treaty, and I think at the time we withheld those amounts, we believed it was required by law to withhold those amounts. It was only in a subsequent proceeding that it was determined that that amount should not have been withheld. And so I do think the reasonableness of our conduct still plays here because it is determined at the time we do the withholding.

If it turns out that the amounts should be returned, then, that is what happened here. They get returned in the normal process of the applicable law, and the procedures that exist to rectify the issue. But, in terms of the facts and the events that lead to that ultimate reimbursement, Samsung did follow the applicable law as it believed it to exist, and, under that applicable law, they did get a refund at the end of the day.

THE COURT: Right. But I guess what I am wondering about is it seems like it is either -- it is either allowed to do it under the applicable law or not, and I am wondering about what Samsung's belief is matters.

MR. RHOW: Well, I think at the time -- well, first, I then think that what you have to interpret into this provision to a certain extent is what I am saying is at the time there can be a reasonable dispute as to what the applicable law is. It was not until later that it was determined that that amount should be refunded. But at the time the withholding occurs, the applicable law as we believe it to be required that withholding.

THE COURT: Yes. I guess so the argument is that the contract provision of applicable law requires the parties to come up with some interpretation of what the applicable law is.

MR. RHOW: I think that is true and applicable law at that point does then consider and contemplate a procedure as occurred here where one side or the other can appeal. I don't think that makes the original belief by Samsung based on its interpretation of law inappropriate or not based on the law. Because, again, I think Samsung and everyone understood there would be a reimbursement procedure to the extent it was appropriate. And, in this case, the Korean tax tribunal deemed it appropriate so the applicable law was followed.

THE COURT: And then on claim 3, you are making an argument that Netlist waived the waiver provision; correct?

MR. RHOW: I am, your Honor.

THE COURT: And what is the best evidence that shows that that was what -- that Netlist intended to waive the waiver provision?

MR. RHOW: So there is really two components to the argument. First, we would argue -- and I admit there is going to be some tension here. First, we would argue that there is no breach and, therefore, the fact that Netlist never complains is in itself evidence that there is no breach. Because when the amount of supply reduces amid 2017, there is no lawsuit, there is no claim asserted. That is considered normal everyday business in the semiconductor world, and there is no complaint about that.

But based on the testimony, and now I am going -- and a lot of this MSJ and I know that SUF was very long, but a lot of it is based on testimony that we got from the 30(b)(6) witnesses. Based on that testimony and what they said, they believed in 2017 there was a massive breach. We don't agree with that, obviously, but that was their belief at the time. They believed that the amount of supply dropped, according to their statements -- I don't think this is true -- to zero or near zero. And that was considered a complete abdication of the core purposes of the agreement. Again, that is

their testimony.

And so if you take their testimony, and, on this MSJ, my whole goal was to use their testimony frankly because that is the only place where a genuine dispute can arise. If you take their testimony in 2017, they are on notice of a massive breach. And they don't do anything about it. And so that is the waiver. In fact, they continued to submit purchase orders just as they did before.

They continued to submit forecasts just as they did before and they have continued to do that not just through the termination of the contract but to the present day. They are still getting supply which, again, tells me that this supply arrangement was outside the four corners of the JDLA, and it is just a separate relationship that exists or, number two, that there was a waiver.

THE COURT: I just want to go back to one thing briefly, when we talked about the ambiguity of the contract, we were looking at Section 6.2 which is the supply provision. You pointed me to some other sections including 6.1 that mentions the NVDIMM project specifically; right?

MR. RHOW: Right.

THE COURT: Doesn't the fact that it is mentioned

in 6.1 but not mentioned in 6.2 direct the Court to construe 6.2 as not limited to the NVDIMM project?

MR. RHOW: Again, in the context of joint development, joint development being Samsung, joint development being Netlist, there is two pieces that have to match together to make an NVDIMM-P module work.

So Samsung is providing its components and that is what Section 6 is entitled supply of components. Components for what? Components for the NVDIMM-P product. And Samsung is providing one aspect, one part of those components and Netlist is providing the other component part. And that is undisputed that those two needed to supply different aspects to make the joint development work.

So when I looked at that second "whereas" provision and I look at the headings, I can't -- like I said, your Honor, I believe it is unambiguous that Section 6.2 has to be limited to a joint development. And here is where, your Honor, I just briefly want to touch on the extrinsic evidence. I know you are in the four corners, but it is also consistent with the negotiations leading up to the JDLA because if 6.2 is construed as Netlist is saying, that would have been the most important part of this contract by far. It would have outweighed anything else in the contract.

It would have been not just a deal point, the deal point. Yet it shows up nowhere in the MOU. It shows up nowhere in the term sheets and Mr. Chun Hong admitted to all that. He said, you are right, it doesn't show up in the documents, the very documents where the most important deal points should show up.

So, if 6.2 is interpreted as Netlist is contending, it is the most important deal point in the entire contract, yet, based on Mr. Hong's own testimony, it is the only deal point that is missing from all of the negotiations including the MOU that formed the basis for this.

THE COURT: Thanks, counsel.

I have a few questions for Netlist's attorney.

MR. LO: Yes, your Honor.

THE COURT: So the claim we are talking about here, the provision in 6.2 requires Samsung to supply products at Netlist's request at a competitive price. Given that the price and the quantity are both left to kind of future negotiation, is that definite enough to create a valid contract? Because, normally, you have got to have at least the quantity; right?

MR. LO: No. That is incorrect under New York law, your Honor. And, in fact, in our everyday lives, we are surrounded by contracts that don't have definite

quantities. I sign up for my utilities. There is a set rate for my water. There is a set rate for my electricity. There is no quantity in terms of how much electricity I must use, and there is no set rate -- there is no set term in terms of how much water I have to use. And the New York courts are consistent about that.

As long as it will ultimately be ascertainable what quantities are at issue including by virtue of the orders that are being placed. That is what the contract law requires. It does not require a contract in advance to state all of the quantities that will be purchased in the future.

And, as I said, we are surrounded by contracts every day that do not have quantity terms to them.

THE COURT: And then what do you make of counsel's argument that this whole agreement was about the NVDIMM project, it is in the "whereas" clause which should inform all the sections that follow. It is in, you know, several of the provisions. Isn't it fair to read that purpose into 6.2?

MR. LO: No. And I think the Court's last question hits directly on the easiest answer to that which is a similar term appears in 6.1, the immediately preceding section and not in 6.2. And in the Quadrant case, the court specifically recites something that I

 think we all learned in law school which is even where there is ambiguity, if parties to a contract omit terms, particularly terms that are readily found in other similar contracts, the inescapable conclusion is the parties intended the omission.

And there is a Latin maxim that goes with it that I know we all learned in law school that I don't want to butcher now, but it is a set standard of the law, and these are two sophisticated parties who put something in 6.1 and did not put it in 6.2.

Let me raise one other issue which is a nonlegal issue. Their position here is internally inconsistent. Samsung's lawyer is not going to stand up here and say that the entirety of the JDLA is limited to the joint development. They are not going to do that for one simple, actually, two simple reasons.

Number one, it is not what the contract says. Number two, it is not what they want the contract to say because right after Section 6 is Section 7 which is a release. Right after Section 7 is Section 8 which is a patent license grant. They do not want an interpretation where Section 7 and Section 8 are limited to the joint development because they want the release, and they want the patent license to be as broad in scope as possible.

So they will not get up here and tell the

Court that their position is that the entire JDLA whether because of the "whereas" clause or whether because of the heading or for any other reason is limited to the joint development because that is not the position they want. What they want the Court to do is to take a limitation that appears in 6.1, import it into 6.2 but not import it into Section 7 and Section 8 and all of the other sections where they want a broad reading of the JDLA.

THE COURT: Let me ask about the consequential damages issue.

Netlist is arguing that gross negligence can pierce the parties' contract provision limiting consequential damages; right?

MR. LO: Correct.

THE COURT: Isn't that at odds with the New York case, Matter of Part 60 Put Back Litigation? I believe that case holds that grossly negligent conduct does not render unenforceable contractual limitations on the remedies available to the nonbreaching party.

MR. LO: I'm sorry. Give me the case again, your Honor.

THE COURT: Matter of Part 60 Put Back Litigation, 36 NY.3d 342. It is a 2020 case.

MR. LO: I will take a look at that, your Honor, because I don't have it handy in front of me, but the

cases that we cited are specific that the reason for the exception to this is that the courts have seen that in some cases when parties negotiate a limitation on liability, it creates a public policy problem that the parties then go on and intentionally breach it. And so the cases that we have cited say that when there is bad faith and gross negligence, that the limitations can be removed.

I haven't answered the Court's question directly, and I intend to but I want to take a look at that case because I don't have it currently in front of me.

THE COURT: Thank you, counsel. Let me follow up with Samsung briefly.

I just wanted to get a response to counsel's argument about the patent license, and the other section that you referred to. Now, I am forgetting. It was the patent license and the release.

MR. RHOW: On -- let me answer that first. I did want to respond to other things if your Court is so inclined to hear. The reason the JDLA was started, the reason we came to the table on this was twofold. One is the game changing joint development product. But the other reason was they threatened patent infringement. That is why it is in there. So the way they brought us

to the table was partly inducement, partly a little bit of a hammer, and the hammer part was the patent infringement threat.

You see it in the documents leading up to the JDLA. It is in the first term sheet that Mr. Hong presented, and, so, yes, we had to get a release on that because that is how they brought us to the table so we needed a release, a broad release, which by the way what is inconsistent is to somehow argue we need a release as to the JDLA in the joint development.

That makes no sense. The reason we need the release, a broad one, is because they were threatening patent infringement to bring us to the table. The reason we needed a patent license is to resolve the issue that, even if we get a release, we still need a license going forward for those same patents. Sections 7 and 8 do not deal with the JDLA and the joint development. It does not deal with NVDIMM, and it is obvious why is because that was the lead up to why we are even negotiating this joint development agreement.

So I very clearly will say to the jury in this case, if I get there, your Honor, Section 7 and Section 8 don't apply to joint development. And it is obvious why. See their own term sheets. See their threats of litigation. That is why it is in there, your Honor.

THE COURT: So the argument that Section 6 applies to joint development as opposed to 6.2 which doesn't mention joint development is based on the location of 6.2 within 6 then?

MR. RHOW: In part, for sure. But it is really, if if you look at -- and, again, I don't mean to overstretch the preamble, but if you look at every section after that, up to supply of components. Components for what? Components for the joint development. The section preceding is called Technology Standardization and Productization.

That means for a product which will need a supply of components. This is the joint development, and there is no dispute based on Mr. Lo's testimony that Sections 1 through 5, 1 through 6, I'm sorry, clearly relate to the joint development.

Admittedly, Section 7 and Section 8 don't, but you can see why if you see the lead up and the negotiations that led to this JDLA. It was to resolve a patent infringement threat that they made to really to force us to the table.

THE COURT: Right. But aren't they arguing that the sort of the deal is the supply contract, you know, for the release and patent license?

MR. RHOW: That is what they are arguing, but I

don't believe that to be true. We had a $15 million convertible note. That is a very significant amount. We have a joint development of a game-changing product, and you can see the recent press on that. But that is how Mr. Hong testified to it.

That was the consideration, an $8 million NRE, a $15 million convertible note and a game-changing joint development product that could ensure supply for this product for, actually, for years and years and decades if this NVDIMM standard remains and continues to be the standard that JTIC employs.

THE COURT: Okay. Great. Thank you, counsel. I think I have got all my questions answered.

MR. RHOW: Thank you, your Honor.

(Proceedings concluded.)

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: September 21, 2021

/s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

MR. LO: [7] 3/10 18/14 18/22 19/20 21/13 21/19 21/23
MR. RHOW: [26]
THE CLERK: [1] 3/3
THE COURT: [32]

**$**

$10 [1] 12/4
$15 [2] 25/1 25/7
$15 million [2] 25/1 25/7
$8 [2] 12/5 25/6
$8 million [2] 12/5 25/6

**-**

-and [2] 2/6 2/12

**/**

/s [1] 26/12

**1**

14 [1] 9/13
1875 [1] 2/12
1st [1] 1/20

**2**

2.1 [3] 10/22 10/22 10/25
20 [2] 1/15 3/1
20-993 [2] 1/8 3/8
2017 [3] 15/11 15/19 16/5
2020 [1] 21/23
2021 [4] 1/15 3/1 11/20 26/10
21 [1] 26/10
28 [1] 26/4

**3**

30 [2] 9/1 15/18
32 [1] 9/12
333 [1] 2/6
342 [1] 21/23
350 [1] 1/20
36 [1] 21/23

**4**

4311 [1] 1/20

**5**

5.1 [1] 11/14

**6**

6.1 [7] 6/24 7/1 16/22 17/1 19/23 20/10 21/6
6.2 [23]
60 [2] 21/16 21/22

**7**

753 [1] 26/4

**9**

90012 [1] 1/21
90067 [1] 2/13
90071 [1] 2/7
9858 [2] 1/19 26/12
993 [2] 1/8 3/8
9:05 [1] 3/2

**A**

A.M [1] 3/2
abandoned [1] 10/9
abandoning [1] 9/22
abandonment [1] 10/2
abdication [1] 15/24
about [15]
above [1] 26/7
above-entitled [1] 26/7
according [1] 15/22
achievable [1] 11/24
acted [1] 12/10
actually [3] [illegible]0/22 20/16 25/9
add [1] 11/9
admit [1] 15/6
admitted [1] 18/4
Admittedly [1] 24/17
advance [1] 19/10
after [3] 20/19 20/20 24/8
again [10] 5/23 6/24 7/8 9/6 14/18 15/25 16/13 17/3 21/20 24/6
agree [1] 15/20
agreement [8] 4/21 5/7 5/25 9/24 11/11 15/25 19/16 23/20
aid [1] 4/6
al [1] 11/14
all [15]
allowed [2] 12/12 13/23
alone [1] 6/23
also [5] 3/12 3/14 5/4 12/24 17/21
am [12] 7/8 8/11 8/18 9/8 11/19 12/11 13/21 13/24 14/3 15/1 15/15 22/17
ambiguity [3] 4/10 16/19 20/2
ambiguous [4] 4/6 4/14 4/17 7/15
amended [1] 7/22
amid [1] 15/11
amount [6] 12/22 13/8 14/6 15/10 15/22 25/2
amounts [4] 12/18 13/5 13/6 13/12
ANGELES [5] 1/14 1/21 2/7 2/13 3/1
another [1] 7/19
answer [2] 19/22 22/19
answered [2] 22/9 25/13
any [2] 9/8 21/3
anything [3] 5/17 16/7 17/25
appeal [1] 14/16
appearances [2] 2/1 3/10
appears [2] 19/23 21/6
applicable [14]
applies [2] 5/25 24/1
apply [1] 23/23
appropriate [2] 14/20 14/22
approval [1] 11/5
approved [1] 11/20
are [29]
aren't [1] 24/22
argue [5] 7/14 10/17 15/6 15/7 23/9
arguing [3] 21/11 24/22 24/25
argument [7] 12/9 14/9 14/24 15/6 19/16 22/16 24/1
arise [1] 16/5
arrangement [1] 16/14
as [27]
ascertainable [1] 19/7
ask [4] 4/12 6/16 7/19 21/9
aspect [1] 17/10
aspects [1] 17/13
aspersions [1] 9/8
asserted [1] 15/12
associated [1] 5/11
attention [1] 6/3
attorney [1] 18/14
available [1] 21/19
Avenue [1] 2/6

**B**

back [3] 16/18 21/16 21/22
bad [1] 22/6
based [9] 10/7 14/17 14/18 15/15 15/17 15/18 18/9 24/3 24/4
basis [2] 10/3 18/11
be [20]
became [1] 10/11
because [18]
been [5] 3/21 11/25 13/8 17/23 18/1
before [3] 11/10 16/9 16/11
behalf [2] 3/13 3/19
behind [1] 10/2
being [4] 11/19 17/4 17/5 19/9
belief [3] 13/24 14/16 15/21
believe [5] 7/2 14/8 17/17 21/16 25/1
believed [5] 12/21 13/5 13/18 15/19 15/21
believes [1] 4/9
best [2] 4/25 15/2
better [2] 6/4 11/6
BIRD [1] 2/11
bit [2] 12/14 23/1
Blake [1] 3/16
both [3] 12/19 12/20 18/19
BOXER [1] 2/11
breach [8] 8/3 10/11 10/16 15/8 15/10 15/20 16/6 22/5
briefly [3] 16/19 17/19 22/14
bring [1] 23/13
broad [4] 20/24 21/8 23/8 23/12
brother [1] 9/2
brought [2] 22/25 23/7
business [1] 15/12
butcher [1] 20/8

**C**

CA [3] 1/21 2/7 2/13
CALIFORNIA [3] 1/2 1/14 3/1
called [1] 24/10
Calling [1] 3/8
came [2] 9/1 22/22
can [11] 5/17 8/2 8/13 10/14 14/4 14/16 16/5 21/11 22/7 24/18 25/4
can't [1] 17/16
case [9] 5/4 14/21 19/25 21/16 21/17 21/20 21/23 22/11 23/22
cases [3] 22/1 22/3 22/6
casting [1] 9/8
CENTRAL [1] 1/2
Century [1] 2/12
certain [2] 5/12 14/3
CERTIFICATE [1] 26/1
certify [1] 26/4
changing [5] 6/1 10/8 22/23 25/3 25/7
Chun [2] 9/12 18/3
cited [2] 22/1 22/6
cites [1] 13/3
claim [8] 8/3 8/4 8/7 8/19 12/8 14/23 15/11 18/16
clause [2] 19/17 21/2
clear [2] 7/16 11/4
clearly [3] 8/6 23/21 24/15
clerk [1] 6/16
Co [1] 1/9
Code [1] 26/5
collaborative [2] 5/20 10/21
come [3] 3/25 9/11 14/11
comes [1] 9/15
comfortable [1] 6/19
competitive [2] 6/12 18/18
complains [1] 15/9
complaint [1] 15/13
complete [1] 15/24

**C**

**component [1]** 17/12
**components [10]** 15/5 17/7 17/8 17/9 17/9 17/11 24/8 24/9 24/9 24/13
**concept [2]** 10/7 10/10
**concluded [1]** 25/15
**conclusion [1]** 20/4
**conduct [4]** 12/12 12/23 13/9 21/17
**confer [2]** 8/14 8/16
**conference [4]** 7/25 8/10 8/18 26/9
**conformance [1]** 26/8
**connection [3]** 5/20 5/22 5/23
**consequential [2]** 21/9 21/13
**consider [1]** 14/14
**consideration [1]** 25/6
**considered [2]** 15/12 15/24
**consistent [3]** 5/18 17/21 19/6
**construe [1]** 17/2
**construed [1]** 17/23
**contemplate [1]** 14/14
**contend [2]** 4/16 9/21
**contending [1]** 18/8
**context [5]** 4/20 4/20 7/13 7/15 17/3
**continued [5]** 11/22 11/23 16/8 16/10 16/11
**continues [1]** 25/10
**contract [33]**
**contracts [3]** 18/25 19/13 20/4
**contractual [2]** 10/6 21/18
**convertible [2]** 25/2 25/7
**core [3]** 10/2 10/12 15/25
**corners [6]** 4/14 4/17 4/22 7/11 16/15 17/21
**correct [5]** 4/3 7/18 14/25 21/14 26/5
**costs [1]** 5/21
**could [6]** 6/4 6/5 6/16 9/17 11/24 25/8
**counsel [6]** 2/1 3/10 8/16 18/13 22/13 25/12
**counsel's [2]** 19/15 22/15
**course [2]** 5/19 6/6
**court [8]** 1/1 1/19 4/5 17/1 19/25 21/1 21/5 22/20
**Court's [2]** 19/21 22/9
**courtroom [1]** 3/14
**courts [3]** 12/16 19/6 22/2
**cover [1]** 10/23
**create [1]** 18/21
**creates [1]** 22/4
**cross [1]** 3/21
**CRR [1]** 26/12
**CRUTCHER [3]** 2/5 3/12 3/13
**CSR [2]** 1/19 26/12
**currently [1]** 22/11
**cutoff [1]** 9/14
**CV [1]** 1/8

**D**

**damages [2]** 21/10 21/13
**date [2]** 9/17 26/10
**day [4]** 7/22 13/20 16/13 19/14
**days [1]** 9/14
**deal [8]** 18/1 18/2 18/6 18/8 18/10 23/17 23/18 24/23
**dealing [2]** 4/1 10/7
**decades [1]** 25/9
**decides [1]** 12/17
**deemed [1]** 14/21
**DEFENDANT [2]** 1/9 2/9
**definite [2]** 18/20 18/25
**definition [1]** 5/19
**denial [2]** 8/4 8/7
**deposed [1]** 9/10
**deposition [5]** 8/23 9/1 9/3 9/4 9/7
**depositions [1]** 9/11
**designed [1]** 7/3
**determine [1]** 4/5
**determined [3]** 13/7 13/10 14/6
**develop [1]** 10/19
**development [31]**
**did [17]**
**didn't [3]** 9/3 9/17 11/16
**different [3]** 10/1 10/10 17/13
**direct [2]** 10/6 17/1
**directly [2]** 19/22 22/10
**discovery [1]** 9/14
**discuss [1]** 8/9
**discussions [1]** 8/19
**dispositive [1]** 7/9
**dispute [4]** 12/17 14/4 16/5 24/14
**DISTRICT [3]** 1/1 1/2 1/4
**DIVISION [1]** 1/2
**do [15]**
**document [2]** 4/22 8/13
**documents [3]** 18/5 18/5 23/4
**does [8]** 6/15 6/23 9/11 11/11 14/14 19/10 21/17 23/17
**doesn't [5]** 5/5 6/13 16/25 18/4 24/2
**don't [15]**
**done [2]** 11/25 11/25
**DRAM [2]** 6/11 7/16
**DROOKS [1]** 2/11
**dropped [1]** 15/22
**DUNN [3]** 2/5 3/12 3/13
**during [2]** 8/17 9/4
**duty [1]** 10/16

**E**

**each [1]** 5/25
**earlier [1]** 9/6
**early [1]** 11/20
**easiest [1]** 19/22
**East [1]** 2/12
**either [4]** 8/20 8/23 13/22 13/23
**EKWAN [2]** 2/11 3/18
**electricity [2]** 19/3 19/4
**Electronics [2]** 1/9 3/9
**elements [2]** 8/4 8/8
**else [3]** 5/17 10/1 17/25
**empirical [1]** 11/24
**employees [1]** 8/24
**employs [1]** 25/11
**end [2]** 12/6 13/19
**enough [1]** 18/20
**ensure [1]** 25/8
**entire [5]** 5/6 5/15 8/7 18/9 21/1
**entirety [2]** 10/4 20/14
**entitled [3]** 11/12 17/8 26/7
**equation [1]** 7/6
**et [1]** 11/14
**even [5]** 5/16 7/9 20/1 23/15 23/19
**events [1]** 13/16
**every [2]** 19/14 24/7
**everyday [2]** 15/12 18/24
**everyone [1]** 14/19
**evidence [17]**
**exact [1]** 8/6
**example [1]** 5/9
**exception [1]** 22/2
**exist [2]** 13/15 13/18
**existed [1]** 8/7
**exists [1]** 16/16
**extent [4]** 4/9 9/17 14/3 14/20
**extrinsic [5]** 4/6 4/11 7/8 9/12 17/20

**F**

**fact [4]** 15/8 16/8 16/25 18/24
**facts [2]** 8/25 13/16
**fair [2]** 10/7 19/19
**faith [2]** 10/7 22/7
**far [1]** 17/24
**fee [2]** 12/9 12/10
**feel [1]** 6/19
**few [2]** 3/22 18/14
**filing [1]** 7/23
**finish [1]** 11/21
**finished [1]** 11/7
**first [10]** 4/16 7/21 8/23 10/17 12/25 14/2 15/6 15/7 22/19 23/5
**Floor [1]** 2/13
**fog [1]** 6/20
**folks [1]** 10/10
**follow [6]** 9/9 11/1 11/3 13/17 19/18 22/13
**follow-up [1]** 9/9
**followed [1]** 14/22
**force [1]** 24/21
**forecasts [1]** 16/10
**foregoing [1]** 26/5
**forgetting [1]** 22/17
**form [1]** 12/20
**format [1]** 26/8
**formed [1]** 18/11
**forth [2]** 4/21 5/24
**forward [2]** 9/24 23/16
**found [1]** 20/3
**foundational [1]** 9/5
**four [6]** 4/14 4/17 4/22 7/11 16/15 17/21
**frankly [3]** 9/3 9/19 16/4
**front [2]** 21/25 22/11
**fruition [2]** 11/3 12/6
**fundamental [1]** 9/23
**future [3]** 6/6 18/20 19/12

**G**

**Gale [1]** 3/15
**game [5]** 6/1 10/8 22/23 25/3 25/7
**game-changing [3]** 6/1 25/3 25/7
**general [3]** 8/3 8/7 8/19
**genuine [1]** 16/4
**get [10]** 6/3 6/3 11/5 13/13 13/19 20/25 22/15 23/6 23/15 23/22
**getting [1]** 16/13
**GIBSON [3]** 2/5 3/12 3/13
**give [2]** 5/5 21/20
**given [2]** 4/17 18/19
**glasses [1]** 6/20
**go [3]** 9/24 16/18 22/5
**goal [1]** 16/3
**goes [1]** 20/6
**going [7]** 12/2 12/17 15/7 15/16 20/13 20/15 23/15
**good [5]** 3/11 3/17 3/18 3/20 10/7
**got [8]** 3/22 9/5 9/13 11/8 11/20 15/18 18/21 25/13
**Grand [1]** 2/6
**grant [1]** 20/21
**Great [1]** 25/12

**G**

**gross [2]** 21/11 22/7
**grossly [1]** 21/17
**guess [2]** 13/21 14/9
**guidance [1]** 8/12

**H**

**H-O-B-B-S [1]** 3/16
**had [5]** 8/7 11/22 11/23 23/6 25/1
**hammer [2]** 23/2 23/2
**handy [1]** 21/25
**happen [2]** 11/17 12/7
**happened [1]** 13/13
**has [2]** 7/20 17/18
**have [25]**
**haven't [1]** 22/9
**He [2]** 9/8 18/4
**heading [1]** 21/3
**headings [4]** 4/20 5/16 5/17 17/16
**hear [1]** 22/21
**held [1]** 26/6
**here [14]**
**hereby [1]** 26/4
**history [1]** 8/13
**hits [1]** 19/22
**Hobbs [1]** 3/16
**holds [1]** 21/17
**Hong [3]** 18/3 23/5 25/5
**Hong's [3]** 9/1 9/13 18/9
**Honor [19]**
**HONORABLE [1]** 1/3
**hours [1]** 9/13
**how [4]** 19/3 19/5 23/7 25/4

**I**

**I'm [3]** 12/4 21/20 24/15
**immediately [1]** 19/23
**import [2]** 21/6 21/6
**important [4]** 12/15 17/24 18/6 18/8
**impossibility [1]** 11/21
**inappropriate [1]** 14/18
**Inc [2]** 1/6 3/9
**inclined [1]** 22/21
**including [3]** 16/22 18/11 19/8
**inconsistent [2]** 20/13 23/9
**incorrect [1]** 18/23
**indicate [1]** 4/23
**indicated [1]** 7/21
**indicates [1]** 5/4
**individual [1]** 5/4
**Indong [1]** 9/7
**inducement [1]** 23/1
**inescapable [1]** 20/4
**infects [1]** 10/4
**inform [1]** 19/18
**infringement [4]** 22/24 23/3 23/13 24/20
**initial [5]** 4/8 4/9 11/4 11/5 11/7
**inquiry [1]** 4/9
**intend [2]** 5/10 22/10
**intended [2]** 15/3 20/5
**intent [1]** 10/19
**intentionally [1]** 22/5
**interface [3]** 5/11 5/12 10/20
**internally [1]** 20/12
**interpret [1]** 14/2
**interpretation [3]** 14/11 14/17 20/21
**interpreted [1]** 18/7
**interrogatory [1]** 7/22
**IPR [1]** 5/22
**is [162]**
**Isn't [2]** 19/19 21/15
**isolation [1]** 3/5
**issue [6]** 15/5 19/8 20/11 20/12 21/10 23/14
**it [92]**
**Item [1]** 3/8
**its [3]** 10/12 14/17 17/7
**itself [2]** 4/15 15/9

**J**

**JASON [2]** 2/5 3/11
**JDLA [10]** 16/15 17/22 20/14 21/1 21/8 22/21 23/5 23/10 23/17 24/19
**JITC [1]** 11/21
**joint [27]**
**jointly [2]** 5/10 10/19
**JTIC [1]** 25/11
**judge [2]** 1/4 12/17
**judgment [1]** 3/22
**Judicial [1]** 26/9
**jury [2]** 12/17 23/21
**just [18]**
**justifies [2]** 12/23 12/24
**justify [1]** 6/5

**K**

**KATIE [2]** 1/19 26/12
**key [1]** 8/25
**Kim [1]** 9/8
**kind [1]** 18/20
**know [10]** 7/21 8/6 8/12 9/16 9/17 15/16 17/20 19/18 20/7 24/23
**knowledgable [1]** 9/2
**Korean [2]** 12/15 14/21

**L**

**LA [2]** 2/6 3/12
**lack [2]** 6/4 11/5
**language [1]** 6/10
**last [4]** 9/11 9/13 13/2 19/21
**late [1]** 9/4
**later [1]** 14/5
**Latin [1]** 20/6
**law [26]**
**lawsuit [1]** 15/11
**lawyer [1]** 20/13
**lead [3]** 13/16 23/19 24/18
**leading [2]** 17/22 23/4
**learned [2]** 20/1 20/7
**least [1]** 18/22
**lecturn [1]** 6/17
**led [1]** 24/19
**left [1]** 18/19
**let [8]** 3/24 4/12 7/19 11/9 20/11 21/9 22/13 22/19
**liability [1]** 22/4
**license [7]** 20/21 20/24 22/16 22/18 23/14 23/15 24/24
**like [5]** 7/2 8/2 10/14 13/22 17/16
**limitation [2]** 21/5 22/3
**limitations [2]** 21/18 22/7
**limited [5]** 17/2 17/18 20/14 20/22 21/3
**limiting [1]** 21/12
**LINCENBERG [1]** 2/11
**litigation [3]** 21/16 21/22 23/25
**little [2]** 12/14 23/1
**lives [1]** 18/24
**LLP [1]** 2/5
**LO [2]** 2/5 3/11
**Lo's [1]** 24/14
**location [1]** 24/3
**long [3]** 6/18 15/17 19/7
**look [16]**
**looked [1]** 17/15
**looking [4]** 4/12 4/14 8/11 16/20
**LOS [5]** 1/14 1/21 2/7 2/13 3/1
**lot [6]** 9/5 9/10 9/14 9/19 15/16 15/17
**love [1]** 6/3
**Ltd [2]** 1/9 3/9

**M**

**made [1]** 24/20
**MAGNA [2]** 2/6 3/12
**make [4]** 7/5 17/6 17/13 19/15
**makes [2]** 14/16 23/11
**making [1]** 14/23
**MARC [2]** 2/12 3/19
**MARELLA [1]** 2/11
**MARK [1]** 1/3
**masks [1]** 6/17
**massive [2]** 15/20 16/6
**MASTERS [4]** 2/12 3/19 8/11 8/18
**match [1]** 17/6
**materialized [2]** 4/24 6/7
**materials [3]** 7/1 7/4 12/3
**matter [3]** 21/16 21/22 26/7
**matters [2]** 12/12 13/25
**maxim [1]** 20/6
**MCS [1]** 1/8
**me [14]**
**mean [1]** 24/6
**means [1]** 24/12
**memory [1]** 5/12
**mention [2]** 6/24 24/3
**mentioned [2]** 16/25 17/1
**mentions [1]** 16/22
**milestones [1]** 11/2
**million [5]** 12/4 12/5 25/1 25/6 25/7
**mind [1]** 8/13
**missing [1]** 18/10
**modify [1]** 7/12
**module [1]** 17/6
**modules [1]** 5/12
**MONDAY [2]** 1/15 3/1
**more [1]** 6/3
**morning [4]** 3/11 3/17 3/18 3/20
**most [4]** 9/2 17/24 18/6 18/8
**motion [1]** 7/23
**motions [2]** 3/21 8/1
**MOU [2]** 18/2 18/11
**move [1]** 12/8
**moves [1]** 11/6
**moving [1]** 7/8
**Mr. [10]** 8/11 8/18 9/1 9/7 9/12 18/3 18/9 23/5 24/14 25/5
**Mr. Chun [2]** 9/12 18/3
**Mr. Hong [2]** 23/5 25/5
**Mr. Hong's [2]** 9/1 18/9
**Mr. Indong [1]** 9/7
**Mr. Lo's [1]** 24/14
**Mr. Masters [2]** 8/11 8/18
**Ms. [1]** 12/19
**Ms. Sasaki's [1]** 12/19
**MSJ [4]** 9/18 9/19 15/16 16/3
**much [2]** 19/3 19/5
**must [1]** 19/4
**my [6]** 6/20 16/3 19/1 19/2 19/2 25/13

**N**

**NAND [2]** 6/11 7/17

## N

**near [1]** 15/24
**necessary [1]** 7/4
**need [5]** 7/5 23/9 23/11 23/15 24/12
**needed [3]** 17/13 23/8 23/14
**needs [1]** 4/5
**negligence [2]** 21/11 22/7
**negligent [1]** 21/17
**negotiate [1]** 22/3
**negotiating [1]** 23/19
**negotiation [1]** 18/20
**negotiations [3]** 17/22 18/11 24/19
**NESSIM [1]** 2/11
**Netlist [23]**
**Netlist's [3]** 6/12 18/14 18/18
**never [6]** 4/24 6/6 11/7 11/7 11/25 15/9
**new [6]** 4/2 4/4 4/19 18/23 19/6 21/15
**next [1]** 6/19
**night [1]** 13/2
**no [15]**
**No. [2]** 3/8 9/12
**No. 1 [1]** 3/8
**No. 32 [1]** 9/12
**nonbreaching [1]** 21/19
**nonlegal [1]** 20/12
**nonperformance [4]** 7/20 7/25 10/3 10/11
**normal [2]** 13/14 15/12
**normally [1]** 18/21
**not [40]**
**note [3]** 11/18 25/2 25/7
**nothing [1]** 6/8
**notice [1]** 16/6
**notion [1]** 5/8
**now [3]** 15/15 20/8 22/17
**nowhere [2]** 18/2 18/3
**NRE [3]** 12/5 12/9 25/6
**number [4]** 10/15 16/16 20/17 20/18
**NVDIMM [27]**
**NVDIMM-P [7]** 9/25 10/9 11/16 11/20 12/2 17/6 17/9
**NY.3d [1]** 21/23

## O

**obligation [3]** 4/23 10/6 10/16
**obligations [2]** 9/20 10/25
**obvious [2]** 23/18 23/23
**obviously [2]** 9/16 15/20
**occurred [1]** 14/15
**occurs [1]** 14/7
**odds [1]** 21/15
**Official [1]** 1/19
**Okay [3]** 3/20 9/20 25/12
**omission [1]** 20/5
**omit [1]** 20/2
**one [12]** 8/3 8/8 10/2 14/15 16/18 17/10 17/10 20/11 20/16 20/17 22/22 23/12
**only [10]** 4/23 5/1 5/14 6/9 6/13 7/16 12/13 13/6 16/4 18/10
**open [1]** 11/19
**opposed [1]** 24/2
**orders [2]** 16/8 19/9
**organizations [1]** 5/13
**original [1]** 14/16
**originally [1]** 12/24
**other [11]** 10/10 14/15 16/21 17/11 20/3 20/11 21/3 21/7 22/16 22/20 22/24
**our [3]** 10/3 13/9 18/24
**out [2]** 10/10 13/12
**outside [1]** 16/14
**outweighed [1]** 17/25
**overall [2]** 4/21 9/7
**overstretch [1]** 24/7
**own [3]** 12/20 18/9 23/24
**ownership [1]** 5/23

## P

**page [1]** 26/7
**paid [1]** 12/4
**papers [3]** 3/21 9/19 12/20
**Park [1]** 2/12
**part [12]** 4/13 12/10 13/2 13/2 13/3 17/10 17/12 17/24 21/16 21/22 23/2 24/5
**particularly [1]** 20/3
**parties [9]** 3/23 5/10 11/15 14/11 20/2 20/5 20/9 22/3 22/5
**parties' [1]** 21/12
**partly [2]** 23/1 23/1
**partner [1]** 10/8
**party [1]** 21/19
**patent [10]** 20/21 20/24 22/16 22/18 22/24 23/2 23/13 23/14 24/20 24/24
**patents [1]** 23/16
**paying [1]** 12/5
**PC [1]** 2/11
**perform [2]** 9/21 10/25
**performance [3]** 8/4 8/8 8/9
**person [1]** 9/2
**phase [4]** 11/4 11/6 11/7 11/8
**phases [1]** 11/4
**phrase [1]** 6/4
**phrases [1]** 8/6
**pieces [1]** 17/5
**pierce [1]** 21/12
**place [1]** 16/4
**placed [1]** 19/9
**plaintiff [3]** 1/7 2/3 3/13
**plays [1]** 13/9
**please [1]** 3/10
**point [6]** 10/15 14/14 18/1 18/2 18/8 18/10
**pointed [1]** 16/21
**points [1]** 18/6
**policy [1]** 22/4
**position [3]** 20/12 21/1 21/4
**possible [2]** 4/10 20/24
**preamble [5]** 5/15 5/18 10/17 10/18 24/7
**preambles [4]** 4/22 5/7 5/7 10/5
**preceding [2]** 19/24 24/10
**prefiling [3]** 7/25 8/10 8/17
**present [1]** 16/13
**presented [2]** 6/2 23/6
**PRESIDING [1]** 1/4
**press [1]** 25/4
**price [3]** 6/12 18/18 18/19
**prior [1]** 9/16
**probably [1]** 5/5
**problem [3]** 6/21 6/22 22/4
**procedure [2]** 14/15 14/20
**procedures [1]** 13/15
**proceeding [1]** 13/7
**proceedings [3]** 1/13 25/15 26/6
**process [1]** 13/14
**product [17]**
**Productization [2]** 11/13 24/11
**products [2]** 6/11 18/18
**project [7]** 5/2 6/14 7/17 9/22 16/22 17/2 19/17
**promote [1]** 5/12
**protocol [1]** 11/20
**provide [1]** 7/3
**provided [1]** 7/7
**providing [3]** 17/7 17/10 17/11
**provision [13]** 4/6 4/13 5/1 5/14 10/14 14/3 14/10 14/24 15/4 16/21 17/16 18/17 21/12
**provisions [2]** 10/15 19/19
**public [1]** 22/4
**purchase [1]** 16/8
**purchased [1]** 19/11
**purpose [4]** 4/21 6/25 9/24 19/20
**purposes [2]** 10/2 15/25
**pursuant [1]** 26/4
**put [4]** 20/9 20/10 21/16 21/22

## Q

**Quadrant [1]** 19/24
**quantities [3]** 19/1 19/8 19/11
**quantity [4]** 18/19 18/22 19/3 19/14
**question [4]** 7/19 12/25 19/22 22/9
**questions [3]** 3/22 18/14 25/13
**quickly [1]** 11/9

## R

**raise [2]** 7/24 20/11
**raised [5]** 7/22 8/12 8/23 9/6 9/8
**rate [3]** 19/2 19/2 19/4
**raw [3]** 7/1 7/3 12/3
**Ray [1]** 3/12
**RAYMOND [1]** 2/6
**read [10]** 4/19 4/20 6/1 7/2 7/3 7/10 7/11 7/15 13/1 19/19
**readily [1]** 20/3
**reading [1]** 21/8
**really [6]** 9/1 10/4 12/1 15/5 24/5 24/20
**reason [8]** 6/2 21/3 22/1 22/21 22/22 22/24 23/11 23/13
**reasonable [1]** 14/4
**reasonableness [2]** 12/11 13/9
**reasonably [2]** 12/10 12/21
**reasons [1]** 20/16
**recent [1]** 25/4
**recites [1]** 19/25
**record [1]** 11/19
**rectify [1]** 13/15
**reduces [1]** 15/10
**references [1]** 7/1
**referencing [1]** 8/5
**referred [1]** 22/17
**referring [1]** 7/16
**refund [1]** 13/19
**refunded [1]** 14/6
**regulations [1]** 26/8
**reimbursement [2]** 13/17 14/20
**relate [2]** 11/11 24/16
**relationship [1]** 16/16
**release [10]** 20/20 20/23 22/18 23/6 23/8 23/8 23/9 23/12 23/15 24/24
**rely [1]** 12/3
**remains [1]** 25/10
**remedies [1]** 21/19
**removed [1]** 22/8
**render [1]** 21/18

**R**

**reported [1]** 26/6
**Reporter [1]** 1/19
**REPORTER'S [1]** 1/13
**representatives [1]** 3/15
**request [2]** 6/12 18/18
**require [2]** 6/16 19/10
**required [5]** 6/11 12/13 13/3 13/5 14/8
**requires [3]** 14/10 18/17 19/10
**resolve [2]** 23/14 24/19
**respect [1]** 7/20
**respond [1]** 22/20
**response [2]** 7/22 22/15
**returned [2]** 13/13 13/14
**RHOW [3]** 2/11 2/11 3/18
**right [14]**
**RPR [1]** 26/12

**S**

**S-A-S-A-K-I [1]** 3/15
**SA [1]** 3/8
**said [5]** 6/16 15/19 17/17 18/4 19/13
**same [3]** 6/22 6/25 23/16
**Samsung [20]**
**Samsung's [5]** 6/3 12/9 12/11 13/24 20/13
**Sasaki [1]** 3/15
**Sasaki's [1]** 12/19
**say [8]** 6/13 6/15 8/2 9/9 20/14 20/18 22/6 23/21
**saying [3]** 11/19 14/3 17/23
**says [4]** 5/10 6/9 6/10 20/17
**SCARSI [1]** 1/3
**school [2]** 20/1 20/7
**scope [2]** 5/6 20/24
**second [6]** 5/9 8/23 9/7 10/18 13/3 17/15
**section [37]**
**sections [8]** 5/5 10/5 11/11 16/21 19/18 21/8 23/16 24/15
**see [9]** 5/17 9/10 9/18 23/4 23/24 23/24 24/18 24/18 25/4
**seems [1]** 13/22
**seen [1]** 22/2
**semiconductor [1]** 15/13
**sense [1]** 23/11
**sent [1]** 7/22
**separate [1]** 16/15
**SEPTEMBER [3]** 1/15 3/1 26/10
**set [6]** 4/21 19/1 19/2 19/4 19/5 20/8
**setting [1]** 5/13
**several [1]** 19/19
**sheet [1]** 23/5
**sheets [2]** 18/3 23/24
**should [8]** 7/12 12/21 12/22 13/8 13/12 14/6 18/6 19/17
**show [2]** 18/5 18/6
**shows [3]** 15/3 18/2 18/3
**side [3]** 8/20 12/2 14/15
**sides [3]** 7/6 12/19 12/21
**sign [1]** 19/1
**significant [1]** 25/2
**signing [1]** 12/20
**similar [2]** 19/23 20/4
**simple [2]** 20/16 20/16
**sits [1]** 7/13
**so [40]**
**some [4]** 14/11 15/7 16/21 22/3
**somebody [1]** 6/19
**somehow [1]** 23/9
**someone [1]** 10/1
**something [3]** 11/23 19/25 20/9
**sophisticated [1]** 20/9
**sorry [5]** 12/5 21/20 24/15 [illegible]
**sort [1]** [illegible]
**South [1]** 2/6
**specific [7]** 6/10 9/20 10/13 10/14 10/24 12/25 22/1
**specifically [4]** 5/8 8/12 16/23 19/25
**specifications [2]** 11/2 11/16
**specifics [3]** 8/4 8/20 8/22
**stand [1]** 20/13
**standard [8]** 4/19 5/13 9/25 10/1 10/9 20/8 25/10 25/11
**standardization [3]** 11/13 11/22 24/11
**standardize [1]** 11/15
**standing [1]** 6/23
**start [1]** 3/24
**started [1]** 22/21
**starting [1]** 6/20
**state [2]** 3/10 19/11
**statements [1]** 15/23
**STATES [4]** 1/1 1/4 26/5 26/9
**stenographically [1]** 26/6
**still [3]** 13/9 16/13 23/15
**Street [1]** 1/20
**stress [1]** 8/25
**submit [2]** 16/8 16/10
**subsequent [3]** 11/6 11/8 13/7
**subsequently [1]** 12/25
**such [1]** 5/12
**SUF [2]** 9/12 15/16
**Suite [1]** 1/20
**summary [1]** 3/22
**supply [20]**
**supplying [1]** 12/3
**support [1]** 8/21
**supposed [1]** 10/8
**sure [2]** 8/15 24/5
**surrounded [2]** 18/25 19/13
**switched [1]** 9/25
**system [1]** 12/15

**T**

**table [5]** 22/22 23/1 23/7 23/13 24/21
**take [9]** 5/16 9/3 12/5 12/6 16/2 16/5 21/5 21/24 22/10
**taken [2]** 8/24 9/7
**taking [1]** 8/18
**talk [2]** 5/8 12/8
**talked [1]** 16/19
**talking [1]** 18/16
**talks [2]** 10/18 11/14
**tax [3]** 12/15 12/21 14/21
**technologies [1]** 5/11
**Technology [2]** 11/12 24/10
**tell [2]** 8/13 20/25
**tells [1]** 16/14
**tension [1]** 15/7
**term [7]** 4/13 11/6 18/3 19/5 19/23 23/5 23/24
**termination [1]** 16/12
**terms [8]** 8/5 8/22 13/16 19/3 19/5 19/14 20/2 20/3
**testified [1]** 25/5
**testimony [10]** 9/13 15/15 15/17 15/18 16/1 16/2 16/3 16/5 18/9 24/14
**Thank [3]** 22/13 25/12 25/14
**Thanks [1]** 18/13
**that [197]**
**their [12]** 8/8 8/9 15/21 15/22 16/1 16/2 16/3 16/5 20/12 21/1 23/24 23/24
**them [5]** 9/13 12/1 12/4 12/5 19/14
**then [12]** 4/10 4/12 10/20 10/9 11/6 13/13 14/2 14/14 14/23 19/15 22/5 24/4
**theory [2]** 7/20 7/24
**there [35]**
**therefore [1]** 15/8
**these [1]** 20/9
**they [34]**
**THIBODEAUX [2]** 1/19 26/12
**thing [1]** 16/18
**things [1]** 22/20
**think [26]**
**Third [1]** 2/13
**this [35]**
**those [8]** 5/17 8/6 9/11 13/5 13/6 17/11 17/12 23/16
**though [2]** 5/19 8/22
**threat [2]** 23/3 24/20
**threatened [1]** 22/24
**threatening [1]** 23/12
**threats [1]** 23/24
**three [1]** 3/14
**through [6]** 3/21 11/1 11/10 16/12 24/15 24/15
**time [7]** 12/18 13/4 13/10 14/1 14/4 14/7 15/21
**timing [1]** 8/22
**Title [1]** 26/4
**Tobin [1]** 3/16
**today [1]** 3/14
**together [5]** 5/10 11/5 11/14 11/15 17/6
**took [2]** 9/18 13/1
**touch [1]** 17/20
**transcript [3]** 1/13 26/6 26/7
**treaty [1]** 13/4
**tribunal [1]** 14/21
**true [4]** 14/13 15/23 25/1 26/5
**turns [1]** 13/12
**Twenty [1]** 2/13
**Twenty-Third [1]** 2/13
**two [11]** 7/6 9/11 9/14 11/3 15/5 16/16 17/5 17/12 20/9 20/16 20/18
**twofold [1]** 22/22

**U**

**U.S [1]** 1/19
**ultimate [1]** 13/17
**ultimately [2]** 12/17 19/7
**unambiguous [3]** 7/2 7/10 17/17
**under [5]** 4/1 10/21 13/18 13/23 18/23
**understand [1]** 4/4
**understanding [1]** 12/14
**understood [1]** 14/19
**undisputed [2]** 7/5 17/12
**unenforceable [1]** 21/18
**UNITED [4]** 1/1 1/4 26/5 26/9
**until [3]** 9/4 9/18 14/5
**up [17]**
**us [6]** 10/8 11/23 22/25 23/7 23/13 24/21
**use [4]** 9/18 16/3 19/4 19/5
**used [1]** 8/6
**utilities [1]** 19/1

**V**

**valid [1]** 18/21
**various [3]** 10/5 11/2 11/10
**versus [1]** 3/9
**very [5]** 9/4 15/17 18/5 23/21 25/2
**view [1]** 5/6
**virtue [1]** 19/8

**V**

**vis [2]** 6/25 6/25
**vis-a-vis [1]** 6/25

**W**

**W-E-L-C-H-E-R [1]** 3/16
**waive [1]** 15/4
**waived [1]** 14/24
**waiver [4]** 14/24 15/4 16/7
 16/17
**want [14]**
**wanted [1]** 22/15
**was [47]**
**water [2]** 19/2 19/5
**way [3]** 11/18 22/25 23/8
**we [44]**
**Welcher [1]** 3/16
**well [5]** 3/20 4/16 6/23 14/1
 14/1
**went [2]** 8/20 11/10
**were [6]** 8/6 8/19 10/8 12/18
 16/20 23/12
**West [1]** 1/20
**WESTERN [1]** 1/2
**what [33]**
**when [16]**
**where [8]** 11/4 14/15 16/4
 17/19 18/5 20/1 20/22 21/8
**whereas [6]** 5/9 5/14 10/18
 17/15 19/17 21/2
**whether [5]** 4/5 10/6 12/11
 21/1 21/2
**which [22]**
**who [2]** 9/2 20/9
**whole [7]** 6/1 6/2 7/2 7/11
 7/15 16/3 19/16
**why [7]** 12/4 22/25 23/18
 23/19 23/23 23/25 24/18
**will [7]** 11/15 19/7 19/11
 20/25 21/24 23/21 24/12
**withheld [4]** 12/18 12/22
 13/5 13/8
**withhold [2]** 12/13 13/6
**withholding [4]** 12/10 13/11
 14/7 14/8
**within [3]** 7/10 7/11 24/4
**without [2]** 4/6 5/17
**witnesses [1]** 15/18
**WOLPERT [1]** 2/11
**wondering [3]** 12/11 13/22
 13/24
**work [7]** 5/10 5/20 10/21
 11/15 11/23 17/6 17/14
**working [2]** 11/5 11/14
**world [1]** 15/13
**would [16]**

**Y**

**years [2]** 25/9 25/9
**yes [3]** 14/9 18/15 23/6
**yet [2]** 18/2 18/9
**York [5]** 4/2 4/4 18/23 19/6
 21/15
**you [49]**
**your [23]**

**Z**

**zero [2]** 15/23 15/24
**zone [1]** 12/6

# Exhibit 13

# Exhibit 14



# Exhibit 15

EKWAN E. RHOW (SB 174604)
erhow@birdmarella.com
MARC E. MASTERS (SB 208375)
mmasters@birdmarella.com
DAVID I. HURWITZ (SB 174632)
dhurwitz@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

MARC F. FEINSTEIN (SB 158901)
mfeinstein@omm.com
JOSEPH R. O'CONNOR (SB 274421)
joconnor@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

MICHAEL G. YODER (SB 83059)
myoder@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, Suite 1700
Newport Beach, California 92660
Telephone: (949) 823-6900
Facsimile: (949) 823-6994

Attorneys for Defendant
Samsung Electronics Co., Ltd.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

NETLIST INC., a Delaware corporation,

Plaintiff,

vs.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,

Defendant.

CASE NO. 8:20-cv-00993-MCS-ADS

**DEFENDANT SAMSUNG ELECTRONICS CO., LTD.'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Date: November 15, 2021
Time: 2:00 pm
Crtrm.: 7C

Assigned to Hon. Mark C. Scarsi

# TABLE OF CONTENTS

**Page**

I. CLAIMS AND DEFENSES ........ 1

A. Summary of Plaintiff's Claims ........ 2

1. Claim 1: Breach of Contract, Damages ........ 2

2. Claim 2: Breach of Contract ........ 3

B. Brief Description of Evidence in Opposition to Each Claim ........ 3

1. Claim 1: Breach of Contract ........ 3

2. Claim 2: Breach of Contract ........ 5

C. Summary of Affirmative Defenses ........ 7

1. Laches ........ 7

2. Acquiescence ........ 7

3. Estoppel ........ 7

4. Waiver ........ 8

5. Failure to Mitigate ........ 8

D. Brief Description of Evidence In Support of Each Affirmative Defense ........ 9

1. Laches ........ 9

2. Acquiescence ........ 10

3. Estoppel ........ 11

4. Waiver ........ 12

5. Failure to Mitigate ........ 13

E. Anticipated Evidentiary Issues ........ 14

F. Identification of Issues of Law ........ 14

II. BIFURCATION OF ISSUES ........ 14

III. JURY TRIAL ........ 15

A. Issues Triable to the Jury ........ 15

1. Breach, Causation and Materiality ........ 15

2. Damages ........ 15

B. Issues Triable to the Court ........ 15

1. Korean Law ........ 15

2. Equitable Defenses ........ 15

IV. ATTORNEYS' FEES ........ 16

V. ABANDONMENT OF ISSUES ........ 16

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Dial-A-Mattress v. Mattress Madness*,
841 F. Supp. 1339 (E.D.N.Y. 1994) .......... 7

*Kuhbier v. McCartney*,
239 F. Supp. 3d 710 (S.D.N.Y. 2017) .......... 15

*Mazzola v. Roomster Corp.*,
849 F.Supp.2d 395 (S.D.N.Y. 2012) .......... 2, 3

*PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.*,
73 F. Supp. 3d 358 (S.D.N.Y. 2014) .......... 6

*Qube Films Ltd v. Padell*,
No. 13-CV-8405 (AJN), 2016 WL 881128 (S.D.N.Y. Mar. 1, 2016) .......... 6

*Schonfeld v. Hilliard*,
218 F.3d 164 (2d Cir. 2000) .......... 6

*Teachers Ins. And Annuity Ass'n of America v. Coaxial Communications of Cent. Ohio, Inc.*,
807 F. Supp. 1155 (S.D.N.Y. 1992) .......... 15

*In re Vebeliunas*,
332 F.3d 85 (2d Cir. 2003) .......... 8

**State Cases**

*D.K. Prop., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
168 A.D.3d 505 (2019) .......... 6

*Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Management, L.P.*,
7 N.Y.3d 96 (2006) .......... 8

*Kverel v. Silverman*,
172 A.D.3d 1345 .......... 7

*LaSalle Bank Nat. Ass'n v Nomura Asset Capital Corp.*,
47 A.D.3d 103 (2007) .......... 8

*Stassa v. Stassa*,
123 A.D.3d 804 (2014)....................................................................................8

*Wilmot v State*,
32 N.Y.2d 164 (1973)....................................................................................8

**Other Authorities**

Fed. R. Civ. P. 39(c) ....................................................................................15

Fed. R. Civ. P. 44.1....................................................................................14, 15

Fed. R. Civ. P. 16....................................................................................1

Federal Rule of Evidence 401 and 403....................................................................................14

Local Rule 16-4 ....................................................................................1

N.Y. C.P.L.R. § 4101....................................................................................15

Pursuant to Federal Rule of Civil Procedure 16 and Local Rule 16-4, Defendant Samsung Electronics Co., Ltd. ("Samsung") respectfully submits the following Memorandum of Contentions of Fact and Law, addressing the contentions of the parties for the trial scheduled to begin on November 30, 2021.

## I. CLAIMS AND DEFENSES

This is a breach of contract action concerning the Joint Development and License Agreement ("JDLA") between Plaintiff Netlist Inc. ("Netlist") and Samsung dated November 12, 2015. New York law governs the JDLA. The operative Complaint alleges three claims for relief. On October 14, 2021, the Court granted in part and denied in part the cross-motions for summary judgment as follows:

On Netlist's first claim for breach of the supply obligation in Section 6.2 of the JDLA, the Court granted partial summary judgment in favor of Netlist as to liability, but did not specify any particular breaches and did not find damages.

On Netlist's second claim for breach of contract, the Court granted partial summary judgment in favor of Netlist as to liability only as to the theory that Samsung breached Section 3.2 of the JDLA by withholding $1.32 million of the $8 million in nonrefundable, non-recurring engineering ("NRE") fees, but denied summary judgment, finding material issues of fact as to whether Samsung reasonably cooperated in obtaining a refund of the withholdings, and the Court did not find damages on any theory of breach.

The Court granted partial summary judgment in favor of Netlist as to its third claim for declaratory relief.

The Court granted partial summary judgment in favor of Samsung on Netlist's prayer for consequential damages, ruling that Netlist cannot recover consequential damages as a remedy for its claims for breach of contract.

The Court denied the parties' summary judgment motions in all other respects.

Thus, following the Court's Order, the issues that remain to be tried are

whether there were specific breaches of Section 6.2 by Samsung, whether those breaches caused harm to Netlist, general damages suffered by Netlist on its first breach of contract claim, general damages suffered by Netlist on its second breach of contract claim as to the theory that Samsung breached by withholding taxes and thus failing to pay the full NRE fees, whether Samsung breached its obligation under Section 3.2 to reasonably cooperate with Netlist's efforts to obtain a tax refund and any general damages if Netlist were to prove such breach, and Samsung's affirmative defenses including waiver, estoppel, laches, acquiescence and failure to mitigate.

Finally, on October 25, 2021, Samsung is filing a motion for reconsideration as to the partial summary judgment on Netlist's third claim for declaratory relief and Samsung's affirmative defense of waiver.

**A. Summary of Plaintiff's Claims**

1. Claim 1: Breach of Contract, Damages

*Summary*: Netlist alleges that Samsung is liable for damages for breaching the supply obligation in Section 6.2 of the JDLA.

*Elements*: Netlist bears the burden to prove specific breaches, that the breaches caused damages, and that it suffered damages that are attributable to breach of the supply obligation. *Mazzola v. Roomster Corp.*, 849 F.Supp.2d 395, 402 (S.D.N.Y. 2012); N.Y. Pattern Jury Instr.—Civil 4:1. Thus, to prove it is entitled to damages, Netlist must prove that it requested specific amounts of Samsung NAND and DRAM products from Samsung through formal purchase orders, that Samsung acted in a commercially unreasonable manner to the extent it failed to supply specific amounts that Netlist actually requested through purchase orders, that Netlist was ready, willing and able and would have completed the purchase from Samsung, and the general damages that Netlist suffered as a result, measured by the difference between the contract price and the cover price.

2. Claim 2: Breach of Contract

*Summary*: Netlist alleges that Samsung is liable for damages for withholding taxes from the payment of NRE fees under Section 3 of the JDLA. Netlist further alleges Samsung breached its obligation to reasonably cooperate with Netlist in its effort to seek a tax refund, in accordance with Section 3 of the JDLA, and that it suffered damages as a result these two alleged breaches.

*Elements*: Netlist has the burden of proving (1) specific breaches, including that Samsung did not reasonably cooperate; (2) causation between the breaches and damages; and (3) general damages that are attributable to Samsung's breach in withholding taxes and/or any breach in failing to reasonably cooperate. *Mazzola*, 849 F.Supp.2d at 402; N.Y. Pattern Jury Instr.—Civil 4:1.

**B. Brief Description of Evidence in Opposition to Each Claim**

1. Claim 1: Breach of Contract

Samsung will introduce the following categories of evidence establishing that Netlist's claimed damages are not attributable to Samsung's alleged breaches because (1) Samsung's decisions not to fill certain of the orders at issue were not breaches of the JDLA and (2) there is no causal link between Netlist's claimed damages and any Samsung breach:

- Evidence establishing that Samsung did not supply certain of Netlist's requests because Netlist did not have sufficient cash or credit to pay for the product requested;
- Evidence establishing that Samsung did not supply certain of Netlist's requests on commercially reasonable grounds including, for example, because the products requested had reasonably been allocated to other customers and were not available to sell to Netlist;
- Evidence establishing that Netlist purchased certain Samsung NAND and DRAM products from resellers (1) without first requesting such products from Samsung and/or (2) absent any refusal from Samsung to

supply such products at Netlist's request;

- Evidence establishing that Netlist did not provide Samsung with timely notice of any alleged breach and a reasonable opportunity to cure before covering;
- Evidence establishing that Netlist's orders were not commercially reasonable given lead times and/or the amounts requested;
- Evidence establishing that Samsung at times did not have the specific parts Netlist requested; and
- Evidence establishing that Netlist often did not submit a request/order within the meaning of Section 6.2 of the JDLA.

Samsung will introduce the following categories of evidence establishing the amount of Netlist's damages:

- Evidence establishing that Netlist selectively bought from Samsung or third party resellers;
- Evidence establishing that Samsung fulfilled the vast majority of Netlist's purchase orders;
- Evidence establishing that many of Netlist's requests were not commercially reasonable;
- Evidence establishing that where Samsung did not supply Netlist with requested products, Netlist did not provide Samsung timely notice and a reasonable opportunity to cure;
- Evidence establishing that where Samsung did not supply Netlist with the requested products, Netlist failed to make a commercially reasonable effort to cover, which had they done so, would have mitigated Netlist's damages; and
- Evidence in the form of expert testimony regarding Netlist's claimed damages.

2. Claim 2: Breach of Contract

Samsung will introduce the following categories of evidence establishing that Netlist did not suffer general damages attributable to Samsung's alleged breach in withholding taxes from the NRE fees:

- Evidence establishing that Netlist obtained a full refund of the withheld taxes plus interest;
- Evidence establishing that Samsung's communications and cooperation with Netlist and the Korean tax authorities did not cause any delay in Netlist obtaining its full refund plus interest; and
- Evidence establishing that Samsung's withholding and any resulting damage was caused at least in part by Netlist's own conduct.

Samsung will introduce the following categories of evidence establishing that Samsung's conduct after the withholding was not a breach of the JDLA regarding Samsung's obligation to reasonably cooperate with Netlist's efforts to obtain a refund from the Korean tax authorities:

- Evidence showing Samsung's cooperation with Netlist and its Korean tax consultant, including without limitation Samsung's communications with the same;
- Evidence establishing that Samsung's communications with the Korean tax authorities were reasonable and consistent with Korean law; and
- Evidence establishing that Samsung's statements to the Korean tax authorities that the $8 million was a royalty payment, and not exclusively NRE, was accurate or, at a minimum, was made reasonably and in good faith.

Samsung will introduce the following categories of evidence establishing that Netlist suffered no damages attributable to Samsung's conduct after the withholding, even if there was a breach of the contractual obligation to reasonably cooperate with Netlist:

- Evidence establishing that Netlist obtained a full refund of the withheld taxes plus interest according to Korean law;

- Evidence establishing any delay in the refund Netlist obtained was not due to Samsung's conduct, including, without limitation, evidence showing that Netlist's own conduct was the primary if not exclusive cause of any delay in the refund; and

- Evidence establishing that Samsung's conduct with respect to Netlist's efforts to obtain a tax refund did not cause any harm to Netlist, which will include evidence of Korean law, and expert testimony on Korean law and tax authority practices.

Netlist has indicated that it will seek to introduce its payment of fees to PwC to assist it in obtaining a tax refund, and also introduce evidence concerning purported losses from its alleged sale of shares. Pursuant to this Court's Order enforcing section 12.5 of the JDLA, this evidence is inadmissible as the amount of PwC's fees are consequential, not general damages, as they are not a measure of the value of Samsung's promised performance. *See Schonfeld v. Hilliard*, 218 F.3d 164, 175–76 (2d Cir. 2000) (distinguishing general and consequential damages); *PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 374 (S.D.N.Y. 2014) (ruling as a matter of law that "investigative audit" fees constitute consequential damages under New York law); *D.K. Prop., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 168 A.D.3d 505, 506 (2019) (consequential damages include expenses attributable to mitigating property damage that insured suffered when insurer failed to make timely payment of claim); *Qube Films Ltd v. Padell*, No. 13-CV-8405 (AJN), 2016 WL 881128, at *6 (S.D.N.Y. Mar. 1, 2016) (under New York law, "out-of-pocket" expenses paid after party breached were consequential damages).

**C. Summary of Affirmative Defenses**

1. Laches

*Summary*: The doctrine of laches reduces or eliminates Netlist's claim for breach and damages for its first claim for relief, reduces or eliminates Netlist's claim for damages for its second claim for relief to the extent that claim is based on the tax withholding, and reduces or eliminates Netlist's claim for breach and damages for its second claim for relief to the extent that claim is based on the purported lack of reasonable cooperation.

*Elements*: To establish laches, Samsung must prove: (1) delay by Netlist in asserting its claim for relief despite the opportunity to do so; (2) Samsung did not have knowledge or notice that Netlist would assert its claim for relief; and (3) Samsung suffered prejudice by the delay. *Kverel v. Silverman*, 172 A.D.3d 1345, 1348, *leave to appeal denied*, 34 N.Y.3d 904 (2019).

2. Acquiescence

*Summary*: The doctrine of acquiescence reduces or eliminates Netlist's claim for breach and damages for its first claim for relief, reduces or eliminates Netlist's claim for damages for its second claim for relief to the extent that claim is based on the tax withholding, and reduces or eliminates Netlist's claim for breach and damages for its second claim for relief to the extent that claim is based on the purported lack of reasonable cooperation.

*Elements*: To establish acquiescence, Samsung must prove (1) Netlist's affirmative conduct that gives rise to actual or apparent consent to some or all of the alleged breaches of contract; and (2) Samsung's reliance on Netlist's consent. *Dial-A-Mattress v. Mattress Madness*, 841 F. Supp. 1339, 1356 (E.D.N.Y. 1994).

3. Estoppel

*Summary*: This affirmative defense applies to Netlist's first and second claims for relief. The equitable doctrine of estoppel bars Netlist from relief and/or reduces the damages to which it is entitled.

*Elements*: To establish the defense of estoppel, Samsung must prove: (1) Netlist concealed material facts, or made a false or misleading representation of material fact; (2) Netlist intended that Samsung would rely or act on that conduct; (3) Netlist knew the real facts; (4) Samsung did not know the real facts, and could not have found out; (5) Samsung relied on Netlist's conduct; and (6) in reliance, Samsung acted differently than it would have if it knew the true facts. *In re Vebeliunas*, 332 F.3d 85, 94 (2d Cir. 2003).

4. Waiver

*Summary*: This affirmative defense applies to Netlist's first and second claims for relief. The equitable doctrine of waiver bars Netlist from relief or reduces the damages to which it is entitled.

*Elements*: To establish waiver, Samsung must prove an intentional relinquishment of a known right by Netlist after knowledge of all relevant facts. Fed. Jury Prac. & Instr. § 126:12; *Stassa v. Stassa*, 123 A.D.3d 804, 805 (2014); *Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Management, L.P.*, 7 N.Y.3d 96, 850 N.E.2d 653, 658 (2006).

5. Failure to Mitigate

*Summary*: This affirmative defense applies to Netlist's first and second claims for relief. Even if Samsung were liable for breach, Netlist's recovery should be reduced or denied because of Netlist's failure to mitigate.

*Elements*: To establish the affirmative defense of failure to mitigate, Samsung must prove (1) Netlist failed to make diligent efforts to mitigate its damages, and (2) such efforts would have diminished Netlist's damages. N.Y. Pattern Jury Instr.--Civil 4:20. 1, *Wilmot v State,* 32 N.Y.2d 164, 297 N.E.2d 90, 92 (1973); *LaSalle Bank Nat. Ass'n v Nomura Asset Capital Corp.*, 47 A.D.3d 103, 846 N.Y.S.2d 95, 99 (2007).

**D. Brief Description of Evidence In Support of Each Affirmative Defense**

For each affirmative defense, Samsung will introduce substantially the same evidence as the evidence in opposition to Netlist's claim for relief to which that affirmative defense is directed, which is incorporated by reference.

1. Laches

In support of this affirmative defense against Netlist's first claim for relief, Samsung will introduce the following categories of evidence in addition to the evidence incorporated by reference:

- Evidence establishing that for at least some purchase orders that Samsung did not fulfill, Samsung's conduct that Netlist complains of took place prior to any notice of breach by Netlist, and prior to this action being brought;

- Evidence establishing that Samsung lacked knowledge or notice that Netlist would later assert that Samsung's failure to fulfill that purchase order was a breach of the JDLA; and

- Evidence establishing that Samsung was injured by this delay.

In support of this affirmative defense against Netlist's second claim for relief, Samsung will introduce the following categories of evidence in addition to the evidence incorporated by reference:

- Evidence establishing that Samsung's conduct that Netlist complains of with respect to any cooperation with its effort to obtain a refund took place prior to any notice of breach by Netlist, and prior to this action being brought;

- Evidence establishing that Samsung lacked knowledge or notice that Netlist would later assert that Samsung's withholding was a breach of the JDLA;

- Evidence establishing that Samsung lacked knowledge or notice that

Netlist would later assert that Samsung's conduct with respect to Netlist's efforts to obtain a tax refund was in breach of the JDLA; and

- Evidence establishing that Samsung was injured by this delay.

2. <u>Acquiescence</u>

In support of this affirmative defense against Netlist's first claim for relief, Samsung will introduce the following categories of evidence in addition to the evidence incorporated by reference:

- Evidence establishing that Netlist affirmatively agreed to modification or cancellation of certain previous requests, including cancellation of purchase orders;
- Evidence establishing that Samsung relied on such modifications or cancellations by shipping products based on the final modified requests and not on the original;
- Evidence establishing that Netlist consented to the amounts stated in purchase orders even if the amounts stated in related forecasts were greater;
- Evidence establishing that Samsung relied on such purchase orders;
- Evidence establishing that Netlist consented to the allocation protocol followed by Samsung; and
- Evidence establishing that Samsung relied on that consent.

In support of this affirmative defense against Netlist's second claim for relief, Samsung will introduce the following categories of evidence in addition to the evidence incorporated by reference:

- Evidence establishing Netlist's affirmative conduct that gives rise to apparent consent to the tax withholding of the NRE Fees;
- Evidence establishing Netlist's affirmative conduct that gives rise to apparent consent to Samsung's conduct with respect to Netlist's efforts to obtain a refund from the Korean tax authorities; and

Case 8:20-cv-00993-MCS-ADS Document 208 Filed 11/02/21 Page 36 of 38 Page ID #:11447

- Evidence establishing that Samsung relied on Netlist's apparent consent in all respects.

3. Estoppel

In support of this affirmative defense against Netlist's first claim for relief, Samsung will introduce the following categories of evidence in addition to the evidence incorporated by reference and evidence substantially the same as the evidence in support of its affirmative defense of laches:

- Evidence establishing that Netlist led Samsung to believe that Netlist did not object to Samsung's practice of allocating NAND and DRAM products among customers including Netlist;
- Evidence establishing that Netlist intended that Samsung would rely or act on that conduct;
- Evidence establishing that Netlist knew the real facts including its true intentions;
- Evidence establishing Samsung did not know the real facts, and could not have found out, including that Netlist would later challenge Samsung's allocation protocol;
- Evidence establishing that Netlist deliberately and unjustifiably delayed for as long as three years before giving notice of the alleged breach of Section 6.2;
- Evidence establishing that Samsung relied on Netlist's conduct;
- Evidence establishing that, in reliance, Samsung acted differently than it would have if it knew the true facts; and
- Evidence establishing that by delaying giving notice of the alleged breaches, Netlist deprived Samsung of a reasonable opportunity to cure.

In support of this affirmative defense against Netlist's second claim for relief, Samsung will introduce evidence substantially the same as the evidence in support of its affirmative defense of laches.

4. Waiver

In support of this affirmative defense against Netlist's first claim for relief, Samsung will introduce the following categories of evidence in addition to the evidence incorporated by reference and evidence substantially the same as the evidence in support of its affirmative defenses of laches, acquiescence, and estoppel:

- Evidence establishing that Netlist deliberately and unjustifiably failed to give timely notice of the alleged breaches of Section 6.2 despite having full knowledge;
- Evidence establishing that Netlist continued to accept the benefits of the contract while it delayed giving notice of the alleged breaches;
- Evidence establishing that Netlist lulled Samsung into believing that Netlist did not intend to assert breaches of Section 6.2 and did not object to Samsung's practice of allocating NAND and DRAM products among customers including Netlist; and
- Evidence establishing that by delaying giving notice of the alleged breaches, Netlist caused injury to Samsung including depriving it of a reasonable opportunity to cure.

In support of this affirmative defense against Netlist's second claim for relief, Samsung will introduce the following categories of evidence in addition to the evidence incorporated by reference and evidence substantially the same as the evidence in support of its affirmative defenses of laches, acquiescence, and estoppel:

- Evidence establishing that Netlist deliberately and unjustifiably delayed before giving notice of the alleged breaches of Section 3.2 despite having full knowledge;
- Evidence establishing that Netlist continued to accept the benefits of the contract while it delayed giving notice of the alleged breaches;
- Evidence establishing that Netlist lulled Samsung into believing that Netlist did not intend to assert breaches of Section 3.2; and

- Evidence establishing that by delaying giving notice of the alleged breaches, Netlist caused injury to Samsung including depriving it of a reasonable opportunity to cure.

5. Failure to Mitigate

In support of this affirmative defense against Netlist's first claim for relief, Samsung will introduce the following categories of evidence in addition to the evidence incorporated by reference:

- Evidence establishing that Netlist could have mitigated any damages by making diligent efforts to obtain the NAND or DRAM products that it contends it was entitled to under the JDLA from another source at a price lower than it did; and
- Evidence establishing that such diligent efforts would have allowed Netlist to obtain those NAND and DRAM products at a price lower than what Netlist paid for them;

In support of this affirmative defense against Netlist's second claim for relief, Samsung will introduce the following categories of evidence in addition to the evidence incorporated by reference:

- Evidence establishing that Netlist failed to make a diligent effort to mitigate any damages from the tax withholding, including by unnecessarily and unjustifiably delaying its effort to seek a tax refund, making unreasonable arguments to the Korean tax authority, failing to make reasonable arguments to the Korean tax authority, and otherwise failing to diligently prosecute its tax case in Korea;
- Evidence establishing that Netlist's damages from the tax withholding would have been diminished had it made such diligent efforts as described above, which will include expert testimony on Korean law and Korean tax authority practices;
- Evidence establishing that Netlist failed to reasonably cooperate with

Case 8:20-cv-00993-MCS-ADS Document 208 Filed 11/07/21 Page 19 of 21 Page ID #:11450

Samsung, or failed to enable further cooperation from Samsung, in its effort to obtain a tax refund, including Netlist's communications with Samsung; and

- Evidence establishing that had Netlist cooperated with Samsung reasonably or enabled further cooperation from Samsung, its damages would have been diminished, including expert testimony on Korean law and tax practices, Netlist's communications with Samsung, and testimony of percipient witnesses.

**E. Anticipated Evidentiary Issues**

Samsung has filed three motions *in limine* concurrently with this memorandum:

1. Samsung has moved to exclude the opinion of Dr. Michael Akemann based on improper methodology, including failure to tie cover damages to breaches and failure to control for the variable of time as to pricing;

2. Samsung has moved to preclude Netlist from offering any evidence of consequential damages, as the Court has already ruled that Netlist is not entitled to such damages. Such evidence is irrelevant and would be unfairly prejudicial and should be precluded under FRE 401 and 403; and

3. Samsung has moved to exclude references to unrelated proceedings against Samsung-affiliated individuals who are not witnesses in this action.

In addition to these evidentiary issues, questions about Korean law should be decided by the Court. Fed. R. Civ. P. 44.1.

**F. Identification of Issues of Law**

The issues of law in this case are those identified in this memorandum.

## II. BIFURCATION OF ISSUES

Neither party seeks bifurcation of any issues.

**III. JURY TRIAL**

**A. Issues Triable to the Jury**

A timely demand for jury trial has been made. The following issues are triable to the jury.

1. Breach, Causation and Materiality

Whether Samsung breached any obligation in the JDLA, such as failing to fulfill specific requests for product or failing to reasonably cooperate with Netlist's efforts to obtain a tax refund are questions of fact for the jury, and whether any such breaches are material, and whether any such breaches caused any harm to Netlist are questions of fact for the jury. *Kuhbier v. McCartney*, 239 F. Supp. 3d 710, 735 (S.D.N.Y. 2017) (collecting cases); *Teachers Ins. And Annuity Ass'n of America v. Coaxial Communications of Cent. Ohio, Inc.*, 807 F. Supp. 1155, 1160 (S.D.N.Y. 1992) ("It is for the jury to determine materiality with respect to any alleged breach."); N.Y. C.P.L.R. § 4101 (issues of fact triable by jury in any action which would permit a judgment for a sum of money only).

2. Damages

The amount of damages that Netlist is entitled to, if any, is a question of fact for the jury.

**B. Issues Triable to the Court**

The following issues are questions of law for the Court.

1. Korean Law

Determining Korean law is a question of law for the court. Fed. R. Civ. P. 44.1. Accordingly, any question of Samsung's obligations under Korean law is a question of law for the court.

2. Equitable Defenses

Pursuant to Fed. R. Civ. P. 39(c), in an action not triable of right by a jury, the court, on motion or on its own, may try any issue with an advisory jury, or may, with the parties' consent, try any issue by a jury whose verdict has the same effect

as if a jury trial had been a matter of right. Samsung requests that its affirmative defenses should be submitted to the jury.

## IV. ATTORNEYS' FEES

Neither side has or makes a claim to attorneys' fees.

## V. ABANDONMENT OF ISSUES

Samsung has elected to abandon its affirmative defenses of statute of limitations, ripeness, justification, good faith, and conformity with laws. In addition, Samsung has omitted from this Memorandum such issues as appear to be disposed of by the Court's ruling on the cross-motions for summary judgment.

DATED: October 25, 2021

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

O'Melveny & Myers LLP

By: */s/ Ekwan E. Rhow*
Ekwan E. Rhow
Attorneys for Defendant Samsung Electronics Co., Ltd.